# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 7** |
| | ) | |
| **NICHOLAS S. GOULETAS,** | ) | **No. 16-01335** |
| | ) | |
| Debtor. | ) | **Hon. Timothy A. Barnes** |
| ─────────────────────── | ) | |
| | ) | |
| **800 SOUTH WELLS COMMERCIAL LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 1:16 ap 141** |
| | ) | |
| **NICHOLAS S. GOULETAS,** | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7056, Local Bankruptcy Rules, Plaintiff submits the following Statement of Undisputed Facts.

### **Parties**

(1)     Plaintiff 800 South Wells Commercial LLC ("Plaintiff" or "800 SWC") is an Illinois limited liability company with its principal place of business in Cook County, Illinois. (Answer (D.N. 7[1]; Px A[2]) ("Ans.") ¶3)

(2)     Debtor/Defendant Nicholas S. Gouletas ("Gouletas") is an individual who resides in Cook County, Illinois. (Ans. ¶4)

---

[1] "D.N. ___" refers to Docket Number for the EFC filings in this Adversary Proceeding.

[2] "Px __" refers to the letter or number of the Exhibits of Plaintiff ("Px") submitted in Plaintiff's Appendix of Exhibits in Support of Plaintiff's Motion for Summary Judgment.

## Jurisdiction And Venue

(3)    This Court has jurisdiction pursuant to 28 U.S.C. §1334. This suit is a core proceeding within the meaning of 28 U.S.C. §157(b). (Ans. ¶5)

(4)    Both Plaintiff and Defendant consent to the entry of final orders or judgment by this Court. (Ans. ¶5)

(5)    Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409. (Ans. ¶6)

## Facts

### A.    Background.

(6)    Gouletas is the Chairman and CEO of American Invsco. (Px I pp. 69-70; Px 29)

(7)    As of September 8, 2013, American Invsco had properties and offices in over 40 major markets around the world. (Px I p. 77; Px 15)

(8)    Marked as Px 20 is a "Balance Sheet" (*i.e.,* "Financial Statement") of Gouletas as of March 31, 2013, which was signed by Gouletas. (Px J p. 25)

(9)    The Gouletas Balance Sheet was prepared by Gouletas' accounting department, and Gouletas would expect his accounting department to fairly and accurately represent his assets and liabilities. (Px J p. 26)

(10)    Gouletas' signature on his Financial Statement indicated that Gouletas had reviewed and approved the Financial Statement, and that his Financial Statement was true and correct to the best of his information. (Px K pp. 210-11)

(11)    Gouletas believed that his Financial Statement was accurate at the time he signed it. (Px I p. 132)

2

(12)    The representation in Gouletas' Financial Statement that Gouletas had a net worth of $25,287,563 was a fair and accurate representation of Gouletas' net worth as of March 31, 2013. (Px K p. 216)

(13)    Gouletas' Financial Statement showed that as of March 31, 2013, Gouletas had cash in the amount of $240,000, but Gouletas claimed that he had "no idea" where the money came from, and did not remember where the money went. (Px K pp. 211-12)

**B.    The River City Complex.**

(14)    In 1997, the River City Complex located at 800 South Wells Street, Chicago, Illinois consisted of (a) an apartment complex of 448 apartments; (b) 240,000 square feet of commercial/retail/office space (the "Commercial Space"); (c) a 133 space underground parking garage (the "Parking Garage"); (d) a surface parking lot; and (e) a 64 slip marina on the Chicago River. (Ans. ¶7)

(15)    In or about April of 1997, American Invsco Development Corporation purchased the River City Complex for $41,300,000, and the Plaintiff herein, 800 SWC, became the owner of the leasehold interests in the Commercial Space and Parking Garage. (Ans. ¶8)

(16)    Gouletas was the former manager of 800 SWC who hired his company, Invesco Management Company, Inc. (d/b/a American Invesco) ("Invesco"), to manage the Commercial Space in exchange for management fees paid by 800 SWC to Invesco. (Ans. ¶11)

(17)    As of late 2005, 800 SWC had refinanced the leasehold interests in the Commercial Space and the Parking Garage on numerous occasions, which were encumbered by two substantial leasehold mortgages.  The first mortgage was comprised of two loans from Parkway Bank and Trust Company ("Parkway") to 800 SWC in the original principal amount of

$18,500,000 (the "First Mortgage").  By the end of 2005, the First Mortgage loan was current,

with the amount owed by 800 SWC to Parkway totaling approximately $11,750,000. (Ans. ¶9)

