**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | No. 16-01335 |
| | ) | |
| Debtor. | ) | Hon. Timothy A. Barnes |
| ——————————————— | ) | |
| | ) | |
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 1:16 ap 141 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

**PLAINTIFF'S APPENDIX OF EXHIBITS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

ARMSTRONG LAW FIRM

Dated: August 21, 2017.

By___*/s/F. Dean Armstrong*_____
   F. Dean Armstrong
   1324 Dartmouth Road
   Flossmoor, IL  60422
   708/798-1599
   Fax: 708/798-1597
   Email: armstronglaw@sbcglobal.net

*Attorneys for 800 South Wells*
*Commercial LLC*

*Index of Exhibits*

Px A   Nicholas S. Gouletas' Answer and Affirmative Defenses to Complaint Objecting to Dischargeability of Debt to Plaintiff and Discharge of Debtor

Px B   Answer and Affirmative Defenses to Third Amended Complaint

Px C   Second Amended Citation to Discover Assets

Px D   Nicholas S. Gouletas' Answer to "Exhibit A" to Citation to Discovery Assets

Px E   Nicholas S. Gouletas' Income and Asset Disclosure Form

Px F   9/30/14 email to Nicholas S. Gouletas re house in Greece

Px H   Nicholas S. Gouletas' Supplemental Responses to Supplemental Proceedings Interrogatories

Px I   July 20, 2015 hearing transcript

Px J   February 10, 2017 deposition of Nicholas S. Gouletas

Px K   October 20, 2014 Citation to Discovery Assets of Nicholas S. Gouletas

Px L   Affidavit of Daniel C. Cadle

Px M   Affidavit of F. Dean Armstrong

Px N   November 24, 2015 hearing transcript

Px O   September 21, 2015 hearing transcript

Px P   September 3, 2015 deposition of Steven Gouletas

Px Q   January 27, 2017 deposition of Steven Gouletas

Px R   February 10, 2017 deposition of Dorothea Touris

Px S   March 1, 2016 Meeting of Creditors

Px T   March 15, 2007 Order

Px 15   American Invsco LinkedIn profile

Px 17   Nicholas Gouletas' Income and Asset Disclosure Form

Px 20   Nicholas S. Gouletas Balance Sheet As of March 31, 2013

Px 29   Nicholas S. Gouletas' business card

32-A    March, 2001 Collateral Pledge and Security Agreement

Px 101 Ameritrade wire request

Px 120 Cashier's check

Px 122 Cashier's check

Px 127 Cashier's check

Px 128 Cashier's check

Px 139 CIB BancShares Stock Certificate

Px 176 Bankruptcy Schedule A/B: Property

Px 177 Touris checking account transaction history

Px 178 Deposit slip to Touris checking account

Px 180 Touris checking account statement

Px 181 Touris check to Steven Gouletas

Px 182 Touris check to George Spanos

Px 183 Bankruptcy Financial Statement

# Px A

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| **NICHOLAS S. GOULETAS,** | ) | No. 16-01335 |
| | ) | |
| Debtor. | ) | Hon. Timothy A. Barnes |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **800 SOUTH WELLS COMMERCIAL LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 16-00141 |
| | ) | |
| **NICHOLAS S. GOULETAS,** | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

### NICHOLAS S. GOULETAS' ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT TO PLAINTIFF AND DISCHARGE OF DEBTOR

Debtor/Defendant Nicholas S. Gouletas, through his attorneys, states the following as his

Answer and Affirmative Defenses to 800 S. Wells Commercial, LLC's Complaint:

1.     The Debtor/Defendant, Nicholas S. Gouletas ("Gouletas"), engaged in self-dealing and otherwise breached fiduciary duties that he owed to Plaintiff 800 South Wells Commercial ("800 SWC"), which resulted in an $11,550,040.12 judgment against Gouletas in favor of 800 SWC. The debt reflected by that judgment is non-dischargeable pursuant to 11 U.S.C. §§523(a)(4) & (a)(6). *See Catrambone v. Adams*, 498 B.R. 839 (N.D. Ill. 2013) (Bucklo, J.).

**ANSWER:**   Denied.

2.     In connection with the subsequent state court citation proceedings, Gouletas concealed assets and fraudulently transferred assets in violation of the citation lien. On the eve of being held in contempt for numerous violations of that citation lien, Gouletas sought sanctuary in this Court by the filing of a Chapter 7 bankruptcy petition. Pursuant to 11 U.S.C. §727(a)(2)(A), Gouletas should be denied a discharge because he fraudulently transferred and concealed his assets within the one-year period preceding his bankruptcy filing. *See Marcus-Rehtmeyer v. Jacobs*, 784 F.3d 430 (7th Cir. 2015).



**ANSWER:**   Denied.

## Parties

3.      Plaintiff 800 South Wells Commercial LLC ("Plaintiff" or "800 SWC") is an Illinois limited liability company with its principal place of business in Cook County, Illinois.

**ANSWER:**   Admit.

4.      Debtor/Defendant Nicholas S. Gouletas ("Gouletas") is an individual who resides in Cook County, Illinois.

**ANSWER:**   Admit.


## Jurisdiction And Venue

5.      This Court has jurisdiction pursuant to 28 U.S.C. §1334. This suit is a core proceeding within the meaning of 28 U.S.C. §157(b).

**ANSWER:**   Admit. Further answering, Gouletas does consent to the entry of final orders or judgment by this Court.


6.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409.

**ANSWER:**   Admit.


7.      In 1997, the River City Complex located at 800 South Wells Street, Chicago, Illinois consisted of (a) an apartment complex of 448 apartments; (b) 240,000 square feet of commercial/retail/office space (the "Commercial Space"); (c) a 133 space underground parking garage (the "Parking Garage"); (d) a surface parking lot; and (e) a 64 slip marina on the Chicago River.

**ANSWER:**   Admit.


8.      In April of 1997, a Gouletas-related entity, American Invesco Development Corporation, purchased the River City Complex for $41,300,000. Sometime thereafter, Plaintiff became the owner of the long-term leasehold interests in the Commercial Space and the Parking Garage. From the time of acquisition of the above leasehold interests until November 16, 2006, Gouletas was the owner of 50% of the membership interests in Plaintiff; was the duly appointed manager of Plaintiff; and dominated and controlled the business affairs and operations of Plaintiff.

**ANSWER:**   Gouletas admits that in or about April of 1997, American Invsco

Development Corporation purchased the River City Complex for $41,300,000 and that 800 S.

Wells Commercial LLC became the owner of the leasehold interests in the Commercial Space

and parking garage. Gouletas further admits that he owned a 50% membership interest in 800 S.

Wells Commercial LLC and was its duly appointed manager.  Gouletas denies the remaining

allegations contained in paragraph 8.

9.     As of late 2005, Gouletas had refinanced the leasehold interests in the
Commercial Space and the Parking Garage on numerous occasions, which were encumbered by
two substantial leasehold mortgages.  The first mortgage was comprised of two loans from
Parkway Bank and Trust Company ("Parkway") to Plaintiff in the original principal amount of
$18,500,000 (the "First Mortgage").  By the end of 2005, the First Mortgage loan was current,
with the amount owed by Plaintiff to Parkway totaling approximately $11,750,000.

**ANSWER:** Gouletas denies that he refinanced the leasehold interests in the Commercial

Space and the Parking Garage.  Gouletas admits the remaining allegations.

10.     The Commercial Space and the Parking Garage were also encumbered by a
second leasehold mortgage lien in favor of CIB Bank ("CIB"), which was comprised of a
$5,900,000 loan from CIB to Plaintiff (the "Second Mortgage").  In March of 2005, the Second
Mortgage was acquired by D.A.N. Joint Venture III, L.P. ("DJV").  By the end of 2005, the
Second Mortgage loan was in default, with the amount owed by Plaintiff to DJV totaling
approximately $10,000,000.

**ANSWER:**   Admit.

11.     Gouletas was the former manager of Plaintiff 800 SWC.  As the manager and
control person of Plaintiff, Gouletas had a duty to manage the business operations of Plaintiff in
such a manner as to maximize the profits of Plaintiff.  Further, Gouletas hired a Gouletas-related
company, Invesco Management Company, Inc. (d/b/a American Invesco) ("Invesco"), to manage
the Commercial Space in exchange for management fees paid by Plaintiff to Invesco.

**ANSWER:**   Gouletas admits that he was the former manager of Plaintiff 800 SWC and

that he hired Invesco Management Company, Inc. (d/b/a American Invesco) ("Invesco"), to

manage the Commercial Space in exchange for management fees paid by Plaintiff to Invesco.

Gouletas denies the remaining allegations.

12.    From 2001 until November 16, 2006, Gouletas grossly mismanaged Plaintiff by (a) diverting income and assets from Plaintiff to other Gouletas-related entities; (b) not authorizing the expenditure of sufficient funds to upgrade the rental spaces; (c) not leasing out the Commercial Space to the point where an acceptable vacancy level of 15% or less could be reached; and (d) leasing out prime portions of the Commercial Space to Gouletas-related entities at below market rates.

**ANSWER:**    Denied.

13.    As a result of the gross mismanagement of the Commercial Space by Gouletas and Invesco, Plaintiff was not able to realize full market value for the Commercial Space and the Parking Garage when they were sold at a foreclosure sale on July 24, 2007 for $11,500,000. Had Gouletas properly managed the Commercial Space and maintained a vacancy rate of 15% or below, the sale of the Commercial Space and Parking Garage leasehold interests in July of 2007 would have generated enough income to pay off both the First Mortgage and the Second Mortgage. Indeed, if the Commercial Space had been properly managed by Gouletas, the Commercial Space and the Parking Garage would have been worth two times the value that they sold for on July 24, 2007.

**ANSWER:**    Denied.

14.    Due to the default of Plaintiff in paying the Second Mortgage, on November 16, 2006 DJV, as the holder of the Second Mortgage, took over control of the voting rights of Plaintiff, and thereafter removed Gouletas as the manager of Plaintiff.

**ANSWER:**    Gouletas admits that on November 16, 2006 DJV, as the holder of the

Second Mortgage purported to assume voting rights of the members of 800 SWC and removed

Gouletas as manager of plaintiff.  Gouletas denies all remaining allegations.

15.    On March 17, 2011 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895 for self-dealing and breaching fiduciary duties owed to 800 SWC (the "Underlying Suit"). Gouletas was represented by counsel in connection with the Underlying Suit, and actively participated in pretrial proceedings.

**ANSWER:**   Gouletas admits that on March 17, 2011 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895 and further admits that for a period of time Gouletas was represented by counsel and actively participated in pretrial proceedings. Gouletas denies the remaining allegations.

16.     Gouletas, however, steadfastly refused to sit for his deposition in the Underlying Suit, and even used "withdrawal of counsel" as a basis to avoid his deposition. Because of Gouletas' pattern of discovery abuse, on December 5, 2013 Plaintiff filed a Motion for Sanctions against Gouletas, which was granted by the Court in the Underlying Suit on December 11, 2013. (Px A) After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the Underlying Suit entered a Default Judgment Order against Gouletas in the amount of $11,550,040.12 (Px B) (the "Judgment").

**ANSWER:**   Gouletas admits that on December 5, 2013 after Gouletas' counsel withdrew, Plaintiff filed a Motion for Sanctions against Gouletas, which was granted by the Court in the Underlying Suit on December 11, 2013.  Gouletas further admits that on January 23, 2014 the Court in the Underlying Suit entered a Default Judgment Order against Gouletas in the amount of $11,550,040.12 on Count Two of its Third Amended Complaint.  Gouletas denies the remaining allegations.

17.     Thereafter, Gouletas, through counsel, took an appeal of the Judgment to the Appellate Court of Illinois, First District, No. 14-0781 (the "First Appeal"). In connection with the First Appeal, Gouletas falsely represented that he was "no longer able to pay for counsel [to defend the Underlying Suit]", and that he was "not represented from September 9, 2013 through the date the Judgment was entered in January of 2014." On November 6, 2014 the Court of Appeals granted Gouletas' Motion to Dismiss the First Appeal.

**ANSWER:**   Gouletas admits that he, through counsel, took an appeal of the Judgment to the Appellate Court of Illinois, First District, No. 14-0781 (the "First Appeal") and that on November 6, 2014 the Court of Appeals granted Gouletas' Motion to Dismiss the First Appeal. Gouletas denies the remaining allegations.

18.     On August 7, 2014 Gouletas filed in the Underlying Suit a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) (the "2-1401 Petition") seeking to set aside the Judgment. In connection with the 2-1401 Petition, Gouletas, once again, falsely represented that he was "no longer able to pay for counsel [to defend the Underlying Suit]", and that he was "not represented from September 9, 2013 through the date the default judgment was entered in January of 2014." On September 18, 2014, the trial court in the Underlying Suit denied Gouletas' 2-1401 Petition.

**ANSWER:**     Gouletas admits that on August 7, 2014 Gouletas filed in the Underlying

Suit a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401)

(the "2-1401 Petition") seeking to set aside the Judgment and that on September 18, 2014, the

trial court in the Underlying Suit denied Gouletas' 2-1401 Petition. Gouletas        denies        the

remaining allegations.

19.     On October 20, 2014 Gouletas, through counsel, appealed the trial court's Order Denying Gouletas' 2-1401 Petition to the Appellate Court of Illinois, First District, No. 14-3214 (the "Second Appeal"). On April 2, 2015, the Court of Appeals dismissed Gouletas' Second Appeal for want of prosecution.

**ANSWER:**     Admit.

## C.     The Citation Proceedings Against Gouletas

20.     Due to Gouletas' failure to pay the amount owed under the Judgment, on June 5, 2014 Plaintiff filed a Citation to Discover Assets against Gouletas (Px C) (the "Citation") in connection with the Underlying Suit (the "Citation Proceedings"). The Citation was personally served on Gouletas on June 9, 2014.

**ANSWER:**     Gouletas admits that Plaintiff filed a Citation to Discover Assets against

Gouletas in connection with the Underlying Suit.   Gouletas denies that the Citation was

personally served on Gouletas on June 9, 2014.   Gouletas lacks sufficient knowledge to admit or

deny the remaining allegations.

21.    In the Citation, it was clearly stated that:

> **YOU ARE PROHIBITED** from making or allowing any transfer
> or other disposition of . . . any property not exempt from execution .
> . . belonging to the judgment debtor or to which the judgment
> debtor may be entitled or which may be acquired by or become due
> to the judgment debtor . . ., until further order of Court or
> termination of the proceedings.

(Px C p. 1)

    **ANSWER:**    Gouletas states that the exhibit speaks for itself as to its terms and denies

any allegations inconsistent therewith.

    22.    In August of 2014 Gouletas filed his Answer to the Citation (Px D) (the "Citation
Answer"), wherein Gouletas represented under oath that he did not own any real estate. (*Id.* p. 2)
In addition, on August 11, 2014 Gouletas represented in a sworn Income and Asset Disclosure
Form filed in the Citation Proceedings (Px E) (the "Citation Disclosure Form") that he did not
own any real estate. (*Id.* p. 2) Gouletas' representations about not owning any real estate were
knowingly false. Indeed, Gouletas owned, with his sister, Evangeline Gouletas, a single family
home in Greece (the "Greece Property"), which he inherited, with his sister, in approximately
2008. At no time in connection with the Citation Proceedings did Gouletas amend or correct his
Citation Answer or his Citation Disclosure Form, or otherwise reveal his ownership interest in
the Greece Property. Indeed, on September 30, 2014 Gouletas received an email from his sister,
Evangeline, about the Greece Property (Px F), yet Gouletas still did not reveal his ownership
interest in the Greece Property during the pendency of the Citation Proceedings. Accordingly, in
connection with the Citation Proceedings, Gouletas concealed his ownership interest in the
Greece Property.

