# Px I

```
 1      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - LAW DIVISION
 2
      800 SOUTH WELLS COMMERCIAL,    )
 3    LLC,                           )
                                     )
 4              Plaintiff,           )
                                     )
 5      vs.                          )  No. 2011 L 002895
                                     )
 6    NICHOLAS S. GOULETAS and       )
      INVSCO MANAGEMENT COMPANY,     )
 7    INC. (d/b/a) AMERICAN INVSCO,  )
                                     )
 8              Defendants.          )

 9

10          REPORT OF PROCEEDINGS at the hearing

11   of the above-entitled cause before the Honorable

12   ALEXANDER P. WHITE, Judge of said court, on Monday,

13   July 20, 2015, commencing at 11:43 a.m.

14

15

16

17

18

19

20

21

22

23   Reported by:   Barbara A. Finn-Figliulo
                     CSR No. 084-002463
24
```

*Px I*

MOTION, 07/20/2015

```
                                                          Page 2
  1    APPEARANCES:

  2        ARMSTRONG LAW FIRM PC, by
           MR. DEAN F. ARMSTRONG
  3        (1324 Dartmouth Road
            Flossmoor, Illinois   60422
  4         708.798.1599
            armstronglaw@sbcglobal.net)
  5           appeared on behalf of the plaintiff;

  6        BEERMANN PRITIKIN MIRABELLI SWERDLOVE
           LLP, by
  7        MR. HOWARD L. TEPLINSKY
           (161 North Clark Street, Suite 2600
  8         Chicago, Illinois   60601
            312.621.9700
  9         hteplinsky@beermannlaw.com)
              appeared on behalf of the defendants.
 10

 11
                 *   *   *   *   *   *   *
 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Urlaub Bowen & Associates, Inc.   312-781-9586

MOTION, 07/20/2015

Page 3

```
 1       THE CLERK:  800 versus Gouletas.

 2       MR. TEPLINSKY:  Morning, your Honor.

 3       MR. ARMSTRONG:  Good morning, Judge White.

 4  My name is Dean Armstrong.  I'm the attorney for

 5  the plaintiff, a judgment creditor.

 6       MR. TEPLINSKY:  Your Honor, my name is Howard

 7  Teplinsky for Mr. Gouletas, who is in court.

 8       MR. ARMSTRONG:  Your Honor, if I could, in

 9  terms of the Court's scheduling, Mr. Gouletas is

10  here as a witness.  It may take about 45 minutes

11  to an hour testimony.

12                 There are some preliminary exhibits

13  to go through.  If the Court wishes, I could go

14  through with the Court and opposing counsel the

15  admissibility of exhibits.

16                 If the Court then wishes to recess

17  to give the staff and the court reporter time to go

18  to lunch, that's fine.  Otherwise, we are ready to

19  proceed.

20       THE COURT:  I'll go through.

21                 Okay.  What I have is an order dated

22  July 10th, plaintiff's motion for indirect civil

23  contempt, Gouletas -- Nick Gouletas's response and

24  plaintiff's reply.  And so I got the motion, the
```

MOTION, 07/20/2015

Page 4

1   response, and the reply.

2        MR. ARMSTRONG:  Okay.

3        THE COURT:  So we have a motion.

4        MR. ARMSTRONG:  Very good.

5             Your Honor, the citation in this

6   case is part of the exhibit booklet.  May I hand

7   it to the Court, please?

8             A copy has been given to opposing

9   counsel, a copy has been given to the court

10  reporter, and that is the Court's copy.

11            There was a final judgment entered

12  on January 23, 2014, that's marked as Exhibit 1.

13            And, your Honor, there's two sets

14  of exhibits.  There's A through, I believe, N,

15  which were attached to the motion, and then there's

16  exhibit numbers which reference exhibits that were

17  marked in connection with Mr. Gouletas's citation

18  judgment debtor examination.

19            So I apologize if there's any

20  confusion.  There is one exhibit number that goes

21  back and forth.  There's Exhibit N -- I'm sorry,

22  Exhibit K, which is also Exhibit 19.

23            Other than that, we should be able

24  to go through them by letter number, which is

MOTION, 07/20/2015

Page 69

1          THE WITNESS:  Okay.

2          MR. ARMSTRONG:  Okay.

3          THE WITNESS:  Thank you.

4    BY MR. ARMSTRONG:

5          Q.    So no, that you didn't, but that's the

6    best you can recall?

7          A.    That's the best I recall.  Okay?

8    I'm -- and to the best of my knowledge.  And, you

9    know, I go through every day, all kinds of things

10   happening, you know.

11               So there's all kinds of -- I can't

12   remember every little thing that happens all day

13   long in the amount of things that I get involved in.

14         Q.    Was it important to you that you comply

15   with the citation that was served upon you?

16         A.    The answer is yes.

17         Q.    Okay.  Take a look at Exhibit 29, sir.

18               And, Judge, this is on the subject

19   of not producing corporate documents.

20         A.    In this book?

21         Q.    Yes, sir.

22         A.    This here?

23         Q.    Yes.  Exhibit 29 is a business card,

24   American Invsco.  It lists Nicholas S. Gouletas,

MOTION, 07/20/2015

1  Chairman and Chief Executive Officer.

2           Do you recall this as one of the

3  documents that was in your briefcase that you left

4  in Mr. Teplinsky's office?

5       A.    That's my business card, yes, sir.

6       Q.    Okay.  Nicholas S. Gouletas, Chairman

7  and Chief Executive Officer, American Invsco.

8  Correct?

9       A.    Correct.

10      Q.    Are you the chairman and chief

11  executive officer of American Invsco?

12      A.    I believe I am.  I have to check the

13  documents, but I believe I am.

14      Q.    Okay.  You did not produce any

15  corporate documents pertaining to American Invsco,

16  did you?

17      A.    I don't know what we produced.

18      Q.    No documents were produced pertaining

19  to American Invsco.

20      MR. TEPLINSKY:  Is that a question?

21      MR. ARMSTRONG:  That's the truth.

22      MR. TEPLINSKY:  No, it's not, your Honor.

23  I object to that.  And if Mr. Armstrong wants to

24  go ahead and sit in the witness stand and testify,

MOTION, 07/20/2015

Page 77

```
1        Q.     Take a look at --

2        A.     Ask me if I get paid.  I don't get paid.

3        Q.     Take a look at Exhibit 15.  American

4   Invsco maintains a website, correct?

5        A.     I don't know.

6        Q.     What is Exhibit 15?  Isn't it the

7   website?

8        A.     I --

9        Q.     As of September 8, 2013, American

10  Invsco has properties and offices in over 40 major

11  markets around the world.

12               Do you agree with that?

13       A.     We've had markets over 40 -- yes.  And

14  is this the website?  I have never looked at our

15  website.

16       Q.     Okay.  But let me just ask you --

17       A.     I have never, ever looked at it.

18       Q.     -- does a brand name have 54

19  developments in Chicago?

20       A.     Have we done 54 plus developments in

21  Chicago?  The answer is yes.

22       Q.     Who has?

23       A.     Usually under LLCs.  Each one is a

24  separately owned entity with its investors and
```

MOTION, 07/20/2015

1      A.    Yes.

2      Q.    On a sale/leaseback provision, correct?

3      A.    It is what it is.  Whatever the

4  document says, yes.

5      MR. ARMSTRONG:  If the Court can take

6  judicial notice, in Exhibit 2, June 9, 2014, the

7  citation was served on Mr. Gouletas.  This is dated

8  September 9, 2014.

9  BY MR. ARMSTRONG:

10     Q.    Did you understand, sir, that the

11 service of the citation upon you froze your

12 assets except for certain circumstances?

13     A.    I'm not a lawyer, sir.  I really cannot

14 tell you to what degree I understand that or not.

15     THE COURT:  I've got to jump in here.

16          When you were served with the

17 citation, you had to be personally served or a

18 member of your household.  Part of the citation

19 language indicates that you will not transfer

20 anything after receiving the citation.

21 BY MR. ARMSTRONG:

22     Q.    Did you have that understanding, sir?

23     A.    Yes, I do.

24     Q.    Okay.  So on September 9, 2014,

Urlaub Bowen & Associates, Inc.   312-781-9586

MOTION, 07/20/2015

Page 132

1      A.    It's -- the document says none.

2      Q.    Okay.  And you list a net worth of

3  $25,287,563, correct?

4      A.    You say "I list."  I did not list

5  these.  The accountants in the office listed all

6  the liabilities and all the assets.

7           I did not list the liabilities or

8  the assets.  You keep saying I listed them.  I did

9  not list them.

10          In the company, the accountants made

11  this document.  Okay?  And that's what they listed,

12  and I did sign it.  And I believe it was accurate

13  at that time.  And if we want to call them in to

14  see how they got to those numbers, I'm sure they

15  would be glad to come in and tell you how they got

16  to the numbers.

17     Q.    Take a look at Exhibit 52, please.

18  52, sir?

19     A.    (Reviewing document.)

20     Q.    Okay.  Do you recall, sir, at

21  your October 20th, 2014 citation examination,

22  this was a document that was in your briefcase

23  in Mr. Teplinsky's office?

24     A.    I don't recall that it was in my

# Px J

```
 1   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
 2
     800 SOUTH WELLS COMMERCIAL      )
 3   LLC,                            )
                                     )
 4                   Plaintiff,      )
                                     )
 5           vs.                     )   No. 11 L 2895
                                     )
 6   NICHOLAS S. GOULETAS and        )
     INVSCO MANAGEMENT COMPANY,      )
 7   INC., d/b/a AMERICAN INVSCO,    )
                                     )
 8                   Defendants.     )

 9

10        The discovery deposition of NICHOLAS

11   GOULETAS, taken under oath on Friday, February 10,

12   2017, at 161 North Clark Street, Suite 2600,

13   Chicago, Illinois, pursuant to the Rules of the

14   Supreme Court of Illinois and the Code of Civil

15   Procedure, before Pauline Strohl, Certified

16   Shorthand Reporter No. 084-001253, commencing at

17   1:38 p.m.

