Px P

```
 1   STATE OF ILLINOIS    )
                          )  SS:
 2   COUNTY OF C O O K    )

 3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT - LAW DIVISION
 4
     800 SOUTH WELLS COMMERCIAL    )
 5   LLC,                          )
                                   )
 6                Plaintiff,       )
                                   )
 7           vs.                   )   No. 2011 L 002895
                                   )
 8   NICHOLAS S. GOULETAS and      )
     INVSCO MANAGEMENT COMPANY,    )
 9   INC. (D/b/a American          )
     INVSCO),                      )
10                                 )
                  Defendants.      )
11

12          The discovery deposition of STEVEN

13   GOULETAS, taken under oath on Thursday,

14   September 3, 2015, at 161 North Clark Street,

15   Suite 2600, Chicago, Illinois, pursuant to the

16   Rules of the Supreme Court of Illinois and the Code

17   of Civil Procedure, before Karen M. Kane, Certified

18   Shorthand Reporter No. 084-004706, commencing at

19   1:34 p.m., pursuant to notice.

20        APPEARANCES:

21            ARMSTRONG LAW FIRM, by
              MR. DEAN F. ARMSTRONG
22            (1324 Dartmouth Road
               Flossmoor, Illinois  60422
23             armstronglaw@sbcglobal.net)
                  appeared on behalf of the plaintiff;

24
```

1  APPEARANCES (continued):

2          BEERMANN PRITIKIN MIRABELLI SWERDLOVE,
           LLP, by
3          MR. HOWARD L. TEPLINSKY
           (161 North Clark Street, Suite 2600
4           Chicago, Illinois  60601
            hteplinsky@beermannlaw.com)
5             appeared on behalf of the defendants.

6

                   *   *   *   *   *   *   *

7
                     I N D E X
8  Witness:                              Page

9  STEVEN GOULETAS

10     Examination by:

11         Mr. Armstrong ....................    3
           Mr. Teplinsky ................... 125
12         Mr. Armstrong ................... 127
           Mr. Teplinsky ................... 130
13         Mr. Armstrong ................... 131

14              *  *  *  *  *  *  *  *

15              E X H I B I T S

16 Number                      Marked/Referenced

17 47  Document ............................ 106
   51  Document ............................ 112
18 54  Document ............................ 108
   58  American INVSCO Organization Chart ....   51
19 58A American INVSCO Organization Chart ....   51
   59  List................................   86
20 62A Sales Agreement.....................   23
   63  Notes Updated April 10, 2013...........   73
21 64  American INVSCO - List of Assets Currently
       for Sale December 9, 2011..............   82
22

23          (Exhibits scanned/attached.)

24

```
 1                    (Witness sworn.)

 2                  STEVEN GOULETAS

 3   called as a witness herein, having been first duly

 4   sworn, was examined and testified as follows:

 5                    EXAMINATION

 6   BY MR. ARMSTRONG:

 7        Q.    Mr. Gouletas, there's a lot of Gouletas

 8   names we're going to come across today.  So if I

 9   occasionally refer to you as Steve or Steven,

10   please take no offense.  Okay?

11        A.    Okay.

12        Q.    I may be referring to your father as

13   Nicholas Gouletas.

14              I also understand you have a brother

15   named Nick Gouletas.

16        A.    And a son.

17        Q.    And a son.  Okay.

18              In the Gouletas family how are they

19   generally referred to to distinguish one from the

20   other?

21        A.    My son is generally referred to as

22   Dylan, his middle name.

23              My brother oftentimes is referred to

24   as Nick, Jr., even though technically he's not a
```

Page 43

1     A.     Correct.

2     Q.     Did he negotiate for you?

3     A.     He negotiated for everyone who
4  received.

5     Q.     So he negotiated for you to receive an
6  interest in the food court once it was sold?

7     A.     Yes.

8     Q.     How did he negotiate for you to have an
9  interest?

10    A.     I wasn't present at the negotiations,
11 so I couldn't tell you how he did that.

12    Q.     How did you find out about it?  Did one
13 day you wake up and say "I'm a beneficiary"?

14    A.     Huh.  Let me think about that.  No.

15    Q.     You knew about it?

16    A.     I did.

17    Q.     Tell me about that.

18    A.     Before that.

19    Q.     When did it happen?

20    A.     Last year, June, July time frame.

21    Q.     June, July 2014?

22    A.     Yes.

23    Q.     How did you find out about it?

24    A.     He asked me to be the managing member

Page 44

1    over those entities, and I had to sign a number of

2    documents associated with that.

