Px S

1

2          STATEMENT ADJOURNING MEETING OF CREDITORS

3                   341(a) MEETING (PART II)

4              DEBTOR: NICHOLAS S. GOULETAS

5                     BK No. 16-01335

6                     March 1, 2016

7

8                          Suite 2600
                           161 North Clark Street
9                          Chicago, Illinois   60601

10

11   PRESENT:

12       Mr. Richard M. Fogel, Bankruptcy Trustee.

13   LIST OF CREDITORS:

14       Mr. Dean F. Armstrong, on behalf of 800 South
             Wells Commercial, LLC;
15       Mr. Pierce Ennessy;
         Mr. James O. Stola, on behalf of Carlos
16           Castillo;
         Mr. James A. West, on behalf of Invesco
17           Employee Services, Inc.
         Mr. Alfred K. Murray, II, on behalf of Muth
18           and Alfonso.

19   DEBTOR:

20       Mr. Nicholas S. Gouletas, debtor;
         Mr. Howard Teplinsky, on behalf of debtor;
21       Mr. William Factor, on behalf of debtor;
         Ms. Ariane Holtschlag, on behalf of debtor.

22

23              *   *   *   *   *   *   *

24

Px S

MEETING, 03/01/2016

Page 2

1      TRUSTEE FOGEL:  For the record, this is the
2  continued meeting of creditors in the bankruptcy
3  case of Nicolas S. Gouletas, 16-1335.
4           My name is Richard M. Fogel.  I am
5  the trustee.  I would like everyone in the room to
6  identify themselves for the record starting to my
7  right.
8      MR. ARMSTRONG:  Hi, My name is Dean
9  Armstrong.  I'm the attorney for 800 South Wells
10  Commercial, Creditor.
11      MR. STOLA:  James Stola, I'm the attorney for
12  Carlos Castillo.
13      MR. ENNESSY:  Pierce Ennessy, creditor.
14      MR. WEST:  Jim West, creditor, Invesco
15  Employee Services.
16      MS. HOLTSCHLAG:  Ariane Holtschlag, counsel
17  for the debtor.
18      MR. FACTOR:  William Factor, counsel for the
19  debtor.
20      MR. TEPLINSKY:  Howard Teplinsky, counsel for
21  the debtor.
22      MR. NICHOLAS GOULETAS:  Nick S. Gouletas.
23      TRUSTEE FOGEL:  Mr. Gouletas, you were placed
24  under oath on February 15th or 16th for the first

Page 3

1  meeting of creditors and you are still under oath.
2  Do you understand?
3      MR. NICHOLAS GOULETAS:  Yes, I do.  Thank you.
4            NICHOLAS S. GOULETAS
5  having been previously duly sworn, was questioned
6  as follows:
7               EXAMINATION
8  BY TRUSTEE FOGEL:
9      Q.   Okay.  I may repeat a couple questions
10  that I asked you the first time around.  I don't
11  mean to do it in any way to slow things down, but I
12  don't remember exactly what I asked you already.
13           So I want to start with you've
14  provided me with two income tax returns:  One for
15  2011 and one for 2012.
16           And are those -- and is the 2012
17  return the most recent return that you have filed?
18      A.   I believe so.  I'm really not sure, but
19  I believe so.
20      Q.   And at the time your accountant was
21  Gerald Zaldman at FGMK?
22      A.   Correct, sir.
23      Q.   Is he still your accountant?
24      MR. FACTOR:  Probably not.  And I can add

Page 4

1  some light on that.
2           They are not doing any more work
3  because there's an unpaid invoice, and we noted
4  that that was not listed on the schedules.  That
5  was an oversight, so we're going to do Amend --
6      TRUSTEE FOGEL:  Amend F, okay.
7  BY TRUSTEE FOGEL:
8      Q.   Mr. Gouletas, in 2012, you were married
9  but you filed separately with your wife; is that
10  correct?
11      A.   That is correct.
12      Q.   So all of the income reflected in the
13  tax return is your personal income; is that correct?
14      A.   I believe so, to the best of my
15  knowledge.
16      Q.   In the year 2012, you received $314,000
17  in wages.
18           Who paid you those wages that year?
19      A.   I don't recall, sorry.
20      Q.   Okay.  And how would we be able to find
21  out?
22      A.   I think we'd have to ask the
23  accountants.
24      Q.   Do you have W-2s for this tax year at

Page 5

1  your home?
2      A.   I'm not sure.
3      Q.   Okay.  In this tax return, you listed
4  one business entity as a business that you owned or
5  controlled.  It was an entity called 800 S. Wells,
6  Phase II.
7           Are you familiar with that entity?
8      A.   Yes, I am.
9      Q.   What was that entity?
10      A.   I don't understand the question.
11      Q.   What did it do?
12      A.   Would you repeat the entity, please?
13      Q.   Here's a copy of the return, sir.
14           (Document tendered.)
15      MR. NICHOLAS GOULETAS:  Are we referring to
16  800 South Wells?
17      TRUSTEE FOGEL:  Yes, sir.
18      MR. TEPLINSKY:  Phase II.
19      MR. NICHOLAS GOULETAS:  Well, 800 South Wells
20  is Lake and Wells.  It's a property that is
21  partially commercial and partially condominium.
22      MR. FACTOR:  Lake and Wells?
23  BY TRUSTEE FOGEL:
24      Q.   So the fact that it says 800 South

MEETING, 03/01/2016

Page 6

1  Wells doesn't have anything to do with the property
2  at 800 South?
3      A.   I'm afraid maybe I'm mixing up the
4  entities.
5      Q.   There's only one -- so far we're
6  talking about one entity.  That entity that you
7  reported is generating a tax loss in the year 2012,
8  and I want to know:  What did that entity do?  Did
9  it own real estate?  Did it manage other property?
10 Did it --
11     A.   Oh, wait, I'm sorry.
12     Q.   Did it whatever.  Tell me.
13     A.   I'm confusing that with another entity,
14 okay?
15     Q.   Okay.  Let's talk about this entity.
16     A.   800 South Wells is an entity that
17 has -- I believe River City?  Is that 800 South
18 Wells?
19     Q.   River City is located at 800 South
20 Wells; yes, sir.
21     A.   Yes.
22     Q.   There are many different companies that
23 at different points in time had something to do
24 with that property.  I'm trying to ask you to tell

Page 7

1  me what that particular business had to do with
2  that particular property, if you know.
3      A.   Yeah.  And I think my answer is I
4  don't -- I do not know the difference between the
5  different properties at this point in time.  I do
6  know that there was some parking facilities there.
7  There was a big property there that had, I don't
8  know, 5 or 600 units.  There was some commercial.
9           So I'm not really sure legally
10 speaking what the 800 South Wells, Phase II,
11 controlled at that time.
12     Q.   Okay.  In 2012, were you involved as an
13 owner of any other businesses that were active in
14 2012?
15     A.   When you're saying "an owner" --
16     Q.   Yeah.  You know, like when you're a
17 member of an LLC, you get a K-1 at the end of a tax
18 year from the LLC.  Or if you're a shareholder of a
19 company, you get a K-1 at the end of the year from
20 that company.  Or if you own a building and you
21 collect rents and incur expenses, you report that
22 on the schedule in your income tax return that
23 you're looking at.
24           And my question to you is:  In the

Page 8

1  year 2012, did you own any other operating entities
2  besides the one that you've reported in your tax
3  return?
4      A.   Okay.  When you say "you" --
5      Q.   You personally.
6      A.   Personally.
7      Q.   Personally, you.
8      A.   To the best of my knowledge, I don't
9  believe so.
10     Q.   Okay.  And that's the same in --
11     A.   I'm not sure, but I -- I don't -- I
12 don't know.
13     Q.   Okay.  And your accountant doesn't like
14 you at the moment because you owe him money, so I'm
15 not quite sure how cooperative he'll be to me, but
16 we'll see.  Could you pass that back?
17     A.   I think -- if I may, may I answer what
18 you just said?
19     Q.   Certainly.
20     A.   I think he's a very fine gentleman.  I
21 think he'd be very cooperative.
22     Q.   Okay, good.
23           When we were together a couple of
24 weeks ago, I told you and your attorneys that I

Page 9

1  would be asking for certain documents and
2  information before we resumed today.  And I have
3  received a number of things, and I want to go
4  through with you now what I've asked for and what
5  I've gotten, and stay with me for that.
6           Item No. 1 was the property in
7  Greece, and I asked for you to give me some
8  documents showing me how and when you inherited the
9  property and any efforts to sell the property and
10 certain other contact information, et cetera.
11           In response, I have received some
12 e-mails from your sister describing the condition
13 of the property and some photographs regarding the
14 property.  And I have gone back to her and asked
15 her if she has any documentation to support the
16 things that she reflected in the e-mail about the
17 property.
18           My question to you is:  Do you have
19 any of those things?
20     A.   No, I do not, sir.  But I did contact
21 my sister to find out as much as we could about it.
22     Q.   I understand.  I just repeated -- or I
23 just reflected on the record what she has provided
24 to me so far.

MEETING, 03/01/2016

Page 10

1    A.   Yes.

2        Q.   Also, for the record, I have asked her

3    whether or not she has any intentions of saving the

4    property or is inclined to let the property go for

5    the delinquent taxes and the unpaid electricity

6    bills and all of the other expenses that she

7    described to me. That's a possibility.

8            The next thing I asked you for, sir,

9    was any and all documents relating to money

10   borrowed from Carlos Castillo. And in response,

11   your attorneys advised me you don't have a copy of

12   any loan documents, and I'm just reflecting that

13   for the record.

14           Fortunately, Carlos Castillo has

15   counsel present, and we have begun some discussions

16   about the situation. And I think we will

17   ultimately hopefully reach some type of sale

18   process for the items in question, maybe to

19   Mr. Castillo or maybe to some third party?

20           The third item on my list, sir,

21   related to your special trust. And you have

22   provided me with a bunch of documents relating to

23   the trust, and I want you to -- for the record,

24   what did the trust own at the time you were ordered

Page 11

1    to turn over the trust assets in state court?

2        A.   I don't recall.

3        Q.   Okay.

4        A.   However, I'm sure there's documents,

5    you know, whatever they are.

6        Q.   Okay. Your attorney for that matter

7    was Jay Erens?

8        A.   Correct.

9        Q.   I know Jay.

10       A.   And he said he would cooperate. I have

11   contacted Mr. Erens and his firm.

12       Q.   Thank you. I appreciate that.

13           The next item I asked about was the

14   TD Ameritrade transaction, and I guess can you

15   explain that transaction to me.

16           You had $51,000 and change in an

17   account at TD Ameritrade, and then you gave that to

18   your wife.

19           Why?

20       A.   Because she had loaned money as we had

21   gone forward, and I owed her much more than that.

22       Q.   Okay. She wrote a bunch of checks from

23   those -- from those funds within a day or two after

24   receiving them.

Page 12

1            Are you familiar with the

2    disbursements?

3        A.   I don't recall all the disbursements.

4        Q.   Let me show them to you so you can

5    refresh your recollection.

6        A.   Thank you.

7        Q.   I would like to know who each of these

8    people are that got money and why they got the

9    money.

10       A.   Should I start with the first one?

11       Q.   Start with the first one, please.

12       A.   John Arnold assisted me in a lot of the

13   things that were coming up or happening, and he

14   spent a lot of time and effort in it, so he was

15   paid $2,000.

16       Q.   What does he do for a living that

17   assisted -- that enabled him to assist you? Is he

18   a professional? Is he an attorney or an accountant

19   or something?

20       A.   He's a -- he used to own his own

21   company. It was an insurance company, so I assume

22   he knows all the accounting and insurance aspects.

23       Q.   Why didn't you write him a check

24   yourself if you owed him money? Why did you give

Page 13

1    money to your wife and have your wife write him a

2    check?

3        A.   Because I -- I didn't have any money,

4    and she was owed the money, so ...

5        Q.   Excuse me. You had $51,000 at the

6    beginning of the process.

7            My question is: Why didn't you

8    write a check to Mr. Arnold yourself? Why did you

9    give the money to your wife and then in turn have

10   her write the checks?

11       A.   Because I owed her the money, okay?

12   And she had paid a lot of the bills that really

13   were my bills to start out with.

14       Q.   Was she in the habit of paying all of

15   your bills?

16       A.   When you say "habit," when I didn't

17   have any money, she'd try to be as supportive as

18   humanly possible.

19       Q.   Go to the next one, please.

20           Who's that -- who's the second check

21   written to?

22       A.   Arlene Freeman.

23       Q.   And how much is it for?

24       A.   1,700.

MEETING, 03/01/2016

Page 14

1    Q.    Do you know what it was for?  Do you
2  know who she is?
3    A.    At this -- I'm sure I do, but at this
4  moment I can't recall.
5    Q.    Okay.  And do you think you owed her
6  money, or do you think this is a transaction that
7  relates to your wife?
8    A.    No, I believe I owed her money.
9    Q.    Okay.  Please go to the next one.
10    A.    Yes.
11    Q.    Who is that one written to?
12    A.    It's written to Crane, Heyman, Simon,
13  Welch --
14    Q.    Law firm?
15    A.    Yes.
16    Q.    And who were -- and how much -- that's
17  like 10,000?
18    A.    Correct.
19    Q.    Who was that law firm representing at
20  that time?
21    A.    They were representing me to possibly
22  file bankruptcy I believe at that time.
23    Q.    You personally or a business of yours?
24    A.    Pardon me?