(18)   The Commercial Space and the Parking Garage were also encumbered by a

second leasehold mortgage lien in favor of CIB Bank ("CIB"), which was comprised of a

$5,900,000 loan from CIB to 800 SWC (the "Second Mortgage").  In March of 2005, the Second

Mortgage was acquired by D.A.N. Joint Venture III, L.P. ("DJV").  By the end of 2005, the

Second Mortgage loan was in default, with the amount owed by 800 SWC to DJV totaling

approximately $10,000,000. (Ans. ¶10)

(19)   On November 16, 2006, DJV, as the owner and holder of the Second Mortgage

loan, took over control of the voting rights of 800 SWC pursuant to a Pledge Agreement

delivered to CIB, which was later assigned to DJV. (Px B p. 11 ¶21; p. 19 ¶3; p. 20 ¶11; Px L

¶19) Thereafter, DJV removed Gouletas as the manager of 800 SWC, and itself became the

manager of 800 SWC. (*Id.*)

### C.   Gouletas Is Sued For Self-Dealing And Breaching Fiduciary Duties Owed To 800 SWC.

(20)   On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of

Cook County, Illinois, No. 2011-L-2895, alleging that Gouletas breached the fiduciary duties

that he owed to 800 SWC by participating in the scheme with 800 SWC's vice president, John

Cadden, to loot the assets of 800 SWC, and by grossly mismanaging the affairs of 800 SWC by

self-dealing (the "Underlying Suit"). (Ans. ¶15; Px L ¶20)

(21)   After Gouletas failed to sit for his deposition despite numerous court orders to do

so, on December 5, 2013 800 SWC filed a Motion for Sanctions against Gouletas, which was

granted by the Court in the Underlying Suit on December 11, 2013. (Px L ¶21; Ans. ¶16)

(22)   After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the Underlying Suit entered a Default Judgment against Gouletas in the amount of $11,550, 040.12 (the "Judgment"). (Px L ¶22; Ans. ¶16)

(23)   Gouletas, through counsel, took an appeal of the Judgment to the Appellate Court of Illinois, First District, No. 14-0781 (the "First Appeal"). On November 6, 2014 the Court of Appeals granted Gouletas' Motion to Dismiss the First Appeal. (Ans. ¶17)

(24)   On August 7, 2014, Gouletas filed in the Underlying Suit a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) (the "2-1401 Petition") seeking to set aside the Judgment. On September 18, 2014, the trial court in the Underlying Suit denied Gouletas' 2-1401 Petition. (Ans. ¶18)

(25)   On October 20, 2014, Gouletas, through counsel, appealed the trial court's Order Denying Gouletas' 2-1401 Petition to the Appellate Court of Illinois, First District, No. 14-3214 (the "Second Appeal"). On April 2, 2015, the Court of Appeals dismissed Gouletas' Second Appeal for want of prosecution. (Ans. ¶19)

**D.**      **The Citation Proceedings Against Gouletas.**

(26)   Due to Gouletas' failure to pay the amount owed under the Judgment, on June 5, 2014 800 SWC filed a Citation to Discover Assets against Gouletas (Px C) (the "Citation") in connection with the Underlying Suit (the "Citation Proceedings"). The Citation was served on Gouletas on or about June 9, 2014. (Ans. ¶20; Px N p. 5; Px M ¶26)

(27)   At all times during the Citation Proceedings, Gouletas was represented by Howard Teplinsky, Esq. from the firm of Beermann Pritikin Mirabelli Swerdlove LLP. (Px M ¶27)

(28)   In the Citation, it was clearly stated that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

(Px C p. 1) Gouletas understood that when he was served with the Citation, he was not to transfer anything after receiving the Citation. (Px I p. 108) Moreover, the Circuit Court judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas that "[f]rom the time you received the citation, all your assets were frozen . . .. [T]he citation language speaks for itself. It said you will not transfer any asset." (Px N p. 7) Further, in response to Judge White's questions, Gouletas testified as follows:

> THE COURT: And you read the citation?
> A (Gouletas): I read the citation, your Honor.
>
> THE COURT: And it said you shall not transfer any assets.
> A: Yes, and I did not think I had transferred any assets.