    **ANSWER:**    Gouletas admits that he served an Answer to the Citation and an Income

and Asset Disclosure Form that the documents are attached to the Complaint as Exhibits D and

E. Gouletas states that said documents speaks for themselves as to their terms and denies any

allegations inconsistent therewith. Gouletas admits that he, along with his sister, inherited the

Greece Property. Gouletas denies the remaining allegations.

23.     Further, in his Citation Answer Gouletas represented under oath that he did not own any stock. (Px D p. 2) In addition, in his Citation Disclosure Form, Gouletas represented under oath that he had no accounts other than three checking accounts and one savings account. (Px E p. 2) At no time did Gouletas amend or correct these representations. In fact, however, Gouletas owned stock in CIB Marine Bankshares with the shares held in a brokerage account in his name at TD Ameritrade. Accordingly, in connection with the Citation Proceedings, Gouletas concealed his ownership interest of the CIB Marine stock and his brokerage account with TD Ameritrade.

**ANSWER:**    Gouletas admits that an Answer to the Citation and an Income and Asset

Disclosure Form that the documents are attached to the Complaint as Exhibits D and E. Gouletas

states that said documents speaks for themselves as to their terms and denies any allegations

inconsistent therewith. Gouletas denies the remaining allegations.

24.     Further, in Gouletas' Citation Answer, he represented that the only personal property that he owned was clothing and office furniture. (Px D p. 2) In his Citation Disclosure Form (Px E), Gouletas did not list ownership in any valuable collectible items. During the Citation Proceedings, however, Gouletas owned a Wurlitzer jukebox worth approximately $10,000, and a mechanical violin/piano (like a player piano, but a violin) worth between $40,000 to $70,000. At no time during the Citation Proceedings did Gouletas amend or correct these representations. Accordingly, in connection with the Citation Proceedings, Gouletas concealed his ownership interest in these valuable collectibles.

**ANSWER:**    Gouletas admits that an Answer to the Citation and an Income and Asset

Disclosure Form that the documents are attached to the Complaint as Exhibits D and E. Gouletas

states that said documents speaks for themselves as to their terms and denies any allegations

inconsistent therewith. Gouletas denies the remaining allegations.

25.     The Citation (Px C) was served on Gouletas on June 9, 2014. In violation of the Citation, on or about September 5, 2014, Gouletas sold the stock that he owned in CIB Marine Bankshares and, through his account at TD Ameritrade, fraudulently transferred $51,322.29 from the sale of that stock to the checking account of his wife, Natel Matschulat. (Px G)

**ANSWER:**    Gouletas admits the Citation was eventually served upon him through

alternative service and that on or about September 5, 2014, he caused stock that he owned in CIB

Marine Bankshares to be sold. Gouletas denies the remaining allegations.


26.    In addition, on March 25, 2015, Gouletas represented under oath that he "does not
have a membership interest in . . . NKM Garvey, LLC" (Px H p. 10), which is an LLC that owns
a 13% interest in a mixed use high-rise retail/office/condominium project under construction at
Clark and Lake Streets in downtown Chicago. Contrary to Gouletas' representation, he does in
fact have an ownership interest in NKM Garvey, LLC. At no time did Gouletas amend or correct
this representation. Accordingly, in connection with the Citation Proceedings, Gouletas
concealed his ownership interest in NKM Garvey, LLC.

**ANSWER:**    Gouletas admits that Exhibit H is a copy of a document entitled Nicholas

Gouletas' Supplemental Responses to Supplemental Proceeding Interrogatories. Gouletas states

that the document speaks for itself as to its terms and denies any allegations inconsistent

therewith. Gouletas admits that he owns a percentage of NKM Garvey, LLC and that he did not

amend Exhibit H. Gouletas denies the remaining allegations.


27.    Moreover, on or about the following dates, Gouletas violated the Citation lien
(served upon Gouletas on June 9, 2014) by transferring funds that, legally or equitably, belonged
to Gouletas:

(a)    In violation of the Citation, on or about September 5, 2014,
Gouletas transferred $51,323.29 of his own funds into an account
in the name of his wife, Natel Matschulat.

(b)    In violation of the Citation, on or about September 5, 2014,
Gouletas caused the transfer of a check in the amount of
$51,328.85 to an undetermined account at an undetermined bank
with a "Chicago LaSalle Branch".

(c)    In violation of the Citation, on or about July 30, 2014, Gouletas
withdrew $2,745.52 from his checking account at Republic Bank.

(d)    In violation of the Citation, on or about July 30, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,745.52 issued to ComputerShare.

(e)    In violation of the Citation, on or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself.

(f)    In violation of the Citation, on or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000.00 issued to himself.

(g)    In violation of the Citation, on or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself.

(h)    In violation of the Citation, on or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself.

(i)    In violation of the Citation, on or about September 9, 2014, Gouletas paid $2,500 to NR-Advisors (Niko Roussos).

(j)    In violation of the Citation, on or about February 6, 2015, Gouletas (through Dorothea Touris) paid $190,000 to his son, Steven Gouletas.

(k)    In violation of the Citation, on or about February 6, 2015, Gouletas paid $5,000 to his son, Steven Gouletas.

(l)    In violation of the Citation, on or about March 24, 2015, Gouletas paid $7,200 to his son, Steven Gouletas.

**ANSWER:**    Denied.

28.    Further, during the Citation Proceedings, Gouletas would routinely deposit his personal funds into checking accounts titled in the name of wife, Natel Matschulat, and would routinely withdraw funds from those accounts for his personal benefit. In addition, during the Citation Proceedings, Gouletas had his wife "lend" large sums of money to Gouletas to cover the payment of legal fees for the bankruptcy filings by certain of Gouletas' entities. During this entire period of time when Gouletas had free and unfettered access to the funds deposited in his wife's checking accounts, Gouletas now claims that his wife, Natel Matschulat, was *non compos mentis*, yet the only person who acted as the guardian for his wife during that time period was Gouletas himself. In connection with the Citation Proceedings, Gouletas concealed his free and

unfettered access to the funds in checking accounts that were titled in the name of his wife, Natel Matschulat, and his routine withdrawal of funds from those accounts for his personal benefit.

**ANSWER:**    Denied.

29.    In addition, Home By Invsco, Inc. ("HBI") was an Illinois corporation owned and controlled by Gouletas, and was, in fact, the alter-ego of Gouletas. In January of 2015, HBI received $2,038,703.84 in net proceeds from the sale of certain properties that were owned by other Gouletas entities that were also, in fact, the alter-egos of Gouletas. Later in January of 2015, Gouletas had his alter-ego, HBI, disburse over $2,000,000 of those proceeds to certain alleged "creditors" of HBI, which included the payment of debts that were owed by Gouletas personally, including Gouletas' personal legal fees. Gouletas, however, never disclosed, and thus concealed, these payments of his personal debts in connection with the Citation Proceedings.

**ANSWER:**    Gouletas admits that Home By Invsco was an Illinois Corporation in

which Gouletas was a shareholder. Gouletas further admits that in January of 2015, HBI, as

mortgagor, received proceeds from the sale of property on which it had a secured interest and

that HBI disbursed funds to its creditors.  Gouletas denies the remaining allegations.

30.    Further, at the Citation Examination of Gouletas held on October 20, 2014, Gouletas represented that he did not make any of the mortgage payments for his condominium at 111 East Chestnut Street, Suite 28K, Chicago, Illinois, and did not pay any of the utility bills or condominium association dues. These representations were false. In fact, Gouletas would routinely pay the mortgage payments, utility bills, and condominium association dues for his condominium.

**ANSWER:**    Deny.

31.    Finally, in a signed financial statement dated as of March 31, 2013, Gouletas represented that he had a net worth of $25,287,653. (Px I) At the time the Citation was served on Gouletas on June 9, 2014, Gouletas and his wife, Natel Matschulat, lived in two condominium units (Suites 28J & 28K) at 111 East Chestnut Street in Chicago. In Rider A to the Citation, Gouletas was required to produce "[c]opies of all homeowner's insurance policies . . . that have insured any property that [Gouletas] owns or has the benefit of use of, for the past five years." (Px C p. 4 ¶IV(C)) Further, the trial court in the Citation Proceedings entered four separate orders (dated July 10, 2014; August 4, 2014; September 24, 2014; and December 18, 2014) requiring Gouletas to comply with the Citation and produce the homeowner's insurance policies covering his residence, which would list the valuable items of personal property owned by Gouletas. Gouletas, however, steadfastly refused to produce the homeowner's insurance policies. Accordingly, Gouletas concealed his property within one year of his bankruptcy filing.

**ANSWER:**   Gouletas admits that Exhibit I is a document entitled "Nicholas S. Gouletas Balance Sheet as of March 31, 2013 (Unaudited)." Gouletas further states that said document speaks for itself as to its terms and denies any allegations inconsistent therewith. Gouletas further states that Rider A to the Citation speaks for itself as to its terms and denies any allegations inconsistent therewith. Gouletas denies the remaining allegations.

### D.   The Contempt Proceedings Against Gouletas

32.   Based on the numerous violations by Gouletas of the Citation lien, on April 24, 2015 Plaintiff filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015. The documents introduced in evidence and the testimony by Gouletas during these contempt hearings conclusively proved that Gouletas had, on numerous occasions, intentionally violated the Citation lien.

**ANSWER:**   Gouletas admits that Plaintiff filed a Motion for Indirect Civil Contempt against Gouletas, which was later amended and that the trial court conducted hearings on July 20, 2015, September 2, 2015 and November 24, 2015, which hearings had not concluded. Gouletas denies the remaining allegations.

33.   The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of being held in contempt for violation of the Citation lien, on January 17, 2016 Gouletas sought sanctuary in this Court by the filing of a Chapter 7 bankruptcy petition.

**ANSWER:**   Gouletas admits that on January 17, 2016 he caused a Chapter 7 bankruptcy petition to be filed on his behalf. Gouletas denies the remaining allegations.

34.   All conditions precedent to recovery by Plaintiff have been performed or have occurred.

**ANSWER:**   Denied.

35.     Plaintiff realleges all preceding and succeeding paragraphs for each of the following Counts.

**ANSWER:**     Gouletas realleges and incorporates by reference his answers to

paragraphs 1 through 34 as if fully set forth herein.

### COUNT ONE
### (Non-Dischargeable Debt
### Pursuant To 11 U.S.C. §523(a)(4))

36.     Pursuant to 11 U.S.C. §523(a)(4), a debtor is not entitled to discharge a debt "for fraud or defalcation while acting in a fiduciary capacity . . .."

**ANSWER**:     Gouletas admits that the cited statute so provides. Gouletas denies that it is

applicable to this case.

37.     The Judgment rendered against Gouletas in the Underlying Suit was for fraud or defalcation by Gouletas while acting in a fiduciary capacity. Accordingly, pursuant to 11 U.S.C. §523(a)(4), Gouletas is not entitled to a discharge of the debt owed to Plaintiff in connection with the Judgment.

**ANSWER:**     Denied.

### COUNT TWO
### (Non-Dischargeable Debt
### Pursuant To 11 U.S.C. §523(a)(6))

38.     Pursuant to 11 U.S.C. §523(a)(6), a debtor is not entitled to discharge a debt "for willful and malicious injury by the debtor to another entity or the property of another entity . . .."

**ANSWER:**     Gouletas admits that the cited statute so provides. Gouletas denies that it is

applicable to this case.

Page 18 of 81
Case 16-00141   Doc 7   Filed 05/20/16   Entered 05/20/16 11:19:50   Desc Main
Document   Page 14 of 16

39.    The Judgment rendered against Gouletas in the Underlying Suit was for willful and malicious injury by Gouletas to Plaintiff and the property of Plaintiff. Accordingly, Gouletas is not entitled to a discharge of the debt owed to Plaintiff in connection with the Judgment.

**ANSWER:**    Deny.

### COUNT THREE
### (Denial Of Discharge
### Pursuant To 11 U.S.C. §727(a)(2))

40.    Pursuant to 11 U.S.C. §727(a)(2), a debtor's bankruptcy discharge should be denied where "(2) the debtor, with intent to hinder, delay or defraud a creditor . . . has transferred . . . or concealed (A) property of the debtor within one year before the date of the filing of the petition . . .."

**ANSWER:**    Gouletas admits that the cited statute so provides. Gouletas denies that it is applicable to this case.

41.    The course of conduct set forth above shows that Gouletas, with intent to hinder, delay or defraud a creditor, transferred or concealed his property within one year before the date of the filing of his bankruptcy petition on January 17, 2016. Accordingly, Gouletas should be denied a bankruptcy discharge pursuant to 11 U.S.C. §727(a)(2).

**ANSWER:**    Deny.

### AFFIRMATIVE DEFENSES

1.    Plaintiff lacks standing to pursue its claim.  The duly appointed manager of 800 S. Wells Commercial, LLC has not authorized this action.  Rather, D.A.N. Joint Venture III, L.P., the alter ego of Daniel Cadle and a creditor of 800 S. Wells Commercial, LLC. has pursued this and other unauthorized actions against the debtor and others, falsely claiming that it stands in the shoes of 800 S. Wells Commercial, LLP.'s members and manager.

2.    Counts I and II of Plaintiff's complaint are barred under the doctrine of *res judicata.*  On January 23, 2014, Plaintiff sought and received a judgment against the debtor on Count Two only of its Third Amended Complaint in the case entitled *800 S. Wells Commercial,*

*LLC v. Gouletas, et al*, 11 L 2895 in the Circuit Court of Cook County, Illinois ("the Law Division Case"). Count Two of the Law Division Case sought damages against Gouletas for "Mismanagement" only. Count One of the Law Division Case – the Count that Plaintiff did not seek a default judgment upon – made a claim against Gouletas for breach of fiduciary duty. Plaintiff did not seek and did not receive a judgment against Gouletas for fraud or breach of fiduciary duty. Further, Cadle's Affidavit filed in support of its Default Judgment on Count II alleged solely as its basis the accusation that Gouletas "mismanaged" the plaintiff, resulting in a judgment of foreclosure previously being entered against 800 S. Wells Commercial LLC and in favor of the entity in first position ahead of Cadle's company, D.A.N. Joint Venture III LLP. (*see* Exhibit A.). Accordingly, the judgment entered against Gouletas in the Law Division Case – the case upon which its claims on Counts I and II herein are based – precludes any claim here that Gouletas acted fraudulently, wilfully, maliciously or in breach of his fiduciary duty.

3. Plaintiff's claims are barred by the equitable doctrine of unclean hands. Plaintiff has pursued its claims in this Court and in the Circuit Court of Cook County with the knowledge that it did not have authority to do so.

WHEREFORE, Nicholas S. Gouletas respectfully requests that the Court enter judgment in his favor and against Plaintiff on Counts I-II of its Complaint, award Gouletas his costs of suit and attorneys' fees and grant such further relief as the Court deems just and proper.