18        APPEARANCES:

19           ARMSTRONG LAW FIRM PC, by
             MR. F. DEAN ARMSTRONG
20           (1324 Dartmouth Road
              Flossmoor, Illinois  60422
21            708.798.1599
              Armstronglaw@sbcglobal.net)
22
                 appeared on behalf of the plaintiff;
23

24
```

Px J

NICHOLAS GOULETAS, 02/10/2017

```
                                                          Page 2
 1        APPEARANCES:  (Cont'd)

 2              BEERMAN, PRITIKIN, MIRABELLI, SWERDLOVE
                LLP by
 3              MR. HOWARD L. TEPLINSKY
                (161 North Clark Street, Suite 2600
 4               Chicago, Illinois  60601
                 312.621.9700
 5               Hteplinsky@beermanlaw.com)

 6           appeared on behalf of the defendants.

 7                  *   *   *   *   *   *   *

 8

                          I N D E X
 9
    Witness:                                Page
10
    NICHOLAS GOULETAS
11
          Examination by:
12
            Mr. Armstrong                      3
13

14                  E X H I B I T S

15  Number                       Marked/referenced

16  Touris Exhibit B                   44, 54
    Exhibit No. 5                    23, 33, 69
17  Exhibit No. 20                     25, 32
    Exhibit No. 65                     27, 29
18  Exhibit No. 105                       70
    Exhibit No. 106                       53
19  Exhibit No. 107                       54
    Exhibit No. 137A                      79
20  Exhibit No. 164                       59
    Exhibit No. 166                       20
21  Exhibit No. 167                       56
    Exhibit No. 169                       41
22  Exhibit No. 170                       27

23
          (Exhibits retained by Mr. Armstrong.)
24
```

Urlaub Bowen & Associates, Inc.  312-781-9586

NICHOLAS GOULETAS, 02/10/2017

Page 3

```
 1                    (Witness sworn.)

 2                  NICHOLAS GOULETAS,

 3  called as a witness herein, having been first duly

 4  sworn, was examined and testified as follows:

 5                    EXAMINATION

 6  BY MR. ARMSTRONG:

 7      Q.   Mr. Gouletas, did you ever request that

 8  Dorothea Touris put money in her account for the

 9  payment of your bills?

10      A.   I believe so.

11      Q.   When?

12      A.   I don't recall.

13      Q.   Why?

14      A.   She handled paying my bills.

15      Q.   Pardon?

16      A.   She handled paying my bills.

17      Q.   Why did you ask her to pay your bills?

18      A.   Because somebody had to do it for me.

19      Q.   Why did you have the money go into her

20  account?

21      A.   So she could pay my bills.

22      Q.   Why didn't you put the money in your

23  account?

24      A.   I don't recall.
```

NICHOLAS GOULETAS, 02/10/2017

Page 4

```
 1        Q.      Did you ever know why you did it?

 2        A.      I don't recall.

 3        Q.      By saying you don't recall, does that

 4  mean you at one time knew but now you don't

 5  remember?

 6        A.      I don't recall.

 7        Q.      Does that mean you have absolutely

 8  positively no recollection as to why you did it?

 9        A.      That's true.

10        Q.      Can you provide the Court with any

11  explanation as to why you did it?

12        MR. TEPLINSKY:   You mean provide you with any

13  explanation?

14  BY MR. ARMSTRONG:

15        Q.      The Court?

16        A.      Not that I know of.

17        Q.      Can you list any possible reasons as to

18  why you did it?

19        A.      No, I don't.

20        Q.      How long did this Dorothea Touris,

21  money in her account paying your bills, how long

22  did that practice go on?

23        A.      I don't recall.

24        Q.      Did you ask her to do it?
```

Urlaub Bowen & Associates, Inc.   312-781-9586

NICHOLAS GOULETAS, 02/10/2017

1      A.    Yes, I did.

2      Q.    When?

3      A.    I don't recall.

4      Q.    Did you ask her to stop?

5      A.    I don't recall.

6      Q.    Is it continuing to this day?

7      A.    Sometimes, yes.

8      Q.    Have you had discussions with her about

9  this, Dorothea, you handle my financial affairs?

10     A.    I don't understand the question.

11     Q.    What would you call what she is doing

12  for you?

13     A.    I don't understand your question.

14     Q.    Does Dorothea take money that you

15  provide to her, put it into her account and then

16  pay your bills?

17     A.    It might be so.

18     Q.    Was that done at your request?

19     A.    Probably.

20     Q.    What would you call that practice what

21  she is doing for you, taking money that you direct

22  her to put into her account and then pay your

23  bills?

24     A.    Helping me out.

NICHOLAS GOULETAS, 02/10/2017

Page 6

1        Q.     Helping me out with your financial

2   situation?

3        A.     Paying my bills.

4        Q.     Now I know you said you don't recall

5   when it started.  Do you recall the event that

6   caused it to start?

7        A.     No, I don't.

8        Q.     The money that you had deposited into

9   Dorothea Touris' checking account, where did that

10  money come from?

11       A.     I don't recall.

12       Q.     How much did you have put into Dorothea

13  Touris' account for the payment of your bills and

14  the handling of your financial affairs?

15       A.     I don't recall.

16       Q.     Can you give me an estimate as to the

17  amount?

18       A.     No, I can't.

19       Q.     Would you agree with me it's more than

20  a dollar?

21       A.     I don't know.

22       Q.     Would you agree with me it's more than

23  a million dollars?

24       A.     I don't know.

NICHOLAS GOULETAS, 02/10/2017

Page 7

1       Q.      Would you agree with me it's less than

2  $10 million?

3       A.      I don't know.

4       Q.      Can you give me your best estimate?

5       A.      No, I can't.

6       Q.      Did you ask anybody is it okay for me

7  to take money and put it into Dorothea Touris'

8  account for the payment of my bills?

9       A.      I don't believe I did.

10      Q.      Have you told anybody about this

11  practice of putting money into her account and

12  having her pay your bills?

13      A.      I don't recall.

14      Q.      Did Dorothea Touris ever ask you Nick,

15  why am I doing this?

16      A.      I don't recall.

17      Q.      If she asked you Nick, why am I doing

18  this, what would you have said?

19      A.      I don't know.

20      MR. TEPLINSKY:  Objection, calls for

21  speculation.  You can answer the question.

22  BY MR. ARMSTRONG:

23      Q.      Did you know that you were under an

24  order from Circuit Court Judge White to not

NICHOLAS GOULETAS, 02/10/2017

Page 16

1      Q.    Can you list any reasons why you didn't

2   put it in your own account?

3      A.    I don't recall.

4      Q.    You'll agree you put that money, had

5   the money put into Dorothea Touris' checking

6   account?

7      A.    I believe so.

8      Q.    Can you list the reasons why you did

9   that?

10     A.    I believe she was paying my bills.

11     Q.    What did you tell her about the money?

12     A.    I don't recall.

13     Q.    Did you tell her anything about the

14  money?

15     A.    I don't recall.

16     Q.    Did she ask any questions about the

17  money?

18     A.    I don't recall.

19     Q.    Did it just happen by accident?

20     A.    I don't recall.

21     Q.    Did you ever have $15,730 wire

22  transferred into Dorothea Touris' checking account?

23     A.    I don't recall.

24     Q.    Other than the $415,000 are you aware

NICHOLAS GOULETAS, 02/10/2017

Page 17

1  of any other sums that you had deposited into

2  Dorothea Touris' checking account?

3          A.      I don't recall.

4          Q.      Do you have any idea where the $15,730

5  that Dorothea Touris testified about, where that

6  money came from?

7          A.      I don't recall.

8          Q.      On March 16, 2015, Dorothea Touris

9  withdrew $5,000 from her checking account in cash.

10 Did she give that cash to you?

11         A.      I don't recall.

12         Q.      On March 20, 2015, there was a $20,000

13 withdrawal of cash from her checking account.  Did

14 she give that cash to you?

15         A.      I don't recall.

16         Q.      How did Dorothea Touris know what bills

17 to pay?

18         A.      I don't remember.

19         Q.      Did she pay the bills on her own?

20         A.      I don't understand your question.

21         Q.      There's check after check after check

22 that's in her checking account records.  Did you

23 understand she just paid whatever she wanted to

24 pay?

NICHOLAS GOULETAS, 02/10/2017

Page 18

```
 1      A.     She paid my bills.

 2      Q.     How did she know which bills to pay?

 3      A.     I don't remember.

 4      Q.     Did you ask her?

 5      A.     I don't remember.

 6      Q.     Do you remember asking her to pay any

 7 particular bills?

 8      A.     Say it again?

 9      Q.     Did you ask her to pay any particular

10 bills?

11      A.     I don't recall.

12      Q.     The cash withdrawals, did you ask her

13 to withdraw cash and give it to you?

14      A.     I don't recall.

15      Q.     Do you deny she withdrew on numerous

16 occasions large sums of money in cash and gave the

17 cash to you?

18      A.     I don't recall.

19      Q.     What did you do with all the cash that

20 she gave you?