3        Q.    Where are those documents?

4        A.    Well, Liz has a copy of them and I have

5    a copy of them.  Liz Friedgut.

6        Q.    Is it F-r-i-e-d-g-u-t?

7        A.    I'm not sure, but I could probably look

8    it up for you.

9        MR. TEPLINSKY:  Yes, that's correct.

10   BY MR. ARMSTRONG:

11       Q.    Okay.  You said your father asked you

12   to be the managing member over these entities.

13   What did he say?

14       A.    He said, Steve, I trust you to manage

15   these assets for your siblings and my wife, and I'd

16   like you to be the managing member.

17             I'm like, Well, am I going to get

18   anything out of it?

19             And he said, No, you don't.  You

20   just get all the responsibility because this is

21   family and you're going to take care of it.

22             I'm like, I'm not happy with that

23   deal, but I'll do it.

24       Q.    You agreed to do it?

1       A.      I did.

2       Q.      And so you're managing -- your father

3   said, I trust you to manage these assets for my

4   siblings and my wife.

5               You got nothing out of it?

6       A.      Well, I got my share.  But for being

7   the managing member, I didn't get anything more

8   than anybody else did.

9       Q.      What are your responsibilities as

10  manager?  Because he's saying "I trust you to

11  manage these," so he's counting on you.

12      A.      I'm supposed to go to the meetings --

13  I'm sorry.  I cut you off.

14      Q.      "I trust you to manage these," so

15  apparently he felt as though there was something

16  important to be done in connection with these

17  assets.

18      A.      And so I'm to attend meetings when

19  meetings are held.  I'm supposed to ask, you know,

20  about the development of the project as it's

21  proceeding.

22      Q.      What are the assets?

23      A.      And so the plan is to build a building

24  where the food court is currently, apartment and

1  hotel.

2       Q.     Those assets went from Nick Gouletas to

3  you and your brother and sisters and grandchildren

4  and Natel Matschulat?

5       A.     We retained a 25 percent interest as a

6  group, and Big Horn purchased that asset and

7  retained a 75 percent interest.  And Nick also

8  contributed a number of other pieces of real

9  estate.

10      Q.     What other pieces of real estate did he

11  contribute?

12      A.     Asked and answered.

13      Q.     What other pieces of real estate did he

14  contribute?

15      A.     I still don't know, and I didn't know

16  the last time you asked me.

17      Q.     Do you have documents which show what

18  the transaction was?

19      MR. TEPLINSKY:  You do.

20      THE WITNESS:  Asked and answered and --

21      MR. TEPLINSKY:  We produced them.

22  BY MR. ARMSTRONG:

23      Q.     So certain Nick Gouletas' assets went

24  into this project?

Page 47

1        MR. TEPLINSKY:  Objection to the

2   characterization of these as Nick Gouletas' assets.

3        THE WITNESS:  Certain American INVSCO entity

4   assets would probably be appropriate.

5   BY MR. ARMSTRONG:

6        Q.    Certain American INVSCO assets went

7   into this project, correct?

8        A.    Correct.

9        Q.    And before they went into that project,

10  neither you, nor your siblings, nor Natel

11  Matschulat owned an interest in those properties,

12  correct?

13       A.    That is correct.

14       Q.    Nick Gouletas owned an interest in

15  those properties, correct?

16       A.    I believe so.

17       Q.    So he takes certain properties that he

18  owns an interest in, he transfers them into an

19  entity, and you get an interest in those assets

20  that you didn't have before, correct?

21       A.    Correct.

22       Q.    Natel Matschulat gets an interest in

23  those properties she didn't have before, correct?

24       A.    Correct.

Page 48

1      Q.    Your brother and sisters got an

2   interest in those properties they didn't own

3   before, correct?