Page 15

1    Q.    You personally or a business of yours?
2    A.    I believe it was me.
3    Q.    Okay.  And did they --
4    A.    To the best of my recall.
5    Q.    You didn't file bankruptcy in 2014 or
6  2015, so did they refund the money to you or to
7  your wife?
8    A.    I don't believe so.
9    Q.    Did they perform any legal services for
10  you?
11    A.    I believe they did a lot of work, and I
12  believe that they advised me to file, but I believe
13  my personal legal would not allow me to do it.
14    Q.    Could you go to the next check.
15          Who is it to?
16    A.    James Feldman.
17    Q.    That's the first guy, okay.  Go to the
18  next one.
19          Who is that one payable to?
20    A.    Michael Tetting, Tetting.
21          By the way, if I may?
22    Q.    Mr. Armstrong has pointed out that I
23  made a mistake.  Go back to the most prior check,
24  Mr. Feldman.

Page 16

1          Do you know who he is?
2    A.    Yes, I do.
3    Q.    Who is he?
4    A.    When you say "who is he," I'm sorry.
5    Q.    Well, what is his relationship to you?
6    A.    Mr. Feldman is a gentleman that has
7  counseled me from time to time on financial
8  matters.
9    Q.    And you owed him money in 2014 as well?
10    A.    I believe so.
11    Q.    Okay.  Go to the next one.
12          Okay.  $2,250, do you know who
13  Tetting is?
14    A.    Yes.  And may I make a statement?
15    Q.    Certainly.
16    A.    I think I was asked before who he was,
17  and I did not remember.
18          I do recall who he is.
19    Q.    Okay.
20    A.    I met Michael at -- I believe at --
21    Q.    So why does he get 2,250 bucks?
22    A.    He had come and been like a secretarial
23  assistant for me, and I had not paid him.
24  Administrative type young man.

Page 17

1    Q.    Okay.  Now, Mr. Feldman gets another 10.
2          Any idea why your wife didn't just
3  write one check instead of writing two checks?
4    A.    I do not recall.
5    Q.    Okay.  The next check is to your
6  attorneys for legal services, and the last check is
7  you probably had an open account at Greek Islands,
8  yes?
9    A.    I believe so.
10    Q.    Okay.
11    A.    I had.
12    Q.    Great restaurant, great restaurant.
13          Okay.  Those are the only questions
14  I have about the Ameritrade.
15    A.    Should I give this back to you, sir?
16    Q.    Sure.
17          Okay.  There was one final
18  transaction with respect to the money that you gave
19  your wife.  It looks like -- let me show you.
20          The last transaction is a checking
21  withdrawal which must have been like a
22  counter-withdrawal, $3,500.  Do you know anything
23  about that?
24    A.    I really do not recall.

MEETING, 03/01/2016

Page 18

1    Q.    Okay.  Who's Donald Moss?  Lawyers?
2    A.    Excuse me?
3    Q.    Who is Donald Moss?
4    A.    Yes.  I believe they're -- where am I
5 looking at?
6    Q.    Donald Moss, there was a wire transfer
7 to him of $5,000 on September 15th.
8    A.    I believe they're a law firm.
9    Q.    Okay.  The last thing I asked you for
10 were copies of homeowners insurance policies, and
11 you didn't provide any of them.  And your attorney
12 advised me that neither a borrower or owner of the
13 property, you don't have access to any of those
14 documents.
15    A.    We --
16    Q.    Did you ask your wife to give them to
17 you to give to me?
18    A.    We called the insurance companies that
19 we had dealt with, both of them.
20    Q.    Okay.
21    A.    And they said that we didn't have any
22 homeowners insurance policies.
23    Q.    Can you provide me with the name of the
24 insurance agent that you referred to so that I can

Page 19

1 contact him?  Because I find it very unusual that
2 people that live in a nice fancy high-rise
3 condominium would not have homeowners insurance to
4 protect the stuff inside of it.
5    A.    We would be glad to provide you with
6 both of the companies.  We did call them; we asked
7 them.  They looked through their records, and we
8 kept the names of the people we talked to.
9    Q.    Okay.  Now, that's a different answer
10 than you not having access to the documents because
11 you're not the owner of the property.  So now
12 you're telling me you tried, there was nothing.
13        Okay.  Well, just circle back to me
14 with the contact information for the insurance
15 agent so that I can confirm that, please.
16    MR. TEPLINSKY:  We'll get it.
17    MR. NICHOLAS GOULETAS:  Yes, thank you.  We
18 did call them.
19 BY TRUSTEE FOGEL:
20    Q.    I hear -- I understand.  I appreciate
21 that.  Thank you.
22    A.    And we kept records.
23    MR. TEPLINSKY:  Several occasions.
24

Page 20

1 BY TRUSTEE FOGEL:
2    Q.    Now, let me look at the schedules and
3 see what my post-it notes were.
4        The Greek property we talked about;
5 the stuff in Mr. Castillo's possession we've talked
6 a little bit about.
7        There is a question in the schedules
8 of assets that asks you to identify any
9 non-publicly traded stock and interest in
10 incorporated and unincorporated businesses,
11 including an interest in an LLC, partnership, or
12 joint venture, and you checked the answer yes, that
13 you have some of those, and it says, See attached
14 list.
15        You don't have that document in
16 front of you, sir.
17    TRUSTEE FOGEL:  Do you maybe have a copy of
18 your petition that you can walk him along with me?
19    MR. TEPLINSKY:  Not with me.
20    MS. HOLTSCHLAG:  We don't have the
21 attachment.  I have the Schedule B.
22    TRUSTEE FOGEL:  Well, do you have --
23    MS. HOLTSCHLAG:  I don't have that.
24    TRUSTEE FOGEL:  Well, Ariane, you prepared

Page 21

1 the schedules?
2    MS. HOLTSCHLAG:  Sure did.
3    TRUSTEE FOGEL:  So for question No. 19 when
4 it says, See attached list, is that referring to
5 the list that is pages 11 through 36 of the
6 schedule that looks like this?
7    MS. HOLTSCHLAG:  I believe so, yes.
8    TRUSTEE FOGEL:  Okay.  Now, we'll get back to
9 this in a minute.
10        There are some other questions that
11 ask you to identify whether or not you have
12 accounts receivable, office equipment, machinery,
13 inventory, and again interest in partnerships and
14 joint ventures; and the answer to each of those
15 questions is, Yes, See attached list, unknown.
16        I didn't see any accounts -- is that
17 referring to the same list?
18    MS. HOLTSCHLAG:  Yes.
19    TRUSTEE FOGEL:  Because there are no accounts
20 receivable or equipment or inventory or anything in
21 this list, so I'm confused.
22    MS. HOLTSCHLAG:  So certainly we did list on
23 that list several of the entities or holding
24 companies who possessed real estate.  Most of those

MEETING, 03/01/2016

Page 22

1 entities, as you can see, are not operating or have
2 been --
3        TRUSTEE FOGEL:  Well, that was going to be my
4 next question.  There's no way for me to know which
5 of these numerous businesses are still in business.
6        MS. HOLTSCHLAG:  Now, we have indicated for
7 each entity the beginning dates and ending dates as
8 we were required to do.
9        TRUSTEE FOGEL:  Oh, wait a minute.  Is this
10 supposed to be -- this is supposed to be a super
11 long spread?
12        MS. HOLTSCHLAG:  Right.
13        TRUSTEE FOGEL:  That's why I can't match any
14 of this up.
15        MS. HOLTSCHLAG:  So I forwarded to you a
16 digital copy of that spreadsheet.  It really
17 doesn't print well.  I did e-mail you a digital
18 copy.
19        TRUSTEE FOGEL:  Which I never looked at.
20        MS. HOLTSCHLAG:  I'm sorry.  It's much easier.
21        TRUSTEE FOGEL:  No, no, don't be sorry.  No,
22 no, no.  So I can crunch down on some of these
23 businesses.
24             But why did you answer yes to the

Page 23

1 question about accounts receivable?
2        MS. HOLTSCHLAG:  Simply in an abundance of
3 caution.  There may be something owed to one of
4 these entities somewhere.  Whether it would be
5 enforceable or not, we don't --
6        TRUSTEE FOGEL:  You're not saying that anyone
7 owes your client money.  An account receivable in
8 my mind --
9        MR. TEPLINSKY:  We're not saying that.
10        TRUSTEE FOGEL:  -- has a different meaning
11 than possible residual value to an ownership
12 interest in an entity.
13        MS. HOLTSCHLAG:  Well, you may be looking at
14 the form slightly different.  These are new forms,
15 so we're all trying to work our way through them.
16 As I see it, that section responds directly to
17 business assets.  So that would be accounts
18 receivable not owed to my client but owed to a
19 business in which my client --
20        TRUSTEE FOGEL:  I disagree with your
21 analysis, but I understand what you're saying.
22 BY TRUSTEE FOGEL:
23        Q.  So there is no equipment that you own,
24 there is no inventory that you own, there are no

Page 24

1 accounts receivable owed directly to you; is that
2 correct?
3        A.  I believe to the best of my knowledge.
4        Q.  Okay.  In your schedules, you indicate
5 that tax returns for the years December -- the
6 years ending December 2013, 2014, and 2015 are
7 being prepared.  It is unknown at this time whether
8 or not the debtor will be entitled to a refund.
9             Who is preparing those returns for
10 you?
11        A.  I don't recall.
12        MR. TEPLINSKY:  I can provide you with that
13 information.
14        TRUSTEE FOGEL:  Okay.  But someone is working
15 on it.
16        MR. TEPLINSKY:  Somebody is hopefully working
17 on it.
18        TRUSTEE FOGEL:  Okay, good.
19 BY TRUSTEE FOGEL:
20        Q.  Mr. Murray's clients have charging
21 orders against you; Mr. Armstrong's client has
22 several turnover orders and charging orders.
23             Other than Mr. Muth or Muth -- I'm
24 not sure how to pronounce it, M-u-t-h, Mr. Alfonso,

Page 25

1 and 800 South Wells Commercial LLC, other than
2 those three parties, do any -- and I guess exclude
3 Mr. Castillo for a moment because you think he
4 might have a lien, other than those parties, do any
5 creditors have judgment liens or citation liens
6 against you?
7        MR. TEPLINSKY:  There was a citation served
8 that was never -- there were no turnovers, never a
9 citation taken.  And if I could see the schedule
10 for a second, I can tell you which one it was.
11 There was a foreign judgment that was -- that was
12 perfected in Illinois:  Guaranteed Solutions, care
13 of Majis N. Price [phonetic].
14        TRUSTEE FOGEL:  And when -- do you know when
15 they served their citation?
16        MR. TEPLINSKY:  Their citation was served in
17 approximately February of 2015 plus or minus a
18 month or so.
19        TRUSTEE FOGEL:  Okay, thank you.
20        MR. TEPLINSKY:  There was never a citation
21 date.
22        MR. ARMSTRONG:  The bankruptcy?
23        MR. TEPLINSKY:  No, 2015.
24        MR. ARMSTRONG:  2015, I'm sorry.

MEETING, 03/01/2016

Page 26

1    TRUSTEE FOGEL: My next question is about one
2 of the answers on the statement of financial
3 affairs that I don't know if you're going to know
4 the answer to but your attorney I'm sure will.
5          Question 16 asks you to identify any
6 people that you paid money to in connection with
7 seeking bankruptcy or preparing a bankruptcy filing.
8          And the answer to the question is
9 that you paid Factor Law, or actually that your son
10 Steven paid Factor Law.
11          Here's my question: The description
12 and value of the property transferred says $10,000;
13 5,000 disbursed to Ron Braver, accountant, and then
14 another $10,000 a couple months later; 5,000
15 disbursed to Ron Braver, accountant.
16          Is Ron Braver the accountant that is
17 preparing the tax returns?
18    MR. TEPLINSKY: No.
19 BY TRUSTEE FOGEL:
20    Q.   Okay. I know who Ron Braver is. Ron
21 Braver, for purposes of disclosure, is a client of
22 my law firm.
23          Why did you give indirectly
24 Ron Braver $10,000?

Page 27

1    A.   I believe that he was handling the
2 accounting of getting the figures together for us
3 for all the information that we are trying to
4 supply.
5    Q.   And you didn't put any figures in your
6 bankruptcy papers to speak of. You listed most
7 creditors as unknown amounts.
8    TRUSTEE FOGEL: And also, are the dates of
9 these payments accurate? 2014? You've been on
10 retainer for over a year for this case?
11    MR. FACTOR: Well, we got the first 10,000 at
12 the end of 2014 and beginning of 2015.
13 BY TRUSTEE FOGEL:
14    Q.   Okay. And you also gave Scott Clair's
15 law firm $10,000 at the same time the month earlier
16 for the same --
17    MR. FACTOR: I don't know if that was a month
18 earlier, was it?
19    TRUSTEE FOGEL: September 5, 2014, he gives
20 Scott's firm $10,000, which he says was for
21 personal bankruptcy consultation that he never went
22 through with.
23          And he paid you $10,000 at
24 approximately the same time for this case?