(Px O p. 15)

(29)    In August of 2014, Gouletas filed his Answer to the Citation (Px D) (the "Citation Answer"). (Ans. ¶22) Further, on August 11, 2014 Gouletas filed in the Citation Proceedings his sworn Income and Asset Disclosure Form (Px E) (the "Citation Disclosure Form"). (Ans. ¶22) In addition, on March 25, 2015, Gouletas submitted in the Citation Proceedings Gouletas' Supplemental Responses to Supplemental Proceeding Interrogatories (Px H) (the "Citation Int. Resp."). (Ans. ¶26)

(30)    At no time during the Citation Proceedings did Gouletas either amend or supplement his Citation Answer (Px D); his Citation Disclosure Form (Px E); or his Citation Interrogatory Responses (Px H). (Ans. ¶26; Px M ¶30)

(31)    In neither Gouletas' Citation Answer (Px D), nor in his Citation Disclosure Form (Px E), did Gouletas disclose any stock ownership in CIB Marine BankShares, or his interest in a stock brokerage account at TD Ameritrade. (Px O p. 16) Through its own investigation conducted during the Citation Proceedings, 800 SWC learned that Gouletas did, in fact, own shares of stock in CIB Marine BankShares (Px 139) (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (Px 101) (the "TDA Account"). (Px M ¶31) Further, through its own investigation, 800 SWC learned that on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 101), and then, on or about that same date, wire transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (Px 101; Ans. ¶25; Px O pp. 20-21 & 33-36; Px N pp. 23-24 & 76-77; Px M ¶31)

(32)    Further, through its own investigation conducted during the Citation Proceedings, 800 SWC uncovered evidence that Gouletas may have violated the Citation lien by obtaining and then cashing numerous cashier's checks issued in his name:

(a)    On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 120);

(b)    On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 122);

(c)    On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 127); and

(d)    On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 128).

(Px M ¶32)

E.     **The Contempt Proceedings Against Gouletas.**

(33)     Based on the alleged violations by Gouletas of the Citation lien, on April 24, 2015 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015. (Ans. ¶32; PX M ¶33)

(34)     In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas' CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

(Px O p. 21) Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014. (Px N pp. 13-14)

(35)     The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in this Court. (Ans. ¶33; Px M ¶35)

(36)     The Citation Proceedings continued in existence at all times from the date the Citation was filed on June 5, 2014 until the date that Gouletas filed for bankruptcy on January 17, 2016. (Px M ¶36)

**F.**     <u>Gouletas Concealed His Ownership Interest In A House In Greece</u>.

(37)     In his Citation Answer, Gouletas represented under oath that he did not own any real estate. (Px D p. 2) In addition, on August 11, 2014, Gouletas represented in his Citation Disclosure Form, again under oath, that he did not own any real estate. (Px E p. 2)

(38)     Shortly after Gouletsa made the above sworn statements (Px D p. 2; Px E p. 2), on September 30, 2014 Gouletas received an email from his sister, Evangeline Gouletas (Px F), about Gouletas' ownership interest in a house in Greece (the "Greece Property") (Ans. ¶22), which he had inherited, with his sister, in approximately 2008. (Px 176 (Schedule A/B: Property) p. 1 no. 1) Gouletas recalls receiving this email (Px F) from his sister. (Px J pp. 50-51)

(39)     While in his Answer to this Adversary Proceeding Gouletas now admits that he, along with his sister, inherited the Greece Property (Ans. ¶22), at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or Citation Disclosure Form to reflect his ownership interest in the Greece property, or otherwise disclose his ownership interest in the Greece Property. (Px M ¶39)

**G.**     <u>Gouletas Concealed His Ownership Of Valuable Items Of Personal Property</u>.

(40)     In Gouletas' Citation Answer, he represented under oath that the only personal property that he owned was clothing and office furniture. (Px D p. 2) Further, in Gouletas' sworn Citation Disclosure Form (Px E), he did not list any ownership in any valuable collectible items.