-15-

## NICHOLAS S. GOULETAS

By:___ /s/ ____ Howard L. Teplinsky_____

Howard L. Teplinsky – 6197501
Beermann Pritikin Mirabelli Swerdlove LLP
161 N. Clark Street, Suite 2600
Chicago, IL 60601
312-621-9700

# Px B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 800 S. WELLS COMMERCIAL LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 11 L 002895 |
| | ) | |
| NICHOLAS S. GOULETAS; 800 S. | ) | Cal. N. |
| WELLS; PHASE I LLC; (a/k/a RIVER | ) | |
| CITY COMMERCIAL); HORWOOD | ) | |
| MARCUS & BERK CHARTERED; | ) | |
| INVESCO MANAGEMENT COMPANY, | ) | |
| INC. (d/b/a AMERICAN INVESCO); | ) | |
| JOHN CADDEN; and | ) | |
| RIVER CITY PARKING LLC; | ) | |
| Defendants. | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED COMPLAINT

Defendants Nicholas S. Gouletas ("Gouletas"), Invsco Management Company Inc. (d/b/a American Invsco) ("American Invsco"), and John Cadden ("Cadden")(collectively referred to herein as the "Invsco Defendants"), by and through their attorneys, Lynch & Stern LLP, hereby state as follows as their Answer to the Third Amended Complaint:

Plaintiff was the owner of the long-term leasehold interests in the commercial space and underground parking garage at the River City Complex in Chicago, Illinois. This suit involves the Defendants' (a) breach of fiduciary duties in connection with the option to acquire the River City Complex underground parking garage, and (b) mismanagement of the River City Complex commercial space.

**ANSWER:**    The Invsco Defendants admit that at one time the Plaintiff owed the long-term leasehold interests described in the first sentence of the introductory paragraph. The Invsco Defendants deny the remaining allegations of this paragraph.

### Parties

1.    **Plaintiff**. Plaintiff 800 South Wells Commercial LLC ("800 SWC") is an Illinois limited liability company with its principal place of business in Cook County, Illinois.



**ANSWER:**    The Invsco Defendants admit the allegations of Paragraph 1.  Further answering,

the Invsco Defendants state that non-party D.A.N. Joint Venture III, LP ("DAN") currently

operates the Plaintiff for the sole benefit of DAN, and that Plaintiff brings this lawsuit in

furtherance of that purpose.

2.    **Defendants.**

2.1.    Defendant Nicholas S. Gouletas ("Gouletas") is an individual resident of Cook
County, Illinois. At all times relevant to this suit, Gouletas was the duly appointed manager of
Plaintiff who dominated and controlled the business affairs and operations of Plaintiff.

**ANSWER:**    The Invsco Defendants admit the allegations of the first sentence of Paragraph

2.1.  The Invsco Defendants further answer that Gouletas was the duly appointed manager of

Plaintiff from approximately January 5, 2006 to November 16, 2006.  The Invsco Defendants

deny the remainder of the allegations of Paragraph 2.1.

2.2.    Defendant 800 South Wells Phase I LLC (a/k/a River City Commercial) ("RCC")
is an Illinois limited liability company with its principal place of business in Cook County,
Illinois.

**ANSWER:**    As the allegations of Paragraph 2.2 are not directed at the Invsco Defendants, they

do not respond to those allegations.  To the extent that any of the allegations of Paragraph 2.2

can be construed to be directed at the Invsco Defendants, the Invsco Defendants deny each and

every one of the allegations of Paragraph 2.2.

2.3.    Defendant Horwood Marcus & Berk Chartered ("HMB") is an Illinois law firm
with its principal place of business in Cook County, Illinois.

**ANSWER:**    As the allegations of Paragraph 2.3 are not directed at the Invsco Defendants, they

do not respond to those allegations.  To the extent that any of the allegations of Paragraph 2.3

can be construed to be directed at the Invsco Defendants, the Invsco Defendants deny each and

every one of the allegations of Paragraph 2.3.

2.4.    Defendant Invesco [sic] Management Company, Inc. (d/b/a American Invesco [sic]) ("Invesco") is an Illinois corporation with its principal place of business in Cook County, Illinois.

**ANSWER:**    The Invsco Defendants admit the allegations of Paragraph 2.4.

2.5.    Defendant John Cadden ("Cadden") is an individual resident of Cook County, Illinois. At all times relevant to this suit, Cadden was a vice president of Plaintiff.

**ANSWER:**    The Invsco Defendants admit the first sentence of Paragraph 2.5. Further answering, the Invsco Defendants state that Cadden was a vice president of Plaintiff until approximately November 16, 2006. The Invsco Defendants deny the remainder of the allegations of Paragraph 2.5.

2.6.    Defendant River City Parking LLC ("RCP") is a Michigan limited liability company which conducts business in Cook County, Illinois.

**ANSWER:**    As the allegations of Paragraph 2.6 are not directed at the Invsco Defendants, they do not respond to those allegations. To the extent that any of the allegations of Paragraph 2.6 can be construed to be directed at the Invsco Defendants, the Invsco Defendants deny each and every one of the allegations of Paragraph 2.6.

<u>Facts</u>

3.    In 1997, the River City Complex located at 800 South Wells Street, Chicago, Illinois consisted of (a) an apartment complex of 448 apartments; (b) 240,000 square feet of commercial/retail/office space (the "Commercial Space"); (c) a 133 space underground parking garage (the "Parking Garage"); (d) a surface parking lot; and (e) a 64 slip marina on the Chicago River.
**ANSWER:**    The Invsco Defendants admit that the allegations of Paragraph 3 appear to be approximately correct.

4.    In April of 1997 a Gouletas-related entity, American Invesco [sic] Development Corporation, purchased the River City Complex for $41,300,000. Sometime thereafter, Plaintiff became the owner of the long-term leasehold interests in the Commercial Space and the Parking Garage. From the time of acquisition of the above leasehold interests until November 16, 2006, Gouletas was the owner of 50% of the membership interests in Plaintiff; was the duly appointed manager of Plaintiff; and dominated and controlled the business affairs and operations of Plaintiff.

**ANSWER:**   The Invsco Defendants admit that American Invsco Development Corporation purchased the River City Complex in approximately April of 1997 and that the purchase price alleged appears to be approximately correct. The Invsco Defendants further answer that the documents that would establish the validity of these allegations are in the possession of the Plaintiff. The Invsco Defendants admit the second sentence of Paragraph 4. The Invsco Defendants admit that Gouletas owned 50% of the membership interests in Plaintiff and was the duly appointed manager of Plaintiff from approximately January 5, 2006 to November 16, 2006. The Invsco Defendants deny the remainder of the allegations of Paragraph 4.

5.   By late 2005, approximately 425 of the 448 residential apartments in the River City Complex had been converted by Gouletas-related entities into condominiums and sold to purchasers at a substantial profit to Gouletas and Gouletas-related entities. These condominium conversions, in turn, created a demand for individually deeded condominium parking spaces at the River City Complex.

**ANSWER:**   The Invsco Defendants answer that the terms "late 2005," "substantial profit" and "Gouletas-related entities" are not sufficiently clear so as to allow for a proper response to the first sentence of Paragraph 5. The Invsco Defendants lack sufficient knowledge as to how many apartments had converted into condominiums and sold to purchasers by the end of 2005 and therefore neither admit nor deny those allegations. Further answering, the Invsco Defendants state that that the documents that would establish the validity of these allegations are in the possession of the Plaintiff. The Invsco Defendants deny the remainder of the allegations of Paragraph 5.

6.   In 2005, the highest and best use for the Parking Garage at the River City Complex was to sell the parking spaces as individually deeded condominium units, which would generate over $5,500,000 in sale proceeds to Plaintiff. As of late 2005, however, Gouletas had refinanced the leasehold interests in the Commercial Space and the Parking Garage on numerous occasions, which were encumbered by two substantial leasehold mortgages. The first mortgage was comprised of two loans from Parkway Bank and Trust Company ("Parkway") to Plaintiff in the original principal amounts of $16,500,000 and $2,000,000 (the "First Mortgage"). By the

end of 2005, the First Mortgage loan was current, with the amount owed by Plaintiff to Parkway totaling approximately $11,750,000.

**ANSWER:**   The Invsco Defendants answer that the first sentence of Paragraph 6 consists of opinions and conclusions, to which no response is required.  To the extent that the first sentence of Paragraph 6 contains allegations of fact, the Invsco Defendants deny those allegations.  The Invsco Defendants answer that the terms "late 2005" and "substantial mortgage" are not sufficiently clear so as to allow for a proper response to the second sentence of Paragraph 6. The Invsco Defendants admit the allegations of the third and fourth sentence of Paragraph 6. The Invsco Defendants deny the remainder of the allegations of Paragraph 6.

7.   The Commercial Space and the Parking Garage were also encumbered by a second leasehold mortgage lien in favor of CIB Bank ("CIB"), which was comprised of a $5,900,000 loan from CIB to Plaintiff (the "Second Mortgage"). In March of 2005 the Second Mortgage was acquired by D.A.N. Joint Venture III, L.P. ("DJV"). By the end of 2005, the Second Mortgage loan was in default, with the amount owed by Plaintiff to DJV totaling approximately $10,000,000.

**ANSWER:**   The Invsco Defendants admit the first sentence of Paragraph 7.  The Invsco Defendants answer that the second sentence of Paragraph 7 was the subject of previous litigation styled *D.A.N. Joint Venture III, LP v. Gouletas, et. al.*, 06 L 12698 (the "Prior Litigation.")   To the extent that the facts contained in the second sentence of Paragraph 7 were not determined by the Prior Litigation, the Invsco Defendants deny these allegations.  The Invsco Defendants lack sufficient knowledge as to how many apartments had converted into condominiums and sold to purchasers by the end of 2005 and therefore neither admit nor deny those allegations.  Further answering, the Invsco Defendants state that that the documents that would establish the validity of these allegations are in the possession of the Plaintiff.

8.   In 2005 WRT-Marc RC LLC ("WRT") was interested in purchasing the Commercial Space from Plaintiff. The Commercial Space, however, was encumbered by the two leasehold mortgage liens referenced above, which totaled in excess of $21,750,000. Because the Commercial Space had been mismanaged and had a much higher than average vacancy rate,

WRT was only willing to offer $10,000,000 to Plaintiff for the Commercial Space and $1,760,000 for the Parking Garage. As a consequence, while WRT's offer of $11,760,000 for the Commercial Space and the Parking Garage was sufficient to cover the amount owed on the First Mortgage, WRT's offering price was not sufficient to cover the amount still owed on the Second Mortgage.

**ANSWER:**    The Invsco Defendants admit the first sentence of Paragraph 8.    Further answering, the Invsco Defendants admit that in 2005, the leasehold interest in the Commercial Space was encumbered by a first and second mortgage.  Unless expressly admitted, the Invsco Defendants deny the remaining allegations of Paragraph 8.

9.    WRT realized, however, that if it purchased the First Mortgage from Parkway for $11,760,000, and then foreclosed on the Commercial Space and the Parking Garage, WRT could wipe out the $10,000,000 Second Mortgage leasehold lien position. Under this strategy, WRC could eliminate the Second Mortgage, and thereby acquire free and clear title to the Commercial Space and the Parking Garage.

**ANSWER:**    Paragraph 9 consists of legal conclusions and speculation as to which no response is required.  To the extent that the allegations of Paragraph 9 can be construed to be factual allegations, the Invsco Defendants lack sufficient knowledge as to these allegations and therefore neither admit nor deny the allegations of Paragraph 9.

10.    In December of 2005 WRT asked Cadden, a vice president of Plaintiff, if Plaintiff would agree to an uncontested foreclosure on the Commercial Space and the Parking Garage. Plaintiff, through its vice president, Cadden, responded that Plaintiff would not agree to an uncontested foreclosure unless Plaintiff, as the owner of the long-term leasehold interest in the Parking Garage, was granted an option to acquire full ownership of the Parking Garage at WRT's cost. WRT agreed with Plaintiff's counter-proposal.

**ANSWER:**    The Invsco Defendants deny the allegations of Paragraph 10.

11.    In mid-January of 2006, WRT and Plaintiff (through Cadden) agreed that if (a) Plaintiff did not contest WRT's foreclosure proceedings on the Commercial Space and the Parking Garage, and (b) WRT was able to acquire title to those leasehold interests at the foreclosure sale, WRT would grant Plaintiff an option to acquire the Parking Garage from WRT at WRT's cost (Px 1) (the "Original Option Agreement").

**ANSWER:**    The Invsco Defendants deny the allegations of Paragraph 11.

12.     The corporate opportunity reflected by the Original Option Agreement was accorded by WRT to Plaintiff (Px 1), was agreed to by WRT and Plaintiff, and was a business opportunity and a valuable asset of Plaintiff. After paying all expenses and the cost of condominium conversion of the Parking Garage, the net profit from Plaintiff's exercise of the Original Option Agreement and the subsequent sale of the condominium parking spaces would have exceeded $3,500,000.

**ANSWER:**     The Invsco Defendants deny the allegations of Paragraph 12.

13.     At all times relevant to this suit, Gouletas and Cadden were officers of Plaintiff who owed fiduciary duties to Plaintiff to maximize the business opportunities available to Plaintiff and to not divert Plaintiff's business opportunities away from Plaintiff to other Gouletas-related entities. Shortly after WRT and Plaintiff entered into the Original Option Agreement, however, Gouletas and Cadden learned that if the option to acquire the Parking Garage was placed in the name of Plaintiff, the $3,500,000 in net profit from the condominium conversion of the Parking Garage would have to be shared with Plaintiff's other creditors, including the owner and holder of the Second Mortgage loan, DJV.

**ANSWER:**     The Invsco Defendants admit that Gouletas was the manager of Plaintiff and that

Cadden was the vice president; the remaining allegations of the first sentence of Paragraph 13

consist of legal conclusions to which no response is required.  The Invsco Defendants deny the

remaining allegations of Paragraph 13.   Unless expressly admitted, the remainder of the

allegations of Paragraph 13 are denied.

14.     In mid-January of 2006 Cadden informed Kenneth W. Bosworth, Esq. ("Bosworth"), a partner at HMB, about the terms of the Original Option Agreement, including the fact that WRT and Cadden, on behalf of Plaintiff, had agreed that Plaintiff, as the borrower, would have the right to acquire the Parking Garage at WRT's cost. Shortly thereafter, on January 23, 2006 Bosworth forwarded a Memorandum to Cadden wherein Bosworth recommended that "[a] new entity . . . would execute an agreement with Marco [WRT] whereby they [the new entity] would have an option to acquire the parking on the property [the Parking Garage] pursuant to the terms and provisions that you [Cadden] have outlined to me." (Px 1.5 p. 6) Accordingly, in mid-January of 2006, and into February and March of 2006, Gouletas and Cadden, with the knowing and substantial assistance of Bosworth and HMB, came up with a plan to place the option to acquire the Parking Garage in the name of another Gouletas-related entity that was not subject to the claims of Plaintiff's creditors.

**ANSWER:**     The Invsco Defendants deny the allegations of the first and third sentence of

Paragraph 14.   As to the second sentence, the Invsco Defendants refer to Px 1.5 for its full and

complete contents and deny any allegations contrary thereto.

15.    On March 29, 2006 Gouletas, with the knowing and substantial assistance of Cadden, Bosworth and HMB, had the formal written option to acquire the Parking Garage placed not in the name of Plaintiff, but rather placed in the name of another Gouletas-related entity, RCC. (Px 2) Then, on the same date, Gouletas and Cadden, with the knowing and substantial assistance of Bosworth, HMB, RCC and RCP, transferred the written option to acquire the Parking Garage to another Gouletas-related entity, RCP. (Px 3) The Defendants' wrongful scheme is diagramed as follows:

**RIVER CITY COMPLEX**

| APARTMENTS/ RESIDENTIAL CONDOS |
| :---: |
| COMMERCIAL SPACE |
| UNDERGROUND PARKING GARAGE |



**ORIGINAL OPTION AGREEMENT**
(a)    A right and asset accorded to Plaintiff 800 SWC (Px 1) to purchase the underground Parking Garage at WRT's cost.
(b)    Wrongfully diverted to another Gouletas-related entity, RCC. (Px 2)

**ANSWER:**    The Invsco Defendants refer to Px 2 and 3 for their full and complete contents and deny any allegations contrary thereto.    The Invsco Defendants deny the remainder of the allegations of Paragraph 15.