21      MR. TEPLINSKY:  Objection.  Objection.

22 Assumes facts not in evidence.  The witness said he

23 doesn't recall.  There's been no testimony that

24 cash was given to Nick.
```

Urlaub Bowen & Associates, Inc.   312-781-9586

NICHOLAS GOULETAS, 02/10/2017

1  BY MR. ARMSTRONG:

2      Q.    Do you deny that Dorothea Touris

3  routinely give you large sums of cash?

4      A.    I don't recall.

5      Q.    Is there any part of your memory to the

6  effect that Dorothea Touris would give me cash?

7      A.    I don't recall.

8      Q.    Did you ever request Dorothea Touris to

9  give you cash?

10     A.    I don't recall.

11     Q.    Did Dorothea Touris ever ask you if she

12 could borrow $90,000 from you?

13     A.    I don't recall.

14     Q.    Did you ever loan any money to Dorothea

15 Touris?

16     A.    I don't recall.

17     Q.    Did you ever provide any money to

18 Dorothea Touris?

19     A.    I don't recall.

20     Q.    Who would know the answers to these

21 questions?

22     A.    I do not know.

23     Q.    What is Europa Holding Company?

24     A.    I don't recall.

NICHOLAS GOULETAS, 02/10/2017

Page 25

1  Exhibit 20 is a balance sheet.

2         MR. TEPLINSKY:  That I have.

3         MR. ARMSTRONG:  There should be attachments.

4         MR. TEPLINSKY:  Not with the copy I have.

5  You're right.  Sorry.

6         MR. ARMSTRONG:  Do you have the attachments?

7         MR. TEPLINSKY:  Yes, I do.

8  BY MR. ARMSTRONG:

9         Q.    Gouletas Exhibit 20 is a balance sheet

10  as of March 31, 2013 signed by you, correct?

11  That's your signature, isn't it?

12        A.    That is my signature.

13        Q.    And why did you sign it?

14        A.    I don't understand the question.

15        Q.    You signed Exhibit 20, that balance

16  sheet for Nicholas S. Gouletas as of March 31,

17  2013.  Why did you sign it?

18        A.    I still don't understand your question

19  why did I sign it.

20        Q.    Why does someone sign a balance sheet?

21        A.    I don't know why someone signs a

22  balance sheet.

23        Q.    Why did you sign it?

24        A.    I'm going to assume that my accounting

NICHOLAS GOULETAS, 02/10/2017

Page 26

1  department or somebody there somewhere gave me this

2  as a balance sheet and I signed it.

3       Q.    Did you sign it for fun?

4       A.    I don't understand what fun means.

5       Q.    Did you sign it because you're

6  verifying as to the accuracy of the

7  representations?

8       A.    I signed it because probably my

9  accounting department gave it to me and said that

10 this is the balance sheet and I signed it.

11      Q.    What did you understand the import to

12 be?

13      A.    I don't understand the word import at

14 all.

15      Q.    What did you understand to be the

16 effect of your signature on that balance sheet?

17      A.    That this is what my accounting

18 department told me it was, so I signed it.

19      Q.    Would you expect your accounting

20 department to fairly and accurately represent

21 assets and liabilities?

22      A.    I would assume that.  I can't say that

23 they did or did not.  But I would assume at that

24 time that I probably thought it was accurate.

NICHOLAS GOULETAS, 02/10/2017

Page 44

1       A.    I don't recall.

2       Q.    If you conveyed your ownership interest

3   in NKM Garvey back to the LLC, can you tell me why

4   you would have done so?

5       A.    I don't recall.

6       Q.    In December of 2014, January 2015, did

7   you have any relationship with 800 South Wells

8   Phase II LLC?

9       A.    I don't know if I did or did not.  I do

10  not recall.

11      Q.    In December of 2014, January 2015, did

12  you have any relationship with Home by Invsco?

13      A.    I may or may not have.  I don't recall.

14      Q.    Marked as Touris Exhibit B, page 8.

15  There's a check dated January 21, 2015, to Dorothea

16  Touris in the amount of $396,218.84.  Reference

17  Home by Invsco.  Do you see the check?

18      A.    I see a copy of a check.

19      Q.    And it's signed by, looks like Howard

20  something.  Do you see the reference to Howard?

21      A.    Yes.

22      Q.    Can you tell me anything about this

23  $396,218.84 check to Dorothea Touris from the law

24  firm Beerman Pritikin?

NICHOLAS GOULETAS, 02/10/2017

Page 45

```
 1        A.    I don't recall exactly what it was in
 2   reference to.
 3        Q.    Can you tell me, do you have any
 4   recollection as to what it was in reference to?
 5        A.    I don't recall.
 6        Q.    Did Paul Jones ever lend money to
 7   Dorothea Touris?
 8        A.    I believe so.
 9        Q.    How much?
10        A.    I don't remember.
11        Q.    Marked as DT 10 as part of Touris
12   Exhibit B in front of you, there's a check dated
13   March 17, 2015, from Paul Jones to Dorothea Touris,
14   $415,000.  Do you see that?
15        A.    Yes, I do.
16        Q.    Does that pertain to the loan by Paul
17   Jones to Dorothea Touris as referenced on the
18   check, loan?
19        A.    I don't understand your question.
20        Q.    Okay.  You said you believed that there
21   was a loan by Paul Jones to Dorothea Touris.  Do
22   you recall that testimony?
23        A.    I don't recall.
24        MR. TEPLINSKY:  You just said it.  You just
```

NICHOLAS GOULETAS, 02/10/2017

Page 50

1     Q.     Where was it?  What was it?

2     A.     It was in Greece.  I don't remember

3  exactly where.

4     Q.     Was it a house, office building?

5     A.     I believe it was a lot.  May or may not

6  have had a house on it.  I don't recall.  At one

7  point it maybe had a house on it.  It might have

8  been torn down.  I'm not sure.

9     Q.     What happened to the lot in Greece that

10  may or may not have had a house on it?

11     A.     I don't recall.

12     Q.     Did you ever have an interest in a

13  house in Greece that your mother used to own?

14     A.     I think that's the house you're talking

15  about.

16     Q.     I don't know.  So you understood you

17  inherited your mother's interest in a house or lot

18  in Greece?

19     A.     I believe that's the house or lot.

20     Q.     Let me show you what has been marked as

21  Exhibit 175.  Purports to be some sort of message,

22  e-mail message from Evangeline Gouletas to Nicholas

23  Gouletas dated September 30th, 2014.  Do you see

24  that reference?

NICHOLAS GOULETAS, 02/10/2017

```
 1      A.      Yes, I do.

 2      Q.      And it refers to Mavro Lithari, house

 3  in Greece.

 4      A.      Yes, I see it.

 5      Q.      Is Mavro Lithari, is that a city, a

 6  town?

 7      A.      I'm not sure.

 8      Q.      Have you ever been to that house?

 9      A.      Yes, I have.

10      Q.      Do you recall receiving this e-mail

11  from your sister?

12      A.      I believe I did.

13      Q.      Did you receive it on or about

14  September 30, 2014?

15      A.      I don't remember when I received it.

16      Q.      "Dear Nick, as I told you a long time

17  ago there are a couple of problems with the house

18  in Mavro Lithari in Athens."  Do you see that

19  reference?

20      A.      Yes, I do.

21      Q.      Do you recall you had discussions with

22  your sister about problems with the house in Mavro

23  Lithari?

24      A.      I don't recall.
```

NICHOLAS GOULETAS, 02/10/2017

Page 55

1      Q.    Did you make on April 29, 2015, a

2   $1,500 gift or contribution to the Annunciation

3   Greek Orthodox Cathedral Church?

4      A.    I don't know if it was me or my wife.

5      Q.    Did you understand your wife's money

6   was put into Dorothea Touris' checking account?

7      A.    I don't recall.

8      Q.    Did you understand your money was put

9   into Dorothea Touris' checking account?

10     A.    I believe so.

11     Q.    Do you admit that on April 29, 2015,

12  you also made a separate $3,500 gift to charity,

13  the Annunciation Greek Orthodox Cathedral Church?

14     A.    I don't recall.

15     Q.    Did you ever examine or look at the

16  issue as to whether or not in April of 2015, you

17  made gifts to charities in excess of $600?

18     A.    I don't recall.

19     Q.    Did you read the bankruptcy schedules

20  before you signed them under penalty of perjury?

21     A.    I don't recall.

22     Q.    Is there any part of your understanding

23  that I'm signing these bankruptcy schedules under

24  pain and penalty of perjury?

NICHOLAS GOULETAS, 02/10/2017

Page 61

1   conversation with a partner.

2   BY MR. ARMSTRONG:

3        Q.    You're exactly correct.  Do you

4   recall -- I mean do you deny you had conversations

5   with Foley and Lardner attorneys about setting up a

6   safety deposit box?

7        A.    I do not recall.

8        Q.    Next page, page number 5 of

9   Exhibit 164.  June 12th, 2001.  VYC.  Let's see who

10  that is.  Vicky Y. Curts, do you know who she is?

11       A.    I do not recall.

12       Q.    Travel to Bank One to get information

13  regarding opening safe deposit box for Mr. Nick

14  Gouletas.

15       A.    I do not recall.

16       MR. TEPLINSKY:  He didn't ask you a question.

17  BY MR. ARMSTRONG:

18       Q.    Have you ever had access to a safety

19  deposit box?

20       A.    I don't recall.

21       Q.    When was the last time you opened up a

22  safety deposit box?

23       A.    I don't recall.

24       Q.    Where do you keep your valuable records

NICHOLAS GOULETAS, 02/10/2017

Page 62

1  and valuable pieces of jewelry?

2        MR. TEPLINSKY:  Objection.  Assuming facts

3  not in evidence.

4        A.    I have a wedding band.

5  BY MR. ARMSTRONG:

6        Q.    Where do you keep your valuable

7  records?

8        A.    I don't remember.

9        Q.    Would you authorize Foley and Lardner

10 to release to me and to the bankruptcy trustee

11 information about whether or not you opened up a

12 safety deposit box?

13       A.    I would have to get counsel on that.

14       MR. TEPLINSKY:  You've already served Foley

15 and Lardner with a subpoena in the state Court

16 proceeding which they have complied with, it's my

17 understanding.  Withholding only privileged

18 information.

19              Mr. Gouletas is maintaining his

20 attorney-client privilege with respect to all other

21 information.  If there is information relating to a

22 safe deposit box that does not reference a

23 privileged communication, my understanding is you

24 would have received it already.

NICHOLAS GOULETAS, 02/10/2017

Page 66

1     Q.    Where did the money come from?

2     A.    I don't understand your question.

3     Q.    $190,000, where did the money come

4 from?

5     A.    I don't understand your question.

6     Q.    You said you authorized Dorothea Touris

7 to pay $190,000 to your son as a repayment of a

8 debt that you owed to your son, correct?

9     A.    Exactly.

10    Q.    Where did the money come from?

11    A.    I don't recall.

12    Q.    Was it her money?

13    A.    Pardon me?

14    Q.    Was it her money?

15    A.    I don't recall.

16    Q.    Was it your money?

17    A.    I don't recall.

18    Q.    The $51,000 that came in in connection

19 with the sale of the CIB Marine Bank shares stock,

20 what happened to that money?

21    A.    I don't recall.

22    Q.    Did that money go to you?

23    A.    I don't recall.

24    Q.    Did the money go to your wife?

NICHOLAS GOULETAS, 02/10/2017

Page 67

```
 1      A.    I don't recall.

 2      Q.    Did you use any of that money for your

 3 own benefit?