4      A.    Correct.

5      Q.    Nick Gouletas' grandchildren got an

6   interest in those properties that they didn't have

7   before, correct?

8      A.    Correct.

9      Q.    What did you give to Nick Gouletas for

10  that transfer?

11     A.    I gave him nothing.

12     Q.    What did Natel Matschulat give to Nick

13  Gouletas for the transfer as far as you're aware?

14     A.    I'm not aware what she did or didn't

15  give him.

16     Q.    Same situation for your brother and

17  sisters, not aware what they gave?

18     A.    I don't believe they gave him anything.

19     Q.    Sometime around June of last year, why

20  did your father do this?  Was it part of estate

21  planning?

22     A.    You should ask him.

23     Q.    Why did you understand he did it, part

24  of the estate planning to take care of his assets?

Page 49

1      A.    Yeah, it was part of -- well, you just

2   said that.  I just figured he was being generous.

3      Q.    Well, there can be -- let's list the

4   possibilities.  Okay?

5              There can be gift --

6      MR. TEPLINSKY:  Well, I'm going to object.

7   Are you going to ask the witness to speculate?

8   Because you're throwing out various possibilities,

9   so I --

10      MR. ARMSTRONG:  The objection is noted.

11      MR. TEPLINSKY:  Okay.

12   BY MR. ARMSTRONG:

13      Q.    It can be estate planning.  You know

14   what estate planning is, don't you?

15      A.    I do.

16      Q.    Either reduce taxes or the ability to

17   transfer assets -- avoid probate for the transfer

18   of assets when somebody dies.  You understand that?

19   It could be a possibility, correct?

20      A.    Yes.

21      Q.    So you think it was because it was a

22   gift?

23      A.    Well, that's how I perceived it, yes.

24      Q.    And you talked to your brother and

1  sisters about it, and your understanding is they

2  believed it was a gift, too?

3       A.    I've talked to them about it, and I

4  would think they have the same understanding, yes.

5       Q.    Okay.  So the plan was to build a

6  building where the food court is and an apartment

7  and a hotel?

8       A.    Yes.

9       Q.    What happened to that plan?

10       A.    I don't know because the developer, Big

11  Horn, is not being communicative.

12       Q.    What was the last that you understood

13  where that project stood?

14       A.    They're seeking zoning and approval

15  from the condo association and the building to the

16  north to be able to develop the property.

17       Q.    Is there financing lined up?

18       A.    They had financing lined up to purchase

19  the property.

20            Whether there's financing lined up

21  to build the building or not, I don't know.

22       Q.    What's the address for the property?

23       A.    I think it's something on Clark.  It's

24  Clark and Lake Street.  I don't know the exact

1  address.

2      Q.    Do you know what the name of the entity

3  was that owned the property before there was this

4  Big Horn transaction?

5      A.    I'm going to screw it up, but it was

6  Garvey Court something.

7      Q.    Let me show you what I've had marked as

8  Exhibit 58 and 58A.  58 is rather small print.  58A

9  is the same thing but on two pages.

10             Have you ever seen this chart

11  before?

12     A.    I don't think so.

13     Q.    Okay.  American INVSCO Organization

14  Chart as of February 8, 2010.  Do you believe you

15  were still there at that time?

16     A.    I purchased National Rental Services

17  almost exactly that same time.  So I was either out

18  or on my way out.

19     Q.    Were there transaction documents in

20  connection with your purchase of NSR?

21     A.    NRS?

22     Q.    I'm sorry.  NRS.

23     A.    I can show you the money that I -- yes,

24  I believe there are.

1      Q.     Very good.

2                  On Garvey Court, you say you managed

3   the entity that holds the membership shares for

4   Natel, your siblings.  And did you say your what,

5   nieces and nephews?

6      A.     Yes.

7      Q.     What is the name of that entity?

8      A.     I'm happy to get it for you.  I don't

9   know off the top of my head.  I'm sorry.

10     Q.     If you could provide that to --

11     A.     Absolutely.

12     Q.     -- Mr. Teplinsky and then provide it to

13  me.

14     A.     It would be my pleasure.

15     Q.     What is that entity?  Is that an LLC;

16  do you know?