Page 28

1    MR. FACTOR: Well, when you say "this case,"
2 we talked at the end of 2014 and early 2015 about
3 potentially filing for bankruptcy, without getting
4 into privileged information.
5    TRUSTEE FOGEL: Of course.
6    MR. FACTOR: So ...
7    TRUSTEE FOGEL: Okay. And so you didn't burn
8 up that money in the last year and a half, and he's
9 not paying you any more money for the case, or is
10 he paying you more money for the case?
11    MR. FACTOR: He is. In our retention
12 agreement, which I think was attached --
13    MS. HOLTSCHLAG: It should be.
14    TRUSTEE FOGEL: Should be.
15    MR. FACTOR: -- there was a provision saying
16 that he'll enter into -- that Nick would enter into
17 a post-petition engagement letter, which is
18 permitted by law, which he has subsequently done.
19 BY TRUSTEE FOGEL:
20    Q.   And how are you paying Mr. Factor for
21 these additional services, or is someone paying him
22 on your behalf?
23    A.   I don't believe anybody's paying
24 Mr. Factor at this point yet.

Page 29

1    MR. FACTOR: Well, we did get another 10,000.
2    TRUSTEE FOGEL: Post-petition?
3    MR. FACTOR: Yes.
4    TRUSTEE FOGEL: And who was the source of
5 payment? His son or his wife?
6    MR. FACTOR: That money came from Warady &
7 Davis.
8    MR. TEPLINSKY: The accounting firm.
9 BY TRUSTEE FOGEL:
10    Q.   So they were holding money on your
11 behalf to cover some of your legal expenses?
12    A.   I believe so.
13    Q.   Is anyone else --
14    A.   To the best of my knowledge.
15    Q.   Is anyone else holding money on your
16 behalf?
17    A.   Not that I recall.
18    Q.   Okay. I want to talk about a couple of
19 the business ventures that you have been involved
20 with in the past. And after I ask you about these,
21 I think I will let other people in the room ask
22 some questions about other businesses that I may
23 not be asking about.
24          I'd like to start with Garvey Court.

MEETING, 03/01/2016

Page 30

1        Do you know what property I'm
2 referring to when I use the word "Garvey Court"?
3    A.   Yes, I do.
4    Q.   Okay.  And in 2013 there was a
5 bankruptcy case filed by a series of entities:  One
6 was called Lake Dearborn; one was called Dearborn
7 Realty -- or Retail, pardon me; one was called
8 LaSalle Commercial.
9        Do you recognize any or all of those
10 names?
11    A.   I know the names.  I don't -- I don't
12 remember the legal entities of them, but I do know
13 some of the names.
14    Q.   Were you a member of those debtor
15 corporations in 2013?
16    A.   (No audible response.)
17    Q.   Do you know -- when I say "member," do
18 you know what a member of an LLC is?
19    A.   Please?
20    Q.   And since you've been involved in
21 hundreds of them, I'm assuming you know what a
22 member of an LLC is.
23    A.   Yes.
24    Q.   Okay.

Page 31

1    A.   But not directly owned.  Okay?  A
2 member.
3    Q.   No, no, no.  A member owns an interest
4 in an LLC.
5    A.   Correct.
6    Q.   Okay.  So were you, Nick Gouletas, a
7 member of Dearborn Retail?
8    A.   I'm going to say to the best of my
9 knowledge I believe I was.
10    Q.   You were.
11        Were there any other members besides
12 you?
13    A.   I don't recall.
14    Q.   Who represented Dearborn Retail and
15 Lake Dearborn and LaSalle Commercial in the
16 bankruptcy case?  Foley & Lardner?
17    A.   I believe so.
18    Q.   Do you know who there was running the
19 case?
20    A.   I do not recall.
21    MR. TEPLINSKY:  It was Harold Israel.
22    MR. FACTOR:  Was that at Foley?  I thought
23 that was at Goldstein & McClintock?
24    MR. TEPLINSKY:  That was Harold Israel, not

Page 32

1 Foley & Lardner.
2    TRUSTEE FOGEL:  Okay.  I saw McKenna's name
3 in some of the decisions that Cox issued when --
4    MR. TEPLINSKY:  Yeah.
5    TRUSTEE FOGEL:  So who did Foley represent?
6    MR. TEPLINSKY:  Foley represented Garvey
7 Court, LLC, and Bighorn, I believe, in certain
8 proceedings filed against them by some creditors --
9    TRUSTEE FOGEL:  Okay.
10    MR. TEPLINSKY:  -- which Mr. Gouletas hadn't
11 been involved in.
12 BY TRUSTEE FOGEL:
13    Q.   So I looked at an order in that
14 bankruptcy case, and it appeared as if Dearborn
15 Retail and LaSalle Commercial were -- contributed
16 the real estate, the Garvey Court real estate, to
17 Garvey Court, LLC.
18        Are you familiar with that
19 transaction?
20    A.   I don't recall.
21    Q.   You don't recall.  Okay.
22        Do you know who structured the
23 transaction?  Was it the lawyers representing the
24 company, or was it the lawyers representing

Page 33

1 Bighorn?
2    A.   I don't recall that.
3    Q.   It appears as if before the real estate
4 was conveyed to Garvey Court, LLC, it was conveyed
5 to NKM Garvey, LLC, and to SEG Garvey, LLC, and in
6 turn conveyed to Garvey Court, LLC.
7        Are you familiar with those
8 particular transactions?
9    A.   I believe -- I remember it
10 transferring, but I don't remember exactly what was
11 in the transfer.
12    Q.   The newspapers reported that you lost
13 the property through the bankruptcy transaction to
14 Bighorn, but you still have an ownership interest
15 in the entity that manages the entity that owns the
16 property, and your family has interests in that
17 entity.
18        How is it that if you lost the
19 property through the bankruptcy sale your family
20 still has a piece of it?
21    A.   I don't recall if that was the
22 negotiations or, you know, how that really appeared.
23    Q.   Who was your lawyer at that time?
24    A.   I don't recall.

MEETING, 03/01/2016

Page 34

1    Q.   You don't recall.
2       MR. NICHOLAS GOULETAS: Who was the lawyer?
3       MR. TEPLINSKY: I believe it was DLA Piper.
4       TRUSTEE FOGEL: Forget it. I want him --
5    either he knows or he doesn't know.
6       MR. NICHOLAS GOULETAS: No, no. I'm sorry.
7    I don't recall. Okay? Please.
8    BY TRUSTEE FOGEL:
9    Q.   Well --
10   A.   I'm not trying --
11   Q.   You're trying to get discharged in
12   bankruptcy, and you're try -- and you're supposed
13   to be able to explain to me your financial affairs.
14       "I don't recall" isn't explaining it
15   to me real well.
16   A.   I'm trying to answer honestly. Okay?
17   As you know, I've had a valve replaced in my heart,
18   five bypasses, five stents, and they opened up my
19   arteries, okay, my legs.
20   Q.   Okay.
21   A.   So there's a lot of things when they do
22   that, chemically speaking, that kind of get out of
23   your brain.
24   Q.   Okay.

Page 35

1    A.   I'm sorry. And I'm 77 years old. I'm
2    going to be 78 in about ten days. Okay?
3    Q.   Okay.
4    A.   So I'm sorry I don't recall certain
5    things.
6       MR. TEPLINSKY: We're doing the best we can.
7       MR. NICHOLAS GOULETAS: I'm not trying not to
8    answer your questions. I'm trying to answer them
9    to the best of my recollection is all I'm trying to
10   do.
11       TRUSTEE FOGEL: Were you, Howard, involved at
12   all in this transaction?
13       MR. TEPLINSKY: No. Other than knowing that
14   it was happening.
15       TRUSTEE FOGEL: But you didn't represent
16   either of the Garvey entities that his family --
17       MR. TEPLINSKY: No.
18       TRUSTEE FOGEL: -- controls or the entity
19   that currently owns or controls the property?
20       MR. TEPLINSKY: Absolutely not.
21       TRUSTEE FOGEL: Okay.
22   BY TRUSTEE FOGEL:
23   Q.   Your son is the manager of NKM Garvey,
24   LLC; is that correct?

Page 36

1    A.   I believe that's correct.
2    Q.   And does NKM Garvey own anything
3    besides the interest that it owns in Garvey Court,
4    LLC?
5    A.   I really do not know or recall.
6    Q.   Who was the attorney for NKM Garvey,
7    LLC?
8    A.   I don't recall.
9    Q.   Okay. What's your son's telephone
10   number? Do you know that?
11   A.   No, I do not.
12   Q.   Okay.
13   A.   But I can certainly look it up and give
14   it to you.
15   Q.   Add that to the couple of contact
16   information you're going to give me.
17   A.   I'd be glad to.
18   Q.   Okay. Last thing I want to talk to you
19   about is the River City property again.
20       MS. HOLTSCHLAG: If I could just clarify --
21   I'm so sorry, Rick.
22       TRUSTEE FOGEL: Don't be.
23       MS. HOLTSCHLAG: Is Steven --
24       TRUSTEE FOGEL: I believe Steven is the

Page 37

1    manager.
2       MS. HOLTSCHLAG: That's the son that you want?
3       TRUSTEE FOGEL: Yes, yes.
4    BY TRUSTEE FOGEL:
5    Q.   Are you familiar with a company known
6    as River City Residences, LLC?
7    A.   I believe it's a legal entity for River
8    City.
9    Q.   Okay. Do you know who the manager of
10   that LLC was?
11   A.   At this moment, I do not know.
12   Q.   Okay. It was you.
13   A.   Okay.
14   Q.   Okay. Well, or I should say does that
15   appear to be your signature on this document that
16   I'm showing you?
17   A.   That is my signature.
18   Q.   Okay. This is the dissolution of that
19   company, River City Residences, LLC, which was
20   dissolved in 2009.
21       Do you know who the member or
22   members of that entity were?
23   A.   I do not recall.
24   Q.   Anthony R. Dibenedetto appears to have

MEETING, 03/01/2016

Page 38

1 been the attorney or registered agent for that
2 company in 2002.
3    A.  He's a lawyer that represented us.
4    Q.  Do you still have any type of
5 relationship with him? Is he still your attorney
6 in any respect?
7    A.  No, he's not.
8    Q.  Okay.
9    A.  I do know who he is, and I do -- you
10 know, I can call him.
11    Q.  I can call him.
12    A.  Yeah.
13    Q.  I can call him. Okay.
14      TRUSTEE FOGEL: I think you guys know more
15 about other entities that may be of interest to me
16 or to you than the ones I've just asked him about.
17      So do you want to take a five-minute
18 break or anything?
19      MR. NICHOLAS GOULETAS: I would like that
20 very much. Thank you.
21      TRUSTEE FOGEL: Let's do that right now.
22      (Recess taken.)
23      TRUSTEE FOGEL: Back on the record.
24      And, Ariane, you said you had a

Page 39

1 couple of answers -- during the break, you said you
2 had answers to a couple of questions that
3 Mr. Gouletas didn't have the answers to?
4      MS. HOLTSCHLAG: Yes.
5      TRUSTEE FOGEL: What were they?
6      MS. HOLTSCHLAG: So you asked about the
7 ownership of River City Residences, LLC?
8      TRUSTEE FOGEL: Yes.
9      MS. HOLTSCHLAG: I am showing the sole member
10 of that LLC as being River City Holdings, LLC, and
11 the manager as being Nicholas S. Gouletas, the
12 debtor in this case.
13      TRUSTEE FOGEL: Okay.
14      MS. HOLTSCHLAG: Now, if you look at River
15 City Holdings, LLC, I believe my investigation has
16 uncovered that Nicholas S. Gouletas, the debtor in
17 this case, is a 50 percent member.
18      TRUSTEE FOGEL: Okay.
19      MS. HOLTSCHLAG: The other 50 percent
20 membership interest belongs to River City
21 Investors, LLC, which is a Michigan, LLC.
22      MR. TEPLINSKY: Michigan corporation,
23 Michigan LLC.
24      TRUSTEE FOGEL: And are there records for

Page 40

1 that entity available in the office that you have
2 been in looking at records?
3      MS. HOLTSCHLAG: Yes.
4      TRUSTEE FOGEL: Okay. We'll make a date to
5 go there.
6      And did you have any other
7 fill-in-the-blank information besides that off the
8 top of your head?
9      MS. HOLTSCHLAG: That's the one I remember.
10      TRUSTEE FOGEL: Good enough. Thank you.
11      MR. ARMSTRONG: Could I ask you a question?
12      You stated "the records." The
13 records are where?
14      MR. TEPLINSKY: The ones you looked at in the
15 office.
16      MR. ARMSTRONG: Paper copies?
17      MS. HOLTSCHLAG: Yes.
18      MR. ARMSTRONG: No computer records?
19      MS. HOLTSCHLAG: I haven't seen any computer
20 records, but I've seen numerous pieces of paper.
21 They're all in filing cabinets. It's clear that
22 there used to be a staff.
23      MR. ARMSTRONG: Do you know where the
24 computer records are?