(41)     During the Citation Proceedings, however, Gouletas owned a Wurlitzer juke box worth approximately $10,000, and a mechanical violin (like a player piano, but a violin) worth between $40,000 to $70,000. (Px 176 (Schedule A/B: Property) pp. 2-3 no. 6)

(42)     While in connection with his Chapter 7 bankruptcy proceeding Gouletas now admits that he did, in fact, own the above valuable items of personal property (*id*.), at no time

during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or Citation Disclosure Form to reflect his ownership interest in the above valuable collectible items, or otherwise disclose his ownership interest in those items. (Px M ¶42)

**H.   Gouletas Concealed His Ownership Interest In The Garvey Court Project And NKM Garvey, LLC.**

(43)   During the Citation Proceedings, Gouletas was involved in a real estate development project referred to as "Garvey Court". (Px P pp. 43-47) The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium project on property that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago, where a "food court" was located. (*Id*. pp. 45-47)

(44)   Basically, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and develop the new high-rise on the Gouletas property. (Citation Int. Resp. (Px H) no. 10 pp. 9-10; Px P pp. 47, 50-51 & 82; Px Q pp. 25-26)

(45)   In the original formulation of the plan, Gouletas was going to retain a 25% interest in the Garvey Court Project. (Px Q pp. 25-26) Eventually, however, Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey, LLC (12%) and NKM Garvey, LLC (13%). (*Id*. p. 26; Citation Int. Resp. no. 10 p. 10; Px P pp. 48-9, 68-70 & 84; Px Q p. 27) The "SEG" stands for Gouletas' son, Steven E. Gouletas, and the "NKM" refers to Gouletas' wife, Natel K. Matschulat. (Px M ¶45)

(46)   On March 25, 2015, Gouletas represented under oath in his Citation Int. Resp. that he "does not have a membership interest in . . . NKM Garvey, LLC." (Px H no. 10 p. 10) In truth, however, during the course of the Citation Proceedings, Gouletas owned a percentage of NKM Garvey, LLC. (Ans. ¶26)

(47)    While in his Answer to this Adversary Proceeding Gouletas now admits that he does, in fact, own a percentage of NKM Garvey, LLC, at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Int. Resp. to reflect his ownership interest in NKM Garvey, LLC, or otherwise disclose his ownership interest in that entity. (Ans. ¶26; Px M ¶47)

**I.     Gouletas Concealed His Deposit Of Money Into Two Checking Accounts In The Name Of Dorothea Touris And His Use Of Those Accounts For His Personal Financial Benefit.**

(48)    In Gouletas' Citation Disclosure Form (Px E; Px 17), Gouletas purported to list all of his bank accounts (*id*. p. 2), and then acknowledged under oath that he had no other accounts other than as listed in his Citation Disclosure Form. (Px Q pp. 15-16) Further, during the course of the Citation Proceedings, Gouletas testified on October 20, 2014 that from and after November of 2013, he "[did]n't know that [he's] been writing any checks." (Px K pp. 204-05)

(49)    At no time did Gouletas reveal that he was, during the Citation Proceedings, depositing his funds into two checking accounts in the name of his close personal friend, Dorothea Touris ("Touris"), and then having Touris write checks from those accounts for his personal financial benefit. (Px M ¶49)

(50)    Touris has known Gouletas for about 40 years. (Px R p. 93) Touris was the director of design for Gouletas at American Invsco, who performed design work for American Invsco over the last 20 years. (Px R pp. 35 & 93)

(51)    Touris lives in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, and she bought her condominium from one of Gouletas' entities after Gouletas developed that property into condominiums. (Px R pp. 3 & 94)

(52)     In early 2015 (and during the Citation proceedings), Gouletas requested that Touris deposit his funds into her checking accounts for the payment of Gouletas' bills. (Px J p. 3; Px R p. 14) Pursuant to Gouletas' plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas' bills out of her accounts. (Px J p. 5; Px R pp. 11, 14 & 16) The funds that Gouletas deposited into Touris' checking accounts belonged to Gouletas. (Px J p. 55; Px R pp. 18, 20-21 & 25)

(53)     On February 17, 2015, Gouletas wire transferred $15,730 into Touris' checking account at Chase Bank (the "Touris Chase Account"). (Px 177; Px R pp. 19-20 & 55) The $15,730 was money that belonged to Gouletas. (Px R pp. 18-19) Gouletas, however, claims to have "no idea" where the $15,730 came from. (Px J p. 17)

(54)     In March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas' bills. (Px R p. 13) Touris then deposited the $415,000 check into her checking account at Chase Bank. (Px R pp. 13 & 16-17; Px 178) According to Touris, she and Gouletas "talked about it together and he wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check] in your account and pay the bills." (Px R p. 14) Although Gouletas claimed that the money was a "loan" to him, he admitted that the $415,000 was his money. (Px R pp. 18 & 23)