16.    The Original Option Agreement is confirmed in Px 1, which was supposed to be an option that was accorded to Plaintiff. As admitted by Cadden (who was an officer of Plaintiff), when he negotiated the basic agreement reflected by Px 1 (SW00513), he was negotiating on behalf of Plaintiff. (Px B p. 56) Further, Cadden admitted that when he negotiated the basic agreement reflected by Px 1, he believed that there was an economic opportunity to Plaintiff for conversion of the parking spaces in the Parking Garage to condominium ownership. (Px B pp. 56-57) In addition, Cadden admitted that when he negotiated the Original Option Agreement marked as Px 1 (SW00513), he was working as a vice president of Plaintiff. (Px B p. 57).

**ANSWER:**    The Invsco Defendants deny the allegations of Paragraph 16.  Further answering,

The Invsco Defendants state that the quoted portions of Mr. Cadden's transcripts are taken out of

context.[1]  Specifically, at another portion in the transcript, Mr. Cadden clarified that he was

negotiating for an option agreement on behalf of 800 South Wells Phase One, LLC.

(Defendants' Exhibit 1, pp. 20-21 of the transcript marked as Px. B).

17.    The Original Option Agreement is not Px 2, but rather is confirmed in Px 1, which was a corporate opportunity that was accorded to Plaintiff. (See Px B pp. 4-6 & 55-57) Px 2 reflects the diversion of the Original Option Agreement from Plaintiff to a Gouletas-related entity, RCC, which was part of the scheme by the Defendants to breach fiduciary duties owed to Plaintiff.

**ANSWER:**    The Invsco Defendants deny the allegations of Paragraph 17.  Further answering,

the Invsco Defendants state that the quoted portions of Mr. Cadden's transcripts are taken out of

context.

18.    Regardless of the documentation reflecting the diversion of the Original Option Agreement (Px 1) away from Plaintiff to Gouletas-related entities (as reflected by Pxs 2 & 3), the Defendants' breach of fiduciary duties was the diversion of an asset that was promised to Plaintiff --the Original Option Agreement (Px 1) --to another Gouletas-related entity, RCC. Further, regardless of who originally held fee-title interest, the option to acquire the Parking Garage originally was promised to Plaintiff (Px B pp. 56-57; Px 1), but, pursuant to the conspiracy by the Defendants, was diverted to another Gouletas-related entity, RCC.

**ANSWER:**    The Invsco Defendants deny the allegations of Paragraph 18.  Further answering,

The Invsco Defendants state that the quoted portions of Mr. Cadden's deposition are taken out of

context.  Specifically, at another portion in the deposition, Mr. Cadden clarified that he was

negotiating for an option agreement on behalf of 800 South Wells Phase One, LLC.

(Defendants' Exhibit 1, pp. 20-21 of the transcript marked as Px. B).

19.    The First Mortgage loan matured on February 13, 2006. At maturity, the principal balance due on that loan totaled approximately $11,758,791, which was not paid by Plaintiff. After WRT acquired the First Mortgage from Parkway, on April 24, 2006 WRT filed suit in WRT-Marc RC LLC v. Parkway Bank & Trust, LLC, No. 06 CH 8134, Circuit Court of Cook County, Illinois, Chancery Division, to foreclose its first mortgage lien on the Commercial Space and the Parking Garage (the "Foreclosure Suit"). As agreed between WRT and Plaintiff, Plaintiff did not contest the foreclosure proceedings. On October 18, 2006 a judgment of foreclosure was entered in the Foreclosure Suit in favor of WRT against Plaintiff in the amount of $12,364,537.60.

---

[1] The Invsco Defendants further note that a large part of page 57 of Px B has been redacted.

**ANSWER:**   The Invsco Defendants admit the allegations of the first, third and fifth sentences of Paragraph 19.   The Invsco Defendants lack sufficient knowledge as to the allegations of the second sentence and therefore neither admit nor deny those allegations.  Further answering, the Invsco Defendants state that the documents that would establish the validity of these allegations are in the possession of the Defendant.  The Invsco Defendants state that the use of the phrase "Plaintiff did not contest the foreclosure proceedings" in the fourth sentence of Paragraph 19 is vague.  The Invsco Defendants affirmatively state that Plaintiff filed an answer to the foreclosure complaint.  Further answering, the Invsco Defendants state that during the pendency of the foreclosure proceedings, DAN took control of the Plaintiff and caused it to file a bankruptcy petition for the purpose of stopping the foreclosure sale.  Additionally, DAN, the entity which now controls and operates Plaintiff, participated in the foreclosure proceedings, arguing against the entry of a judgment of foreclosure and sale based in a large part on the claims raised in th instant complaint.   Furthermore, Plaintiff raised claims in its bankruptcy action substantially similar to those raised here in an effort to stop the foreclosure from proceeding.   Unless expressly admitted, the Invsco Defendants deny the remaining allegations of Paragraph 18.

20.     A foreclosure sale on the Commercial Space and the Parking Garage was then held on July 24, 2007, where WRT was the highest bidder with a credit bid in the amount of $11,500,000.  On October 9, 2007 WRT received foreclosure deeds for Plaintiff's long-term leasehold interests in the Commercial Space and the Parking Garage.  Pursuant to the conspiracy among Gouletas, Cadden, RCC and RCP, the option to acquire the Parking Garage at WRT's cost was diverted to another Gouletas-related entity, RCC (Px 2), and then assigned to still another Gouletas-related entity, RCP. (Px 3)  Thus, Gouletas and Cadden, with the knowing and substantial assistance of HMB, RCC and RCP, diverted the economic opportunity of the option to acquire the Parking Garage at WRT's cost from Plaintiff to RCC, and then from RCC to RCP.

**ANSWER:**   The Invsco Defendants admit the allegations of the first and second sentences of Paragraph 20.  The Invsco Defendants deny the remaining allegations of Paragraph 20.

21.     On November 16, 2006 DJV, as the owner and holder of the Second Mortgage, took over control of the voting rights of Plaintiff, and thereafter removed Gouletas as the manager of Plaintiff.

**ANSWER:**     The Invsco Defendants admit the allegations of Paragraph 21.

22.     All conditions precedent to recovery by Plaintiff have been performed or have occurred.

**ANSWER:**     The Invsco Defendants deny the allegations of Paragraph 22.

23.     Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following counts.

**ANSWER:**     The Invsco Defendants incorporate their responses to all preceding and succeeding paragraphs as the basis of its response to each of the following counts.

### Count One
### (Breach Of Fiduciary Duties
### By Gouletas And Cadden)

The allegations of Count One are not directed at American Invsco and therefore American Invsco makes no response to those allegations.  To the extent that the allegations of Count One can be construed to be directed at American Invsco, American Invsco denies those allegations.

24.     At all relevant times, Gouletas was the duly appointed manager of Plaintiff with the power and the ability to control and direct the business activities and affairs of Plaintiff. Gouletas, as the manager and control person of Plaintiff, owed fiduciary duties to Plaintiff, including the duty of loyalty and the duty of highest good faith. Gouletas breached those duties by diverting the corporate opportunity pertaining to the option to acquire the Parking Garage (Px 1) away from Plaintiff to a Gouletas-related entity, RCC (Px 2), and then from RCC to another Gouletas-related entity, RCP. (Px 3)

**ANSWER:**     Cadden and Gouletas answer that Gouletas was the duly appointed manager of Plaintiff from approximately January 5, 2006 to November 16, 2006.   The second sentence of Paragraph 24 consists of legal conclusions to which no response or required.  The Cadden and Gouletas deny the allegations of the third sentence of Paragraph 24.  Unless expressly admitted, Cadden and Gouletas deny the remaining allegations of Paragraph 24.

11

25.     At all relevant times, Cadden was the vice president of Plaintiff. Cadden, as the vice president of Plaintiff, owed fiduciary duties to Plaintiff, including the duty of loyalty and the duty of highest good faith. Cadden breached those duties by diverting the corporate opportunity pertaining to the option to acquire the Parking Garage (Px 1) away from Plaintiff to a Gouletas-related entity, RCC (Px 2), and then from RCC to another Gouletas-related entity, RCP. (Px 3)

**ANSWER:**     Cadden and Gouletas answer that Cadden was the vice president of Plaintiff until

approximately November 16, 2006.     The second sentence of Paragraph 25 consists of legal

conclusions to which no response or required.  Cadden and Gouletas deny the allegations of the

third sentence of Paragraph 25.  Unless expressly admitted, Cadden and Gouletas deny the

remaining allegations of Paragraph 25.

26.     The option to acquire the Parking Garage at WRT's cost (approximately $1,760,000) was promised to Plaintiff; was an activity in which Plaintiff had the capacity to engage; was of practical advantage to Plaintiff; and was a corporate opportunity of Plaintiff.

**ANSWER:**     Cadden and Gouletas deny the allegations of Paragraph 26.

27.     Plaintiff could have and would have been able to raise sufficient funds (through its new manager, DJV, and otherwise) to allow Plaintiff to exercise the option as reflected by the Original Option Agreement (Px 1) to acquire the Parking Garage, and then convert the Parking Garage into individual condominium units. Had Gouletas and Cadden not diverted Plaintiff's rights under the Original Option Agreement (Px 1) to RCC and RCP, Plaintiff could have and would have been able to exercise the option, and thus acquire the Parking Garage from WRT at WRT's cost. The wrongful conduct of Gouletas and Cadden as set forth above caused direct, proximate and consequential damages to Plaintiff in the amount of at least $3,500,000.

**ANSWER:**     Cadden and Gouletas lack sufficient knowledge as to the allegations of the first

sentence of Paragraph 27 and therefore neither admit nor deny the same.  Cadden and Gouletas

deny the remainder of the allegations of Paragraph 27.

28.     At all times relevant to this suit, Gouletas' adverse domination and control of Plaintiff prevented Plaintiff from suing Gouletas and Cadden for the above-described breach of fiduciary duties that were owed by Defendants to Plaintiff. Thus, Plaintiff was first able to pursue the claims alleged herein no earlier than November 16, 2006, the date that Gouletas was removed from the position as manager and control person of Plaintiff.

**ANSWER:**     Cadden and Gouletas deny the allegations of Paragraph 28.

<u>**Prayer As To Count One**</u>

Plaintiff respectfully requests that Plaintiff have judgment against Defendants Gouletas and Cadden, jointly and severally, for direct, proximate and consequential damages in the amount of $3,500,000, along with pre-and post-judgment interest at the highest lawful rate.

**ANSWER:**    To the extent a response is required to the Plaintiff's prayer for relief, the Invsco

Defendants deny the allegations contained therein.

<u>**Count Two**</u>
**(Mismanagement By**
**Gouletas And Invesco [sic])**

The allegations of Count Two are not directed at Cadden and therefore Cadden makes no

response to those allegations.  To the extent that the allegations of Count Two can be construed

to be directed at Cadden, Cadden denies those allegations.

     29.    Gouletas was the former manager of Plaintiff 800 SWC. As the manager and control person of Plaintiff, Gouletas had a duty to manage the business operations of Plaintiff in such a manner as to maximize the profits of Plaintiff.  Further, Gouletas hired a Gouletas-related company, Invesco [sic], to manage the Commercial Space in exchange for management fees paid by Plaintiff to Invesco [sic]. On information and belief, Gouletas has controlled, and continues to control, the business and operations of Invesco [sic].

**ANSWER:**    Gouletas and American Invsco admit the allegations of the first sentence of

Paragraph 29.  The second sentence of Paragraph 29 is a legal conclusion to which no response is

required.  To the extent that the second sentence of Paragraph 29 can be construed to contain

allegations of fact, Gouletas and American Invsco deny those allegations.    Gouletas and

American Invsco admit that American Invsco was hired to manage the Commercial Space.

Unless expressly admitted, Gouletas and American Invsco deny the remaining allegations of

Paragraph 29.

     30.    From 2001 until November 16, 2006, Gouletas and Invesco [sic] grossly mismanaged Plaintiff by (a) diverting income and assets from Plaintiff to other Gouletas-related entities; (b) not authorizing the expenditure of sufficient funds to upgrade the rental spaces; (c) not leasing out the Commercial Space to the point where an acceptable vacancy level of 15% or

less could be reached; and (d) leasing out prime portions of the Commercial Space to Gouletas-related entities at below market rates.

**ANSWER:**   Gouletas and American Invsco deny the allegations of Paragraph 30.

31.   At all relevant times, a vacancy rate of 15% or less was a commercially reasonable vacancy rate for the Commercial Space, with a vacancy rate in excess of 15% constituting mismanagement. Indeed, Gouletas has admitted that a vacancy rate in excess of 15% for the Commercial Space would constitute mismanagement, and that whoever allowed the vacancy rate for the Commercial Space to exceed 15% should be held responsible for mismanagement. Further, Gouletas has admitted that the failure to lease out the additional vacant Commercial Space was mismanagement, which caused harm and damage to Plaintiff 800 SWC. As of October 15, 2004, however, Gouletas and Invesco [sic] had let the vacancy rate for the Commercial Space increase to 28.2%, with vacancy rates thereafter increasing above 30%.

**ANSWER:**   Gouletas and American Invsco deny the allegations of Paragraph 31.

32.   Moreover, on July 1, 2001 Gouletas and Invesco [sic] had Plaintiff enter into a 10-year lease with another Gouletas-related entity, American Invesco [sic] Realty, for 4,000 square feet of prime commercial space at the rate of $5.99 per square foot, which was far below the market rate of approximately $14.00 per square foot.

**ANSWER:**   Gouletas and American Invsco admit that Plaintiff and American Invsco Realty

entered into a 10 year lease on or about July 1, 2001. Unless expressly admitted, Gouletas and

American Invsco deny the remaining allegations of Paragraph 33.

33.   Further, Gouletas has admitted that the mismanagement of Plaintiff 800 SWC by failing to lease out the additional Commercial Space hurt the fair market value of the leasehold rights in the Commercial Space, and if the Commercial Space had been leased out properly, the leasehold interests in the Commercial Space and the Parking Garage would have been worth $23,000,000, which was two times the value that those leasehold interests sold for at the foreclosure sale. Further, Gouletas has admitted that if the Commercial Space had been properly managed by leasing out additional vacant space, the foreclosure sale of the Commercial Space and the Parking Garage in November of 2006 would have brought in sufficient money to pay off both the First Mortgage and the Second Mortgage.

**ANSWER:**   Gouletas and American Invsco deny the allegations of Paragraph 33.

34.   Gouletas was an owner of 50% of Plaintiff 800 SWC, and, on information and belief, was the owner (through entities that he owned or controlled) of other office buildings in downtown Chicago. On information and belief, at the same time that Gouletas and Invesco [sic] were mismanaging Plaintiff by failing to lease out vacant portions of the Commercial Space, they were diverting prospective tenants to other commercial spaces in other buildings which were owned, controlled and/or managed by Gouletas, Invesco [sic] or other Gouletas-related

entities, or were otherwise preferring the interests of other Gouletas-related office buildings to the detriment of Plaintiff.

**ANSWER:**   Gouletas and American Invsco admit that at one point, Gouletas owned a 50%

interest in Plaintiff.  Gouletas and American Invsco further admit that from time to time Gouletas

had ownership interests in other buildings in the Chicago area.  Unless expressly admitted,

Gouletas and American Invsco deny the remaining allegations of Paragraph 34.

  35. Gouletas and Invesco [sic] did not exercise their management of the affairs of Plaintiff solely in the best interests of Plaintiff, and were not diligent and careful in carrying out the fiduciary duties that they owed to Plaintiff. Rather, Gouletas and Invesco [sic] were in a position where their personal interests would prevent them from acting for the best interests of Plaintiff, and displayed a profound lack of due care in their management of the affairs of Plaintiff.