 4      A.    I don't recall.

 5      Q.    Did you gift it to your wife?

 6      A.    I don't recall.

 7      Q.    Do you deny it was gifted to your wife?

 8      A.    I don't recall.

 9      Q.    Do you deny that you transferred that

10 $51,000 to your wife's account to hide it from your

11 creditors?

12      A.    I don't recall.

13      Q.    Who's Ron Braver?

14      A.    I don't recall.

15      Q.    Do you understand that there's been

16 what's called an adversary complaint filed by 800

17 South Wells Commercial LLC against you in

18 connection with this bankruptcy proceeding?

19      A.    I know there was a complaint.  I don't

20 exactly understand what the complaint is all about.

21      Q.    The plaintiff, 800 South Wells

22 Commercial LLC, you understand they're the party

23 that filed the complaint; they're the plaintiff?

24      A.    Okay.
```

NICHOLAS GOULETAS, 02/10/2017

Page 68

1        Q.    What's your understanding as to what

2   the plaintiff has done in connection with this

3   bankruptcy proceeding that you object to?

4        A.    I don't know.

5        MR. TEPLINSKY:  I don't understand the

6   question even.  Can you rephrase it?

7   BY MR. ARMSTRONG:

8        Q.    Do you believe the plaintiff has

9   unclean hands?

10        A.    I have no idea.

11        Q.    Tell me what facts you're aware of to

12   support a claim that the plaintiff has unclean

13   hands?

14        A.    I have no idea.

15        Q.    Do you believe the plaintiff has the

16   authority to proceed with this suit?

17        A.    I have no idea.

18        Q.    Tell me what facts you're aware of to

19   support any claim that the plaintiff does not have

20   authority to proceed with this suit?

21        A.    I have no idea.

22        MR. ARMSTRONG:  If you could please give me

23   five minutes to go through my notes, we are very

24   near the end.

# Px K

```
1   STATE OF ILLINOIS    )
                         )  SS:
2   COUNTY OF C O O K    )

3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - LAW DIVISION
4
    800 SOUTH WELLS COMMERCIAL    )
5   LLC,                          )
                                  )
6                 Plaintiff,      )
                                  )
7          vs.                    )  No. 2011 L 002895
                                  )
8   NICHOLAS S. GOULETAS and      )
    INVSCO MANAGEMENT COMPANY,    )
9   INC. (D/b/a American          )
    Invsco),                      )
10                                )
                  Defendants.     )
11

12       CITATION TO DISCOVER ASSETS of NICHOLAS S.

13  GOULETAS, taken under oath on Monday, October 20,

14  2014, at 161 North Clark Street, Suite 2600,

15  Chicago, Illinois, pursuant to the Rules of the

16  Supreme Court of Illinois and the Code of Civil

17  Procedure, before Christa Yan, Certified

18  Shorthand Reporter No. 084-004816, commencing

19  at 10:00 o'clock a.m., pursuant to notice.

20       APPEARANCES:

21           ARMSTRONG LAW FIRM, by
             MR. DEAN F. ARMSTRONG
22           (1324 Dartmouth Road
              Flossmoor, Illinois  60422
23            armstronglaw@sbcglobal.net)
                appeared on behalf of the plaintiff;
24
```



GOULETAS NICHOLAS S., 10/20/2014

```
                                                      Page 2
  1       APPEARANCES:  (Cont'd)

  2             BEERMANN PRITIKIN MIRABELLI SWERDLOVE,
                LLP, by
  3             MR. HOWARD L. TEPLINSKY
                (161 North Clark Street, Suite 2600
  4              Chicago, Illinois  60601
                 hteplinsky@beermannlaw.com)
  5               appeared on behalf of the defendants.

  6
                     *  *  *  *  *  *  *
  7
                       I N D E X
  8

  9  Witness:                              Page

 10       NICHOLAS S. GOULETAS

 11          Examination by:

 12             Mr. Armstrong.................... 4

 13
                     E X H I B I T S
 14

 15
     No.  Description              Marked/Referenced
 16
        9  Statement of Financial Affairs, Page
 17        12 of 13............................ 10
       11  Statement of Financial Affairs, Page
 18        1 of 13.............................  7
       19  Special Trust......................... 44
 19    27  Chase Checking Account............... 81
       28  Scheduling Book.......................116
 20    29  Business Card.........................118
       30  ID card...............................118
 21    31  Credit Card...........................119
       32  Receipt, Midwest Motorcycle
 22        Mechanics.............................120
       33  Handwritten Notes.....................122
 23    34  Handwritten Notes.....................123
       35  Unsigned Check........................124
 24    36  Associated Bank.......................130
       37  Jim Feldman Note......................145
```

Urlaub Bowen & Associates, Inc.  312-781-9586

GOULETAS NICHOLAS S., 10/20/2014

Page 3

1    38   Addressed Envelope.....................164
     39   Addressed Envelope.....................166
2    40   Addressed Envelope.....................166
     41   Cleveland Clinic Envelope.............167
3    42   Natel Matschulat, City Gold...........171
     43   Natel Matschulat, Bank of America.....172
4    44   Natel Matschulat, Bank of America.....172

5

6   (Exhibits 5, 11, 17, 19, 20, 26 attached/scanned.)

7

              (Exhibits 28, 41 withdrawn.)
8

9     (Exhibits 27 - 44 maintained by Mr. Teplinsky)

10
                       - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

GOULETAS NICHOLAS S., 10/20/2014

Page 4

```
 1                    (Witness sworn.)

 2                 NICHOLAS S. GOULETAS

 3  called as a witness herein, having been first duly

 4  sworn, was examined and testified as follows:

 5                      EXAMINATION

 6  BY MR. ARMSTRONG:

 7       Q.    Mr. Gouletas, my name is Dean Armstrong.

 8  We're here today for your judgment debtor or

 9  citation examination.  You're here today without

10  your doctor, correct?

11       A.    Correct.

12       Q.    If at any point you feel as though you

13  need to take a break, please do so.  Okay?

14       A.    Thank you.

15       Q.    That's a yes, correct?

16       A.    Correct.

17       Q.    All right.  And you just took an oath,

18  you realize that?

19       A.    Yes, I do.

20       Q.    To tell the truth, the whole truth, and

21  nothing but the truth, correct?