17     A.     It's an LLC.

18     Q.     Did your dad talk to you about this

19  Garvey Court gift before the gift to you?

20     A.     Yes.

21     Q.     What did he say?

22     A.     Just that he would like to, you know,

23  take care of us kids, his kids by giving us an

24  interest in this LLC, this entity, you know,

1   something to that effect.

2       Q.      Did you talk to Natel Matschulat about

3   this gift?

4       A.      I did not.

5       Q.      Did you talk to your sister Irene?

6       A.      It's my Aunt Irene.

7       Q.      I'm sorry.

8       A.      Nick's sister.  I did not talk to her.

9       Q.      Did you talk to your brother Nick about

10  it, Nick, Jr.?

11      A.      I talked to him about it, yes.

12      Q.      Did he think that this gift was a good

13  idea?

14      A.      He wanted the portion that was going to

15  go to him to go to his children rather than to him.

16      Q.      Did it?

17      A.      Yes.

18      Q.      I understand you had a sister that

19  passed away.

20      A.      Yes.

21      Q.      Her name was Deanna?

22      A.      Yes.

23      Q.      What's the name of your other sisters?

24      A.      The name of my other sisters are

Page 70

1    Desiree Witte, Victoria Gouletas, and Rosalie

2    Calhoun.

3         Q.     Did you talk to your sisters about this

4    gift pertaining to Garvey Court?

5         A.     I believe I did.

6         Q.     And what were their comments -- or what

7    did you say to them, what did they say to you?

8         A.     I told them that Nick wanted to give

9    them this interest in these entities and we're

10   going to send over documents for them to sign.

11        Q.     Did they ask what it was about?

12        A.     They wanted to know what -- you know, I

13   shared with them that it was basically about the

14   food court and that they're going to put up a

15   tower.

16        Q.     "Put up a tower," did you say?

17        A.     Yes, apartments and hotels and share in

18   the profits.

19        Q.     Did they ask you are there any

20   liabilities?

21        A.     I don't recall them asking me -- well,

22   they asked -- they asked if there were liabilities

23   in terms of signing for the mortgages, having any

24   personal liability as it relates to that.

1    that your dad owned three commercial condominiums

2    at that address?

3        A.    I knew that he had a penthouse, which

4    the elevator didn't go to and was not finished.

5    There was no plumbing or anything up there, no

6    walls.

7                 I believe the unit that you

8    previously mentioned --

9        Q.    4701?

10       A.    -- and maybe the space where he used to

11   have his sales center, but, you know, I think all

12   of that was included in the Garvey Court

13   properties.

14       Q.    You had a file set up for the Garvey

15   Court transaction, I recall you saying?

16       A.    I have a list of documents that were at

17   the closing.

18       Q.    It's your recollection there was some

19   properties at 200 North Dearborn that were part of

20   the Garvey Court transaction?

21       A.    I believe there were.

22       Q.    Let me show you Exhibit 64, please,

23   PX 64.  American INVSCO, and then it says List of

24   Assets Currently for Sale December 9, 2011.

1   square feet with 153 space parking lot).  Are you

2   familiar with that property, the last one?

3       A.    I'm familiar with the outdoor parking

4   lot there.

5       Q.    All right.  On the second page of

6   Exhibit 64, take a look at that, if you would,

7   please.

8              The description of 200 North

9   Dearborn.  Can you read the description here and

10  see if this looks like part of the properties that

11  were included in the Garvey Court gift?

12      MR. TEPLINSKY:  Objection to the

13  characterization of the Garvey Court gift.

14  BY MR. ARMSTRONG:

15      Q.    If I could, Mr. Steven Gouletas, you

16  said it was a gift, correct?

17      A.    No, I did not say that the transfer of

18  these assets were a gift.  That's incorrect.

19      Q.    Well, what was a gift to you was the

20  membership units in an entity that acquired those

21  properties?

22      A.    That is correct.

23      Q.    Okay.  If you could, take a minute to

24  read the paragraph No. 1 on page 2 of Exhibit 64.