Page 41

1      MS. HOLTSCHLAG: I don't. I've only seen
2 paper records.
3      MR. TEPLINSKY: We have no access to any of
4 that stuff.
5      MR. ARMSTRONG: There were computers.
6      MR. TEPLINSKY: There still are.
7      MR. ARMSTRONG: Where are they?
8      MR. TEPLINSKY: The computers are there. I
9 don't know what you're asking.
10      MR. ARMSTRONG: Did anybody take a look at
11 what's on them?
12      MR. TEPLINSKY: I told you we haven't even
13 been able to get access to them.
14      MR. ARMSTRONG: But you had access to the
15 paper.
16      MR. TEPLINSKY: Because paper is tangible,
17 and you can see it and touch it and feel it.
18      MR. ARMSTRONG: Why don't you have access to
19 the computers?
20      MR. TEPLINSKY: For the same reason you don't
21 have access to the computers.
22      MR. ARMSTRONG: But he's your client.
23      What am I missing?
24      MR. TEPLINSKY: You're missing the fact that

MEETING, 03/01/2016

Page 42

1 nobody sitting in this room has access to the
2 computers.
3       MR. ARMSTRONG: But they're his computers.
4       TRUSTEE FOGEL: Is that because no one has a
5 password or --
6       MR. TEPLINSKY: No one has a password and
7 nobody -- yeah, nobody knows what the status of the
8 network even is. Nobody has a password to any of
9 that stuff.
10      MR. ARMSTRONG: But somebody knew.
11      MR. TEPLINSKY: I suppose at some point in
12 time somebody knew.
13      MR. ARMSTRONG: Don't you think you should
14 ask?
15      MR. TEPLINSKY: What makes you think we
16 haven't?
17      MR. ARMSTRONG: All right.
18      TRUSTEE FOGEL: You want to pay for a
19 computer buster to go in and dupe these drives and
20 figure it out, we can get authority to do that, or
21 if they would probably maybe --
22      MR. FACTOR: Yeah, the records should --
23      TRUSTEE FOGEL: -- he'd let you do that.
24      MR. FACTOR: The record should reflect that

Page 43

1 Mr. Armstrong has had complete access.
2       MR. ARMSTRONG: To the papers.
3       MR. TEPLINSKY: Right.
4       MR. FACTOR: And was he shown the computers?
5       MR. TEPLINSKY: Well, nothing was turned on
6 or open, but the computers are there.
7       TRUSTEE FOGEL: Okay.
8           Dean Armstrong, I'm going to let you
9 ask some questions about any operating businesses
10 that the debtor has a direct or indirect interest
11 in or any closed businesses that have closed
12 recently that might result in the bankruptcy estate
13 having some interest.
14      MR. ARMSTRONG: Okay.
15      TRUSTEE FOGEL: I don't want you to ask
16 questions that relate specifically to your client's
17 claim against him to the extent you can
18 differentiate.
19      MR. ARMSTRONG: Okay.
20          EXAMINATION
21 BY MR. ARMSTRONG:
22      Q.   Mr. Gouletas, on the bankruptcy
23 schedules -- by the way, it was mentioned that
24 there was an accountant bill that wasn't reflected

Page 44

1 on your bankruptcy schedules and that you're going
2 to amend the schedules.
3           Are there any other amendments? Any
4 other changes?
5       A.   I don't --
6       MR. FACTOR: Objection. Isn't that a
7 question that the trustee asks?
8           Rick, are you ceding this exam to
9 Mr. Armstrong?
10      TRUSTEE FOGEL: I'm letting him ask some
11 questions now, yes.
12      MR. FACTOR: Right. So why don't you ask
13 specific questions about the schedules rather than
14 general questions about whether he's going to amend.
15 BY MR. ARMSTRONG:
16      Q.   Are there any other amend -- any other
17 corrections that you feel need to be made to the
18 schedules?
19      A.   I do not know.
20      Q.   Okay.
21      MR. FACTOR: He said -- did you hear the
22 answer?
23      MR. ARMSTRONG: Yeah.
24      MR. FACTOR: What did he say?

Page 45

1       MR. ARMSTRONG: It's on the record.
2       MR. FACTOR: What did he say?
3       MR. ARMSTRONG: It's on the record.
4       MR. FACTOR: You don't want to answer the
5 question?
6       MR. ARMSTRONG: I want to move on.
7       MR. FACTOR: He said he doesn't know.
8       MR. ARMSTRONG: That's what he said.
9       MR. FACTOR: Okay.
10 BY MR. ARMSTRONG:
11      Q.   Mr. Gouletas, on your summary of assets
12 and liabilities, question No. 1, there's a
13 reference to what I'll call the Greece property.
14          Do you see that reference?
15      MS. HOLTSCHLAG: Mr. Armstrong, are we
16 looking at the summary, or are we looking at
17 Schedule A/B. I just want to follow along.
18      MR. TEPLINSKY: A/B.
19      MR. ARMSTRONG: Yeah.
20      MS. HOLTSCHLAG: Thank you.
21      MR. NICHOLAS GOULETAS: The answer is yes, I
22 see what it is.
23 BY MR. ARMSTRONG:
24      Q.   You say there you inherited jointly

MEETING, 03/01/2016

Page 46

1 with sister Evangeline, E-v-a-n-g-e-l-i-n-e,
2 Gouletas upon passing of your mother approximately
3 eight years ago. Do you see that reference?
4    A.   Yes, I do.
5    Q.   So in about 2008, your mother died,
6 correct?
7    A.   Approximately, yes.
8    Q.   And then by operation of probate, the
9 property went to you and your sister Evangeline?
10    A.   I don't know what you mean by
11 "probate." My mother somehow, you know, passed it
12 on to Evangeline and I.
13    Q.   How did it go from your mother or your
14 mother's estate to you and your sister?
15    A.   I do not know.
16    TRUSTEE FOGEL: It apparently hasn't
17 transferred. Title is still in the mother's name.
18 BY MR. ARMSTRONG:
19    Q.   Were there probate proceedings in
20 Greece?
21    A.   I do not know.
22    MR. FACTOR: He said he doesn't know.
23 BY MR. ARMSTRONG:
24    Q.   How do you know you have an ownership

Page 47

1 interest in that property?
2    A.   I don't know if my sister Angie or
3 somebody said my mom left me something.
4    Q.   If your mother what?
5    A.   That she left me something.
6    Q.   Right.
7       My question was: How do you know
8 you have an ownership interest in that property?
9    MR. FACTOR: He just answered the question.
10    TRUSTEE FOGEL: He said he thinks his sister
11 told him.
12    MR. FACTOR: Are you intent on just harassing
13 him, or are you going to listen to the answers?
14 BY MR. ARMSTRONG:
15    Q.   That's the only way you know you have
16 an interest in it? Your sister --
17    MR. FACTOR: Objection.
18 BY MR. ARMSTRONG:
19    Q.   -- told you?
20    TRUSTEE FOGEL: No, that's a fair question.
21 Don't object to that.
22    MR. NICHOLAS GOULETAS: To the best of my
23 recollection, somebody told me. I think it was my
24 sister Angie. It might not have been. It might

Page 48

1 have been somebody else. My mother passed away
2 and, you know, somebody mentioned that there was a
3 home there and that somehow my mother passed it on
4 to Angie and I.
5 BY MR. ARMSTRONG:
6    Q.   When did you learn that?
7    A.   I don't recall.
8    Q.   Have you seen any documents pertaining
9 to your ownership interest?
10    MR. FACTOR: Rick, we're going to object to
11 this. This is in his complaint. He's using this
12 as a setup to his complaint. And how is this at
13 all relevant? Either he has an interest or he
14 doesn't. It's on the schedules.
15    TRUSTEE FOGEL: Good point.
16 BY MR. ARMSTRONG:
17    Q.   Do you have any documents?
18    TRUSTEE FOGEL: He said no. I asked that
19 question already.
20    MR. NICHOLAS GOULETAS: I don't believe I
21 have documents.
22 BY MR. ARMSTRONG:
23    Q.   Have you ever seen the property?
24    A.   I believe I saw it maybe 20 years ago,

Page 49

1 15 years ago. Some -- I believe somewhere along
2 the line I have seen the property.
3    Q.   Your attorney sent to Mr. Fogel an
4 e-mail dated September 30, 2014 -- let me show you
5 my copy -- September 30, 2014, from your sister to
6 you pertaining to the property.
7       Do you see that, sir?
8    MR. FACTOR: What e-mail is this?
9    TRUSTEE FOGEL: It's the first one.
10    MR. TEPLINSKY: First one.
11    MR. FACTOR: Again, we object. This is in
12 his complaint.
13    MR. ARMSTRONG: So what? It pertains to the
14 meeting of the creditors.
15    MR. FACTOR: How does it -- no, it pertains
16 to your separate lawsuit. We have a standing
17 objection on this.
18    MR. ARMSTRONG: Objection noted.
19    MR. FACTOR: If you want to take discovery,
20 you do a 2004 or in this case --
21    TRUSTEE FOGEL: Well, no. Now you would take
22 a dep --
23    MR. FACTOR: Rule 7026. This is highly
24 inappropriate. Especially for a creditor who's

MEETING, 03/01/2016

Page 50

1 been conducting discovery for a year and a half.
2     MR. TEPLINSKY: Longer than that, but yeah.
3 BY MR. ARMSTRONG:
4     Q.  Okay.  You produced an e-mail to the
5 trustee, correct?
6     A.  We produced this to the trustee.
7     Q.  The e-mail was on your computer,
8 correct?
9     A.  I don't know what it was on.
10     Q.  How did you get it?
11     A.  I don't remember.
12     MR. TEPLINSKY: What does this have to do
13 with -- come on.
14     MR. FACTOR: We're going -- we're going to
15 ask the court to reconvene this thing, because this
16 is --
17     TRUSTEE FOGEL: Dean, I wanted to ask him
18 questions about businesses that I wasn't aware of.
19 I really didn't want you to go on this property,
20 which I've already pretty much asked questions
21 about and understand what to do with in the
22 bankruptcy case.
23 BY MR. ARMSTRONG:
24     Q.  Well, let me ask you about the Carlos

Page 51

1 Castillo loan.  Okay?
2         How much was the loan?
3     A.  It was 80 some thousand dollars, I
4 believe.
5     Q.  Now, you told the trustee or you put in
6 writing there you don't have any documents
7 pertaining to that loan, correct?
8     A.  I believe there is a document.  I do
9 not have the document.
10     Q.  And in your schedules, you list a
11 Wurlitzer jukebox, correct?
12     A.  Correct.
13     Q.  Where is that Wurlitzer jukebox now?
14     A.  I believe that Carlos Castillo has
15 possession of it.
16     Q.  And he also has possession of a
17 mechanical violin?
18     A.  Correct.
19     Q.  And when did he get those items?
20     A.  I don't recall the dates.  Probably
21 been -- I don't know if it's been a year, two
22 years, whatever it's been.
23     Q.  Within the last couple years, how --
24 were they transferred from you over to him?

Page 52

1     A.  They were -- he has possession of them.
2     Q.  Okay.
3     TRUSTEE FOGEL: His attorney's now in the
4 case, and I think it would be easier to just work
5 through with Mr. Stola what documents exist to
6 support a claim against the estate and ultimate
7 disposition of the property.  So I'd prefer if you
8 skip this topic and move to the businesses.
9 BY MR. ARMSTRONG:
10     Q.  Okay.  On Garvey Court, there were
11 three entities that the trustee asked you about:
12 Dearborn Residential, LLC; Dearborn Retail, LLC;
13 and LaSalle Commercial, LLC.
14         Do you recall that discussion?
15     A.  I do.
16     Q.  And you owned the membership interest
17 in those LLCs, correct?
18     MR. TEPLINSKY: I think he said he didn't
19 know if he owned the membership interest in the
20 LLCs.
21 BY MR. ARMSTRONG:
22     Q.  You had some ownership interest in
23 those LLCs, correct?
24     MR. TEPLINSKY: It's the same answer to the

Page 53

1 same question, Dean.
2 BY MR. ARMSTRONG:
3     Q.  Is that correct?
4     MR. TEPLINSKY: Do you know the answer of
5 what you said before?
6     TRUSTEE FOGEL: I think you said you weren't
7 sure.
8     MR. NICHOLAS GOULETAS: I'm not sure.
9 BY MR. ARMSTRONG:
10     Q.  Okay.  Whatever ownership interest you
11 had in those LLCs, how did that get -- how did the
12 assets of those LLCs get to your wife and your kids
13 and your other family members?
14     MR. TEPLINSKY: Whatever ownership interest
15 you had in the LLCs, how did the assets get
16 transferred?
17     TRUSTEE FOGEL: I was asking pretty much the
18 same question before.
19         How is it that -- why did it go from
20 the debtor entities to entities that his family
21 controlled and ultimately to the current owner.
22 But he didn't -- he said he didn't know.  We're
23 going to have to subpoena the attorneys and get
24 their files.

MEETING, 03/01/2016

Page 54

1 BY MR. ARMSTRONG:
2    Q.   In your schedules, you show you have a
3 7 percent interest in NKM Garvey, LLC.
4         How did you acquire that interest?
5    A.   I don't recall.
6    Q.   How do you know you have that interest?
7    A.   I don't know.
8    Q.   Where are the records pertaining to
9 that entity, NKM Garvey, LLC?
10   A.   I do not know where the records are.
11   Q.   How can you swear to that in your
12 petitions?
13   A.   At this moment, I do not recall. I'm
14 under a lot of pressure. I might have looked at
15 some schedules or some information that, you know,
16 that showed me what I had. Okay?
17   MS. HOLTSCHLAG: I think I could -- do we
18 actually want the answer to this, or we're just
19 trying to find out --
20   MR. ARMSTRONG: Sure.
21   MR. TEPLINSKY: I think it's just a number.
22   MS. HOLTSCHLAG: Yeah. We talked to
23 Elizabeth Friedgut. Elizabeth Friedgut?
24   MR. NICHOLAS GOULETAS: She's a lawyer.