(55)     The total amount of Gouletas' funds that he deposited into Touris' Chase Account was in excess of $431,145. (Px 177; Px R p. 31) Gouletas did not have the right on his own to withdraw funds from Touris' Chase Account. (Px R p. 61) Accordingly, by depositing Gouletas' funds into Touris' Chase Account, Gouletas put those funds beyond the reach of his creditors. (*Id.*)

(56)   The account summaries for Touris' checking account at Chase Bank are reflected by DT 14 through DT 21, and are remarked herein as Px 180. Those account summaries all pertain to the requests that Gouletas made about taking funds that Gouletas had put into her checking account, and that Touris then withdrew from her account at Gouletas' request. (Px R pp. 89 & 116-17) As acknowledged by Touris, "those [account summaries reflected by Px 180 (DT 14 through DT 21)] are all of the financial transactions that [she] handled for Nick Gouletas with Nick Gouletas' money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it." (Px R p. 30 & 54)

(57)   Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy herein on January 17, 2016 (Px M ¶57), the account summaries for Touris' Chase Account (Px 180) reflect the regular, continuous and systematic use of that account by Gouletas from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account until September 14, 2015 with the payment of Gouletas' credit card bill. (*Id.*) Some of the more significant withdrawals by Gouletas from Touris' Chase Account are set forth below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 180-14; Px R pp. 55-56) |
| 3/16/15 | $5,000 | Cash. (Px 180-14; Px R pp. 56-57) |
| 3/17/15 | $5,000 | Cash. (Px 180-14; Px R pp. 59-60) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 180-14; Px R p. 60) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas' request to "Santander, B". (Px 180-14; Px R p. 60) |
| 3/20/15 | $20,000 | Cash. (Px 180-14; Px R p. 61) |
| 3/20/15 | $5,000 | Cash. (Px 180-14; Px R pp. 61-62) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/20/15 | $90,000 | Loan to Touris. (Px 180-15; Px R p. 62) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 180-15; Px R p. 65) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $440 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas' wife. (Px 180-15; Px R pp. 66-67) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 180-15; Px R pp. 67-68) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas' condominium. (Px 180-15; Px R pp. 67-68) |
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 180-15; Px R p. 68) |
| 3/26/15 | $869.09 | Payment of Gouletas' ComEd bill. (Px 180-15; Px R p. 68) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 180-15; Px R p. 69) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 180-15; Px R p. 69) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 180-15; Px R p. 69) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 180-17; Px R pp. 70-71 & 83-84) |
| 4/9/15 | $3,581.01 | Assessment for Gouletas' condominium. (Px 180-17; Px R p. 71) |
| 4/13/15 | $1,391.55 | Payment for Gouletas' condominium on Delaware Street. (Px 180-17; Px R pp. 71-72) |
| 4/13/15 | $230 | Assessment for Gouletas' condominium on Delaware Street. (Px 180-17; Px R pp. 74-75) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas' condominium. (Px 180-17; Px R p. 75) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas' condominium. (Px 180-17; Px R p. 75) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas' condominium at Delaware Place. (Px 180-17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas' ComEd bill. (Px 180-17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 180-17) |
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas' condominium. (Px 180-17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 180-17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas' mortgage. (Px 180-17; Px R p. 75) |
| 4/16/15 | $2,69_.25 | Payment of Gouletas' assessment on condominium. (Px 180-17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas' parking. (Px 180-17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 180-18; Px R p. 76) |
| 4/28/15 | $1,620.10 | Payment for Gouletas' condominium. (Px 180-18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 180-18; Px R pp. 76) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 180-18; Px R p. 76) |
| 4/30/15 | $2,000 | Unexplained. (Px 180-18) |
| 5/4/15 | $13,000 | Payment to Gouletas' wife, Natel Matschulat. (Px 180-18; Px R p. 78) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 180-18; Px R p. 78) |
| 5/13/15 | $5,000 | Unexplained. (Px 180-18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 180-18) |
| 5/21/15 | $1,000 | Unexplained. (Px 180-18) |
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 180-19) |

| Date | Amount | Payee/Explanation |
|---|---|---|
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 180-19; Px R pp. 80-81) |
| 5/28/15 | $5,000 | Cash.   (Px 180-19; Px R pp. 81-82) |
| 5/28/15 | $5,000 | Cash. (Px 180-19; Px R pp. 81-82) |
| 5/29/15 | $900 | Payment on Gouletas' credit card. (Px 180-19) |
| 5/29/15 | $6,500 | Payment on Gouletas' wife's credit card. (Px 180-19; Px R p. 82) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 180-19; Px R pp. 82-83) |
| 6/8/15 | $2,171.10 | Payment on Gouletas' credit card. (Px 180-19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas' condominium. (Px 180-19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 180-19; Px R pp. 86-87) |
| 6/24/15 | $1,000 | Payment on Gouletas' credit card. (Px 180-20) |
| 6/24/15 | $5,000 | Unexplained. (Px 180-20) |
| 7/2/15 | $2,000 | Cash. (Px 180-20; Px R pp. 89-90) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 180-21; Px R p. 91) |