**ANSWER:**   Gouletas and American Invsco deny the allegations of Paragraph 35.

  36. As a result of the mismanagement of the Commercial Space by Gouletas and Invesco, Plaintiff did not realize full market value for the Commercial Space and the Parking Garage when they were sold for $11,500,000 at the foreclosure sale on July 24, 2007. Had Gouletas and Invesco [sic] properly managed the Commercial Space and maintained a vacancy rate of 15% or below, the sale of the Commercial Space and Parking Garage leasehold interests in July of 2007 would have generated enough income to pay off both the First Mortgage and the Second Mortgage. Indeed, if the Commercial Space had been properly managed by Gouletas and Invesco [sic], the Commercial Space and the Parking Garage would have been worth two times the value that they sold for on July 24, 2007. Accordingly, the gross mismanagement of Plaintiff by Gouletas and Invesco [sic] resulted in direct, proximate and consequential damages to Plaintiff in the amount of $11,500,000.

**ANSWER:**   Gouletas and American Invsco deny the allegations of Paragraph 34.

  37. At all times relevant to this suit, Gouletas' adverse domination and control of Plaintiff prevented Plaintiff from suing Gouletas and Invesco [sic] for the above-described mismanagement and breach of fiduciary duties that were owed by Defendants to Plaintiff. Thus, Plaintiff was first able to pursue the claims alleged herein no earlier than November 16, 2006, the date that Gouletas was removed from the position of manager and control person of Plaintiff.

**ANSWER:**   Paragraph 37 consists of legal conclusions to which no response is required.  To

the extent that the second sentence of Paragraph can be construed to contain allegations of fact,

Gouletas and American Invsco deny those allegations.  Gouletas and American Invsco admit that

American Invsco was hired to manage the Commercial Space. Unless expressly admitted, Gouletas and American Invsco deny the remaining allegations of Paragraph 37.

### Prayer as to Count Two

Plaintiff respectfully requests that Plaintiff have judgment against Defendants Gouletas and Invesco [sic], jointly and severally, for direct, proximate and consequential damages in the amount of $11,500,000, along with pre-and post-judgment interest at the highest lawful rate.

**ANSWER:**   To the extent a response is required to the Plaintiff's prayer for relief, Gouletas and American Invsco deny the allegations contained therein.

### Count Three
### (Aiding And Abetting Breach Of
### Fiduciary Duties By HMB, RCC And RCP)

The allegations of Count Three are not directed at the Invsco Defendants and therefore the Invsco Defendants make no response to those allegations. To the extent that the allegations of Count Two can be construed to be directed at the Invsco Defendants, the Invsco Defendants deny those allegations.

38.     Plaintiff realleges ¶¶1-23 above as part of this Count Three.

39.     RCC and RCP, as Gouletas-related entities, provided knowing and substantial assistance to Gouletas and Cadden in breaching their fiduciary duties to Plaintiff by assisting with the diversion of the option to acquire the Parking Garage from Plaintiff to RCC, and then from RCC to RCP.

40.     By late 2005 and early 2006, Bosworth and HMB were long-standing counsel to Gouletas and various Gouletas-related entities, including RCC, and were counsel to Gouletas in connection with WRT's efforts to foreclose on and acquire ownership of the Commercial Space. As a consequence, Bosworth and HMB knew that on January 31, 2006 WRT and Plaintiff had agreed to the Original Option Agreement (Px 1) whereby if Plaintiff did not contest WRT's foreclosure proceedings on the Commercial Space and the Parking Garage, and WRT was able to acquire title to those leasehold interests at the foreclosure sale, WRT would accord Plaintiff an option to acquire the Parking Garage from WRT at WRT's cost. (Px 1.5)

41.     Further, Bosworth and HMB knew that, as of early 2006 and into the spring of 2006, Gouletas was the manager of Plaintiff and Cadden was the vice president of Plaintiff, and thus they knew that Gouletas and Cadden owed fiduciary duties to Plaintiff to not divert

corporate opportunities from Plaintiff to other Gouletas-related entities. Accordingly, HMB knew it was a breach of Gouletas' and Cadden's fiduciary duties for Gouletas and Cadden to arrange for the diversion of the option to acquire the Parking Garage (Px 1) from Plaintiff to a Gouletas-related entity, RCC (Px 2), and then from RCC to another Gouletas-related entity, RCP. (Px 3)

42.    In mid-January of 2006, Bosworth and HMB had specific knowledge that the business opportunity reflected by the Original Option Agreement was originally accorded to Plaintiff (Px 1.5), and provided knowing and substantial assistance in the diversion of that business opportunity from Plaintiff to other Gouletas-related entities. In connection with the diversion of the business opportunity reflected by the Original Option Agreement from Plaintiff to other Gouletas-related entities, HMB was not acting as counsel for Plaintiff. Rather, HMB provided knowing and substantial assistance to Gouletas and Cadden in their breach of fiduciary duties that they owed to Plaintiff.

43.    In mid-January of 2006, and carrying into February and March of 2006, HMB provided knowing and substantial assistance to Gouletas and Cadden in their breach of fiduciary duties owed to Plaintiff by advising and counseling Gouletas and Cadden on ways to divert the option to acquire the Parking Garage from Plaintiff to other Gouletas-related entities, and negotiating, drafting, reviewing and preparing the documents for the placement of the option in the name of RCC and RCP. HMB's knowing and substantial assistance to Gouletas and RCC in breaching their fiduciary duties to Plaintiff was not part of HMB's performance of legal services for Plaintiff, but rather was part of HMB's desire to assist Gouletas and RCC in diverting the Original Option Agreement (Px 1) from Plaintiff to RCC. Accordingly, HMB did not provide legal services to Plaintiff in connection with the diversion of the Option Agreement from Plaintiff to RCC, but rather provided knowing and substantial assistance to Gouletas and RCC in their breach of fiduciary duties owed to Plaintiff.

44.    Plaintiff could have and would have been able to raise sufficient funds (through its new manager, DJV, and otherwise) to allow Plaintiff to exercise the option as reflected by the Original Option Agreement (Px 1) to acquire the Parking Garage, and then convert the Parking Garage into individual condominium units. Had Gouletas and Cadden not diverted Plaintiff's rights under the Original Option Agreement (Px 1) to RCC and RCP, Plaintiff could have and would have been able to exercise the option, and thus acquire the Parking Garage from WRT at WRT's cost. The wrongful conduct of Gouletas, Cadden, RCC, RCP and HMB as set forth above caused direct, proximate and consequential damages to Plaintiff in the amount of at least $3,500,000.

45.    At all times relevant to this suit, Gouletas' adverse domination and control of Plaintiff prevented Plaintiff from suing RCC, RCP and HMB for the above-described aiding and abetting breach of fiduciary duties that were owed by Defendants to Plaintiff. Thus, Plaintiff was first able to pursue the claims alleged herein no earlier than November 16, 2006, the date that Gouletas was removed from the position of manager and control person of Plaintiff.

### Prayer As To Count Three

Plaintiff respectfully requests that Plaintiff have judgment against Defendants HMB, RCC and RCP, jointly and severally, for direct, proximate and consequential damages in the amount of $3,500,000, along with pre- and post-judgment interest at the highest lawful rate.

### Count Four
#### (Potential Punitive Damage Claim)

46.    Pursuant to the Court's August 8, 2012 Order, Plaintiff reserves the right to seek leave of court at the close of discovery to replead a claim for punitive damages.

**ANSWER:**    Pursuant to the Court's order dated August 8, 2012, Plaintiff's prayer for punitive damages has been stricken. The Invsco Defendants object to the inclusion of a "potential" claim as improper. To the extent a response is required to Paragraph 46, the Invsco Defendants deny the allegation that Plaintiff is entitled to punitive damages.

### PRAYER

Plaintiff respectfully requests:
(1)    that Plaintiff have judgment against Defendants Gouletas and Cadden, jointly and severally, for the direct, proximate and consequential damages requested in Count One;
(2)    that Plaintiff have judgment against Defendants Gouletas and Invesco, jointly and severally, for the direct, proximate and consequential damages requested in Count Two;
(3)    that Plaintiff have judgment against HMB, RCC and RCP, jointly and severally, for the direct, proximate and consequential damages requested in Count Three;
(4)    that the Court grant Plaintiff pre-and post-judgment interest at the highest lawful rate; and
(5)    that the Court grant Plaintiff court costs and such other and further relief to which Plaintiff may be entitled.

**ANSWER:**    To the extent a response is required to the Plaintiff's prayer for relief, the Invsco Defendants deny the allegations contained therein, and pray for the entry of an order dismissing the Plaintiff's claims; entering judgment in favor of the Invsco Defendants and against Plaintiff, and awarding the Invsco Defendants their costs.

### AFFIRMATIVE DEFENSES

Defendants Nicholas S. Gouletas ("Gouletas"), Invsco Management Company Inc. (d/b/a American Invsco) ("American Invsco"), and John Cadden ("Cadden")(collectively referred to

18

herein as the "Invsco Defendants"), by and through their attorneys, Lynch & Stern LLP, hereby state as follows as their affirmative defenses to Plaintiff's Third Amended Complaint:

### First Affirmative Defense – Failure to Mitigate

1.      WRT-Marc RC LLC v. Parkway Bank & Trust, LLC, No. 06 CH 8134, Circuit Court of Cook County, Illinois, Chancery Division (the "Foreclosure Suit") commenced on or about April 24, 2006.

2.      On or about October 18, 2006, a judgment of foreclosure and sale was entered. A judicial sale of the judgment of foreclosure and sale entered in favor of WRT-Marc in the Foreclosure Suit was scheduled for November 28, 2006.

3.      On or about November 16, 2006, pursuant to a pledge agreement delivered to CIB Bank, and later assumed by DAN (the "Pledge Agreement,") DAN took over control of the voting rights of Plaintiff, and removed Gouletas as the manager of Plaintiff.

4.      On or about November 27, 2006, DAN caused the Plaintiff to file a voluntary Chapter 11 petition, *In Re: 800 S. Wells, Commercial, LLC*, 06 B 15500 (the "Bankruptcy"). The Bankruptcy was dismissed on or about June 27, 2007.

5.      Throughout the pendency of the Bankruptcy, the Plaintiff, controlled by DAN, continued to take action to prevent the judicial sale of WRT-Marc's judgment of foreclosure and sale from occurring.

6.      Plaintiffs' actions with respect to the Bankruptcy caused the judicial sale of Plaintiff's leasehold interest to be delayed approximately seven months.

7.      Upon information and belief, the sale of Plaintiff's leasehold interest in November of 2006 would have generated substantially more dollars than were ultimately realized by the sale of the subject leasehold when it was ultimately sold.

19

8.      Additionally, Plaintiff, controlled by DAN, made the representation to the court presiding over the Bankruptcy that it since the filing of the Bankruptcy, it had been operating the Property in conjunction with the Receiver.

9.      During the time in which Plaintiff, as controlled by DAN, operated the Property, it failed to find tenants for the vacant space. As such, Plaintiff failed to mitigate the damages it claims to have suffered as a result of the vacancy rates at the Property.

10.      Furthermore, in June of 2006, in connection with the Foreclosure Action, DAN filed a Verified Answer and Affirmative Defenses, a copy of which is attached hereto as Exhibit 2. DAN answered that it disputed that the Mortgage Modification Agreement between 800 SWC, Gouletas and WRT-Marc dated March 29, 2006 was valid and enforceable. Ex. 2, p. 2, ¶ 2(c). A copy of the Mortgage Modification Agreement referenced by DAN was attached to the complaint in the Foreclosure Action, and is attached hereto as Exhibit 3. Notably, paragraph 3.13 of the Mortgage Modification Agreement expressly refers to the Option Agreement that is the subject of the instant litigation. Therefore, DAN was on notice that the Option Agreement existed before June of 2006.

11.      DAN took control of the Plaintiff on November 16, 2006 pursuant to a Collateral Pledge and Security Agreement, which allowed DAN to do so once an Event of Default occurred.

12.      Before June of 2006, when DAN was inarguably was aware of the existence of the Option Agreement at issue in this litigation, an Event of Default under the Collateral Pledge and Security Agreement had occurred, as such DAN could have taken control of Plaintiff much sooner and brought the claims that DAN now raises on behalf of the Plaintiff.

13.    Moreover, the facts outlined above establish that Plaintiff was aware of the existence of the Option Agreement before its termination on March 29, 2008. (See Px 2, p. 8). If the Plaintiff's allegations as to its ownership rights in the Option Agreement can be established, which Defendants deny, had Plaintiff brought its claim in a timely manner, it could have caused a transfer of the Option Agreement to itself and avoided the damages it now claims.

**WHEREFORE,** Defendants Nicholas S. Gouletas, Invsco Management Company, Inc. and John Cadden pray for the entry of an order dismissing the Plaintiff's claims; entering judgment in favor of Defendants and against Plaintiff, and awarding Defendants their costs.

<u>**Second Affirmative Defense – Laches**</u>

14.    Defendants incorporate and re-allege Paragraphs 1-13 of their Affirmative Defenses as if fully restated herein.

15.    Plaintiff has been aware of the claims it raises in the Complaint for at least six years.

16.    On March 16, 2007, Plaintiff filed its First Amendment to Bankruptcy Schedules. Thereon, Plaintiff added to Paragraph 21 (Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor and rights to setoff claims) of its Schedule B (Personal Property): "Potential claim against Nicholas Goletas [sic] – preferential and fraudulent transfers to insiders." Exhibit 4.

17.    Likewise, on or about May 25, 2007, Plaintiff filed a disclosure statement in connection with the Bankruptcy which again referenced potential claims against Nicholas Goletas [sic]. Exhibit 5.

18.    The passage of time caused by Plaintiff's delay in bringing its claims will cause prejudice to the Defendants' ability to defend against the allegations. In addition, as a result of

Plaintiff's delay in bringing its claims, the ownership of Parking Structure has changed and the Option Agreement at issue has expired.

19.    The facts outlined above establish that Plaintiff was aware of the existence of the Option Agreement before its termination on March 29, 2008. (See Px 2, p. 8). If the Plaintiff's allegations as to its ownership rights in the Option Agreement can be established, which Defendants deny, had Plaintiff brought its claim in a timely manner, it could have caused a transfer of the Option Agreement to itself and avoided the damages it now claims. Plaintiff's failure to do so has caused prejudice to the Defendants.

**WHEREFORE,** Defendants Nicholas S. Gouletas, Invsco Management Company, Inc. and John Cadden pray for the entry of an order dismissing the Plaintiff's claims; entering judgment in favor of Defendants and against Plaintiff, and awarding Defendants their costs.


Dated: November 30, 2012          Respectfully submitted,

Daniel Lynch                               Nicholas S. Gouletas, Invsco Management
Amy J. Hansen                             Company, Inc. and John Cadden,
LYNCH & STERN, LLP #44520
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606                         By:  _____
312-346-1600 / 312-896-5883 (fax)            One of Their Attorneys

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 800 S. WELLS COMMERCIAL LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-L-002895 |
| | ) | |
| NICHOLAS S. GOULETAS; 800 S. | ) | |
| WELLS, PHASE I LLC; (a/k/a RIVER | ) | |
| CITY COMMERCIAL); HORWOOD | ) | |
| MARCUS& BERK CHARTERED; | ) | |
| INVSCO MANAGEMENT COMPANY, | ) | |
| INC. (d/b/a AMERICAN INVSCO); | ) | |
| JOHN CADDEN; and | ) | |
| RIVER CITY PARKING LLC; | ) | |
| Defendants. | ) | |

### DECLARATION OF WANT OF KNOWLEDGE PURSUANT TO 735 ILCS 5/2-610(b)

I, Nicholas S. Gouletas, after being duly sworn, hereby state under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, that the statements set forth in this instrument are true and correct.