22       A.    Correct.

23       Q.    You take your oath seriously, don't you?

24       A.    Yes, I do.
```

GOULETAS NICHOLAS S., 10/20/2014

Page 204

1        Q.    All right.  November 2013, tell Judge

2  White, okay?  Prior to November of 2013, for the

3  month before, let's say October 2013, did you have

4  the pattern of practice of writing entries in a

5  check register like Gouletas Exhibit 27?  Do you

6  think you had that prior pattern of practice?

7        A.    No.  Because usually I had someone that

8  was doing that work and I was signing checks, okay?

9  So I didn't keep -- I did not keep that pattern.

10       Q.    Okay.

11       A.    Okay?  Now that I don't have anybody,

12  yeah, I sometimes write things down either on

13  yellow pieces of paper like you showed me, okay?

14  Or there to try to keep track.

15       Q.    Okay.

16       A.    But I've been trying to keep track.  I

17  have not kept track of everything that's going on.

18       Q.    In October of 2013, who kept track of

19  your check writing activity?

20       A.    I don't know.

21       Q.    For personal matters.

22       A.    I don't know.

23       Q.    After November of 2013, who keeps track

24  of your check writing activity?

GOULETAS NICHOLAS S., 10/20/2014

Page 205

1      A.    I don't know that I've been writing any

2  checks.  You know, I don't think I've written any

3  checks for the last couple months.

4      Q.    December of 2013?

5      A.    December.  Yeah, back then, I was

6  probably writing checks.  A year ago, you say?

7      Q.    Yeah.

8      A.    So probably.

9      Q.    Okay.  Where's the register for those

10 checks?

11     A.    I'm sure the bank has it.

12     Q.    No, no, no.

13     A.    I do not -- that's as much as I got,

14 right there.  You've got what I got.

15     Q.    But this was in your briefcase.  You

16 didn't produce it before.

17     A.    Yeah, it was in my briefcase.  I wasn't

18 hiding it.  But you can get all that from any bank

19 I've done business with, and you know that.  I

20 mean, you know, why are you continuing to harass me?

21     Q.    I'm not harassing you.

22     A.    You are.  I'm sorry, you're harassing

23 me.  You were screaming at me a while ago, you

24 know.

GOULETAS NICHOLAS S., 10/20/2014

Page 210

1       Q.    All right.  Is he still with FGMK?

2       A.    I'm not sure which firm he's with, but

3   I'm sure you can look him up.  I talked to him a

4   couple weeks ago.  He came over as a courtesy call

5   and told me he couldn't do my -- couldn't file my

6   tax account this year because I didn't pay him, and

7   his firm would not allow him to do it.

8       Q.    Last time you knew, he was in

9   Ban-a-cock-burn, B-a-n-n-o-c-k-b-u-r-n?

10      MR. TEPLINSKY:  Bann-ock-burn.

11  BY MR. ARMSTRONG:

12      Q.    Bann-ock-burn.  Last time you knew,

13  that's where he was located?

14      A.    Where he lived, or where he --

15      Q.    Where his office was.

16      A.    Oh, I have no idea where his office

17  was.  I would be glad to call him and give you his

18  name and address and phone number.

19      Q.    Would you, please?

20      A.    Absolutely.  He came to apologize that

21  he just couldn't do my tax account, so I have not

22  filed a tax return this year.

23      Q.    Take a look, sir, if you could, at

24  Gouletas Exhibit 20.  Is that your signature on the

GOULETAS NICHOLAS S., 10/20/2014

Page 211

1   first page?

2          A.     Yes, it is.

3          Q.     By your signature, does that indicate

4   that you've reviewed it, the information?

5          A.     Yes, it does.

6          Q.     Does that indicate to you that you've

7   reviewed it and approved it, and it's true and

8   correct to the best of your information?

9          A.     Whatever information I reviewed, yes.

10  I didn't do the accounting.

11         Q.     Okay.  Gouletas Exhibit 20, why was

12  this balance sheet prepared?

13         A.     I do not remember.

14         Q.     As of March 31, 2013, it shows cash in

15  the amount of $240,000.  Do you see that reference?

16         A.     No, I don't.

17         Q.     Assets, Cash, 240?

18         A.     That's $240, I believe, isn't it?

19         Q.     $240,000.

20         A.     I don't think so.  Is it?

21         MR. TEPLINSKY:  That's $240,000.

22         THE WITNESS:  Is it?  Okay.

23  BY MR. ARMSTRONG:

24         Q.     As of March 31, 2013, somebody

GOULETAS NICHOLAS S., 10/20/2014

Page 212

1  indicated you had cash of $240,000, correct?

2      A.    This sheet says -- yes, it says that

3  there's $240,000 sitting somewhere.

4      Q.    Where did that money come from?

5      A.    I have no idea.

6      Q.    Where did it go?

7      A.    I don't remember.

8      MR. TEPLINSKY:  A little over a hundred

9  thousand of it was taken by a creditor.

10  BY MR. ARMSTRONG:

11      Q.    Anything else, sir?

12      A.    Oh, that's when they locked up the

13  account.

14              No, but I'm sure that, if you'd

15  like, whoever prepared it can come and answer your

16  questions.  I didn't prepare it.

17      Q.    Okay.  You signed off on it.

18      A.    I sign off on a lot of things.

19      Q.    Okay.  But does your signature mean

20  anything?

21      A.    It means I signed off.  It does not

22  mean that I prepared it.  It does not mean that

23  I -- there's no way that I would know how they came

24  to all these figures.  And nobody in my position

GOULETAS NICHOLAS S., 10/20/2014

Page 216

1        Q.    Do you have any reason to disagree with

2   the representation in Gouletas Exhibit 20 that as

3   of March 31, 2013, you had no liabilities?

4        A.    I don't know.  Don't know.  Seems a

5   little odd to me.

6        Q.    On Gouletas Exhibit 20, it reflects

7   a net worth of $25,287,563.  Do you see that

8   reference?

9        A.    Yes, I do.

10        Q.    Is that a fair and accurate

11   representation of your net worth as of March 31,

12   2013?

13        A.    According to this piece of paper.

14        Q.    Do you have any reason to disagree with

15   that?

16        A.    I don't have any reason to disagree,

17   but when I see that it says "none liabilities," I

18   wonder how I could have no liabilities at any

19   particular time.

20        Q.    Well, what do you think your

21   liabilities were in March of 2013?

22        A.    I have no idea.  No idea.

23        Q.    Can you list any?

24        A.    Say again?  I have no idea.  I'm not an

Urlaub Bowen & Associates, Inc.  312-781-9586

# Px L

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | No. 16-01335 |
| | ) | |
| Debtor. | ) | Hon. Timothy A. Barnes |
| ——————————————— | ) | |
| | ) | |
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 1:16 ap 141 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

### AFFIDAVIT OF DANIEL C. CADLE

My name is Daniel C. Cadle. I am over the age of 21, fully competent to make this affidavit, and personally acquainted with the facts and matters set forth herein. If called upon to testify at trial or a hearing in the above matter, I could and would testify as follows:

1.     I am the duly appointed Manager of D.A.N. Joint Venture III, L.P. ("DJV"), which in turn is the duly appointed Manager of Plaintiff 800 South Wells Commercial LLC ("800 SWC"), the Plaintiff herein, and as such, I am authorized to submit this Affidavit on Plaintiff's behalf.

2.     The paragraphs numbered below correspond to the numbered paragraphs in Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment.

19.     On November 16, 2006, DJV, as the owner and holder of the Second Mortgage loan, took over control of the voting rights of 800 SWC pursuant to a Pledge Agreement (Px 32-

A) delivered to CIB Bank ("CIB"), which was later assigned to DJV. Thereafter, DJV removed Defendant/Debtor Nicholas S. Gouletas ("Gouletas") as the manager of 800 SWC, and itself became the manager of 800 SWC.

20.    On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, alleging that Gouletas breached the fiduciary duties that he owed to 800 SWC by participating in the scheme with 800 SWC's vice president, John Cadden, to loot the assets of 800 SWC, and by grossly mismanaging the affairs of 800 SWC by self-dealing (the "Underlying Suit").

21.    After Gouletas failed to sit for his deposition despite numerous court orders to do so, on December 5, 2013 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Court in the Underlying Suit on December 11, 2013.

22.    After Gouletas, once again, failed to sit for his deposition, on January 23, 2014 the Court in the Underlying Suit entered a Default Judgment against Gouletas in the amount of $11,550,040.12 (the "Judgment").

73.    Further, pursuant to the Pledge Agreement, River City Investors ("RCI") and Gouletas agreed that, upon default by 800 SWC in repayment of the full amount of financial obligations owed by 800 SWC, CIB (now DJV) could serve as the manager of 800 SWC unless and until the full amount of the financial obligations owed by 800 SWC to DJV was paid in full. (Px 32-A ¶¶1.1, 4.1, 4.8, 4.12 & 6.1) To date, the full amount of the financial obligations owed by 800 SWC to DJV has not been paid in full.

Under penalties as provided pursuant to Section 1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: August 2/, 2017

Daniel C. Cadle

Daniel C. Cadle

# Px M

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | No. 16-01335 |
| | ) | |
|     Debtor. | ) | Hon. Timothy A. Barnes |
| | ) | |
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 1:16 ap 141 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | |
| | ) | |
|     Debtor/Defendant. | ) | |

### AFFIDAVIT OF F. DEAN ARMSTRONG

My name is F. Dean Armstrong. I am over the age of 21, fully competent to make this affidavit, and personally acquainted with the facts as set forth herein. I am an attorney licensed to practice law in the State of Illinois, and I am lead counsel for Plaintiff 800 South Wells Commercial LLC ("800 SWC") in connection with the above Adversary Proceeding.

1.    The paragraphs numbered below correspond to the numbered paragraphs in Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment.

26.    Due to the failure of Defendant/Debtor Nicholas S. Gouletas ("Gouletas") to pay the amount owed under the January 23, 2014 Judgment entered against Gouletas in the Underlying Suit, on June 5, 2014 800 SWC filed a Citation to Discover Assets against Gouletas (the "Citation") in connection with the Underlying Suit (the "Citation Proceedings"). The Citation was served on Gouletas on or about June 9, 2014.



27.    At all times during the Citation Proceedings, Gouletas was represented by Howard Teplinsky, Esq. from the firm of Beermann Pritikin Mirabelli Swerdlove LLP.

30.    At no time during the Citation Proceedings did Gouletas either amend or supplement his Citation Answer; his Citation Disclosure Form; or his Citation Interrogatory Responses.

31.    In neither Gouletas' Citation Answer, nor in his Citation Disclosure Form, did Gouletas disclose any stock ownership in CIB Marine BankShares, or his interest in a stock brokerage account at TD Ameritrade. Through our investigation conducted during the Citation Proceedings, we learned that Gouletas did, in fact, own shares of stock in CIB Marine BankShares (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (the "TDA Account"). Further, through our investigation, 800 SWC learned that on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000, and then, on or about that same date, wire transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat.

32.    Further, through our investigation conducted during the Citation Proceedings, 800 SWC uncovered evidence that Gouletas may have violated the Citation lien by obtaining and then cashing numerous cashier's checks issued in his name.

33.    Based on the alleged violations by Gouletas of the Citation lien, on April 24, 2015 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015.

35.    The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with the motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in this Court.

36.    The Citation Proceedings continued in existence at all times from the date the Citation was filed on June 5, 2014 until the date that Gouletas filed for bankruptcy on January 17, 2016.

39.    While in his Answer to this Adversary Proceeding Gouletas now admits that he, along with his sister, inherited the Greece Property, at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or Citation Disclosure Form to reflect his ownership interest in the Greece property, or otherwise disclose his ownership interest in the Greece Property.

42.    While in connection with his Chapter 7 bankruptcy proceeding Gouletas now admits that he did, in fact, own certain valuable items of personal property, at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or Citation Disclosure Form to reflect his ownership interest in those valuable collectible items, or otherwise disclose his ownership interest in those items.

45.    The "SEG" in SEG Garvey, LLC stands for Gouletas' son, Steven E. Gouletas, and the "NKM" in NKM Garvey, LLC refers to Gouletas' wife, Natel K. Matschulat.

47.    While in his Answer to this Adversary Proceeding Gouletas now admits that he does, in fact, own a percentage of NKM Garvey, LLC, at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Int. Resp. to reflect his ownership interest in NKM Garvey, LLC, or otherwise disclose his ownership interest in that entity.

49.     At no time did Gouletas reveal that he was, during the Citation Proceedings, depositing his funds into two checking accounts in the name of his close personal friend, Dorothea Touris ("Touris"), and then having Touris write checks from those accounts for his personal financial benefit.

57.     The Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy herein on January 17, 2016.

65.     At no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or his Citation Disclosure Form to reflect his deposit of funds into Touris' checking accounts, or otherwise disclose his deposit of funds into and use of Touris' checking accounts.

77.     The exhibits referred to in Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment (specifically, Pxs A, B, C, D, E, F, H, I, J, K, L, M, N, O, P, Q, R, S, T, 15, 17, 20, 29, 32-A, 101, 120, 122, 127, 128, 139, 176, 177, 178, 179, 180, 181, 182 & 183) are true and correct copies of the original; are what they purport to be; and are admissible in evidence in this action.

Under penalties as provided pursuant to Section 1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: August **21** 2017                                    _____
                                                                      F. Dean Armstrong

Px N

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT - LAW DIVISION
 2
     800 SOUTH WELLS COMMERCIAL, LLC,  )
 3                                     )
                    Plaintiff,         )
 4                                     )  No. 11 L 2895
         vs.                           )
 5                                     )
     NICHOLAS S. GOULETAS and INVSCO   )
 6   MANAGEMENT COMPANY, INC., d/b/a   )
     AMERICAN INVSCO,                  )
 7                                     )
                    Defendants.        )
 8
          TESTIMONY OF:  NICHOLAS S. GOULETAS
 9

10        REPORT OF PROCEEDINGS at the hearing of

11   the above-entitled cause before the Honorable

12   Alexander P. White, Judge of said court, on

13   Tuesday, November 24, 2015, commencing at 11:41 a.m.

14

15

16

17

18

19

20

21

22   Reported by:   Katie K. Elliott
                    CSR No. 084-004537
23

24
```