Px Q

```
 1       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
 2
    800 SOUTH WELLS COMMERCIAL    )
 3  LLC,                          )
                                  )
 4              Plaintiff,        )
                                  )
 5         vs.                    )   No. 11 L 2895
                                  )
 6  NICHOLAS S. GOULETAS and      )
    INVSCO MANAGEMENT COMPANY,    )
 7  INC., d/b/a AMERICAN INVSCO,  )
                                  )
 8              Defendants.       )

 9

10       The discovery deposition of STEVEN GOULETAS,

11  taken under oath on Friday, January 27, 2017, at

12  161 North Clark Street, Suite 2600, Chicago,

13  Illinois, pursuant to the Rules of the Supreme

14  Court of Illinois and the Code of Civil Procedure,

15  before Pauline Strohl, Certified Shorthand Reporter

16  No. 084-001253, commencing at 10:00 a.m.

17       APPEARANCES:

18          ARMSTRONG LAW FIRM PC, by
            MR. F. DEAN ARMSTRONG
19          (1324 Dartmouth Road
             Flossmoor, Illinois  60422
20           708.798.1599
             Armstronglaw@sbcglobal.net)
21
               appeared on behalf of the plaintiff;
22

23

24
```



STEVEN GOULETAS, 01/27/2017

```
                                                        Page 2
 1        APPEARANCES:  (Cont'd)

 2            BEERMAN, PRITIKIN, MIRABELLI, SWERDLOVE
              LLP, by
 3            MR. HOWARD L. TEPLINSKY
              (161 North Clark Street, Suite 2600
 4            Chicago, Illinois  60601
              312.621.9700
 5            Hteplinsky@beermanlaw.com)

 6            appeared on behalf of the defendants.

 7
                  *   *   *   *   *   *   *
 8

 9                    I N D E X

10  Witness:                               Page

11  STEVEN GOULETAS

12        Examination by:

13      Mr. Armstrong                       3
        Mr. Teplinsky                     100
14

15                  E X H I B I T S

16  Number                        Marked/referenced

17  SEG 1 through 261                     92

18  PX 59                         52, 62, 74, 81
    PX 114                              90
19  PX 115                              90
    PX 117                              91
20  PX 137                              77

21  Nicholas Gouletas Ex. No. 5          18

22  SEG Exhibit A                     81, 93
    SEG Exhibit B                     57, 72
23  SEG Exhibit C                     92, 102

24
```

STEVEN GOULETAS, 01/27/2017

```
                                                    Page 3
 1                 E X H I B I T S (cont'd)
 2     SEG2 57                            15
 3     SEG2 93                        4, 17
       SEG2 94                             4
 4     SEG2 140                          47
       SEG2 185                          48
 5     SEG2 189                          50
       SEG2 251                          21
 6
 7  (Exhibits retained by Mr. Armstrong.)
 8                  - - - - -
 9                 (Witness sworn.)
10                 STEVEN GOULETAS,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13                    EXAMINATION
14  BY MR. ARMSTRONG:
15       Q.   Mr. Gouletas, thank you for showing up
16  today.  We're here to take your deposition in
17  connection with a bankruptcy adversary proceeding
18  against Nicholas S. Gouletas.  Are you ready to
19  proceed?
20       A.   I am.
21       Q.   In the documents that were produced I
22  have had my secretary Bates number SEG2 for the
23  second production of documents.  You produced some
24  documents in connection with the original
```

STEVEN GOULETAS, 01/27/2017

Page 15

1       Q.      In connection with 800 South Wells

2   Phase II bankruptcy, actually it was coming out of

3   bankruptcy, wasn't it, the sale of that property,

4   the sale of the parking lot?

5       A.      I don't know.

6       Q.      There is an e-mail dated -- and I know

7   they're not in chronological order, but let me try

8   to find it.  It's marked as 57.  SEG2 57.  And I

9   know it won't be easy to find.  But anyway it's in

10  that stack.  There's an e-mail from you dated

11  July 17, 2014, to Elizabeth Friedgut.

12              Let me show it to your lawyer and

13  maybe he can try to find it.  It's marked as SEG2

14  000057.  And it's from you to Elizabeth Friedgut

15  dated July 17, 2014.  No subject listed.  "Liz,

16  Nick says he is listing the River City property

17  with Dan as you recommended!"  Steve.  You're the

18  Steve.  The Liz is Liz Friedgut.  The River City

19  property is?