Page 55

1    MS. HOLTSCHLAG: And she provided me with a
2 copy of NKM's operating agreement, which I'm happy
3 to share, whoever wants it. And it did show us
4 that 7 percent, so that's where I got that. And
5 you know, as we were putting all this together,
6 that was the document we reviewed, and that's where
7 that came from.
8    MR. ARMSTRONG: Could you give me the date of
9 the operating agreement?
10   MS. HOLTSCHLAG: I don't know it off the top
11 of my head, but I can get that for you.
12   TRUSTEE FOGEL: We're going to get all that
13 stuff.
14        These entities were set up in 2014
15 in connection with the transaction. The ownership
16 was laid out the way it was laid out. Why it
17 happened this way makes no sense, but maybe the
18 attorney can explain it to us; he can't.
19 BY MR. ARMSTRONG:
20   Q.   Okay. The trustee asked you about
21 attorneys' fees, and I believe you mentioned there
22 was the additional $10,000 paid to Mr. Factor
23 post-petition? Do I have that right?
24   MR. FACTOR: Yes.

Page 56

1    MR. ARMSTRONG: And it came from -- was it
2 Warady & Davis?
3    MR. FACTOR: Yes.
4    MR. ARMSTRONG: How do you spell Warady?
5    MR. FACTOR: W-a-r-a-d-y.
6 BY MR. ARMSTRONG:
7    Q.   And they were holding your money,
8 correct?
9    MR. FACTOR: He didn't say that.
10 BY MR. ARMSTRONG:
11   Q.   Okay. Well, you tell me.
12   A.   They paid it. They were holding money
13 from somewhere.
14   Q.   Okay. How much were they holding?
15   A.   I don't recall.
16   Q.   Did you ask them to pay it over to the
17 attorney?
18   A.   It was a bill that they paid out of
19 those funds.
20   Q.   Okay. Why are they holding those funds?
21   A.   I presume it's to pay attorneys or
22 accountants.
23   Q.   How did the money get to them?
24   A.   I don't recall.

Page 57

1    Q.   Is it your money?
2    A.   I don't know that it's my money.
3    Q.   Is it reflected on your schedules?
4    A.   I don't know that it's reflected on my
5 schedules.
6    Q.   Who was the contact at -- that's an
7 accounting firm?
8    A.   I believe so.
9    Q.   Who was the contact there?
10   A.   I don't recall.
11   MR. FACTOR: His name is Rick Franklin.
12   MR. NICHOLAS GOULETAS: Thank you.
13 BY MR. ARMSTRONG:
14   Q.   Does Rick Franklin or that firm do any
15 other accounting work -- do any accounting work for
16 you?
17   MR. FACTOR: For him personally?
18   MR. ARMSTRONG: Yes.
19   MR. NICHOLAS GOULETAS: I don't believe --
20   TRUSTEE FOGEL: Are they the accountants that
21 are going to do his returns?
22   MR. TEPLINSKY: They're the accountant that
23 has been -- that was retained to do returns for, I
24 believe, one or two entities, and which would have,

MEETING, 03/01/2016

Page 58

1 I suppose, been Mr. Gouletas' returns ultimately as
2 well.
3        TRUSTEE FOGEL: I don't mean to interrupt
4 you, but is that firm -- does that firm do tax work
5 for NKM Garvey or SEG Garvey?
6        MR. TEPLINSKY: I don't believe so. I would
7 say no, actually.
8        MR. ARMSTRONG: Best you know, Howard, just
9 for him personally?
10       MR. TEPLINSKY: No, that's not what I said at
11 all.
12       TRUSTEE FOGEL: Not for him personally. For
13 different entities.
14       MR. TEPLINSKY: Warady & Davis was retained a
15 while back -- I don't recall exactly when -- to
16 assist with tax returns that hadn't been filed for
17 some entities that may or may -- that we believe
18 had some income, and Mr. Gouletas' personal returns
19 I think are considered consolidated returns or
20 something like that. And I'm not an accountant. I
21 don't know the exact language of that. But it was
22 an attempt to start getting these returns done.
23       TRUSTEE FOGEL: And the entities that you're
24 referring to, are those currently operating

Page 59

1 entities?
2        MR. TEPLINSKY: There are -- they are no
3 longer operating, but they hadn't had returns done
4 for them, I believe, when they were operating
5 entities.
6        TRUSTEE FOGEL: Okay. Well, we can call him
7 and find out who he's representing and whether he
8 has any other money that belongs to Mr. Gouletas.
9 BY MR. ARMSTRONG:
10       Q.   Okay. The trustee asked you about the
11 River City parking lot. Do you recall that?
12       A.   I do.
13       Q.   And that entity went into bankruptcy,
14 800 South Wells Commercial, Phase II, LLC, correct?
15       A.   I believe so.
16       Q.   And in connection with that bankruptcy,
17 the parking lot was sold, correct?
18       A.   It was sold.
19       Q.   Okay. And there was roughly
20 $2.1 million in excess proceeds above the amount
21 required to pay the secured creditor, correct?
22       MR. TEPLINSKY: There was more than one
23 secured creditor in that bankruptcy. I think you
24 know that.

Page 60

1 BY MR. ARMSTRONG:
2        Q.   There was $2.1 million in excess of the
3 amount owed to the secured creditors, correct?
4        A.   I don't remember exactly what the
5 number was.
6        Q.   Does that sound about right?
7        A.   It sounds -- yes.
8        Q.   Okay. What happened to the 2.1 million?
9        A.   It was paid to creditors.
10       Q.   Whose creditors?
11       A.   Creditors I believe that had invested
12 in the property.
13       Q.   Were any of --
14       MR. FACTOR: Objection. Again, this is his
15 exact complaint.
16       TRUSTEE FOGEL: Wait, wait, no.
17       If he's the -- I'm interested in
18 this now. If he's the member of the entity and he
19 got $2 million a couple years ago, I want to know
20 what he did with it.
21       MR. FACTOR: He didn't get $2 million.
22       MR. NICHOLAS GOULETAS: I did not get a penny.
23       MR. FACTOR: That's his whole complaint.
24       MR. TEPLINSKY: And you know that. You know

Page 61

1 that.
2        MR. NICHOLAS GOULETAS: I did not get a
3 single -- and please --
4        MR. ARMSTRONG: It went to his entity.
5 BY MR. ARMSTRONG:
6        Q.   Let me put it on the record here.
7             $2.1 million went to an entity that
8 you owned and controlled called Home by Invesco --
9        MR. FACTOR: Objection.
10 BY MR. ARMSTRONG:
11       Q.   -- HBI, correct?
12       MR. FACTOR: Objection, objection, objection.
13             This is not your deposition.
14 BY MR. ARMSTRONG:
15       Q.   $2.1 million should be paid to the
16 creditors in this case because --
17       MR. TEPLINSKY: Objection.
18       MR. FACTOR: Objection, objection.
19       MR. TEPLINSKY: You have to be kidding, Dean.
20 You've got to be kidding. You know that Home by
21 Invesco was a secured creditor in that bankruptcy.
22 Home by Invesco received some proceeds. Home by
23 Invesco had creditors, judgment creditors, who were
24 paid out of proceeds from that. You know that.

MEETING, 03/01/2016

Page 62

1    MR. NICHOLAS GOULETAS: And I did not receive
2 a penny, not a single penny.
3 BY MR. ARMSTRONG:
4    **Q.   The question is: Were any --**
5    A.   And that's on record.
6    **Q.   Were any of your creditors, personal**
7 **creditors, paid from that $2.1 million?**
8    A.   When you say "personal creditors," I
9 don't know what --
10    MR. FACTOR: What do you mean?  Do you want
11 to identify the personal creditors?
12    Objection, relevance.
13 BY MR. ARMSTRONG:
14    **Q.   The $2.1 million that came in from the**
15 **sale of that parking lot, okay, the underlying**
16 **entity, 800 South Wells, Phase II, LLC, you had an**
17 **ownership interest in that entity, correct?**
18    TRUSTEE FOGEL: He's the sole -- wait a
19 minute. He's the sole owner of that entity.
20    MR. ARMSTRONG: Right, right.
21 BY MR. ARMSTRONG:
22    **Q.   So the money comes in --**
23    A.   No.  Home by Invesco.
24    TRUSTEE FOGEL: You were the sole owner of

Page 63

1 800 South Wells, Phase II.  It's reported on his
2 tax return.  It's not partial.
3    MR. TEPLINSKY: I don't know if he -- I don't
4 know.
5    TRUSTEE FOGEL: This is an entity that he
6 owns.  So wait, so --
7    MR. ARMSTRONG: So that --
8    TRUSTEE FOGEL: -- that entity was a debtor.
9 That entity sold real estate in a bankruptcy case
10 that covered all of the debt of that entity?
11    MR. ARMSTRONG: There was 2.1 million profit --
12    TRUSTEE FOGEL: Did it cover all of the
13 unsecured debt of the entity?
14    MR. ARMSTRONG: They dismissed the bankruptcy
15 after the secured creditors were paid.  Same old
16 story.
17    TRUSTEE FOGEL: Same old story.
18    MR. FACTOR: So the creditors of the entity
19 were paid.
20    TRUSTEE FOGEL: How do we get an accounting
21 for what happened to that money?
22    MR. FACTOR: We can get you that.
23    MR. TEPLINSKY: I can provide it for you.
24    MS. HOLTSCHLAG: I think I have that.

Page 64

1    MR. FACTOR: And by the way, his lawsuit
2 violates the stay, so I want to put on the record
3 that we are reserving all of our rights, because
4 he's trying to allege an alter ego in his lawsuit.
5 To the extent that's part of the bankruptcy estate,
6 he doesn't have the ability to do that and he's --
7    TRUSTEE FOGEL: I didn't read the complaint.
8    MR. FACTOR: -- exercising control of estate
9 property.
10    TRUSTEE FOGEL: Well, part of my problem is
11 trying to figure out what is the estate property.
12    MR. FACTOR: And we can certainly answer
13 those questions but not when you've got a guy who
14 files a complaint that's based on lies.  He knows
15 that that money was not the debtor's money.
16    TRUSTEE FOGEL: I'm missing the point.
17    Why wasn't it the debtor's money?
18    MR. FACTOR: Because the entity had creditors.
19    MR. TEPLINSKY: Secured creditors.
20    TRUSTEE FOGEL: And those secured creditors
21 were paid, and then there's $2 million to make --
22    MR. FACTOR: No.
23    MR. TEPLINSKY: No.
24    TRUSTEE FOGEL: No?

Page 65

1    MR. TEPLINSKY: Here's what happened.
2    TRUSTEE FOGEL: I don't want to do it now.
3    MR. TEPLINSKY: I'll provide you with
4 whatever accounting --
5    TRUSTEE FOGEL: Move on.  I want to know
6 about the proceeds of this sale.
7    MR. ARMSTRONG: No further questions.
8    TRUSTEE FOGEL: Got anything?
9    MR. STOLA: Yes.
10    EXAMINATION
11 BY MR. STOLA:
12    **Q.   Do you have any -- with regard to the**
13 **items -- James Stola, for the record, on behalf of**
14 **Carlos Castillo.**
15    **With regard to the items that are**
16 **listed that you own that are in the possession**
17 **of -- which you allege you're in the possession,**
18 **which you allege you own -- do you have any**
19 **documentation as to the ownership of those items?**
20    A.   There is -- I don't understand your
21 question.
22    TRUSTEE FOGEL: Do you have a receipt for the
23 purchase of the Wurlitzer jukebox, for example?  Is
24 that what you meant, Jim?

MEETING, 03/01/2016

Page 66

1  BY MR. STOLA:
2      Q.   Yeah.  I deal with artifacts and
3  artwork, and I know that when we do transactions of
4  this nature we do bill of sales and contracts.  And
5  a lot of times we have nondisclosure clauses in
6  those.
7            But I would like to know if you have
8  any documentation with regard to your ownership of
9  those -- if you received anything, like a receipt,
10  as the trustee stated?
11     A.   I'm sure there -- I'm sure there's some
12  documentation.  I don't have it in my possession at
13  this time, and I don't know where it might be, but
14  I'm sure there is some documentation.
15     MR. TEPLINSKY:  In response to your question,
16  Rick, we've been looking.
17     TRUSTEE FOGEL:  Okay.  Jim, does your client
18  have any reason to think that someone other than
19  Mr. Gouletas owns those items?
20     MR. STOLA:  I don't know.  I just -- my
21  client found out about this on last Friday.  There
22  was no notice given to him that I'm aware of, and I
23  just -- he contacted me, and the first meeting I
24  had with him was last Friday afternoon.