As of February 10, 2017, there was only $1,368 of Gouletas' funds left in Touris' Chase Account.

(Px R p. 30)

(58)   At his deposition conducted in this Adversary Proceeding, Gouletas was less than

candid in testifying about his deposit and withdrawal of funds from Touris' Chase Account:

Q:   Why didn't you put the money in your own account?
A:   I don't recall.

Q:   Did you ever know why you did it?
A:   I don't recall.

Q:   By saying you don't recall, does that mean you at one time  knew
but now you don't remember?
A:   I don't recall.

* * *

Q:    Can you provide the Court with any explanation as to why  you
      did it?

* * *

A:    Not that I know of.

Q:    Can you list any possible reasons as to why you did it?
A:    No, I don't.

Q:    How long did this Dorothea Touris, money in her account   paying
      your bills, how long did that practice go on?
A:    I don't recall.

* * *

Q:    The money that you had deposited into Dorothea Touris' checking
      account, where did that money come from?
A:    I don't recall.

Q:    How much did you . . . put into Dorothea Touris' account    for  the
      payment of your bills and the handling of your financial affairs?
A:    I don't recall.

Q:    Can you give me an estimate as to the amount?
A:    No, I can't.

Q:    Would you agree with me its more than a dollar?
A:    I don't know.

Q:    Would you agree with me its more than a million dollars?
A:    I don't know.

Q:    Would you agree with me its less than $10 million?
A:    I don't know.

* * *

Q:    Can you list any reasons why you didn't put [that money] in your
      own account?
A:    I don't recall.

* * *

Q:    Did you tell [Touris] anything about the money?
A:    I don't recall.

Q:    Did she ask any questions about the money?
A:    I don't recall.

Q:    Did it just happen by accident?

17

A:      I don't recall.

Q:      Did you ever have $15,730 wire transferred into Dorothea Touris' checking account?

A:      I don't recall.

Q:      Other than the $415,000 are you aware of any other sums that you had deposited into Dorothea Touris' checking account?

A:      I don't recall.

\* \* \*

Q:      On March 16, 2015, Dorothea Touris withdrew $5,000 from her checking account in cash. Did she give that cash to you?

A:      I don't recall.

Q:      On March 20, 2015, there was a $20,000 withdrawal of cash from her checking account. Did she give that cash to you?

A:      I don't recall.

Q:      How did Dorothea Touris know what bills to pay?

A:      I don't remember.

\* \* \*

Q:      The cash withdrawals, did you ask her to withdraw cash and give it to you?

A:      I don't recall.

Q:      Do you deny she withdrew on numerous occasions large sums of money in cash and gave the cash to you?

A:      I don't recall.

\* \* \*

Q:      Do you deny that Dorothea Touris routinely gave you large sums of cash?

A:      I don't recall.

Q:       Is there any part of your memory to the effect that Dorothea Touris would give [you] cash?

A:      I don't recall.

Q:      Did you ever request Dorothea Touris to give you cash?

A:      I don't recall.

(Px J pp. 3-4, 6-7 & 16-19)

(59)    In connection with Gouletas' "convenient amnesia" as to why he deposited his

funds into Touris' checking accounts, Gouletas previously admitted that he understood "it's just

as much a violation of your oath to say you don't recall when you do recall as it is to make an affirmative misrepresentation." (Px J p. 5)

(60)   In late January of 2015, Touris met with Gouletas at his office, at which time Gouletas presented Touris with a check in the amount of $396,218.84. (Px R pp. 22-23) Touris understood that those funds belonged to Gouletas. (*Id.* p. 23) Gouletas, however, claims to not have "any recollection" about what the $396,218.84 check was in reference to. (Px J pp. 44-45)

(61)   Gouletas then told Touris that "I would like you [Touris] to deposit this [the $396,218.84 check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas' son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]" (*id.* pp. 23-25), with the balance of a $150,000 to be kept by Touris as a purported reimbursement on an investment. (*Id.* p. 23)