1.       My name is Nicholas S. Gouletas, and I am over the age of twenty-one and am competent to testify to the facts stated herein.

3.       I have read the attached Answer and Affirmative Defenses to Third Amended Complaint; and with respect to those answers therein asserting a lack of knowledge, I lack knowledge or information sufficient to form a belief as to the truth of those allegations of the Third Amended Complaint.

Dated: November 28, 2012

Respectfully submitted,

_____
Nicholas S. Gouletas

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| 800 S. WELLS COMMERCIAL LLC, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>NICHOLAS S. GOULETAS; 800 S. )<br>WELLS, PHASE I LLC; (a/k/a RIVER )<br>CITY COMMERCIAL); HORWOOD )<br>MARCUS & BERK CHARTERED; )<br>INVSCO MANAGEMENT COMPANY, )<br>INC. (d/b/a AMERICAN INVSCO); )<br>JOHN CADDEN; and )<br>RIVER CITY PARKING LLC; )<br>      Defendants. ) | Case No. 11-L-002895 |

## DECLARATION OF WANT OF KNOWLEDGE PURSUANT TO 735 ILCS 5/2-610(b)

      I, Nicholas S. Gouletas, after being duly sworn, hereby state under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, that the statements set forth in this instrument are true and correct.

      1.     My name is Nicholas S. Gouletas, and I am over the age of twenty-one and am competent to testify to the facts stated herein.  I am currently the President of Invsco Management Company, Inc. ("American Invsco").

      3.     I have read the attached Answer and Affirmative Defenses to Third Amended Complaint; and with respect to those answers therein asserting a lack of knowledge, American Invsco lacks knowledge or information sufficient to form a belief as to the truth of those allegations of the Count of Third Amended Complaint.

Dated: November 2𝟺, 2012

Respectfully submitted,

Nicholas S. Gouletas
President of Invsco Management Company, Inc

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 800 S. WELLS COMMERCIAL LLC, | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-L-002895 |
| | ) | |
| NICHOLAS S. GOULETAS; 800 S. | ) | |
| WELLS, PHASE I LLC; (a/k/a RIVER | ) | |
| CITY COMMERCIAL); HORWOOD | ) | |
| MARCUS& BERK CHARTERED; | ) | |
| INVSCO MANAGEMENT COMPANY, | ) | |
| INC. (d/b/a AMERICAN INVSCO); | ) | |
| JOHN CADDEN; and | ) | |
| RIVER CITY PARKING LLC; | ) | |
|      Defendants. | ) | |

### DECLARATION OF WANT OF KNOWLEDGE PURSUANT TO 735 ILCS 5/2-610(b)

I, John Cadden, after being duly sworn, hereby state under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, that the statements set forth in this instrument are true and correct.

1.    My name is John Cadden, and I am over the age of twenty-one and am competent to testify to the facts stated herein.

3.    I have the read the attached Answer and Affirmative Defenses to Third Amended Complaint; and with respect to those answers therein asserting a lack of knowledge, I lack knowledge or information sufficient to form a belief as to the truth of those allegations of the Third Amended Complaint.

Dated: November ___, 2012

Respectfully submitted,

_____
John Cadden

# Px C

6-5-14

*This is an attempt to collect a debt and any information obtained will be used for that purpose.*

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT – LAW DIVISION

| | |
|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco),<br><br>      Defendants. | Case No. 2011-L-002895<br><br>Judgment Amount: $11,550,040.12 plus accruing statutory interest<br><br>Date of Judgment: January 23, 2014<br><br>Judge WHITE; Room 2503; Calendar 5<br><br>Return Date: <u>JULY 10</u>, 2014<br>Return Time: 9:30 a.m. |

### SECOND AMENDED CITATION TO DISCOVER ASSETS

TO: NICHOLAS S. GOULETAS; SEE ATTACHED SERVICE LIST

YOU ARE COMMANDED to appear before Judge WHITE, or any Judge sitting in his stead in Courtroom 2503 of the Richard J. Daley Center, Chicago, IL 60692 on <u>JULY 10</u> ___, 2014, at 9:30 a.m. to be examined under oath to discover assets or income not exempt from the enforcement of the judgment.

Judgment was entered on January 23, 2014 in the Circuit Court of Cook County, Law Division, in favor of Plaintiff 800 SOUTH WELLS COMMERCIAL LLC and against Defendants NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), in the sum of $11,550,040.12, plus accruing *per diem* statutory interest. Further sums may become due as costs and interest accrued.

YOU ARE COMMANDED to produce at the examination: See Exhibit "A" and Rider "A" attached hereto and made a part hereof, along with all books, papers or records in your possession or control which may contain information concerning the property or income of, or indebtedness due judgment debtor.

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of Court or termination of the proceedings.   You are not required to withhold the payment of any money beyond double the amount of the judgment.

WARNING: IF YOU FAIL TO APPEAR AS DIRECTED IN THIS NOTICE, YOU MAY BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE COUNTY JAIL.  735 ILCS 5/2-1402.

F. Dean Armstrong
Armstrong Law Firm
1324 Dartmouth Road
Flossmoor, Illinois  60422
(708) 798-1599
Attorney No. 36232

DOROTHY BROWN
CLERK OF CIRCUIT COURT

JUN 0 5 2014

Clerk of the Court

Deputy Clerk

PX C

## CERTIFICATE OF ATTORNEY

Note: This citation must be accompanied at the time of service by either a copy of the underlying judgment or a certification by either the clerk that entered the judgment or the attorney for the judgment creditor setting forth:

1. Judgment in the amount: $11,550,040.12, plus accruing statutory *per diem* interest;
2. Name of the Court:   Circuit Court of Cook County, Illinois, County Department, Law Division; and
3. Case No. 2011 L 002895.

I, the undersigned, certify under penalties as provided by law pursuant to 735 ILCS 5/1-109 to the Court that the foregoing information is true and correct.

F. Dean Armstrong

## CERTIFICATE OF SERVICE

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, I, F. Dean Armstrong, hereby certify and state under oath that:

I am over 21 years of age and not a party to this case.  Pursuant to the Court's **6|5**, 2014 Order Granting Plaintiff's Motion Pursuant to Special Order, I served the citation to discover assets on **NICHOLAS S. GOULETAS** by (a) having the process server serve a copy of the Amended Citation to Discover Assets and related Citation proceeding papers upon Defendant Gouletas through the doorman at 111 E. Chestnut Street, Chicago, Illinois, with a directive to deliver these papers to Defendant Gouletas' condominium unit at Suite 28K; (b) having the process server serve a copy of an Amended Citation to Discover Assets and related Citation proceedings upon Defendant Gouletas by taping these pleadings to the door at Gouletas' office address at 182 W. Lake Street, Suite 200, Chicago, Illinois 60601; and (c) mailing, by certified mail, return receipt requested, a copy of the Amended Citation to Discover Assets and related Citation proceeding papers to Defendant Gouletas' counsel, Katharine M. Grosh, Esq. at Beermann Pritikin Mirabelli Swerdlove LLP, 161 North Clark Street, Suite 2600, Chicago, IL 60601.

Signature of Attorney

F. Dean Armstrong
Armstrong Law Firm
1324 Dartmouth Road
Flossmoor, Illinois  60422
(708) 798-1599
Attorney No. 36232

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned, **NICHOLAS S. GOULETAS** ("Deponent" or "Judgment Debtor"), hereby certifies and states that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such, the undersigned certifies as aforesaid that (s)he verily believes the same to be true.

Name:

Social Security and/or Tax I.D. Number:

Residence Address and Telephone Number:

Business Address and Telephone Number:

Name of Business/Businesses and/or interest in same for the two (2) years preceding the date of this request, and address of same:

Dependents:

Stocks, Bonds or other Negotiable Instruments, and where they are located:

Automobile(s)- Make, Model, Year, V.I.N., whether the same are insured and by whom (i.e. proof of insurance):

Real Property Owned and how property is held:

Name of your Bank:

Checking Account Number(s):

Savings Account Number(s):

Certificates of Deposit:

Other Personal Property Owned:

Household Goods:

Money and Jewelry on Person:

Any other title or interest and any other property, real or personal, not listed or described above:

By: _____

Printed
Name: _____
**NICHOLAS S. GOULETAS**

## RIDER A

### I.    GENERAL DOCUMENT REQUEST

All books, papers, documents, computer generated or computer readable media possessed or controlled by you, your agent, your fiduciary, your representative or other persons known to you that directly or indirectly relate to your income or assets or interest in assets held within the last seven (7) years and those documents relating to any income or interest in other assets that you (the "Judgment Debtor" or "Deponent") expects to receive in the future, including moneys or assets expected to be received from any individual, group of individuals, partnerships or corporate entities or government entities.   These documents should include but should not be limited to the following:

A.    State and Federal income tax returns, and gift tax returns, for 2002-2013.

B.    All drafts and final versions of any and all personal financial statements (by whatever name known), whether or not distributed to any third party, including, but not limited to, the "draft financial statement" that was referenced at ¶18 of Gouletas' March 24, 2014 affidavit.

C.    All documents evidencing any account held with a brokerage firm, stock firm, investment firm, bank, savings and loan or other financial institution.

D.    All documents evidencing any safe deposit box, storage locker or other secured storage area.

E.    All documents evidencing ownership of or any interest or beneficial interest in real estate or other real property within the last 7 years.

F.    All documents evidencing any trust, including land trusts, in which the judgment debtor has any interest or over which the judgment debtor holds any power whatsoever.

G.    All certificates of deposit or similar deposit instruments in which the judgment debtor has an interest.

H.    All treasury bills, savings bonds or other instruments evidencing indebtedness to the judgment debtor by the federal, state or local government.

I.    All insurance policies insuring any interest the judgment debtor may possess or annuities or similar interests owing to the judgment debtor as a beneficiary.

J.    All stock certificates, bonds, commodity accounts or any evidence regarding ownership of or power of attorney over same.

K.  All documents in your possession or control pertaining to any loan to which the judgment debtor is a party.

L.  All promissory notes or other evidence of indebtedness to the judgment debtor in your possession and control.

M.  All books of account of any business enterprise in which the judgment debtor holds an interest, including, but not limited to, a Profit/Loss Statement, and all Accounts Receivables and Accounts Payable

N.  All titles to automobiles, planes, boats or other vehicles or modes of transportation, including, but not limited to, a 1971 Mercedes Benz CP280, VIN #11102712003878; 1993 Cadillac Sedan Touring 4 Seville STS, VIN #1G6KY5298PU834808; and 1959 Merz. 4D, VIN #300D9500105, including any appraisals of these forms of transportation.

O.  All documents evidencing any pension plan or other tax-deferred plan or account.

P.  Copies of all pleadings involving actions in which the judgment debtor seeks a money judgment in his favor or in which any business or other entity in which the judgment debtor holds a financial interest seeks a money judgment in its favor.

Q.  All documents evidencing any winnings from a state lottery or lawfully acquired winnings through other forms of gambling, including horse racing and games of chance.

R.  All documents evidencing any interest in horses, livestock or other perishable commodities.

## II.  BANK RECORDS

A.  Any and all documents and records of checking, savings, or any other type of account, foreign or domestic, maintained by deponent with any type of financial institution during the last five years, including but not limited to monthly account statements, checks, check registers, check stubs, cancelled checks, and deposit slips.

B.  All documents that refer to, relate to, reflect or concern any transfers made to or from any financial account held for the benefit of deponent, by any third party, for the last five years.

C.  Any and all signature cards that name deponent as an authorized signatory on any financial account, for any entity or other third party, for the past five years.

D.  Any and all financial statements, credit applications or other documents submitted to any financial institution, or any other person or entity, by deponent, for any loan,

credit, extension or advance, in any capacity (borrower, guarantor, or surety) for the past five years.

E.  Any and all documents concerning any interest in, or claimed title to, any certificates of deposit, letters of credit, money orders, cashier's checks, traveler's checks, bank deposits or escrow funds owned or held be deponent in the past five years.

F.  Any and all documents related to any account in which any of deponent's earnings or other income has been deposited into in the past five years, whether deponent continued to have an interest in it or not.

G.  Any and all documents evidencing deponent having authority to access any safe deposit box or other bank-secured area, for the last five years.

H.  Any and all documents evidencing any application signed by deponent or on behalf of deponent or deponent's wife and/or children, to open a foreign or offshore financial account in the name of deponent or any other entity.

I.  Copies of IRA contracts for all IRAs that you currently have.

J.  Copies of any IRA or 401K's that were "rolled over".

K.  Complete contribution and distribution records for any current or previous IRAs or 401Ks.

L.  Copies of any and all bills or living expenses paid for with your IRA or 401K distributions.

M.  Copies of any loans taken against your IRA or 401K.

III.  **REAL PROPERTY**

A.  Any and all documents that refer to, reflect, or relate to any real property owned by deponent in the past five years.

B.  Any and all documents that refer to, reflect, or relate to encumbrances on any real property owned by deponent.

C.  Any and all documents evidencing ownership of real property in which deponent currently enjoys a direct or indirect beneficial interest.

D.  Any and all checks, receipts, deeds or other evidence of the sale or transfer of any real property in which you had a legal or equitable ownership interest in, within the past five years.

-3-

E. Any and all lease agreements for real property in which deponent is the landlord, or has a beneficial interest in.

F. Any and all lease agreements for real property in which the deponent is the lessor or lessee.

G. Any and all documents that evidence deponent's name being on any real property tax records, as payor or trustee for the past five years.

H. Any and all deeds that title any real property to deponent as trustee for any other person or entity.

I. Any and all deeds of trust or mortgages held in favor of deponent at present or owned during the last five years.

J. Any and all documents evidencing any time-shares that deponent enjoys the use of.

K. Copies of any appraisals or other forms of valuation for any property that you have an interest in or had an interest within the past five years.

L. Promissory Notes or Mortgages you signed during the past six years.

M. Copies of all deeds/mortgages to which you hold property as tenants by the entireties, tenants in common or joint tenants.

N. Copies of any and all deeds, leases, tax statements and all utility bills (including, but not limited to, gas, electric, water and cable bills) for any place that you have resided from January 1, 2002 to the present, including, but not limited to 111 E. Chestnut Street, Suite 28J and/or 28K, Chicago, Illinois.

## IV. PERSONAL PROPERTY

A. Certificates of title or other evidence of ownership of any boat, automobile, truck, watercraft, motorcycle, four-wheeler, recreational vehicle, go-kart, aircraft, agricultural equipment, or construction equipment owned by or in possession of deponent, whether owned by deponent or entity that deponent is affiliated with, or held in trust by deponent.

B. Any and all note receivables, pledges or security interests in favor of deponent now, and in the past five years.

C. Copies of all homeowner's insurance policies and any other insurance policies or riders that have insured any property that deponent owns or has the benefit of use of, for the past five years.

-4-

D.  List of household furnishings and fixtures that have been purchased within the last year that had a purchase price of $999 or more, including all cell phones, computers and iPads/tablets, as well as copies of all documents pertaining to the acquisition thereof, as well as copies of all telephone, cable and internet bills for the last five years.

E.  Copies of all dock slips or other documentation evidencing the right to dock any watercraft, whether deponent has a legal or beneficial interest in.

F.  Any and all documents that refer to or reflect any horses or livestock owned by deponent within the past five years.

G.  List and valuation of all collectibles (i.e. stamps, coins, sports cards, etc) that deponent now owns or has owned within the past five years.

H.  Any and all documents that refer to, or relate to any guns, jewelry, antiques, art, paintings or other similar assets owned by deponent or in deponents possession within the past five years.