$P_x N$

NICHOLAS S. GOULETAS, 11/24/2015

```
                                                    Page 2
 1    APPEARANCES:

 2        ARMSTRONG LAW FIRM, PC, by
          MR. DEAN F. ARMSTRONG
 3        (1324 Dartmouth Road,
           Flossmoor, Illinois   60422
 4         708.798.1599
           armstronglaw@sbcglobal.net)
 5           appeared on behalf of the plaintiff;

 6        BEERMANN PRITIKIN MIRABELLI SWERDLOVE,
          LLP, by
 7        MR. HOWARD L. TEPLINSKY
          (161 North Clark Street, Suite 2600
 8         Chicago, Illinois   60601
           312.621.9700
 9         hteplinsky@beermannlaw.com)
             appeared on behalf of the defendants.
10

11              *   *   *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24
```

NICHOLAS S. GOULETAS, 11/24/2015

Page 3

```
 1          THE CLERK:  Step up 800 versus Gouletas.

 2          MR. TEPLINSKY:  Morning, your Honor.  Howard

 3   Teplinsky for Mr. Gouletas.

 4          MR. ARMSTRONG:  Good morning, Judge.  Dean

 5   Armstrong for plaintiff, judgment creditor,

 6   800 South Wells Commercial.

 7                We're here for a continuation of the

 8   contempt hearing after the amended motion for

 9   contempt.

10          MR. TEPLINSKY:  Correct.

11          THE COURT:  So we have a witness.

12          MR. TEPLINSKY:  We have a witness.

13          MR. ARMSTRONG:  Yes, your Honor, we do.

14          MR. TEPLINSKY:  I want to just let everybody

15   know that -- Mr. Gouletas reminded me of this on

16   the way in.  It may or may not -- it will likely

17   not be an issue, but he's taking some diuretic

18   pills, so it's quite possible that he will --

19          THE COURT:  Need a break.

20          MR. TEPLINSKY:  -- need a break on fairly

21   short notice.  So okay?

22          MR. ARMSTRONG:  Give me one minute, your

23   Honor.  Let me finish setting up.

24                In case there's a dispute, these are
```

NICHOLAS S. GOULETAS, 11/24/2015

Page 5

```
 1        A.    Yes.  I have a new valve and five

 2  bypasses and five stents put in, and the doctor

 3  keeps me under --

 4        Q.    Okay.

 5        A.    -- water pills.

 6        Q.    Your mental facilities are otherwise

 7  good?

 8        A.    Some of them.  Not my memory.

 9        Q.    Okay.  These two exhibits booklets in

10  front of you, the first exhibit booklet was

11  admitted into evidence in connection with the first

12  hearing.  Almost all of the exhibits we'll be

13  looking at today will be in the second exhibit

14  booklet that doesn't have a white page on the

15  front.  Okay?

16        A.    (No audible response.)

17        Q.    You recall that a citation to discover

18  assets, which contained a citation lien, was served

19  on you on June 7, 2014.  Do you understand that?

20        A.    Say it again, please.

21        Q.    A citation was served on you on June 7,

22  2014.

23        A.    Correct.

24        Q.    And you understood that part of that
```

Urlaub Bowen & Associates, Inc.   312-781-9586

NICHOLAS S. GOULETAS, 11/24/2015

Page 7

1       A.    I didn't understand -- I did not

2   understand that I could not be in business, if

3   that's -- I'm trying to answer your question

4   honestly.

5       THE COURT:  Sir, I'll try to explain it to

6   you.

7       THE WITNESS:  Yes, sir.

8       THE COURT:  We are talking about assets.

9   From the time that you received the citation, all

10  your assets were frozen.  If it meant that you

11  couldn't be in business, you couldn't be in

12  business.

13      THE WITNESS:  That's what I'm asking.  Does

14  it mean I couldn't be in business?

15      THE COURT:  Sir, the citation language speaks

16  for itself.  It said you will not transfer any

17  assets.

18  BY MR. ARMSTRONG:

19      Q.    Let me show in your exhibit booklet

20  Plaintiff's Exhibit 119.

21      MR. ARMSTRONG:  And, Mr. Teplinsky, rather

22  than hand them back to you here, if you could --

23  thank you.

24

NICHOLAS S. GOULETAS, 11/24/2015

Page 13

```
 1   correct.

 2        Q.    Same day you had a cashier's check made

 3   payable to you, correct?

 4        A.    Correct.

 5        Q.    Did you ask permission to do that?

 6        A.    No, I did not.

 7        Q.    Then you cashed that check, didn't you,

 8   sir?

 9        A.    I don't know what I did with that check.

10        Q.    The stamp on the bottom, does that

11   indicate to you it was cashed?

12        A.    I don't know what that stamp on the

13   bottom indicates.

14        Q.    What did you do with the money?

15        A.    I don't know what I did with the money.

16        Q.    Did you understand you were under a

17   judicial lien not to transfer your funds without

18   permission from the Court?

19        A.    I did not understand that I was not to

20   be in business.

21        Q.    Take a look at Exhibit 122, please, sir.

22               122 is a cashier's check in the

23   amount of $10,000 dated August 1, 2014.  The

24   remitter is you, correct, sir?
```

NICHOLAS S. GOULETAS, 11/24/2015

Page 14

```
 1      A.    Correct.

 2      Q.    Paid to the order of you, correct, sir?

 3      A.    Correct.

 4      Q.    $10,000; August 1, 2014.

 5            Your signature cashing that check is

 6  on the copy at the bottom of Exhibit 122, correct?

 7      A.    Correct.

 8      Q.    That's your signature?

 9      A.    Correct.

10      Q.    What'd you do with that money, sir?

11      A.    I do not know what I did with that

12  money.  I don't remember.

13      Q.    Was there a plan?

14      A.    I don't remember what I did with that

15  money.

16      Q.    We're going to go through a series of

17  cashier's checks.

18            Was there a plan for you to try to

19  circumvent the court order by getting cashier's

20  checks?

21      A.    No, there was not.

22      Q.    It just happened that way.

23      A.    I don't remember why it happened that

24  way.
```

NICHOLAS S. GOULETAS, 11/24/2015

Page 23

1  is what directs someone else to transfer stock for

2  you?

3       A.   If that's what -- if that's what stock

4  power means, that's what it means.  I -- I do not

5  know what stock power -- if somebody asked what it

6  means, I do not work in the stock market.  I don't

7  usually do stock.

8       Q.   Exhibit 138, that's your signature, and

9  it's dated August 28, 2014, correct?

10      A.   Excuse me?  Are you talking about here

11  now?

12      Q.   Yes, sir.  Exhibit 138.

13      A.   That is my signature, correct.

14      Q.   Dated August 28, 2014.

15      A.   I'm looking -- I'm looking for the date.

16      Q.   It's across from your signature.

17      A.   Correct.

18      Q.   Take a look, sir, to Exhibit 101.

19           101 is an Ameritrade form signed by

20  you, correct, dated September 4, 2014?

21      A.   Correct.

22      Q.   Did you instruct TD Ameritrade to sell

23  your CIB Marine stock, as reflected by Exhibit 139?

24      A.   Correct.

NICHOLAS S. GOULETAS, 11/24/2015

Page 24

1        Q.     Pardon?

2        A.     Yes.

3        Q.     Your stock.

4        A.     That's my signature and whatever the --

5        Q.     My only point, sir:  Your stock, your

6   money, correct?

7        A.     That is my signature, and that is --

8   that is a form of how they are to sell things.

9        Q.     How they are to --

10       A.     It says outbound wire request.

11       Q.     You understood your CIB Marine

12   Bancshare stock was sold for a little over $51,000,

13   correct?

14       A.     It says here the amount of wires,

15   $51,323.29, so I presume that's accurate.

16       Q.     You understood that was your money,

17   correct?

18       A.     I don't know whose money it was.

19       Q.     But it was your stock, correct?

20       A.     The stock was in my name, I presume,

21   because that's what they said when they called me.

22       Q.     So if the stock was in your name, the

23   stock is sold, who owns the money for the sale of

24   the stock?

NICHOLAS S. GOULETAS, 11/24/2015

```
 1   money.
 2        Q.    Well, you had money from the sale of
 3   your stock, didn't you?
 4        A.    No.
 5        Q.    You didn't have that money because you
 6   put it in your wife's account.
 7        A.    No.
 8        Q.    What'd you do with that money?
 9        A.    I paid back people that had invested in
10   it.  I did not get a penny from it.  Not one single
11   penny.  I paid the investors, okay, back their
12   money but not all their money.  A portion of their
13   money.  They still have a lot of money in there
14   that they'll never get.
15        Q.    You had $51,000 come in in September
16   2014.
17        A.    Yes.
18        Q.    You put it in your wife's account.
19        A.    It was tran -- it was sent to my wife's
20   account, right.
21        Q.    So if someone were suspicious, we've
22   got money going to you, going into your wife's
23   account, and then money going out of your wife's
24   account to pay your bills.  Fair enough?
```

Urlaub Bowen & Associates, Inc.  312-781-9586

NICHOLAS S. GOULETAS, 11/24/2015

Page 77

```
 1        A.    No, it isn't fair enough.

 2        Q.    You remember we had the discussion

 3    about Foley & Lardner, the estate planning

 4    attorneys, about documents that they had?

 5        A.    Please refresh my memory.

 6        Q.    July 2015 --

 7        MR. ARMSTRONG:  May I approach the witness,

 8    your Honor?

 9        THE COURT:  (Nodding.)

10    BY MR. ARMSTRONG:

11        Q.    Testimony in this case, page 51.  I'm

12    sorry, 51.

13        A.    Go ahead.

14        Q.    Line 15 through 24; then page 53,

15    lines 7 through 10:

16                        "Question -- Armstrong to

17                        you -- You'd have no objection

18                        with me contacting Foley &

19                        Lardner to check and see the

20                        schedule of initial listing of

21                        assets and liabilities you

22                        provided to them both in 2001

23                        and 2006?

24                        "Answer:  Absolutely no
```