20      A.      I believe it's referring to the parking

21  lot at River City.

22      Q.      And the Dan is Dan Hyman?

23      A.      I believe so, yes.

24      Q.      And that's Millenium Properties?

STEVEN GOULETAS, 01/27/2017

Page 16

```
 1     A.     Yes.

 2     Q.     Is that John Cadden's father-in-law?

 3     A.     I don't know.

 4     Q.     "Nick says he is listing the River City

 5  property with Dan as you recommended."  All right.

 6  So it's your understanding Liz Friedgut was

 7  recommending Dan Hyman to be the listing agent for

 8  the River City parking lot, correct?

 9     A.     Correct.

10     Q.     And your Dad was making a decision as

11  to who the listing agent would be?

12     A.     Correct.

13     Q.     And you were passing that information

14  on to Liz Friedgut?

15     A.     Correct.

16     Q.     Why?

17     A.     She had spoken to me about it and was

18  encouraging me to encourage him to use Dan because

19  she thought he was a good broker.

20     Q.     Why is the parking lot being sold?

21     A.     I suppose to generate cash.

22     Q.     For whom?

23     A.     I wasn't involved in his bankruptcy so

24  I couldn't tell you, you know, what that was going
```

STEVEN GOULETAS, 01/27/2017

1      Q.    Were there any pro formas prepared as

2   to what the Garvey Court property would be worth

3   upon development?

4      A.    I believe there were.  I didn't prepare

5   any of them.

6      Q.    You recall that you received pro

7   formas?

8      A.    I don't recall that I did or didn't.

9      Q.    How much were the properties worth when

10  they were packaged together as part of this Garvey

11  Court transaction?

12     A.    What do you mean by these, the

13  properties?

14     Q.    Why don't you explain to me what you

15  understood the transaction to be?

16     A.    Okay.  Nick was selling the land and

17  donating the proceeds from the sale of a number of

18  assorted other properties to a new entity that was

19  formed to develop the property as a hotel and condo

20  and/or rentals.

21            And he was going to retain a

22  25 percent interest in that development.  And he

23  was going to get paid a certain amount of money for

24  the sale.  And it would pay off, you know, other

STEVEN GOULETAS, 01/27/2017

Page 26

1  debts and obligations that he had on the property.

2       Q.    Did you acquire this understanding from

3  conversations with your Dad?

4       A.    My Dad and Mark Goldstein, both.

5       Q.    Was there a lawyer hired to implement

6  this Garvey Court transaction that you just

7  summarized?

8       A.    So Liz Friedgut was hired to implement

9  that transaction.

10      Q.    Did Mr. Teplinsky also provide advice

11  and guidance as to how to shape this transaction?

12      A.    I've seen his name on e-mails that were

13  received that most of the advice was from Liz

14  Friedgut.

15      Q.    We'll get to those e-mails in a little

16  bit.  So your Dad was going to sell the land;

17  donate the proceeds from the sale of a number of

18  assets of other properties and then a new entity

19  would be formed to develop the hotel and the condo.

20  And your Dad was going to retain a 25 percent

21  interest.  Do you recall that testimony?

22      A.    Yes.

23      Q.    So in the original formulation of this

24  plan, it was your Dad who was going to retain the

STEVEN GOULETAS, 01/27/2017

1   25 percent interest in the Garvey Court

2   development?

3       A.   Yes.

4       Q.   Eventually though your Dad's 25 percent

5   interest did not go to him personally.  It went to

6   SEG Garvey and NKM Garvey, correct?

7       A.   Correct.

8       Q.   Who made the decision to transfer that

9   25 percent interest from your Dad to those two

10  LLCs?

11      A.   My Dad.

12      Q.   When?

13      A.   Before the closing of the property.

14      Q.   Did you see the deal documents when it

15  was supposed to be the 25 percent interest being

16  retained by your Dad?

17      A.   I don't recall seeing them.

18      Q.   Did you have any discussions with

19  anybody about transferring your Dad's 25 percent

20  interest in the development to other entities?

21      A.   Could you repeat the question, please?

22      Q.   Sure.

23           (From the record above the reporter read

24            the following:  Question.  Did you have