Page 67

1      TRUSTEE FOGEL:  We'll talk.
2      MR. STOLA:  And when I realized that these
3  were listed -- he didn't know that these were even
4  listed as assets until that point, until I -- and
5  then I checked up and got through the filings, and
6  he was shocked.  So I still haven't had a meeting
7  with him.  He just --
8      TRUSTEE FOGEL:  We'll talk.  You'll talk.
9  You'll get some paperwork on your side.  We'll
10  figure our way out of this.
11  BY MR. STOLA:
12     Q.   And do you have any documentation in
13  your possession as to the transfer of those items
14  to Carlos?
15     A.   No, I do not.
16     Q.   Okay.  And you stated that there was an
17  $80,000 loan from Carlos; is that right?
18     A.   I believe it was somewhere around
19  $80,000.
20     Q.   And what was the -- do you know what
21  was the form of that?  Was it cash?  Was it check?
22  Or what happened?
23     A.   I don't recall.
24     Q.   Okay.  And did Carlos ever give you

Page 68

1  more money than $80,000?
2      A.   Not that I recall.  He might have, but
3  I do not recall.
4      MR. STOLA:  I have no further questions.
5      TRUSTEE FOGEL:  Thank you.
6            And just for the record, my request
7  to you is after you meet with Mr. Castillo I'd like
8  to see whatever paperwork he has regarding either
9  the placement of the items in his control or
10  anything that he might have regarding ownership of
11  the items or anything.  Or documentation for the
12  debt.  We'll share.
13            Sir?
14     MR. ENNESSY:  Mr. Ennessy, I have no
15  questions.
16     TRUSTEE FOGEL:  Sir?
17     MR. WEST:  No questions for me.
18     TRUSTEE FOGEL:  Sir?
19     MR. MURRAY:  Just a couple maybe brief.
20            My apologies.  For the record,
21  Alfred Murray.  I represent the creditors Muth and
22  Alfonso.
23            I didn't realize, Mr. Fogel, that
24  the A/B schedule was supposed to be one long

Page 69

1  spreadsheet, so ...
2      TRUSTEE FOGEL:  I didn't either.
3      MR. MURRAY:  So my apologies for these
4  questions.
5            Do you have the spreadsheet open?
6      MS. HOLTSCHLAG:  I do.
7      MR. MURRAY:  The entities that I'm looking at
8  are 440 North Wabash Commercial, LLC -- four
9  separate entities -- 440 North Wabash Holding
10  Company, LLC; and then 440 North Wabash, LLC.
11            Those are all identified on page 12
12  of 144 on document 15, but are you with me?
13     MS. HOLTSCHLAG:  I think so.
14     MR. MURRAY:  Okay.  If you go all the way to
15  the far right where it lists the date of those
16  entities, are any of those still active?
17     MS. HOLTSCHLAG:  All right.
18            So 440 North Wabash, LLC, I'm
19  showing the ending date of April 2, 2009, and I'm
20  showing that as an involuntary dissolution of an
21  Illinois LLC.
22     MR. MURRAY:  Okay.
23     MS. HOLTSCHLAG:  Then it was 440 North Wabash
24  Holding Company?

MEETING, 03/01/2016

**Page 70**

1    MR. MURRAY: Correct, LLC.

2    MS. HOLTSCHLAG: LLC.

3        I'm showing again involuntary
4 dissolution of that entity Illinois LLC on
5 December 14th of 2012.

6        And what was the third entity?

7    MR. MURRAY: It was the one right above that:
8 440 North Wabash Commercial, LLC.

9    MS. HOLTSCHLAG: I'm showing an ending date
10 of June 8, 2012, by involuntary dissolution of an
11 Illinois LLC.

12    MR. MURRAY: Okay. Then the only other one I
13 have would be SEG Plaza -- sorry -- SEG Plaza 440,
14 LLC.

15    MS. HOLTSCHLAG: Yeah, one second.

16        SEG Plaza 440, LLC, I'm showing
17 that's an Illinois LLC, involuntary dissolution on
18 December 14, 2012.

19    MR. MURRAY: Okay. I think that's all I
20 have.

21    TRUSTEE FOGEL: Okay. Do you have any -- go
22 ahead.

23

24

**Page 71**

1        FURTHER EXAMINATION

2 BY MR. ARMSTRONG:

3    Q.    On Garvey Court -- I apologize -- you
4 understand it's a proposed 80-story mixed use
5 office building?

6    A.    Pardon me?

7    Q.    Garvey Court, the proposal is it's an
8 80-story mixed use office residential condominium
9 building?

10    MR. FACTOR: What do you mean by "proposal"?

11    MR. NICHOLAS GOULETAS: I don't understand.

12 BY MR. ARMSTRONG:

13    Q.    There's a building that's supposed to
14 be constructed there, right?

15    MR. FACTOR: By whom?

16    MR. ARMSTRONG: Who cares?

17 BY MR. ARMSTRONG:

18    Q.    You understand there's a building
19 that's supposed to be constructed there?

20    A.    I don't know that there's a building to
21 be constructed there.

22    Q.    Isn't that what you understand the
23 proposal to be when Bighorn came in and financed
24 the transaction?

**Page 72**

1    A.    What they were going to put up, I don't
2 recall.

3    Q.    Who advised and counseled you as to how
4 to structure the Garvey Court transaction?

5    TRUSTEE FOGEL: Liz Friedgut.

6 BY MR. ARMSTRONG:

7    Q.    Anybody else?

8    A.    I don't recall.

9        She's a lawyer with a big firm.

10    TRUSTEE FOGEL: I understand. She'll provide
11 us information.

12    MR. NICHOLAS GOULETAS: She can provide you
13 whatever you need.

14 BY MR. ARMSTRONG:

15    Q.    And on the TD Ameritrade, was that a
16 new account that was set up to receive the $51,000
17 in proceeds from the sale of the stock?

18    A.    I believe so.

19    Q.    Did you set it up?

20    A.    I'm sure some law firm set it up.

21    Q.    Who was the law firm?

22    A.    I don't recall.

23    Q.    The checks that the trustee went over
24 with you, they all appear to be checks for your

**Page 73**

1 personal benefit. Would that be fair?

2    A.    I don't know that it's my personal
3 benefit.

4    Q.    Why didn't you put the funds into a
5 separate account somewhere else?

6    A.    I don't understand your question.

7    Q.    You have 51,000 that comes in to your
8 wife's account. The checks that go out are for
9 your personal benefit by and large.

10        Why didn't you just put the funds
11 into a separate account and you do it yourself?

12    A.    I don't recall.

13    MS. HOLTSCHLAG: I do think he answered that
14 question when Rick asked him.

15    TRUSTEE FOGEL: I think he said the same
16 answer when I asked him. He didn't recall.

17    MR. NICHOLAS GOULETAS: My wife --

18    TRUSTEE FOGEL: I remember I asked why he did
19 that too instead of writing the checks himself
20 or -- oh, he said that his wife paid his bills.

21    MR. FACTOR: Well, I -- go ahead.

22    TRUSTEE FOGEL: No, go ahead.

23    MR. FACTOR: I also think that at that point
24 his accounts were frozen, so I don't know if he

MEETING, 03/01/2016

Page 74

1 remembers that.
2        That your accounts were frozen at
3 the time?
4        MR. NICHOLAS GOULETAS: Yes.
5        MR. TEPLINSKY: You had citations going on.
6        TRUSTEE FOGEL: Shouldn't the Ameritrade
7 accounts have been frozen too?
8        MR. FACTOR: Well, I think that's what they
9 were arguing in the state court.
10       MR. ARMSTRONG: And that's what the consent
11 was about.
12       TRUSTEE FOGEL: So you already -- I didn't
13 know that. I didn't know you already fought about
14 this.
15       MR. TEPLINSKY: Oh, yeah, yeah.
16       MR. FACTOR: It's in his complaint.
17       MR. TEPLINSKY: This is nothing new.
18 BY MR. ARMSTRONG:
19    Q.   On September 26th, there's checking
20 withdrawal, $800. Did you withdraw those funds?
21    A.   Can I see what he's looking at?
22    Q.   Sure.
23    A.   Where is it? So what's the question?
24       MR. TEPLINSKY: Did you withdraw those funds?

Page 75

1        TRUSTEE FOGEL: Did you take the money out?
2        MR. NICHOLAS GOULETAS: I don't remember what
3 this was.
4        MR. TEPLINSKY: I don't think she could hear
5 you.
6        MR. NICHOLAS GOULETAS: I don't remember what
7 that was about.
8 BY MR. ARMSTRONG:
9    Q.   And then the earlier withdrawal, I
10 think it was 3,500. Did you personally or did your
11 wife take those funds out?
12       MR. FACTOR: Well, that's a mixed question.
13       MR. TEPLINSKY: Yeah.
14       MR. FACTOR: Do you want to ask him if he
15 personally did it?
16       MR. ARMSTRONG: Overruled.
17       MR. FACTOR: Well, what's your question?
18 BY MR. ARMSTRONG:
19    Q.   Did you personally withdraw those funds?
20    A.   I don't recall.
21    Q.   The wire transfer to the -- was it Moss
22 firm?
23       Let me see. It's on the top of that
24 page, the second page.

Page 76

1        The wire transfer, that's, what, how
2 much? 5,000?
3        MR. FACTOR: Again, our objection, this is
4 all in his complaint.
5        MR. ARMSTRONG: This isn't.
6        MR. NICHOLAS GOULETAS: I believe they're
7 lawyers. Moss group is a law firm.
8        MR. TEPLINSKY: What's the question?
9 BY MR. ARMSTRONG:
10    Q.   How much is it? 5,000?
11    A.   Correct.
12    Q.   Wire transfer, correct?
13    A.   I don't know.
14       MR. TEPLINSKY: He already said that.
15       MR. NICHOLAS GOULETAS: I can't tell whether
16 it's a wire transfer.
17 BY MR. ARMSTRONG:
18    Q.   It's your lawyers or your wife's
19 lawyers?
20    A.   I don't know.
21    Q.   Who gave the instructions to wire
22 transfer the money out?
23    A.   I don't recall.
24       MR. ARMSTRONG: Can I have that back, please?

Page 77

1 Nothing further.
2        TRUSTEE FOGEL: All right. Meeting is
3 adjourned.
4              (The proceedings adjourned at
5              2:29 p.m.)

MEETING, 03/01/2016

Page 78

1
2
              REPORTER'S CERTIFICATE
3
4       I, Katie K. Elliott, do hereby certify that
5   I reported in shorthand the proceedings of said
6   meeting as appears from my stenographic notes so
7   taken and transcribed under my direction.
8
9       IN WITNESS WHEREOF, I have hereunto set my
10  hand at Chicago, Illinois, this 8th day of March
11  2016.
12
13              *Katie K. Elliott*
14          Illinois CSR No. 084-004537
15
16
17
18
19
20
21
22
23
24

# Px T

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 800 S. Wells Commercial, LLC, | ) | Case No. 06 B 15500 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |

## ORDER ON RIVER CITY INVESTORS, LLC & NICHOLAS GOULETAS'
## MOTION TO DISMISS

The Debtor's leasehold interest in the commercial space at 800 S. Wells Street, Chicago, Illinois is the subject of a state court mortgage foreclosure case which resulted in a judgment of foreclosure and a finding that the Debtor owes its senior secured lender $12,364,537.66. WRT-Marc RC LLC ("WRT"), as successor in interest to Parkway Bank & Trust Company, presently holds this senior security interest. The Debtor's junior secured lender, D.A.N. Joint Venture III, L.P. ("D.A.N."), resists the foreclosure sale arguing that such a fire sale would satisfy WRT's debt only. Movants, River City Investors and Nicholas Gouletas, now seek dismissal of the Debtor's bankruptcy case under sections 1112(b) or 305(a)(1) of the Bankruptcy Code ("Code").

According to the Debtor's Operating Agreement ("Agreement"), Movant Nicholas Gouletas held a 50% membership interest in the Debtor and was listed as the Debtor's Managing Member. Movant River City Investors held the remaining 50% interest. Movants entered into a Collateral Pledge and Security Agreement ("Pledge Agreement") in March 2001 with CIB Bank ("CIB") whereby they pledged their membership interests in the Debtor to CIB.

D.A.N. succeeded to CIB's interests by exercising its rights under the Pledge Agreement; it became Debtor's Managing Member by ousting Nicholas Gouletas and River City Investors. D.A.N. then voted to file this Chapter 11 bankruptcy proceeding in an effort to sell the Debtor's leasehold interest on the open market pursuant to section 363 of the Code.

In an agreement dated March 29, 2006, WRT released Nicholas Gouletas from his guarantee of Debtor's $5.2 million debt to WRT. WRT released Mr. Gouletas in exchange for Mr. Gouletas' payment of $22,375.54 and a promise that should a bankruptcy be filed, that Mr. Gouletas would

PxT

seek its dismissal and an acknowledgment that amounts WRT claimed it was owed by Debtor were in fact owed.

The Movants rely on section 1112(b) to advance their argument that the case should be dismissed "for cause." In particular, Movants allege that the filing of the bankruptcy petition was not authorized under the Operating Agreement. Movants additionally argue that the petition was filed in bad faith.

Citing section 305(a)(1), they argue that this court should decline jurisdiction over this case because the state chancery court would provide for more efficient administration and therefore represents a better forum for resolving the dispute at the center of the bankruptcy case. Movants also contend that this dispute constitutes a non-core proceeding under 28 U.S.C. § 157(c)(1).

### 11 U.S.C. § 1112(b) vs. 11 U.S.C. § 305(a)(1)

The Bankruptcy Code contains two separate statutes by which a Chapter 11 case can be dismissed—section 305(a) and section 1112(b). Section 1112(b) provides, in part, that:

> Except as provided in paragraph (2) of this subsection, . . ., on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested . . . dismissal is not in the best interests of creditors and the estate, the court *shall* . . . dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C.A. § 1112(b)(1)(emphasis added). While the term "cause" is not defined in the Code, section 1112(b)(4) contains a non-exhaustive list of what "cause" includes.[1] The burden of proving

---

[1] Section 1112(b)(4) states:
For purposes of this subsection, the term 'cause' includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
(B) gross mismanagement of the estate;
(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
(E) failure to comply with an order of the court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown

that a case should be dismissed under section 1112(b) "for cause" lies with the moving party. <u>See</u> <u>Matter of Woodbrook Assoc.</u>, 19 F.3d 312, 317 (7th Cir. 1994).