(62)   This was the first deposit of Gouletas' money into Touris' checking account. (Px R p. 24)

(63)   Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 to Steven E. Gouletas (Px 181; Px R pp. 96-97 & 117), and a $50,000 check to George Spanos. (Px 182; Px R pp. 116-117)

(64)   In addition to his "convenient amnesia" during his deposition conducted in this Adversary Proceeding, Gouletas provided conflicting testimony as to his deposit of funds into, and use of, other people's checking accounts. During the Contempt Proceedings, Gouletas told Judge White that his wife used the $51,323.29 from the sale of Gouletas' CIB Stock to "buy groceries" and pay for other "living expenses". (Px O pp. 21 & 30-31) At his 341 Meeting of Creditors, however, Gouletas, when confronted by copies of checks from Gouletas' wife's checking account, testified that he used the $51,323.29 placed in his wife's checking account to

pay business and personal expenses. (Px S pp. 11-18) During his subsequent deposition conducted in this Adversary Proceeding, however, Gouletas claimed that he "did not remember" what he did with the $51,323.29 (Px J p. 66), and supposedly "did not remember" if he transferred those funds to his wife and used any of that money for his own benefit. (*Id.* pp. 66-67)

(65)    At no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or his Citation Disclosure Form to reflect his deposit of funds into Touris' checking accounts, or otherwise disclose his deposit of funds into and use of Touris' checking accounts. (Px M ¶65)

**J.    Gouletas Failed To Disclose Charitable Contributions In Excess Of $600 That He Made To The Annunciation Greek Church Within Two Years Of His Bankruptcy Filing.**

(66)    In his bankruptcy filing, Gouletas represented under oath that he did not make any gifts to charities within the two years preceding his bankruptcy filing. (Px 188 (Statement of Financial Affairs) p. 11 no. 13) That representation was false. (*See* Px R pp. 10-11 & 76-77)

(67)    In truth, on April 29, 2015, Gouletas had Touris, on Gouletas' behalf, take Gouletas' funds out of Touris' Chase Account, and write two checks (check nos. 2416 and 2417) (Px 180-18)) totaling $5,000 in charitable contributions by Gouletas to the Annunciation Greek Church. (Px R pp. 10-11 & 76-77)

**K.    Gouletas Was Evasive About The Handling Of His Financial Affairs.**

(68)    Not only was Gouletas evasive about the funds that he deposited in checking accounts held in the name of Touris, he was evasive about the handling of his financial affairs during the deposition that was conducted in this Adversary Proceeding:

Q:    Have you ever had access to a safety deposit box?
A:    I don't recall.

* * *

Q:      Where do you keep your valuable records?

A:      I don't remember.

(Px J pp. 61-62)

**L.      800 SWC Files An Adversary Complaint Against Gouletas For
Denial Of Discharge Pursuant To 11 U.S.C. §727(a)(2).**

(69)    On March 1, 2016, 800 SWC filed an Adversary Complaint against Gouletas

seeking, in Count Three, the denial of Gouletas' bankruptcy discharge pursuant to 11 U.S.C.

§727(a)(2)(A). (D.N. 1) Gouletas filed his answer to the above Adversary Complaint on May 20,

2016. (D.N. 7; Px A)

**M.      There Is No Evidence To Support Gouletas' Affirmative Defenses.**

(70)    In Gouletas' Answer filed herein, Gouletas asserted two affirmative defenses

pertaining to Count Three. In his First Affirmative Defense, Gouletas asserted that "Plaintiff

lacks standing to pursue its claim." (Ans. p. 14 ¶1) And in his Third Affirmative Defense,

Gouletas asserted that "Plaintiff's claims are barred by the equitable doctrine of unclean hands."