I.  Any and all documents evidencing any interest deponent may have in any patents, trademarks, copyrights, franchises, royalties of any kind, oil and gas rights, timber rights, or mineral rights.

V.  **BUSINESS INTERESTS/EMPLOYMENT**

A.  All documents that identify the name and addresses of any person or entity that has employed deponent within the past five years.

B.  All documents that identify any person or entity that deponent has acted as an independent contractor for in the past five years.

C.  All documents referring in any way, directly or indirectly, to any and all businesses in which deponent is a stockholder, partner, officer, director, owner, member, manager or registered agent.

D.  Any and all corporate charters, minutes of stockholders meetings, operating agreements, resolutions, or recorded evidence of any kind relating to the affairs of any corporation or LLC owned or controlled by deponent, or any subsidiary or other entity in which such corporation or LLC holds an ownership interest during the past five years.

E.  Lists of all customers, clients, etc. of any kind with which the corporation (or any other business entity owned or controlled by deponent) does business or has done business during the past five years.

-5-

F. All local, state and federal tax returns filed by deponent in the past five years, including all attachments, schedules, W-2's, K-1's, 1099 and 1098 forms, and any information regarding any tax refunds or claims for tax refunds.

G. All documents referring, relating or pertaining to any records of salaries, commissions, bonuses, income from employment, wages, pay stubs, dividends, royalties, allowances, expenses or other sums of money paid to deponent within the past five years.

H. Any and all employment contracts that deponent has had in the past five years.

## VI.    INVESTMENTS

A. Any and all documents and records of stocks, ownership units, membership units, bonds, mutual funds, debentures, certificates of deposit or any other investment vehicle owned or held for the benefit of deponent.

B. Any and all documents relating to any retirement accounts or annuities, whether individual or employer sponsored, that are owned by deponent, or held for the benefit of deponent.

C. Any and all rent rolls for all properties in which deponent has had an ownership interest in for the past five years.

D. Copies of all K-1s, 1099-D's or 1099-I's issued to deponent within the past five years.

E. Any and all documents referring to any stock options or profit-sharing plans held by deponent or for the benefit of deponent.

F. Any and all documents that evidence a cash value in any life insurance policy of deponent and copies of all policies whether term, whole life or universal

## VII.    MISCELLANEOUS

A. All documents evidencing any trusts or amendments to trusts in which the deponent is a grantor, settlor, trustee, or beneficiary.

B. All documents evidencing any and all trusts or amendments to trusts that the deponent has directly or indirectly contributed any assets to within the past ten years.

C. Copies of all pre and post-nuptial agreements, to include the list of assets and liabilities to be held separately.

D. Copies of all separate property agreements, to include the list of assets and liabilities to be held separate.

E. Copy of any Wills including all amendments in which deponent is or was named as a beneficiary.

F. All passports for travel outside of the United States.

G. Copies of any and all credit card statements, for all cards in which deponent is an authorized user, for the past two years.

H. All documents referring or reflecting the name and address of any storage facility or mini-warehouse to which deponent has access.

I. Copies of any and all financial statements that deponent has prepared for any lender, creditor, court or any other person or entity in the past five years.

J. Copies of any and all professional licenses that are held by deponent.

K. Copies of all driver's licenses.

L. Copy of birth certificate.

M. Copies of all divorce decrees and any affidavits submitted in those proceedings.

N. Copies of documents pertaining to any advances and/or retainers paid to any lawyer and/or law firm by you or any other person or entity for or on your behalf.

O. Copies of all corporate books and records for 800 South Wells Phase II LLC, including all documents pertaining to the sale, transfer, pledging and/or encumbrance of the vacant land located at 800 South Wells Street, Chicago, Illinois 60605, Permanent Index Nos. 17-16-401-013 and 17-16-401-014.

P. Copies of all documents in any way pertaining to any cash, gold, investment securities, partnership interests, real estate or any other asset of any form or nature whatsoever that any person or entity holds or controls for or on your behalf or for your use, enjoyment or benefit.

Q. Please provide your affidavit of completeness, verifying under oath that you have produced all documents within your possession, custody and control responsive to each of the categories set forth in all parts of §§I-VII above.

# Px D

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION

| | | |
|---|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11 L 2895 |
| NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), et al., | ) ) ) ) | |
| Defendants. | ) ) | |

### NICHOLAS GOULETAS' ANSWER TO "EXHIBIT A" TO CITATION TO DISCOVER ASSETS

In answer to "Exhibit A" attached to the Citation to Discover Assets served upon NICHOLAS GOULETAS (hereinafter "Judgment Debtor"), under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies and states that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such, the undersigned certifies as aforesaid that he verily believes the same to be true.

Name:  Nicholas S. Gouletas

Social Security and/or Tax I.D. Number: XXX-XX-4160

Residence Address and Telephone Number: 111 E. Chestnut, 28k, Chicago, IL 60611

Business Address and Telephone Number: 181 W. Lake Street, Suite 200, Chicago, Illinois 60601

Name of Business/Businesses and/or interest in same for the two (2) years preceding the date of this request, and address of same:

1. Invsco Construction and Design;
2. Mortgage Funding Consultants;
3. Invsco Management, Inc.;
4. 111 E. Chestnut Consultants, Inc.;
5. American Invsco Design and Construction;
6. American Invsco Realty, Inc.;
7. American Invsco Florida Realty, Inc.;
8. American Invsco Development Corporation;

1



9.      Invsco Development Consultants, Inc.;
10.     Invsco Development LLC;
11.     Invsco Development Members LLC;
12.     Invsco Employee Services, Inc.;
13.     Invsco Group Ltd.;
14.     Invsco Holding LLC.
15.     800 South Wells Phase II LLC
16.     Dearborn Residential LLC
17.     DR Dearborn Investment Company LLC
18.     Dearborn Retail LLC
19.     Ontario Century Property LLC
20.     LaSalle Commercial LLC


All businesses located at 182 W. Lake Street, Chicago, IL.

Dependents: n/a

Stocks, Bonds or other Negotiable Instruments, and where they are located: None.

Automobile(s)- Make, Model, Year, V.I.N., whether the same are insured and by whom (i.e. proof of insurance): 2007 Lexus owned by an American Invsco entity. Mercedez Benz automobile purchased in approximately 1994.


Real Property Owned and how property is held: None.

Name of your Bank: Chase Bank. Private Bank. Republic Bank.

Checking Account Number(s): 000000675469480 (Chase)

Savings Account Number(s): 000001830187777 (Chase)

Certificates of Deposit: None.

Other Personal Property Owned: Clothing, office furniture,

Household Goods: Appliances, television, furniture.

Money and Jewelry on Person: None

Any other title or interest and any other property, real or personal, not listed or described above: None. Mr. Gouletas has membership interests in certain LLC's described above. Documents evidencing the interests will be provided.

2

By: _____

Howard L. Teplinsky
Katherine A. Grosh
BEERMANN PRITIKIN MIRABELLI SWERDLOVE LLP
161 North Clark Street, 26th Floor
Chicago, Illinois  60601
(312) 621-9700
Firm No. 80095

# Px E

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT – LAW DIVISION

| | |
|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 11 L 2895 |
| | ) |
| NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), et al., | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## NICHOLAS GOULETAS' INCOME AND ASSET DISCLOSURE FORM

### PERSONAL INFORMATION

Name:                Nicholas S. Gouletas

Phone Number:        312-621-8615

Home Address:        111 E. Chestnut, 28k, Chicago, IL 60611

Date of Birth:       3/14/1938

Marital Status:      Married

Dependants:          None

### EMPLOYMENT    Do you have a job?  YES

Company Name that I work for:    American Invsco

Company's address:    182 W. Lakes Street, No. 200, Chicago, IL 60601

Job/Title:           President

I earn $:            0. I currently take no salary.

I have the following benefits with my employer:    None.



I receive social security in the approximate amount of $3,000 per month.

REAL ESTATE:            Do you own any real estate?  No.

___    I own real estate at: None

___    Additional real estate I own: None

___    Beneficial Interest in a Land Trust?  None.

___    The beneficial interest is listed in my name and: None.

___    There is a mortgage on my real estate: I do not own real estate.

___    An assignment of beneficial interest in the land trust was signed to secure a loan
       from:        None.

I have the following accounts:

    Checking account at Chase Bank:

        Current account balance: $111,433.28 (account frozen)

    Checking Account at Private Bank:

        Current account balance: believed to be less than $2,000

    Checking Account at Republic Bank:

        Current account Balance: less than $2,000

    Savings Account at Chase Bank:

        Current account Balance: $612.18

    Money market or certificate of deposit: None.

    Safe deposit box at: None

    Other accounts: None

PERSONAL PROPERTY

I own:

Vehicles:    Mercedez Benz automobile purchased in approximately 1994. Currently not in operating condition.

Jewelry:    Wedding band and watch.

Other property: Miscellaneous office furniture, home furnishings including daughter's art work, clothes, appliances, television.

Under penalties of law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned citation respondent/judgment debtor certifies that the facts set forth in the foregoing Income and Asset Form are true to the best of his knowledge, information and belief.

_____
Nicholas S. Gouletas

Dated: _August 11th 2014_

3

Px F

**From:** "Evangeline Gouletas" <egouletas@skylineequities.com>
**Date:** September 30, 2014, 2:18:16 PM CDT
**To:** "Gouletas, Nicholas S" <nicholas.gouletas@americaninvsco.net>
**Subject: MAVRO LITHARI HOUSE IN GREECE**

Dear Nick,

As I told you a long time ago there are a couple problems with the house in Mavro Lithari in Athens.

When I was in Greece, last year, I tried to find out and to solve some of the problems.

First, I had to find out what is going on with the electricity in Mavro Lithari because, as you probably know, there is no electricity in the house. So George drove me to the Spata *Electricity* Authority. Mavro Lithari is coordinated by the Spata office. After I confirmed that the electricity was disconnected because the bills were unpaid I also discovered that the electric account is still in our mother's, Maria Gouletas name



1

The Greek Government trys to collect the real estate taxes through the electric bills. As you can understand, because the electric is disconnected the real estate taxes are unpaid.

In the last two months, Greece changed the procedures in order to collect the real estate taxes directly and not through the electric bill. Greece established a new tax named ENFIA which the Greek Ministry of Economics sends to the owner of the property. After the owner receives this alert, he has to pay within 4-5 months the real estate taxes which are related to the specific property.

As you can understand the last 4-5 years (and who knows since when) the Mavro Lithari real estate taxes are totally unpaid. If these taxes are unpaid *they* are under a very tough interest rate, I don't know exactly how much it is. If the real estate taxes will not be paid for a couple of years the next step is that the Greek Ministry of Economics (the Greek IRS) puts the property under foreclosure.

Summarizing I think that we have to react otherwise the house will be totally lost to the Greek Government. Also, because everything has changed in Greece we may in the future have trouble entering Greece because our names will be in the system with the customs officials.

Please let's schedule a conference call in order to solve this situation.

*Please let me know what you wish to do.*

*It would be a shame to lose the house due our not addressing the situation.*

*Evangeline Gouletas.*

Chairman & Chief Executive Officer
**Skyline Equities**

egouletas@skylineequities.com
www.skylineequities.com
**Direct**: 786.470.3245

**Main:** 305.285.7272
801 Brickell Avenue, PH-1, Suite 2560,

Miami, FL 33131

www.SkylineRealtyInternational.com

www.LPTRP.com

www.CiteChicago.com

www.EvangelineGouletas.com

"Make no little plans; they have no magic to stir men's blood and probably themselves

will not be realized. Make big plans; aim high in hope and work, remembering that a noble,

logical diagram once recorded will not die, but long after we are gone be a living thing,

asserting itself with ever-growing insistence.  Remember that our sons and our grandsons are

going to do things that would stagger us.  Let your watchword be order and your beacon

beauty." -- Daniel Hudson Burnham

--

**Confidentiality Note:** The information contained in this message, and any attachments, may contain confidential and/or privileged material. It is intended solely for the person or entity to which it is addressed.   Any review, retransmission, dissemination, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and delete the material from any computer.

# Px H

3|25|15

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 L 2895 |
| | ) | |
| NICHOLAS S. GOULETAS; 800 SOUTH | ) | |
| WELLS PHASE I LLC (a/k/a RIVER CITY | ) | |
| COMMERCIAL); INVSCO | ) | |
| MANAGEMENT COMPANY, INC. (d/b/a | ) | |
| AMERICAN INVESCO), JOHN CADDEN; | ) | |
| And RIVER CITY PARKING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### NICHOLAS GOULETAS'SUPPLEMENTAL RESPONSES TO SUPPLEMENTAL PROCEEDING INTERROGATORIES

Nicholas Gouletas, through his attorneys, states the following as his Supplemental

Answers to Plaintiff's Supplemental Proceeding Interrogatories:

### RESPONSES

1.      In a Balance Sheet dated as of March 31, 2013 (copy attached as Gouletas Ex. 20), you list as assets (1) "Interest in American Invsco Group Ltd."; (2) "Interest in Invsco Holding LLC"; (3) "Interest in 800 South Wells Ph II LLC"; and (4) "Interest in American Invsco Realty, LLC". For each of the four entities listed in (1) through (4) above, please describe in full and complete detail (a) what the "Interest" was that you owned or claimed to own in each of the four listed entities; (b) how, when, under what circumstances, and to whom each of the four listed entities was transferred (in whole or in part), including the consideration for each such transfer; and (c) your current direct and/or indirect ownership interest in each of the four listed entities.

ANSWER:      Gouletas did not prepare the balance sheet attached as Exhibit 20. As a

result, Gouletas cannot state with any degree of certainty what comprises the interests being

identified therein. Notwithstanding, to the best of his information, knowledge and belief, as of

March 31, 2013, Gouletas had an interest in each of the following entities which he believes

comprised the assets of the identified entities:



A.     800 S. Wells Phase II, LLC.

The entity owned a parcel of vacant real property located at 800 S. Wells Street, Chicago.

Gouletas owned 100% of the membership interests in the LLC.   On August 19, 2013, 800 South

Wells Phase II, LLC filed for protection under Chapter 11 of the U.S. Bankruptcy Code.  On or

about December, 2014, the debtor sold the assets of 800 S. Wells Street Phase II, LLC at an

auction held pursuant to the bankruptcy.   The assets were sold to an unaffiliated third party

purchaser for $7,750,000.  All of the proceeds of the sale went to 800 S. Wells Phase II, LLC's

creditors.   As a result, on December 31, 2014, the bankruptcy was voluntarily dismissed.

Gouletas did not receive any of the proceeds and the LLC has no assets.  A true and correct copy

of the 800 S. Wells Phase II First Amended Operating Agreement is being produced

concurrently herewith.

B.     404 North Wabash Commercial, LLC.

The entity owns real property located at 7 E. Illinois Street, Chicago. The membership

interest in 404 North Wabash Commercial, LLC is owned by 404 North Wabash Holding

Company, LLC.  It is believed that Mr. Gouletas, either directly or indirectly, currently owns

100% of the membership interest in 404 North Wabash Holding Company, LLC.  A true and

correct copy of the 404 North Wabash Commercial, LLC Operating Agreement is being

produced concurrently herewith.

C.     LaSalle Commercial, LLC.

The entity owned approximately 16,000 square feet of vacant office space and 26 parking

spaces at 1212 N. LaSalle Street, Chicago.   The initial members of the LLC were LaSalle

Commercial Consultants, Inc. and Home By Invsco, Inc. On or about May 8, 2014, as part of the

"Big Horn Transaction" described herein, the assets of the LLC were transferred to an entity

2

called Garvey Court, LLC. Mr. Gouletas was a shareholder of Home By Invsco, Inc. It is believed that Garvey Court, LLC., an entity not controlled by Gouletas, has sold some or all of the assets to satisfy debt. Mr. Gouletas has not received any proceeds from the sale of any of the assets. A true and correct copy of the LaSalle Commercial, LLC Operating Agreement is being produced concurrently herewith.