Urlaub Bowen & Associates, Inc.   312-781-9586

# Px O

```
 1       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
 2
     800 SOUTH WELLS COMMERCIAL,    )
 3   LLC,                           )
                                    )
 4                 Plaintiff,       )
                                    )
 5         vs.                      )   No. 2011 L 003895
                                    )
 6   NICHOLAS S. GOULETAS and       )
     INVSCO MANAGEMENT COMPANY,     )
 7   INC. (d/b/a) AMERICAN          )
     INVSCO,                        )
 8                                  )
                   Defendants.      )
 9

10        TESTIMONY OF NICHOLAS GOULETAS

11

12        REPORT OF PROCEEDINGS at the hearing of the

13   above-entitled cause before the Honorable ALEXANDER

14   P. WHITE, Judge of said court, Daley Center Room

15   2503, on September 21, 2015, commencing at 11:45

16   a.m.

17

18

19

20

21

22   Reported by:  Pauline Strohl
                   CSR No. 084-001253
23

24
```

Px O

HEARING, 09/21/2015

**Page 2**

1  APPEARANCES:
2      ARMSTRONG LAW FIRM PC, by
        MR. DEAN F. ARMSTRONG
3      (1324 Dartmouth Road
        Flossmoor, Illinois 60422
4      708.798.1599
        Armstronglaw@sbcglobal.net)
5
        appeared on behalf of the plaintiff;
6
7      BEERMANN PRITIKIN MIRABELLI SWERDLOVE,
        LLP, by
8      MR. HOWARD L. TEPLINSKY
        (161 North Clark Street, Suite 2600
9      Chicago, Illinois 60601
        312.621.9700
10     Hteplinsky@beermanlaw.com)
11     appeared on behalf of the defendants.
12
                * * * * * * *
13
14     MR. ARMSTRONG: Good morning, your Honor.
15 Dean Armstrong on behalf of the plaintiff and
16 movant, 800 South Wells Commercial. This is a
17 continuation of the motion for indirect civil
18 contempt against the judgment debtor, Nicholas S.
19 Gouletas.
20     MR. TEPLINSKY: Good morning, your Honor.
21 Howard Teplinsky for Mr. Gouletas who's in court.
22     MR. ARMSTRONG: We're ready to proceed, your
23 Honor.
24     MR. TEPLINSKY: Your Honor, before we do

**Page 3**

1  that, we were here approximately four hours or so
2  first go around. We took a break during which case
3  Mr. Armstrong served some subpoenas, viewed some
4  documents and the like. And in terms of planning
5  what the rest of this is going to look like, I'm
6  wondering, for example, what Mr. Armstrong was
7  given access to was the entire office and all of
8  the documents in the office.
9      He received documents from Foley and
10 Lardner. He received documents from a Steven
11 Gouletas. Took his deposition. There are seven
12 categories of things that Mr. Armstrong claims
13 Mr. Gouletas failed to produce. This is a motion
14 for indirect civil contempt which means that the
15 way to -- the only way Mr. Gouletas would be able
16 to purge himself or overturn the contempt is to
17 hand over the things that Mr. Armstrong alleged
18 were insufficient.
19     We don't think there's anything
20 left. We don't agree that Mr. Gouletas was ever in
21 contempt of court. But the landscape has changed
22 significantly since the last time we were in court.
23 And I think that at a minimum the scope of this is
24 narrowed substantially.

**Page 4**

1      And I just want to get a sense of
2  what it is that we're going to be doing here. He
3  can't show him anymore. He can't show
4  Mr. Armstrong any more documents related to his
5  businesses because he let him and his client loose
6  in the business to look at every piece of paper
7  that they have there, for example. Foley and
8  Lardner, hand over all of the estate documents that
9  Mr. Armstrong was apparently looking for. So I'm
10 just not sure where we're going to go with this.
11     THE COURT: The subject of this hearing deals
12 with a rider that was submitted to the judgment
13 debtor in which he was to produce all the documents
14 or an affidavit or object to any part of the rider.
15 So the rider speaks for itself. If there are
16 things that are still missing, okay, that we
17 haven't got to purging yet because we haven't got
18 any contempt.
19     MR. TEPLINSKY: Correct.
20     THE COURT: We don't have any sanctions. We
21 don't have any penalties. As a result of it, I
22 think it's premature. What it is we have to
23 have a case where -- which of course is rebuttable,
24 in which we indicate that there are still

**Page 5**

1  violations of the requests contained in the rider.
2      MR. TEPLINSKY: I understand that. The
3  motion for indirect civil contempt of court however
4  was much more narrow than that. And indicated
5  seven areas that were deficient. Due process says
6  that's what I'm here to respond to. This is
7  indirect civil contempt. And that's what we're
8  prepared to be here to respond to.
9      And as a side matter we think
10 everything else in the rider was spoken for which
11 is why there were only these seven categories
12 included. But having said that, if at the end of
13 the day --
14     THE COURT: They have to make a prima facie
15 case indicating what parts of the rider were not
16 complied with. And you know, once he does that,
17 the burden shifts over to the other side to show
18 that there was compliance with it.
19     MR. TEPLINSKY: I understand that.
20     THE COURT: Instead of getting ahead of
21 ourselves, let's see what they have to say to show
22 that there are violations of either production of
23 documents or an inability to present, certain
24 things were requested, responding to questions or

HEARING, 09/21/2015

Page 14

1 and after the date of the service of the citation,
2 June 9, 2014, from and after that date you couldn't
3 transfer certain assets?
4    A.   I didn't think I had.
5    Q.   You didn't think you had what?
6    A.   Transferred certain assets.
7    Q.   Whether you had or you didn't?
8    A.   I didn't think I had.
9    Q.   Okay. All right. Did you understand
10 that from an after June 9, 2014, you were
11 prohibited from transferring nonexempt assets?
12    A.   I didn't think I had.
13    Q.   Whether you thought you had or not,
14 let's back up. Did you understand from and after
15 June 9, 2014, you couldn't transfer certain assets?
16    A.   I didn't think I had.
17    Q.   I don't know what that means I didn't
18 think I had.
19    A.   I didn't think I had transferred
20 certain assets.
21    Q.   So back up. Did you understand from
22 and after June 9, 2014, you were prohibited, not
23 whether you did or you didn't, from and after
24 June 9, 2014, you were prohibited from transferring

Page 15

1 certain assets?
2    A.   I have to state I'm not a lawyer. I
3 did not think I had transferred assets.
4    THE COURT: Did you read the citation?
5    A.   I read the citation, your Honor.
6    THE COURT: And it said you shall not
7 transfer any assets.
8    A.   Yes. And I did not think I had
9 transferred any assets. Okay.
10    MR. ARMSTRONG: Your Honor, the record will
11 speak for itself.
12 BY MR. ARMSTRONG:
13    Q.   In the small exhibit booklet,
14 Exhibit 17, first exhibit, this is Nicholas
15 Gouletas' income and asset disclosure form. Take a
16 look at page three. Tell me if that is your
17 signature under oath?
18    A.   That is my signature.
19    Q.   Page two of Exhibit 17, I have the
20 following accounts. You list some bank accounts,
21 right?
22    A.   It's a listing of bank accounts.
23    Q.   One, two, three, four, four bank
24 accounts. Then there's a final entry, other

Page 16

1 accounts. None. Do you see that reference?
2    A.   Correct.
3    Q.   You swore under oath you have no other
4 accounts other than as listed there on Exhibit 17,
5 correct?
6    A.   I believe so.
7    Q.   Did you have a stock brokerage account?
8    A.   I believe that when I signed this, I
9 did not believe I had a stock brokerage account.
10    Q.   Take a look at Exhibit A, rider A.
11 Category 1C. 1C. Do you see the reference there?
12 Account holding with brokerage firms. You didn't
13 produce any documents, did you, pertaining to any
14 brokerage firms?
15    A.   I don't believe I did.
16    Q.   Category D, stock certificates. You
17 didn't produce any stock certificates, did you?
18    A.   I don't believe I did.
19    Q.   Category rider A, IIB, transfers --
20 IIB, on the rider A. Transfers to or from any
21 brokerage accounts. Did you produce any documents
22 pertaining to that?
23    A.   I don't believe I did.
24    Q.   Why not?

Page 17

1    A.   Because I don't believe I knew that I
2 had any stock brokerage account.
3    Q.   In your small exhibit booklet, take a
4 look at PX 99.
5    MR. TEPLINSKY: May I have a copy?
6    MR. ARMSTRONG: Yes. I'm sorry,
7 Mr. Teplinsky.
8 BY MR. ARMSTRONG:
9    Q.   98, 99. This is a document I got from
10 your office. Do you know whose handwriting that
11 is?
12    A.   No, I don't.
13    Q.   877-373-6374, do you know whose phone
14 number that is?
15    A.   Not that I recall.
16    Q.   Have you ever heard of a company called
17 Comp Share or Compu-Share or Computer-Share?
18    A.   I do not know the number.
19    Q.   And after this handwriting from your
20 office Comps Share account number C00000, that's
21 five zeros, 11126, do you see that reference?
22    A.   Yes, I do.
23    Q.   Handwriting at the very bottom, is that
24 your handwriting? Open account, on line account

HEARING, 09/21/2015

**Page 18**

1 number, Tony Greenwood, is that your handwriting?

2   A.   No, it is not.

3   Q.   Do you have any idea what that

4 Compu-Share account number 0000011126, any idea

5 what that pertains to?

6   A.   I don't understand your question.

7   Q.   There's a reference in the handwritten

8 notes that I got from your office to Comps Share

9 and an account number.

10   A.   Yes.

11   Q.   Do you know what that Comps Share

12 account number pertains to?

13   A.   I don't know why I don't understand

14 your question.

15   Q.   Handwritten notes.

16   A.   I see the note.

17   Q.   From your office?

18   A.   I don't know where it came from.

19   Q.   Okay. Put that aside. Pretend it's

20 not there. Have you ever heard of Comps Share and

21 account number 0000011126?

22   A.   I've heard of Comps Share at a point in

23 time.

24   Q.   What's Comps Share?

**Page 19**

1   A.   Comps Share. Your Honor, may I ask you

2 a question? Your Honor?

3   THE COURT: Yes.

4   A.   This here was a complete surprise.

5 Okay. And someone called me and said how do you

6 want to vote your shares. I had no knowledge that

7 I had any shares whatsoever, none at all. And I

8 asked them what are you talking about shares. I

9 don't have any shares. They said well, you do.