In contrast, the dismissal provision in section 305(a) states in relevant part that:

(a) The court, after notice and a hearing, *may* dismiss a case under this title . . ., at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal . . . .

11 U.S.C.A. § 305(a)(1)(emphasis added).[2] Courts that have interpreted the dismissal provision in section 305 have generally concluded that dismissal is appropriate "only where the court finds that

---

by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

[2] In total, section 305 states:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

(2)(A) a petition under section 1515 for recognition of a foreign proceeding has been granted; and (B) the purposes of chapter 15 of this title would be best served by such dismissal or suspension.

(b) A foreign representative may seek dismissal or suspension under subsection (a)(2) of this section.

(c) An order under subsection (a) of this section dismissing a case or suspending all proceedings in a case, or a decision not so to dismiss or suspend, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of title 28 or by the Supreme Court of the United States under section 1254 of title 28.

-3-

both "creditors and the debtor" would be "better served" by a dismissal. (Citations omitted) This test requires that both creditors and debtors benefit from the dismissal, rather than applying a simple balancing test to determine whether dismissal is appropriate." In re Globo Comunicacoes e Participacoes S.A., 317 B.R. 235, 255 (S.D.N.Y. 2004). See also In re Edwards, 214 B.R. 613, 620 (B.A.P. 9th Cir. 1997); In re RAI Marketing Services, Inc., 20 B.R. 943, 945-46 (Bankr. D. Kan.1982). However the provision fails to identify what types of "interests" warrant dismissal under section 305 or "what" might better serve the interests of both the creditors and debtor. See In re International Zinc Coatings & Chemical, Inc., 355 B.R. 76, 82 (Bankr. N.D. Ill. 2006); In re Spade, 258 B.R. 221, 228 (Bankr. D. Colo. 2001). Courts that have engaged in a section 305(a) dismissal analysis have considered and applied various factors to the specific facts of each individual case. See International Zinc, 355 B.R. at 82; In re Corino, 191 B.R. 283, 287 (Bankr. N.D.N.Y. 1995). As noted by Judge Goldgar in International Zinc,

> The many lists mentioned in the decisions vary, but typically they include the following: (1) the presence of unsettled issues of non-bankruptcy law; (2) the availability of another forum to decide those issues; (3) economy and efficiency of administration; (4) any prejudice to the parties; and (5) the purpose of the bankruptcy. See, e.g., In re St. Marie Dev. Corp. of Mont., Inc., 334 B.R. 663, 672 (Bankr. D. Mont. 2005); Fortran, 297 B.R. at 94; In re Realty Trust Corp., 143 B.R. 920, 926 (Bankr. D. N. Mar. I. 1992). Other factors sometimes considered include the nature of the estate's assets and the motivations of the parties. Spade, 258 B.R. at 231; In re Jr. Food Mart of Ark., Inc., 241 B.R. 423, 426 (Bankr. E.D. Ark.1999).

355 B.R. at 82.

Despite the fact that dismissal can be sought under section 305(a) instead of under section 1112(b), courts have viewed dismissal under section 305 as an extraordinary remedy that should be applied with extreme caution because the decision is not reviewable by a Circuit Court of Appeals or the Supreme Court. See 11 U.S.C. § 305(c). See also In re Iowa Trust, 135 B.R. 615, 621 (Bankr. N.D. Iowa 1992); In re Marker, 133 B.R. 340 (Bankr. W.D. Pa. 1991). Nor should a dismissal motion premised on section 305(a) be used as a substitute for a motion to dismiss under section 1112(b). See In re Shur Management Co., Ltd., 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005). The burden of proving that dismissal is appropriate under section 305(a)(1) rests with the party requesting the relief. See In re Taylor Agency, Inc., 281 B.R. 354, 359 (Bankr. S.D. Ala. 2001); In re Sherwood

Enter., Inc., 112 B.R. 165, 167 (Bankr. S.D. Tex. 1989).

### 11 U.S.C. §1112(b): Authority to File

D.A.N.'s exercise of its pledge agreement rights to succeed Nicholas Gouletas and River City Investors, LLC as Debtor's Managing Member has been challenged generally. However, this challenge is without legal and factual support.

A voluntary case is commenced by the filing of a petition by "an entity that may be a debtor under such chapter." See 11 U.S.C. § 301(a).[3] A bankruptcy case filed by an individual who lacks legal authority to act on behalf of an entity is generally deemed improper and must be dismissed. See Huger v. Gibson, 108 F.3d 35, 39 (4th Cir. 1997); In re Real Homes, LLC, 352 B.R. 221, 225 (Bankr. D. Idaho 2005). As to who possesses authority to file a petition, the Supreme Court held with respect to corporate debtors that the determination is governed by applicable corporate governance laws. See Price v. Gurney, 324 U.S. 100, 104-106 (1945)("[T]he initiation of the [bankruptcy] proceedings, like the run of corporate activities, is left to the corporation itself, i.e. to those who have the power of management."). See also In re Gen-Air Plumbing & Remodeling, Inc., 208 B.R. 426, 430 (Bankr. N.D. Ill. 1997). Although Price focuses on a corporate debtor, nothing in the Supreme Court's decision limits application of its analysis and reasoning when the entity is a limited liability company. See e.g., In re Delta Starr Broad., LLC, 2006 WL 285974 (E.D. La. Feb. 6, 2006); Real Homes, LLC, 352 B.R. at 225; In re Avalon Hotel Partners, LLC, 302 B.R. 377, 380-81 (Bankr. D. Or. 2003). The Debtor was organized under Illinois law and whether Debtor's Executive Vice-President, William E. Shaulis, was authorized to file the bankruptcy petition on the

---

[3]The Code's requirements as to who may be a debtor for the purposes of a Chapter 11 case are controlled by § 109(d):

> Only a railroad, a person that may be a debtor under chapter 7 of this title (except a stockbroker or a commodity broker), and an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991 may be a debtor under chapter 11 of this title.

11 U.S.C. § 109(d).

Debtor's behalf is controlled by Illinois law.[4]

While Illinois' Limited Liability Company Act ("LLC Act"), see 805 ILCS 180/1-1 et al., does not specifically address who within the structure of a limited liability company has the authority to file a bankruptcy petition, the LLC Act does state that limited liability companies are permitted to "enter into an operating agreement to regulate the affairs of the company and the conduct of its business and to govern relations among the members, managers, and company." See 805 ILCS 180/15-5. See also 805 ILCS 180/1-30(15)("Each limited liability company organized and existing under this Act may . . . have and exercise all powers necessary or convenient to effect any or all of the purposes for which the limited liability company is organized.")

Under the Debtor's Operating Agreement, Section 5.1 states that "the Managing Member shall have the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by Managing Members under the [LLC] Act," subject to certain limitations. However , Section 5.3(viii) specifically states that the Managing Member "shall not have the authority to, . . .without the unanimous consent of the Members, . . . [f]ile or permit a voluntary petition for protection under the Bankruptcy Code as set forth under Title 11 of the United States Code." Movants take issue with whether D.A.N. held the authority, by way of the Pledge Agreement, to commence Debtor's bankruptcy case.

The argument that D.A.N. has not acquired all of the manager-member power is without basis. Paragraph 1.1 of the Pledge Agreement states "Pledgor assigns, pledges and grants to Lender a security interest in and lien upon all of Pledgor's right, title and interest in and to Pledgor's interest in Borrower (including without limitation, Pledgor's rights to note, to interim cash...". D.A.N. succeeded to all, 100%, of the Pledgor's interest. [v]

The Movants assert that D.A.N. has improperly transferred an interest in Debtor's property. The property was not transferred. The Debtor's management was changed; Debtor continues to hold the leasehold interest.

---

[4] While Mr. Shaulis signed the petition as the "Authorized Individual" authorized to file the petition, the "Resolution" attached to the petition as Exhibit 1 states that D.A.N. elected to exercise its rights under the Mar 21, 2001 Pledge Agreement as controller of 100% membership interest and authorize the Debtor's Chapter 11 bankruptcy filing. Mr. Shaulis signed the Resolution as the vice-president of D.A.N's general partner, The Cadle Company.

### *11 U.S.C. § 1112(b): Bad Faith*

The Seventh Circuit Court of Appeals has, on occasion, recognized that dismissal "for cause" under section 1112(b) includes a lack of good faith on the part of the debtor when filing and maintaining a bankruptcy case. See e.g., Matter of James Wilson Associates, 965 F.2d 160, 170 (7th Cir. 1992)(stating without analysis that section 1112(b) "authorizes the bankruptcy judge to dismiss a bankruptcy proceeding for want of good faith."); Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.), 886 F.2d 859, 867 (7th Cir. 1989)(noting that section 1112(b) does not explicitly provide that lack of good faith may constitute cause; Matter of Madison Hotel Assoc., 749 F.2d 410, 426 (7th Cir. 1984)("It is generally recognized that "good faith" is a threshold prerequisite to securing Chapter 11 relief . . . and that the lack of such good faith constitutes "cause," sufficient for dismissal under 11 U.S.C. § 1112(b)."). However the Seventh Circuit has stopped short of defining "good faith" in relation to the "for cause" requirement of section 1112(b). But see Madison Hotel Assoc., 749 F.2d at 424-25 (Court defined "good faith" as it is specifically used in section 1129(a)(3)). Recognizing that no single test for establishing "bad faith" can be recited, other circuit courts of appeal have looked at the totality of the circumstances of each particular case and weighed various factors. See e.g., Laguna Assoc. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assoc. Ltd. P'ship), 30 F.3d 734, 738 (6th Cir. 1994)(listing factors); Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir. 1989)(noting that any conceivable list of factors is non-exhaustive and no single factor will necessarily lead to a finding of bad faith); Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.), 779 F.2d 1068 (5th Cir. 1986)(listing factors). Compare Matter of Love, 957 F.2d 1350, 1355 (7th Cir. 1992)(holding within the context of a motion to dismiss a Chapter 13 case that the determination of "good faith" requires bankruptcy courts to look at the totality of the circumstances).

Courts that have addressed whether a petition was filed in "good faith" have, for example, found good faith to be lacking where a petition was filed solely to collaterally attack a state court judgment, see Baker v. Latham Sparrowbush Assoc. (Matter of Cohoes Indus. Terminal, Inc.), 931 F.2d 222, 228 (2d Cir. 1991), the debtor had no reasonable probability of reorganizing at the time the petition was filed, see C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1310 (2d Cir. 1997), and where the petition was filed by a single asset debtor on the eve of a

mortgage foreclosure, see generally Trident Assoc. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re

Trident Assoc. Ltd. P'ship), 52 F.3d 127 (6th Cir. 1995).

Dismissal for Debtor's alleged lack of good faith is not warranted in this instance. The

factors that most courts consider are:

(1) the debtor has one asset;
(2) the pre-petition conduct of the debtor has been improper;
(3) there are only a few unsecured creditors;
(4) the debtor's property has been posted for foreclosure, and the debtor has been
unsuccessful in defending against the foreclosure in state court;
(5) the debtor and one creditor have proceeded to a standstill in state court litigation,
and the debtor has lost or has been required to post a bond which it cannot afford;
(6) the filing of the petition effectively allows the debtor to evade court orders;
(7) the debtor has no ongoing business or employees; and
(8) the lack of possibility of reorganization.

See Laguna Associates Ltd. P'ship, 30 F.3d at 738.    While there can be no dispute that Debtor

generally possesses 1 asset and the foreclosure action in state court did not go in Debtor's favor,

these facts—without a showing of more—fail to paint a picture that this case was filed by Debtor

with an "intent to abuse the judicial process and the purposes of the reorganization provisions." See

generally Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d

1393, 1394 (11th Cir. 1988). The court fails to find that Debtor's bankruptcy petition was filed in bad

faith.

## *11 U.S.C. § 305(a)*

Movants ask that this proceeding be dismissed pursuant to 11 U.S.C. § 305 which allows

suspension or dismissal of a bankruptcy matter where dismissal serves the best interests of the

creditors and the debtor. Movants argue in their Motion to Dismiss that this court should dismiss

this proceeding in reliance on In re 801 S. Wells St. Ltd. P'ship, 192 B.R. 718 (Bankr. N.D. Ill.

1996). The bankruptcy court found that dismissal or suspension was appropriate. This court

declines to follow that case as it is radically different from this matter. 801 S. Wells involved an

involuntary petition filed by junior mortgagees against a debtor who had no equity in the property.

The debtor expressed no intent in reorganizing; the court found that the proceeding was a dispute

between junior mortgagees. According to Appraiser Schlitz,[5] this Debtor has equity in the property at issue and has expressed interest in reorganizing or selling its assets pursuant to a § 363 sale. It is in the best interests of the debtor and all creditors to obtain full value for the property interest at issue. Dismissal would be severely prejudicial to junior secured creditor D.A.N.

Additionally, Movants' jurisdictional argument is unavailing. The court is not being asked to adjudicate the state court foreclosure action. Nor are there any non-core matters presently before the court. What is presently before this court is a motion to dismiss that is purely based on Bankruptcy Code provisions. See 28 U.S.C. § 157(b)(1)(2).

Dismissal is not warranted under this provision.

The Motion to Dismiss is DENIED.