(*Id*. p. 15 ¶3)

(71)    There is no evidence to support Gouletas' affirmative defense of Plaintiff's

supposed lack of standing. In his "standing" affirmative defense, Gouletas argued that "[t]he duly

appointed manager of [800 SWC] has not authorized this action." (Ans. p. 14 ¶1) Gouletas

testified, however, that he has "no idea" whether Plaintiff has the authority to proceed with this

suit, and has "no idea" of any facts to support any claim that Plaintiff did not have the authority

to proceed with this suit. (Px J p. 68)

(72)    DJV became the manager of 800 SWC on November 16, 2006 pursuant to the

terms of a Collateral Pledge and Security Agreement (Px 32-A) (the "Pledge Agreement")

executed by (1) the "Borrower", 800 SWC, and (2) the "Pledgors", River City Investors ("RCI") and Gouletas, as the sole members of 800 SWC, in favor of the "Lender", CIB Bank, which was succeeded by DJV. (*Id*. p. 1) As admitted by Gouletas, "on or about November 16, 2006, pursuant to a [Pledge Agreement] delivered to CIB Bank, and later assumed by DJV . . ., DJV took over control of the voting rights of [800 SWC], and removed Gouletas as the manager of [800 SWC]." (Px B p. 19 ¶3) Further, Gouletas admitted that "DJV took control of [800 SWC] . . . pursuant to [the Pledge Agreement], which allowed DJV to do so once an event of default occurred." (*Id*. p. 20 ¶11 (emphasis added))

(73)   Further, pursuant to the Pledge Agreement, RCI and Gouletas agreed that, upon default by 800 SWC in repayment of the full amount of financial obligations owed by 800 SWC, CIB (now DJV) could serve as the manager of 800 SWC unless and until the full amount of the financial obligations owed by 800 SWC to DJV was paid in full. (Px 32-A ¶¶1.1, 4.1, 4.8, 4.12 & 6.1) It is undisputed that, to date, the full amount of the financial obligations owed by 800 SWC to DJV has not been paid in full. (Px L ¶73)

(74)   In addition, Gouletas and the other previous member of 800 SWC, RCI, previously contested the ability of DJV to serve as the manager of 800 SWC. As concluded by Bankruptcy Judge Jacquelyn P. Cox in her Order denying Gouletas' prior Motion on the authority of DJV to continue as manager of 800 SWC:

> The argument [by RCI and Gouletas] that [DJV] has not acquired all of the manager-member power is without basis. Paragraph 1.1 of the Pledge Agreement [Px 32-A] states "Pledgor [*i.e.*, Gouletas and RCI] assigns, pledges and grants to Lender [DJV] a security interest in and lien upon all of Pledgor's right, title and interest in and to Pledgor's interest in Borrower [800 SWC] (including without limitation, Pledgor's rights to [v]ote . . .". [DJV] succeeded to all, 100%, of the Pledgor's [*i.e.*, Gouletas and RCI's] interest.

(Px T p. 6)

(75)    In his other affirmative defense pertaining to Count Three, Gouletas argued that

Plaintiff has "unclean hands" because "Plaintiff has pursued its claims in this Court and in the

Circuit Court of Cook County with the knowledge that it did not have authority to do so." (Ans.

p. 15 ¶3) As discussed above, Plaintiff has the authority to pursue with its claims herein and had

the authority to pursue its claims in the Circuit Court. (*See* Nos. 72-74)

(76)    Further, there is no evidence to support Gouletas' affirmative defense of unclean

hands. During his deposition herein, Gouletas admitted that he has "no idea" whether Plaintiff

has unclean hands, and has "no idea" of any facts to support a claim that Plaintiff has unclean

hands. (Px J p. 68)

**N.     The Exhibits Referred To Above Are True And Correct Copies
Of The Originals, Are What They Purport To Be, And Are
Admissible In Evidence Herein.**

(77)    The exhibits referred to above (specifically, Pxs A, B, C, D, E, F, H, I, J, K, L, M,

N, O, P, Q, R, S, T, 15, 17, 20, 29, 32-A, 101, 120, 122, 127, 128, 139, 176, 177, 178, 179, 180,

181, 182 & 183) are true and correct copies of the originals, are what they purport to be, and are

admissible in evidence in this action. (Px M ¶77)

<div style="margin-left: 50%">

Respectfully submitted,

ARMSTRONG LAW FIRM

</div>

Dated: August 21, 2017.

<div style="margin-left: 50%">

By    */s/F. Dean Armstrong*
  F. Dean Armstrong
  1324 Dartmouth Road
  Flossmoor, IL  60422
  708/798-1599
  Fax: 708/798-1597
  Email: armstronglaw@sbcglobal.net

*Attorneys for 800 South Wells
Commercial LLC*

</div>

### Certificate of Service

The undersigned certifies that a true and correct copy of the foregoing pleading was served upon all parties receiving CM/ECF noticing on this 21st day of July, 2017.

*/s/F. Dean Armstrong*
F. Dean Armstrong