D.    Ontario Century Property LLC and 182 W. Commercial LLC

Ontario Century Property LLC four condominium units located at 182 W. Lake Street, Chicago. 182 W. Commercial LLC owned an office condominium at the same address. The members of the Ontario Century Property LLC are OC Residential Manager LLC and Ontario Century Manager LLC. It is believed that Gouletas directly or indirectly owns 100% of the interests in the members. All but one of the four residential units comprising the assets of the LLC were sold. Gouletas did not receive any of the proceeds from the sales. The office condominium is still owned by 182 W. Commercial LLC. A true and correct copy of the Ontario Century Property LLC Operating Agreement is being produced concurrently herewith.

E.    Dearborn Residential, LLC and Dearborn Retail, LLC

These entities owned four residential condominium units, parking spaces and a food court located at 200 N. Dearborn, Chicago. The sole member of the LLCs was Lake Dearborn, LLC. It is believed that Gouletas directly or indirectly owned 100% of Lake Dearborn LLC's membership interests.    On or about May 8, 2014, as part of the "Big Horn Transaction" described herein, the assets of the LLCs were transferred to an entity called Garvey Court, LLC. It is believed that Garvey Court, LLC., an entity not controlled by Gouletas, has sold some or all of the assets to satisfy debt. Mr. Gouletas has not received any proceeds from the sale of any of

3

the assets.  A true and correct copy of the Dearborn Residential, LLC and Dearborn Retail,LLC

Operating Agreements are being produced concurrently herewith.


2.      In the Balance Sheet dated February 28, 2014 (copy attached as Gouletas Ex. 5), you list as assets (1) "Garvey Court", (2) "1212 N LaSalle Commercial"; (3) "200 N Dearborn Unsold Condominium Units"; (4) "182 W Lake Commercial"; (5) "Century Tower Condominiums"; (6) "440 N Wabash Commercial LLC"; and (7) "River City Land". For each of the assets listed in (1) through (7) above, please describe and explain in full and complete detail (a) the ownership interest that you had or claimed to have in each of the seven listed assets; (b) how, when, under what circumstances, and to whom each of the seven listed assets was transferred (in whole or in part) out of your name, including the consideration for each such transfer; and (c) your current direct and/or indirect ownership interest in each of the seven listed assets.

ANSWER:    See answer to Interrogatory No. 1.


3.      As of (1) March 31, 2013; and (2) January 31, 2015, does anyone owe you any money?  If so, please (a) list the amount of money allegedly owed as of each of the listed dates; (b) identify the person and/or entity that owes the money; (c) identify the person and/or entity to whom the money is owed; and (d) describe the repayment terms for each indebtedness (including the principal amount owed; interest rate; maturity date; and collateral); and (e) provide a full and complete description of any and all documents evidencing each indebtedness (or, in lieu thereof, produce as document No. 3(e), all documents evidencing any such indebtedness).

ANSWER:    Gouletas does not believe that anyone owes him any money as of the

listed dates.


4.      As of (1) March 31, 2013; and (2) January 31, 2015, do you owe any person or entity any money?  If so, please (a) list the amount of money allegedly owed as of each of the listed dates; (b) identify the person and/or entity that owes the money; and (c) identify the person and/or entity to whom the money is owed; and (d) describe the repayment terms for each indebtedness (including the principal amount owed; interest rate; maturity date; and collateral); and (e) provide a full and complete description of any and all documents evidencing each indebtedness (or, in lieu thereof, produce as document No. 4 (e), all documents evidencing any such indebtedness).

ANSWER:    To the best of his information, knowledge and belief, Gouletas has

judgments against him in the following cases:

4

A.  *800 S. Wells Commercial LLC v. Gouletas, et al*, 11 L 2895 (Cook).
    Amt.:      $11,500,000 + int. judgment
    Contact:   Dean Armstrong

B.  *Karl Muth v. Gouletas*, 13 L 8995 (Cook).
    Amt.:      $761,353 + int. judgment
    Contact:   Swanson, Martin & Bell

C.  *Humberto Alfonso v. Gouletas*, 13 L 9345 (Cook).
    Amt.:      $454,038 + int. – part of amt. was satisfied by bank turnover of $111,000
    Contact:   Swanson, Martin & Bell

In addition, Gouletas is being sued personally in the following cases and his liability has not been determined:

A.  *Couturier et al v. American Invsco and Gouletas*, 12 CV-01104-APG-NJK (USDC Nevada)(See cases 12-cv-01104-01111).

B.  *Taddeo v. American Invsco, et al*, 2:12-cv-01110-APG-NJK, (USDC Nev.).

C.  *Suntrust Mortgage v. Estate of Deanna Gouletas*, 48-2013-CA-015214 (19 Judicial Circuit, Florida).

D.  *DK Enterprises, Inc. v. Gouletas, et al*, CV-13-5263 (7th Judicial District of Idaho).

E.  *Garvey Court LLC v. Gouletas, et al*, 14 L 10993 (Cook).
    Amt.:      $200,000

F.  *Novack Macey v. Gouletas*, 14 L 13200 (Cook).
    Amt.:  In excess of $50,000.

G.  *200 North Dearborn Condo Assn. v. American Invsco Corp.*, 13 L 8515 (Cook)
    Amt.: In excess of $30,000.

H.  *Murphy Hourihane LLC v. Gouletas*, 13 L 13981 (Cook).
    Amt.: $216,643.

Additionally, Gouletas owes the law firm of Beermann Pritikin Mirabelli Swerdlove LLP the sum of $124,354.18 and the law firm of Lynch & Stern an unknown sum believed to be in

5

excess of $50,000.   Further, Gouletas believes that he owes the following individuals money as

of the dates set forth in the interrogatory:

      a.    Steven Gouletas.  Gouletas believes that he owes Steven Gouletas approximately $200,000.

      b.    Dorthea Touras. Gouletas believes that he owes Dorthea Touras several hundred thousand dollars for sums that Ms. Touras provided to Gouletas personally prior to 2014 to invest in one or more American Invsco-related projects.

      c.    George Spanos.  Gouletas believes that he owes George Spanos approximately $200-300,000 that Mr. SPanos provided to Gouletas personally prior to 2014 to invest in one or more American Invsco-related projects.

      d.    Paul Jones. 5 Ashley Oak, Flossmoor, IL 60422.  Gouletas believes that Paul Jones invested approximately $600,000 in a failed real estate transaction attempting to purchase certain assets of Corus Bank.  This occurred in 2012.

      e.    James Paul. 2640 14th Ave., Carmel, CA. 93923. 831-905-1734. Gouletas believes that James Paul invested approximately $600,000 in a failed real estate transaction attempting to purchase certain assets of Corus Bank.  This occurred in 2012.

      f.    Steven Funk. 1055 W. Hastings St. Suite 1188, Vancouver, Canada V6E 2E9. Gouletas believes that Steven Funk invested approximately $250,000 in a failed real estate transaction attempting to purchase certain assets of Corus Bank.  This occurred in 2012.

      Gouletas will provide any documents in his possession, custody or control relating to the

various debts owed to the individuals.

      5.    For each lawyer and/or law firm who has represented you or provided legal services to you from March 31, 2013 to the present, please (a) identify the lawyer and/or law firm; (b) identify the legal matter for each such representation was provided; (c) list the date and the amount of each payment to each lawyer for each such matter, including the identity of the person and/or entity who paid the legal fees; (d) list the current amount owed to each such lawyer/law firm; and (e) identify the terms of representation, including a description of any retainer agreements (or, in lieu thereof, produce as document No. 5 (e) a copy of all retention/retainer agreements).

**ANSWER:** Gouletas objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege. Notwithstanding said objection and without waiving the same, Gouletas states as follows:

A. Novack & Macey. Various attorneys. The law firm represented Gouletas individually in *200 North Dearborn Condo Assn. v. American Invsco Corp.*, 13 L 8515 (Cook). In addition, the law firm represented Gouletas as well as American Invsco Corp. in the law suit entitled *Donna Walsh v. American Invsco and Gouletas*, 13 M1 147311 (Cook). Novack & Macey was paid approximately $10,000 in March of 2014. The source of the funds was Irene Gouletas, Gouletas' sister. Further answering, see the response to Interrogatory No. 4. Investigation continues.

B. Beermann Pritikin Mirabelli Swerdlove LLP. The law firm represents Gouletas individually in the following matters: *800 S. Wells Commercial, LLC v. Gouletas, et al.*, 11 L 2895 *(Cook); Karl Muth v. Gouletas*, 13 L 8995 (Cook); *Humberto Alfonso v. Gouletas*, 13 L 9345 (Cook); *Garvey Court LLC v. Gouletas, et al*, 14 L 10993 (Cook). The law firm received payment on April 2, 2014 and September 9, 2014. The April 2, 2014 payment was $10,000 and was paid by Irene Gouletas, Gouletas' sister. The September 9, 2014 payment was for $10,000 and was paid by Natel Matschulat, Gouletas' wife. Further answering, see the response to Interrogatory No. 4.

C. Lynch & Stern. The law firm represented Gouletas in the following matter: *800 S. Wells Commercial, LLC v. Gouletas, et al.*, 11 L 2895 *(Cook)*. Investigation continues.

6.    Please provide the last known mailing address and phone numbers for the following: (a) Mr. Spanos; (b) Linda Torringa; (c) Carlos Castillo; (d) Steve Gouletas; (e) Rosalie (your daughter); (f) Martha Mendoza; (g) Debbie _____ (check no. 2693 dated November 20, 2013); (h) Dorothea Touras; and (i) Eunice Jendraszek.

**ANSWER:** (a) 312-953-2399 – address unknown; (b) 219-922-1566 – 9512 Erie, Highland, Indiana 46322; (c) 312-217-1889 – 412 S. Dearborn, Chicago, IL; (d) 312-361-1928 – 10 E. Ontario, 7th Floor, Chicago, IL 60611; (e) 505-946-7350 – 5 Camino Sabamero, Santa Fe, NM 87508; (f) last known address and telephone number unknown; (g) last known address and telephone number unknown; (h) 312-986-9007 – 111 E. Chestnut, Chicago, IL; (h) 312-375-9294 – 2625 N. Clark Street, No, 1105, Chicago, IL.

7

7.    Please provide the address and phone number for the current location of the 1971 Mercedes Benz.

**ANSWER:**    Buddy's Parking Garage. 412 S. Dearborn, Chicago, IL. 60605. 312-217-1889.

8.    Please list the amount of any and all of your tax refunds for the years 2012, 2013 and/or 2014, with a description of the account into which the tax refunds were deposited, and a description of your use of all or any portion of those tax refunds.

**ANSWER:**    Gouletas received a refund on his 2012 taxes in the amount of $73,027.

On information and belief, the refund was deposited in Gouletas' personal checking account at

J.P. Morgan Chase.    The entire refund was used to fund Gouletas' day-to-day living expenses.

In addition, some of the deposit may have been subsequently turned over to the plaintiff in the

case of *Karl Muth v. Gouletas*, 13 L 8995 pursuant to a turnover order.    Gouletas has not

received a refund for his 2013 and 2014 taxes.

9.    In November of 2013 you received a "bank refund" in the amount of $8,500. Please identify and describe in detail (a) the bank which made the refund; (d) the person to whom the refund was made; (c) the account into which the refund was paid; and (d) how you used or spent any such bank refund.

**ANSWER:**    Gouletas has no recollection of having received a bank refund in or about

November of 2013 and, without more information, cannot determine the responses to questions

(a) through (d).

10.    For the period from March 31, 2013 to the present, please identify any and all checking accounts for which you have had signatory authority, including the joint Account that you held with Linda Torringa.

**ANSWER:**    Gouletas has had signatory authority over a savings and checking account

at J. P. Morgan Chase Bank.    In addition, Gouletas has had signatory authority over one or more

business accounts at the Private Bank. Investigation continues.

11.     In connection with your Citation/Judgment Debtor Examination held on October 20, 2014, there was some testimony by you and representations by your counsel about a "Big Horn" entity that has control of certain properties or entities that were involved in certain bankruptcies, and that certain "secured creditors" were paid through a loan taken out by Garvey Court LLC. Please describe and explain in full and complete detail (a) the "Big Horn" and/or "Garvey Court" transaction (b) the consideration that was paid to and/or received by you in connection with any such restructuring and/or transaction; (c) any direct or ownership interest that you have in any such restructured entity; and (d) the identity of the documents reflecting approval for and the mechanics of the above transaction (or, in lieu thereof, produce as document No. 11 (d) all documents providing this information and evidencing any such transactions).

**ANSWER:**   Gouletas is producing herewith the following documents in response to Interrogatory No. 11:

      a.     Operating Agreement of Garvey Court, LLC

      b.     Contribution Agreement.

Gouletas does not have possession, custody or control over any other documents relating to this transaction. The genesis of the transaction arose out of various Gouletas-related entities filing for protection under Chapter 11 of the United States Bankruptcy Code in jointly administered case *In re Lake Dearborn LLC*, No. 13 B 36813. On August 19, 2013 (the *"Initial Petition Date"*), Lake Dearborn, LLC (*"Lake Dearborn"*), Dearborn Residential (*"Dearborn Residential"*), Dearborn Retail, LLC (*"Dearborn Retail"*), DR Dearborn Investment, LLC (*"DR Dearborn"*), 800 South Wells Phase II, LLC(*"South Wells"*), and La Salle Commercial, LLC (*"La Salle Commercial,"* and collectively with Lake Dearborn, Dearborn Residential, Dearborn Retail, DR Dearborn, and South Wells, the *"Initial Debtors"*) each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The various entities in bankruptcy attracted several possible suitors. In the spring of 2014, an entity entitled Big Horn Capital completed negotiations with the debtors in possession to create an entity that would borrow sufficient funds to pay the entities' secured and unsecured

creditors.  Big Horn through its nominees Garvey Court, LLC, Garvey Court Investors, LLC and

Garvey Court Holdings, LLC entered into a contribution agreement with NKM Garvey, LLC and

SEG Garvey, LLC whereby NKM and SEG, having acquired the certain assets of LaSalle

Commercial, LLC., Dearborn Residential, LLC and Dearborn Retail, LLC, contributed the assets

to a newly created venture named Garvey Court, LLC.  Garvey Court LLC borrowed sums from

a private lender sufficient to pay the secured and unsecured creditors.  On June 6, 2014, after all

of the secured creditors and many of the unsecured creditors received payment, all of the

bankruptcies except *In re 800 S. Wells Phase II, LLC* were dismissed.

Gouletas has no interest in Garvey Court, LLC, Big Horn or the lender.  The members of

Garvey Court LLC are the Big Horn-related "Garvey Court Investors, LLC," holding a 75%

interest, "SEG Garvey, LLC," holding a12% interest and "NKM Garvey LLC," holding a 13%

interest.  Gouletas does not have a membership interest in SEG Garvey, LLC or NKM Garvey,

LLC.


NICHOLAS S. GOULETAS

By:_____

One of His Attorneys

Howard L. Teplinsky
Katherine A. Grosh
BEERMANN PRITIKIN MIRABELLI SWERDLOVE LLP
161 North Clark Street, 26th Floor
Chicago, Illinois  60601
(312) 621-9700
Firm No. 80095

## VERIFICATION BY CERTIFICATION

Under penalty of perjury, the undersigned certifies that the foregoing answers to interrogatories are true and correct expect as to those matters answered on information and belief and to such matters, he verily believes the same to be true.

Nicholas Gouletas