10 How would you like to vote?

11   So I said, send me the information

12 on shares that I have so I can respond. I have no

13 knowledge of any shares. They called me out of the

14 blue in reference to voting the shares that I had

15 no idea that I had whatsoever.

16   And I asked them to send me the

17 information to tell me what shares they were

18 alleging I had and that they wanted me to vote.

19 And they sent me information on those shares that

20 they wanted me to vote. And that's where this came

21 up to.

22   THE COURT: Just to clarify for the record,

23 are we taking about a violation of a production

24 request or are we talking about a transfer of

**Page 20**

1 assets?

2   MR. ARMSTRONG: We're talking about three

3 things, your Honor. Violation of production

4 requests, number one. Number two, violation of

5 transfer of assets and violation of the citation.

6 And also number three, credibility. I'd like to

7 proceed, Judge, if I could.

8 BY MR. ARMSTRONG:

9   Q.   Mr. Gouletas, Mr. Gouletas, okay. So

10 you got a call. Somebody said how would you like

11 your shares voted. Okay. So you said what shares?

12   A.   Correct.

13   Q.   And you found out from and after the

14 date of the citation, June 9, 2014, you owned stock

15 in CIB Midland bank shares, correct?

16   A.   Correct.

17   Q.   And then after you found out that you

18 owned the stock, you transferred them, didn't you?

19   A.   When you say transferred --

20   Q.   Tell us what did you do with the CIB

21 bank shares from and after June 9, 2014, after the

22 date of the citation lien, what did you do with

23 them?

24   A.   I asked them to sell them.

**Page 21**

1   Q.   Sell them?

2   A.   Sell the shares.

3   Q.   All right. And then what did you do

4 with the money?

5   A.   I bought groceries and used them to

6 live on.

7   Q.   That's your story and you're sticking

8 with it?

9   A.   Pardon me?

10   MR. TEPLINSKY: Objection, argumentative,

11 your Honor.

12   A.   Pardon me?

13 BY MR. ARMSTRONG:

14   Q.   Did you transfer the money from --

15   THE COURT: I'm a little bit confused here.

16 We have a citation that says produce certain things

17 and don't transfer assets. And what I'm hearing

18 from the testimony is that apparently the stock was

19 sold. The money was forthcoming and was used to

20 buy food, which is a violation of the citation.

21   MR. ARMSTRONG: Two things, Judge. Number

22 one, I'm going to show the Court the documents that

23 he didn't produce. And then number two, I'm going

24 to show the Court what he just said is not the

Urlaub Bowen & Associates, Inc.   312-781-9586

HEARING, 09/21/2015

Page 30

1    Q.   Is it a secret account?
2    A.   I don't believe it's a secret account.
3 It's Republic Bank.
4    Q.   All right. So we're going to get into
5 other documents. You had check writing authority
6 out of that bank, didn't you?
7    A.   I don't believe that I did or did not
8 at that point have check writing authority. If I
9 wrote a check, I'm sure I had check writing
10 authority. I would not have written a check if I
11 did not have check writing authority.
12    Q.   Did you ask the Court for permission to
13 write a check to Computer Share after the date of
14 the service of the citation on you on June 9, 2014?
15    A.   I didn't know that I had the
16 responsibility to do that.
17    Q.   So you wrote a check to Computer Share
18 because you wanted to get your lost stock
19 certificates, correct?
20    A.   That's what I was advised to do if I
21 wanted to get them, yes.
22    Q.   And you said that you then paid the
23 check for the bond. You said you then got the
24 stock and used it for groceries?

Page 31

1    A.   Yes, for living expenses.
2    Q.   Take a look at Exhibit 101, sir. By
3 the way, before you go to that, Exhibit 99 wasn't
4 produced, your Honor. Exhibit 100 wasn't produced,
5 your Honor. Exhibit 101, that's the one we're on
6 now, this wasn't produced.
7    MR. TEPLINSKY:   Well, actually, your Honor,
8 if in fact these documents were obtained by some
9 other party, I have not received copies pursuant to
10 a subpoena. They have not been provided to me.
11 And I object if we're talking about transfer of
12 assets. This is not in his motion for indirect
13 civil contempt.
14    I'm seeing these things for the very
15 first time. This is an ambush. And the Appellate
16 Court and the Illinois Supreme Court says that in a
17 motion for contempt, you can't do this. This is
18 entirely unfair. These are being given to me for
19 the very first time. We didn't produce them
20 because we don't have them.
21    MR. ARMSTRONG:   Judge, I swear to tell the
22 truth, the whole truth and nothing but the truth,
23 so help me God. I got that document from Nick
24 Gouletas' office.

Page 32

1    MR. TEPLINSKY:   So then we did produce them.
2    MR. ARMSTRONG:   Right. But you didn't
3 produce them in response to the subpoena, in
4 response to the citation.
5    MR. TEPLINSKY:   Why else did you get them
6 then, Mr. Armstrong? We gave you carte blanche
7 over the documents in the office. We did it months
8 and months and months ago. This is completely
9 unfair and off base.
10    MR. ARMSTRONG:   What matters most, your
11 Honor, is the content. I'll withdraw anything --
12    MR. TEPLINSKY:   What matters most of all is
13 being bamboozled here by being given a motion for
14 indirect civil contempt that says one thing and
15 then Mr. Armstrong trying to prove something else.
16 That just isn't permitted.
17    MR. ARMSTRONG:   Credibility is always an
18 issue, Judge.
19    MR. TEPLINSKY:   This is not about
20 credibility. Stop it, Dean.
21    MR. ARMSTRONG:   May I proceed, please?
22    MR. TEPLINSKY:   Come on.
23    MR. ARMSTRONG:   May I proceed, please?
24    THE COURT:   Yes.

Page 33

1 BY MR. ARMSTRONG:
2    Q.   Exhibit 101, your signature in the
3 lower left-hand column, correct?
4    A.   That is my signature, correct.
5    Q.   You wanted to cash in that stock to pay
6 for groceries, correct?
7    A.   Pay for groceries and living expenses,
8 yes.
9    Q.   When did you open up an account at TD
10 Ameritrade?
11    A.   I believe and I can't -- I'm going back
12 with my memory. They told me in order to do that,
13 I had to have an account.
14    Q.   So you opened up an account at TD
15 Ameritrade?
16    A.   They told me I had to have an account
17 for them to refund the money.
18    Q.   Did you understand you're supposed to
19 disclose that in connection with your citation
20 proceedings?
21    A.   I did not understand it, no, I did not.
22    Q.   Take a look at this -- by the way, it
23 is your signature in the lower left-hand column
24 correct, sir?

HEARING, 09/21/2015

Page 34

1    A.   On page 101?
2    Q.   Exhibit 101, correct?
3    A.   I think I already said that, didn't I?
4    Q.   I apologize, sir. It will just save
5 time if you say, yes, that's my signature.
6    A.   Yes, that's my signature.
7    Q.   That's dated September 4th, 2014,
8 correct?
9    A.   That is correct.
10    Q.   And you were directing that the stock
11 be sold for $51,323.29 and you wanted that money
12 wired where, sir? Wait. I'm sorry. Previous
13 page. You wanted $51,323.29 wire transferred to an
14 account after the date of the service of citation
15 upon you into what account, sir? Excuse me. This
16 is the page we're looking at, sir.
17    A.   Do you want me to try to remember what
18 account I went and wired it?
19    Q.   How about what you filled out? You
20 signed this. You wanted the funds transferred to
21 your wife's account, Natel Matschulat, at Private
22 Bank, the funds wire transferred in, correct?
23    A.   Correct.
24    Q.   You wanted it wired in on

Page 35

1 September 5th, correct?
2    A.   Whatever the date was. I could not
3 tell you whether it was the fourth, fifth, sixth or
4 seventh.
5    Q.   Transferring funds for stock that you
6 owned after the date of the citation to your wife's
7 account. Did you understand that to be a violation
8 of the citation?
9    A.   No, I did not.
10    Q.   Why did you want the funds wire
11 transferred to your wife's account?
12    A.   Because my accounts were all locked up.
13    Q.   So you were using your wife's account
14 to conduct your business affairs?
15    MR. TEPLINSKY: Objection. You know what,
16 withdraw the objection.
17    A.   That's the only account that I could
18 have it wired or transferred to that was not locked
19 up.
20 BY MR. ARMSTRONG:
21    Q.   So after you had the form filled out to
22 get the stock, you wanted the stock sold and you
23 wanted the funds wired to your wife's account,
24 correct?

Page 36

1    A.   Correct.
2    Q.   Did you ever think maybe I better ask
3 the Court's permission?
4    A.   No, I did not because I did not know
5 that I would have to ask the Court's permission to
6 wire or to transfer these funds.
7    Q.   So we've got the payment for the bond
8 after the date of the citation, correct?
9    A.   Correct.
10    Q.   No permission requested, correct?
11    A.   I did not know that I had to request
12 permission. I'm sorry that I did not know.
13    Q.   We have after the date of the citation,
14 wire transferred the funds to your wife's account,
15 correct?
16    A.   Correct.
17    Q.   You didn't ask permission for that
18 either?
19    MR. TEPLINSKY: Your Honor, this has been
20 asked and answered. The witness has answered these
21 questions. Mr. Armstrong wants to do a summation,
22 a closing argument, I suppose we can deal with it
23 then.
24    MR. ARMSTRONG: I'll move on, your Honor.

Page 37

1 BY MR. ARMSTRONG:
2    Q.   Take a look at Exhibit 102, sir. Tell
3 me if that's your signature?
4    A.   That is my signature.
5    Q.   September 2, 2014, please issue
6 $51,323.85 check from account number 868-098840
7 made payable to Natel Matschulat, that's your wife,
8 correct?
9    A.   Correct.
10    Q.   Send the check to Chicago LaSalle
11 branch on September 5, 2014. Do you see that, sir?
12    A.   Correct.
13    Q.   So we've got the wire transfer of
14 funds. Now we've got you directing a check,
15 correct?
16    A.   Correct.
17    Q.   Who are you directing this to, someone
18 in your office?
19    A.   I don't understand your question.
20    Q.   Okay, you signed it. You're saying
21 please issue.
22    A.   Yes.
23    Q.   Who are you telling to issue? Please
24 issue check 51,323.85 check from account number