Dated:        March 15, 2007                    ENTERED:        *Jacqueline P. Cox*

                                                                J. P. Cox
                                                                _____
                                                                Jacqueline P. Cox
                                                                United States Bankruptcy Judge

---

[5] In conjunction with the hearing on Movants' motion to dismiss, the court held a hearing on WRT's motion to lift the automatic stay whereby valuation testimony from Mr. Schlitz was presented. The parties elected to have the same evidence considered for both motions. An order denying WRT's motion to lift stay was entered on March 14, 2007.

# Px 15

American Invsco | LinkedIn                                    http://www.linkedin.com/company/american-invsco

**Linked** in.                                                          Join Today · Sign In

---

**Join LinkedIn and see how you are connected to American Invsco. It's free.**      [ Join LinkedIn ]      Already a member?
Sign in →
Get access to insightful information about your network at thousands of companies!

---

## American Invsco

**Overview**    Employee Insights

**AMERICAN INVSCO**

Chicago's leading condominium developer was founded by Nicholas Gouletas in 1969. From a tiny office on Clark Street in Chicago, the company has grown into a leading name in international development with properties and offices in over 40 major markets around the world. The company has over 54 developments in Chicago alone and is currently putting the finishing touches on 200 North Dearborn, an amazing new condo building in the heart of the Theater district.

**Specialties**
Chicago Real Estate, Gold Coast Condos, Chicago Loop Properties, Foreclosures and Short-Sales, Lincoln Park Homes and Condos, Bucktown Chicago

less

ADS YOU MAY BE INTERESTED IN

**Newsletter from Javelin**
Want to keep abreast of changing marketing trends in financial services?                    ›



**Simplify coded UI testing**
Keyword test automation for visual studio pays for itself. Free trial.    ›



**CMP Hazardous Glands**
T3/CDS Triton Metric & FNP / A2F / PX2KX glands - stock                     ›

Check out insightful statistics about American Invsco employees »

**Type**
Privately Held

**Company Size**
51-200 employees

**Website**
http://www.americaninvsco.net

**Industry**
Real Estate

**Founded**
1969

**Headquarters**

111 E Chestnut Street
182 Lake Street
Chicago, IL 60611
UNITED STATES

---

LinkedIn company directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more  |  Browse companies

By using this site, you agree to LinkedIn's terms of use. Commercial use of this site without express authorization is prohibited



EXHIBIT
GOULETTAS
EX. 15

## Ⓐ AMERICAN INVSCO

| HOME | ABOUT | PORTFOLIO | NEWS | CONTACT |

---

OUR COMPANY | CHICAGO IS OUR HOME | OUR PEOPLE

Since its inception in 1969, American Invsco has been a pioneer in the residential real estate industry. American Invsco has acquired, developed, marketed, and managed 124 multi-family residential buildings in over 40 U.S. cities consisting of more than 45,000 units with a current real estate value of approximately $15 billion.



American Invsco takes a strategic approach to building its property portfolio. Our team conducts thorough market analysis to identify and evaluate potential multi-family properties that we are able to acquire for significantly less than replacement values.

During more than 40 years of real estate experience, American Invsco has been active in apartments, condominiums and condo conversions. We are expert at stabilizing property financials and value-added repositioning to garner higher lease amounts at higher occupancy rates.

Copyright © 2013 American Invsco. All Rights Reserved. - Managed by Teraleads.com

## AMERICAN INVSCO - PORTFOLIO


**100 Bellevue Place**
Chicago, IL


**11th Street Lofts**
Chicago, IL


**1212 N. LaSalle**
Chicago, IL


**1313 Ritchie Court**
Chicago, IL


**191 Presidential**
Bala-Cynwyd, PA


**200 North Dearborn**
Chicago, IL


**2400 Lakeview**
Chicago, IL


**2626 Lakeview**
Chicago, IL


**333 Meyer West**
Kansas City, MO


**336 Wellington**
Chicago, IL


**360 Wellington**
Chicago, IL


**3800 Lake Shore Drive**
Chicago, IL


**5000 Town Center**
South Field, MI


**Acorn Lofts**
Chicago, IL


**Bayou Woods**
Houston, TX


**Bermuda Dunes**
Orlando, FL


**Brittany Place**
Chicago, IL


**Burton Place**
Chicago, IL


**Carriage Hill**
Arlington, OH


**Century Towers**
Chicago, IL


**Chatham Village**
Chatham Village of
Towamencin, PA


**Chatham Village**
Chatham Village of
Memphis, TN


**Cherrywood Village**
Bayside, WI


**Delaware Place on the Park**
Chicago, IL


**Elm at Clark Private Residences**
Chicago, IL


**Elysees Private Residences**
Chicago, IL


**Fountain Terrace**
Chicago, IL


**Galt Towers**
Orlando, FL


**Georgetown**
Nashville, TN


**Georgetown**
Penllyn, PA


**Gold Coast Galleria**
Chicago, IL


**Golf Towers**
Chicago, IL


**Grosvenor Park**
Rockville, MD


**Hale Lofts**
Chicago, IL


**Harbor House**
Chicago, IL


**Heartbreak Lofts**
Chicago, IL










Hermitage on Huron — Chicago, IL    Hermitage on Huron — Chicago, IL    Hollywood Towers — Chicago, IL    Imperial Towers — Chicago, IL    Inwood Manor — Houston, TX    Lake Point Tower — Chicago, IL

Millennium Centre — Chicago, IL    Morgan Town Lofts — Chicago, IL    Oaks of Woodlake — Houston, TX    One East Schiller — Chicago, IL    Ontario Place — Chicago, IL    Outer Drive East — Chicago, IL

Paper Place — Chicago, IL    Parc IV and V — Houston, TX    Park 900 — New York, NY    Park West — Chicago, IL    Plantation Park — Orlando, FL    Plaza 400 — New York, NY

Plaza 440 — Chicago, IL    Plaza on Dewitt — Chicago, IL    Plaza Towers — Atlanta, GA    Regency House — Milwaukee, WI    River City — Chicago, IL

Copyright © 2013 American Invsco. All Rights Reserved - Managed by Teraleads.com

| | Share 0 More Next Blog»                                      Create Blog   Sign In

# The Verifiable Truth

It's all verifiable: archives, resources and stuff they might not tell you.
A comprehensive archive chronicling the activities of Motor City casino syndicators (Marian Ilitch & Family, Michael Malik, Herb Strather, etc.); their associates, partners & affiliates; and the unfulfilled commercial & Indian casino schemes they are bankrolling in Michigan (Port Huron, Flint Township), Hawaii (Waikiki), New York (Long Island / The Hamptons), and California (Barstow).

**FRIDAY, JANUARY 02, 2009**

## Heirs of Chicago-based American Invsco founder helped bankroll casino ... are they at it again?

Three of Chicago-based Nicholas S. Gouletas' daughters were among the original investors in Atwater Entertainment Associates LLC (AEA), the entity that pushed to legalize gaming in Detroit during the mid-1990s and then eventually morphed into MotorCity Casino which opened its doors in 1999 with financing from, and under the management control of, Las Vegas-based Mandalay Resort Group (Circus Circus).



Nicholas S. Gouletas - American Invsco

A Web site which lists the names of AEA investors includes the names of Andrea Desiree Gouletas (born Oct. 1969), Deanna Eileen Gouletas (born Oct. 1960) and Victoria Michelle Gouletas (born May 1974). They are three of Nicholas Gouletas' six children.

AEA was formed in 1995 by Detroiter Herb Strather and a partner Nellie Varner to syndicate financial interest and raise capital needed to advance their local casino plans. At that time, the Gouletas sisters' ages would have ranged from about 21 – 35 years old.

Crain's Detroit indicates that many AEA investors were also investors in AtMashpee, LLC, another casino syndication organized by Strather to raise the money he needed to bankroll the Mashpee Wampanoag Indian tribe's effort win federal recognition and build a casino resort on Cape Cod. That tribe's former chairman has been under federal investigation and has agreed to plea guilty to federal campaign contribution violations and charges of fraud. AtMashpee enabled his wrong doing by dumping $4 million into a hidden fund.

It's not clear if the Gouletas family is helping to bankroll that plan for a large scale Massachusetts casino resort.



As owners of American Invsco, the Gouletas family carries one of the most highly recognizable names in Chicago real estate. Siblings Nicholas S. "Nick" Gouletas, Evangeline "Engie" Gouletas and Vincent Goulet (he changed his last name) established American Invsco four decades ago (1969)

Today, the privately held real estate conglomerate is one of the leading developers of condominiums in the U.S. Nicholas is chairman and CEO of American Invsco and his son Steven is president. The Gouletas were pioneers in the business of condo conversions and the development of luxury hi-rise residential buildings. It is reported that American Invsco has developed and marketed over 45,000 condominiums in more than 40 cities across the U.S. with property values in excess of $4 billion.

In 1981, while attending Ronald Reagan's 1st Inauguration, Engie Gouletas met then-New York Governor Hugh L. Carey, a widower; and they were married less than four months later. In 1998, she left American Invsco and formed Skyline Equities Realty LLC in part because of a long running feud with her brother Nicholas

As one of the largest condo developers in the U.S., American Invsco and its affiliates haven't been without controversy throughout the years

Most recently, the Las Vegas Review Journal has reported on a class-action lawsuit being brought by those who purchased units in an American Invsco project known as The Meridian, located at 250 E. Flamingo Road, just one block from the famed Las Vegas Strip.

Curiously, a 10.17.08 Review Journal article indicates that Meridian Private Residence CH LLC, a

**UNIQUE VISITORS**

145155

**FOLLOW BY EMAIL**

Email address   [Submit]

**TWITTER**

**VER·I·FY** [ver-*uh*-fahy]
*verb (used with object),* -fied, -fy
-ing.
1.  to prove the truth of, as by evidence or testimony; confirm; substantiate: *Events verified his prediction.*
2.  to ascertain the truth or correctness of, as by examination, research, or comparison: *to verify a spelling.*
3.  to act as ultimate proof or evidence of; serve to confirm.

**THE PLAYERS ...**

Marian ILITCH (Ilitch Holdings, MotorCity Casino, cash, cache) &
Michael J. MALIK, Sr. (controversial syndicator, schmooze, bully, criminal, political bag-man)

... of Malik, his partner said, *"Mike is the day-to-day bulldog on casinos."*

... in Court his wife was forced to say, he has a pattern of *"bullying, intimidation & influence peddling."*

**THEIR GUYS ...**

Mike Ilitch - Marian's husband & partner; co-founded Little Caesars Pizza, 1959; Chairman @ Ilitch Holdings; assumed her duties at Tigers Baseball Club in 1996 when she divorced the Tigers; swears he's got *no interest* in MotorCity/Indian gaming ventures; *Forbes:* he's the $1.5 Billion Man.

Tom Shields – Ilitch longtime PR & political advisor; often spokesman for Ilitch entities and tribes, other front groups; owner and president @ Lansing-based Marketing Resource Group Inc.; MI GOP activist

John M. Kotlar – v.p. tax affairs @ Ilitch

# Px 17

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT – LAW DIVISION

| | |
|---|---|
| 800 SOUTH WELLS COMMERCIAL LLC, | ) )<br>) |
| Plaintiff, | ) ) |
| v. | ) )  No. 11 L 2895 |
| NICHOLAS S. GOULETAS and INVSCO MANAGEMENT COMPANY, INC. (d/b/a American Invesco), et al., | ) ) ) ) |
| Defendants. | ) ) |

## NICHOLAS GOULETAS' INCOME AND ASSET DISCLOSURE FORM

### PERSONAL INFORMATION

Name:                Nicholas S. Gouletas

Phone Number:        312-621-8615

Home Address:        111 E. Chestnut, 28k, Chicago, IL 60611

Date of Birth:       3/14/1938

Marital Status:      Married

Dependants:          None

### EMPLOYMENT   Do you have a job?  YES

Company Name that I work for:    American Invsco

Company's address:   182 W. Lakes Street, No. 200, Chicago, IL. 60601

Job:/Title:          President

I earn $:            0. I currently take no salary.

I have the following benefits with my employer:    None.

P×17

I receive social security in the approximate amount of $3,000 per month.

REAL ESTATE:          Do you own any real estate?  No.

____   I own real estate at: None

____   Additional real estate I own: None

____   Beneficial Interest in a Land Trust?  None.

____   The beneficial interest is listed in my name and: None.

____   There is a mortgage on my real estate: I do not own real estate.

____   An assignment of beneficial interest in the land trust was signed to secure a loan
       from:          None.

I have the following accounts:

 Checking account at Chase Bank:

  Current account balance: $111,433.28 (account frozen)

 Checking Account at Private Bank:

  Current account balance: believed to be less than $2,000

 Checking Account at Republic Bank:

  Current account Balance: less than $2,000

 Savings Account at Chase Bank:

  Current account Balance: $612.18

 Money market or certificate of deposit: None.

 Safe deposit box at: None

 Other accounts: None

PERSONAL PROPERTY

I own:

Vehicles:     Mercedez Benz automobile purchased in approximately 1994. Currently not in operating condition.

Jewelry:     Wedding band and watch.

Other property: Miscellaneous office furniture, home furnishings including daughter's art work, clothes, appliances, television.


Under penalties of law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned citation respondent/judgment debtor certifies that the facts set forth in the foregoing Income and Asset Form are true to the best of his knowledge, information and belief.

_____
Nicholas S. Gouletas

Dated: _August 11th 2014_