## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS S. GOULETAS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | No. 16-01335 |
| _____ | ) | |
| | ) | Chapter 7 |
| v. | ) | |
| | ) | Hon. Timothy A. Barnes |
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 1:16 ap 141 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

## DEBTOR'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Debtor Nicholas S. Gouletas, by his attorneys, in response to the Local Bankruptcy Rule 7056 Statement of Facts, states as follows:

### Parties

(1)     Plaintiff 800 South Wells Commercial LLC ("Plaintiff" or "800 SWC") is an Illinois limited liability company with its principal place of business in Cook County, Illinois. (Answer (D.N. 7[1]; Px A[2]) ("Ans.") ¶3)

**RESPONSE:** **Debtor admits.**

(2)     Debtor/Defendant Nicholas S. Gouletas ("Gouletas") is an individual who resides in Cook County, Illinois. (Ans. ¶4)

**RESPONSE:**  **Debtor admits.**

### Response to Jurisdiction And Venue

---

[1] "D.N. ___" refers to Docket Number for the EFC filings in this Adversary Proceeding.

[2] "Px __" refers to the letter or number of the Exhibits of Plaintiff ("Px") submitted in Plaintiff's Appendix of Exhibits in Support of Plaintiff's Motion for Summary Judgment.

1

(3)    This Court has jurisdiction pursuant to 28 U.S.C. §1334. This suit is a core proceeding within the meaning of 28 U.S.C. §157(b). (Ans. ¶5)

**RESPONSE:  Debtor admits.**

(4)    Both Plaintiff and Defendant consent to the entry of final orders or judgment by this Court. (Ans. ¶5)

**RESPONSE:  Debtor admits.**

(5)    Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409. (Ans. ¶6)

**RESPONSE: Debtor admits.**

## Response to Facts

A.    **Background.**

(6)    Gouletas is the Chairman and CEO of American Invsco. (Px I pp. 69-70; Px 29)

**RESPONSE:  Debtor admits that, as of July 20, 2015, Debtor admitted that Px 29 is his business card. On that same day, however, Debtor testified only that he believed himself to hold both those positions with American Invsco, but that he would "have to check the documents…."**

(7)    As of September 8, 2013, American Invsco had properties and offices in over 40 major markets around the world. (Px I p. 77; Px 15)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px I, p.77 and the excerpts from American Invsco's website at Px 15.  Answering further, the only fair reading of Debtor's testimony is that American Invsco *has had* – presumably since its inception in 1969 – properties in "over 40 major markets around the world" and has "done 54 plus developments in Chicago."**

(8)    Marked as Px 20 is a "Balance Sheet" (i.e., "Financial Statement") of Gouletas as of March 31, 2013, which was signed by Gouletas. (Px J p. 25)

**RESPONSE: Debtor admits.**

(9)    The Gouletas Balance Sheet was prepared by Gouletas' accounting department, and Gouletas would expect his accounting department to fairly and accurately represent his assets and liabilities. (Px J p. 26)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px J. Answering further, Debtor testified in February 2017 (at p. 25, line 24 – page 26, line 24) about the March 2013 balance sheet as follows: "I'm going to *assume* that my accounting department or somebody there somewhere gave me this as a balance sheet and I signed it"; and that he "would *assume* at that time that [he] probably thought it was accurate." [Emphasis added.]**

(10)    Gouletas' signature on his Financial Statement indicated that Gouletas had reviewed and approved the Financial Statement, and that his Financial Statement was true and correct to the best of his information. (Px K pp. 210-11)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px J. Answering further, Debtor testified in October 2014 that although he signed off on the March 2013 balance sheet: "I didn't do the accounting" and he does not remember why the balance sheet was prepared. Debtor further testified (Px K, page 212, lines 18-24: "I sign off on a lot of things"; and "It does not mean that I prepared it. It does not mean that I. – there's no way that I would know how they came to all these figures."**

(11)    Gouletas believed that his Financial Statement was accurate at the time he signed it. (Px I p. 132)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px I because the words "Financial Statement" do not even appear in Px I. Accordingly, this alleged "fact" lacks an adequate evidentiary foundation and is inadmissible.**

(12)    The representation in Gouletas' Financial Statement that Gouletas had a net worth of $25,287,563 was a fair and

accurate representation of Gouletas' net worth as of March 31, 2013. (Px K p. 216)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px K because the words "Financial Statement" do not even appear in Px K or in Px 20. Accordingly, this alleged "fact" lacks an adequate evidentiary foundation and is inadmissible. Answering further, Debtor testified in October 2014 that his March 2013 balance sheet (Px. 20) indicating that he had no liabilities "[s]eems a little odd to me" and that he wondered how he "could have no liabilities at any particular time." Px K, page 216, lines 1-19.**

(13) Gouletas' Financial Statement showed that as of March 31, 2013, Gouletas had cash in the amount of $240,000, but Gouletas claimed that he had "no idea" where the money came from, and did not remember where the money went. (Px K pp. 211-12)

**RESPONSE: Debtor objects to Plaintiff's characterization of Debtor's testimony in Px K because the words "Financial Statement" do not even appear in Px K or in Px 20. Accordingly, this alleged "fact" lacks an adequate evidentiary foundation and is inadmissible. Answering further, Debtor testified in October 2014 that although he signed off on the March 2013 balance sheet: "I didn't do the accounting" and he does not remember why the balance sheet was prepared. Debtor further testified (Px K, page 212, lines 18-24: "I sign off on a lot of things"; and "It does not mean that I prepared it. It does not mean that I. – there's no way that I would know how they came to all these figures."**

B.     The River City Complex.

(14) In 1997, the River City Complex located at 800 South Wells Street, Chicago, Illinois consisted of (a) an apartment complex of 448 apartments; (b) 240,000 square feet of commercial/retail/office space (the "Commercial Space"); (c) a 133 space underground parking garage (the "Parking Garage"); (d) a

surface parking lot; and (e) a 64 slip marina on the Chicago River. (Ans. ¶7)

**RESPONSE:  Debtor's Answer (Px A) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences.**

(15)    In or about April of 1997, American Invsco Development Corporation purchased the River City Complex for $41,300,000, and the Plaintiff herein, 800 SWC, became the owner of the leasehold interests in the Commercial Space and Parking Garage. (Ans. ¶8)

**RESPONSE:  Debtor's Answer (Px A) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences.**

(16)    Gouletas was the former manager of 800 SWC who hired his company, Invesco Management Company, Inc. (d/b/a American Invesco) ("Invesco"), to manage the Commercial Space in exchange for management fees paid by 800 SWC to Invesco. (Ans. ¶11)

**RESPONSE:   Debtor's Answer (Px A) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences.**

(17)    As of late 2005, 800 SWC had refinanced the leasehold interests in the Commercial Space and the Parking Garage on numerous occasions, which were encumbered by two substantial leasehold mortgages. The first mortgage was comprised of two loans from Parkway Bank and Trust Company ("Parkway") to 800 SWC in the original principal amount of $18,500,000 (the "First Mortgage"). By the end of 2005, the First Mortgage loan was current, with the amount owed by 800 SWC to Parkway totaling approximately $11,750,000. (Ans. ¶9)

**RESPONSE:   Debtor's Answer (Px A) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such**

differences.

(18) The Commercial Space and the Parking Garage were also encumbered by a second leasehold mortgage lien in favor of CIB Bank ("CIB"), which was comprised of a $5,900,000 loan from CIB to 800 SWC (the "Second Mortgage"). In March of 2005, the Second Mortgage was acquired by D.A.N. Joint Venture III, L.P. ("DJV"). By the end of 2005, the Second Mortgage loan was in default, with the amount owed by 800 SWC to DJV totaling approximately $10,000,000. (Ans. ¶10)

**RESPONSE: Debtor's Answer (Px. A) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences.**

(19) On November 16, 2006, DJV, as the owner and holder of the Second Mortgage loan, took over control of the voting rights of 800 SWC pursuant to a Pledge Agreement delivered to CIB, which was later assigned to DJV. (Px B p. 11 ¶21; p. 19 ¶3; p. 20 ¶11; Px L ¶19) Thereafter, DJV removed Gouletas as the manager of 800 SWC, and itself became the manager of 800 SWC. (*Id.*)

**RESPONSE: Debtor objects to Plaintiff's conclusions that "DJV…took over control of the voting rights of 800 SWC…and itself became the manager of 800 SWC" because, implicit in that conclusion, is that DJV did so *lawfully* by satisfying the "written notice" prerequisite of Section 8.12 of the Pledge Agreement (Px 32-A) necessary to DJV's exercising of voting rights pursuant to Section 6.1 of the Pledge Agreement. Accordingly, Plaintiff has failed to provide an adequate evidentiary foundation for the lawfulness of this alleged "fact" and, therefore, it is inadmissible.**

## C. Gouletas Is Sued For Self-Dealing And Breaching Fiduciary Duties Owed To 800 SWC.

(20) On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, alleging that Gouletas breached the fiduciary duties that he owed to 800 SWC by participating in the scheme with 800 SWC's

vice president, John Cadden, to loot the assets of 800 SWC, and by
grossly mismanaging the affairs of 800 SWC by self-dealing (the
"Underlying Suit"). (Ans. ¶15; Px L ¶20).

**RESPONSE: Debtor's Answer (Px A, ¶15) speaks for itself; and to the extent**

**Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies**

**all such differences.  Answering further, implicit in Plaintiff's filing of suit is that DJV**

***lawfully* acquired the voting rights or other rights – by satisfying the "written notice"**

**prerequisite of Section 8.12 of the Pledge Agreement (Px 32-A) necessary to DJV's**

**exercising of voting rights pursuant to Section 6.1 of the Pledge Agreement – that would**

**give it standing to file that suit; and, therefore, these alleged "facts" are not admissible.**

(21)    After Gouletas failed to sit for his deposition despite
numerous court orders to do so, on December 5, 2013 800 SWC
filed a Motion for Sanctions against Gouletas, which was granted
by the Court in the Underlying Suit on December 11, 2013. (Px L
¶21; Ans. ¶16)

**RESPONSE:  Debtor's Answer (Px A, ¶16) speaks for itself; and to the extent**

**Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies**

**all such differences.  Answering further, implicit in Plaintiff's filing of a motion for**

**sanctions is that DJV *lawfully* acquired the voting rights or other rights – by satisfying the**

**"written notice" prerequisite of Section 8.12 of the Pledge Agreement (Px 32-A) necessary**

**to DJV's exercising of voting rights pursuant to Section 6.1 of the Pledge Agreement – that**

**would give it standing to file that motion; and, therefore, these alleged "facts" are not**

**admissible.**

(22)    After Gouletas, once again, failed to sit for his
deposition, on January 23, 2014 the Court in the Underlying Suit
entered a Default Judgment against Gouletas in the amount of
$11,550, 040.12 (the "Judgment"). (Px L ¶22; Ans. ¶16)

**RESPONSE:  Debtor's Answer (Px A, ¶16) speaks for itself; and to the extent**

Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies

all such differences.

> (23)    Gouletas, through counsel, took an appeal of the Judgment to the Appellate Court of Illinois, First District, No. 14-0781 (the "First Appeal"). On November 6, 2014 the Court of Appeals granted Gouletas' Motion to Dismiss the First Appeal. (Ans. ¶17)

**RESPONSE: Debtor's Answer (Px A, ¶17) speaks for itself; and to the extent**

Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies

all such differences.

> (24)    On August 7, 2014, Gouletas filed in the Underlying Suit a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) (the "2-1401 Petition") seeking to set aside the Judgment. On September 18, 2014, the trial court in the Underlying Suit denied Gouletas' 2-1401 Petition. (Ans. ¶18)

**RESPONSE: Debtor's Answer (Px A, ¶18) speaks for itself; and to the extent**

Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies

all such differences.

> (25)    On October 20, 2014, Gouletas, through counsel, appealed the trial court's Order Denying Gouletas' 2-1401 Petition to the Appellate Court of Illinois, First District, No. 14-3214 (the "Second Appeal"). On April 2, 2015, the Court of Appeals dismissed Gouletas' Second Appeal for want of prosecution. (Ans. ¶19)

**RESPONSE: Debtor's Answer (Px A, ¶19) speaks for itself; and to the extent**

Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies

all such differences.

**D.    The Citation Proceedings Against Gouletas.**

> (26)    Due to Gouletas' failure to pay the amount owed under the Judgment, on June 5, 2014 800 SWC filed a Citation to Discover Assets against Gouletas (Px C) (the "Citation") in

connection with the Underlying Suit (the "Citation Proceedings"). The Citation was served on Gouletas on or about June 9, 2014. (Ans. ¶20; Px N p. 5; Px M ¶26)

**RESPONSE:  Debtor's Answer (Px A, ¶20) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences.**

(27)     At all times during the Citation Proceedings, Gouletas was represented by Howard Teplinsky, Esq. from the firm of Beermann Pritikin Mirabelli Swerdlove LLP. (Px M ¶27)

**RESPONSE:  Debtor admits.**

(28)     In the Citation, it was clearly stated that:

**YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging **to** the judgment debtor [Gouletas] or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

(Px C p. 1) Gouletas understood that when he was served with the Citation, he was not to transfer anything after receiving the Citation. (Px I p. 108) Moreover, the Circuit Court judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas that "[f]rom the time you received the citation, all your assets were frozen . . [T]he citation language speaks for itself. It said you will not transfer any asset." (Px N p. 7) Further, in response to Judge White's questions, Gouletas testified as follows:

THE COURT: And you read the citation?
A (Gouletas): I read the citation, your Honor.

THE COURT: And it said you shall not
transfer any assets. A: Yes, and I did not think
I had transferred any assets.

(Px O p. 15)

**RESPONSE:  Px C speaks for itself; and to the extent Plaintiff's characterization herein differs in any way for Px C, Debtor denies all such differences.**

(29)      In August of 2014, Gouletas filed his Answer to the Citation (Px D) (the "Citation Answer"). (Ans. ¶22) Further, on August 11, 2014 Gouletas filed in the Citation Proceedings his sworn Income and Asset Disclosure Form (Px E) (the "Citation Disclosure Form"). (Ans. ¶22) In addition, on March 25, 2015, Gouletas submitted in the Citation Proceedings Gouletas' Supplemental Responses to Supplemental Proceeding Interrogatories (Px H) (the "Citation Int. Resp."). (Ans. ¶26)

**RESPONSE: Px D, Debtor's Answer (Px A, ¶¶22 and 26), Px E and Px H speak for themselves; and to the extent Plaintiff's characterization herein differs in any way from them, Debtor denies all such differences.**

(30)      At no time during the Citation Proceedings did Gouletas either amend or supplement his Citation Answer (Px D); his Citation Disclosure Form (Px E); or his Citation Interrogatory Responses (Px H). (Ans. ¶26; Px M ¶30)

**RESPONSE: Px D, Px E, Px H and Debtor's Answer (Px A, ¶26) speak for themselves; and to the extent Plaintiff's characterizations of them differ in any way from them, Debtor denies all such differences. Answering further, Debtor denies to the extent that Px H on its face states that it is Debtor's "Supplemental Responses to Supplemental Proceeding Interrogatories."**

(31)      In neither Gouletas' Citation Answer (Px D), nor in his Citation Disclosure Form (Px E), did Gouletas disclose any stock ownership in CIB Marine BankShares, or his interest in a stock brokerage account at TD Ameritrade. (Px O p. 16) Through its own investigation conducted during the Citation Proceedings, 800 SWC learned that Gouletas did, in fact, own shares of stock in CIB Marine BankShares (Px 139) (the "CIB Stock"), which Gouletas held through a stock brokerage account at TD Ameritrade (Px 101) (the "TDA Account"). (Px M ¶31) Further, through its own investigation, 800 SWC learned that on or about September 4, 2014, Gouletas sold his CIB Stock through his TDA Account for just over $51,000 (Px 101), and then, on or about that same date, wire transferred $51,323.29 from that stock sale into a checking account held in the name of his wife, Natel Matschulat. (Px 101; Ans. ¶25; Px O pp. 20-21 & 3336; Px N pp. 23-24 & 76-77; Px M ¶31)

**RESPONSE: Px D, Px E and Debtor's Answer (Px A, ¶25) speak for themselves; and to the extent Plaintiff's characterizations of them differ in any way from them, Debtor denies all such differences. Answering further: Px O, p. 16 does not state anything about "stock ownership in CIB Marine Bankshares, or [Debtor's interest in a stock brokerage account at TD Ameritrade; Px 139 and Px 101 lack any independent evidentiary foundation necessary for their admissibility; and the exact circumstances surrounding their acquisition are not explained in Px M ¶31 or elsewhere, other than by Plaintiff's counsel's bare conclusions that lack evidentiary foundations.**

(32)     Further, through its own investigation conducted during the Citation Proceedings, 800 SWC uncovered evidence that Gouletas may have violated the Citation lien by obtaining and then cashing numerous cashier's checks issued in his name:

(a)     On or about July 31, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,530.52 issued to himself (Px 120);

(b)     On or about August 1, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $10,000 issued to himself (Px 122);

(c)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $1,500.00 issued to himself (Px 127); and

(d)     On or about August 22, 2014, Gouletas, as the remitter, had a cashier's check in the amount of $2,500.00 issued to himself (Px 128).

(Px M ¶32)

**RESPONSE: Debtor objects to and denies the contents of Px M, including but not limited to ¶32, in that it lacks the necessary evidentiary foundation that would permit its admissibility in this proceeding.**

**E.    The Contempt Proceedings Against Gouletas.**

(33)    Based on the alleged violations by Gouletas of the Citation lien, on April 24, 2015 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015. (Ans. ¶32; PX M¶33)

**RESPONSE: Debtor's Answer (Px A, ¶32) speaks for itself; and to the extent Plaintiff's characterization herein differs in any way from Debtor's Answer, Debtor denies all such differences. Answering further, Debtor objects to, and denies, Px M, ¶33 in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

(34)    In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock without obtaining permission from the Court, Judge White stated:

I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas' CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

(Px O p. 21) Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014. (Px N pp. 13-14)

**RESPONSE: Debtor admits only to any verbatim recitations of transcripts of proceedings. Answering further, Debtor testified repeatedly on November 24, 2015 that he "didn't understand – [he] did not understand that [he] could not be in business, if that's – [he's] trying to answer your question honestly." Px N, page 7, lines 1-4; "I did not understand that I was not to be in business." Px N, page 13, lines 16-20; and, in response to a question of whether there was a plan for him to circumvent the court order: "No, there**

was not." Pz N, page 14, lines 18-21.

(35)    The final day of the contempt hearing was
scheduled for January 19, 2016. On the eve of Judge White's
decision in connection with the motion to hold Gouletas in
contempt, on January 17, 2016 Gouletas filed a Chapter 7
bankruptcy petition in this Court. (Ans. ¶33; Px M ¶35)

**RESPONSE:** Debtor admits.

(36)    The Citation Proceedings continued in existence at
all times from the date the Citation was filed on June 5, 2014 until
the date that Gouletas filed for bankruptcy on January 17, 2016.
(Px M ¶36)

**RESPONSE:** Debtor objects to, and denies, Px M, ¶36 in that it lacks an adequate

evidentiary foundation and, therefore, is inadmissible for these purposes.


F.    **Gouletas Concealed His Ownership Interest In A House In Greece.**

(37)    In his Citation Answer, Gouletas represented under
oath that he did not own any real estate. (Px D p. 2) In addition, on
August 11, 2014, Gouletas represented in his Citation Disclosure
Form, again under oath, that he did not own any real estate. (Px E
p. 2)

**RESPONSE:** Debtor admits only to verbatim recitations of Px D and Px E.

(38)    Shortly after Gouletas made the above sworn
statements (Px D p. 2; Px E p. 2), on September 30, 2014 Gouletas
received an email from his sister, Evangeline Gouletas (Px F),
about Gouletas' ownership interest in a house in Greece (the
"Greece Property") (Ans. ¶22), which he had inherited, with his
sister, in approximately 2008. (Px 176 (Schedule A/B: Property) p.
1 no. 1) Gouletas recalls receiving this email (Px F) from his sister.
(Px J pp. 50-51)

**RESPONSE:** Debtor admits only to any verbatim recitations of Px D, Px E, Px F,

Px J and Px A.

(39)    While in his Answer to this Adversary Proceeding
Gouletas now admits that he, along with his sister, inherited the
Greece Property (Ans. ¶22), at no time during the Citation
Proceedings did Gouletas amend, supplement or correct his

Citation Answer or Citation Disclosure Form to reflect his ownership interest in the Greece property, or otherwise disclose his ownership interest in the Greece Property. (Px M ¶39)

**RESPONSE:  Debtor objects to, and denies, Px M, ¶39 in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

**G.    Gouletas Concealed His Ownership Of Valuable Items Of Personal Property.**

(40)    In Gouletas' Citation Answer, he represented under oath that the only personal property that he owned was clothing and office furniture. (Px D p. 2) Further, in Gouletas' sworn Citation Disclosure Form (Px E), he did not list any ownership in any valuable collectible items.

**RESPONSE:   Debtor admits only to any verbatim recitations of Px D and Px E.**

(41)    During the Citation Proceedings, however, Gouletas owned a Wurlitzer juke box worth approximately $10,000, and a mechanical violin (like a player piano, but a violin) worth between $40,000 to $70,000. (Px 176 (Schedule A/B: Property) pp. 2-3 no. 6)

**RESPONSE:  Px 176 speaks for itself.**

(42)    While in connection with his Chapter 7 bankruptcy proceeding Gouletas now admits that he did, in fact, own the above valuable items of personal property (*id.*), at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or Citation Disclosure Form to reflect his ownership interest in the above valuable collectible items, or otherwise disclose his ownership interest in those items. (Px M ¶42)

**RESPONSE:  Debtor objects to, and denies, Px M, ¶42 in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

**H.    Gouletas Concealed His Ownership Interest In The Garvey Court Project And NKM Garvey, LLC.**

(43)    During the Citation Proceedings, Gouletas was involved in a real estate development project referred to as

"Garvey Court". (Px P pp. 43-47) The Garvey Court Project involved the construction of a mixed use high-rise retail/office/condominium project on property that Gouletas owned (through entities that he owned and controlled) at Clark and Lake Streets in Chicago, where a "food court" was located. (*Id.* pp. 45-47)

**RESPONSE:** Debtor admits to only any verbatim recitations of Px P.

(44)      Basically, Gouletas placed certain properties that he owned into a new entity -- Garvey Court, LLC -- which would pay off the existing debt on the properties, and develop the new high-rise on the Gouletas property. (Citation Int. Resp. (Px H) no. 10 pp. 9-10; Px P pp. 47, 50-51 & 82; Px Q pp. 25-26)

**RESPONSE:**  Debtor admits to only any verbatim recitations of Px H, Px P and Px

**Q.**

(45)      In the original formulation of the plan, Gouletas was going to retain a 25% interest in the Garvey Court Project. (Px Q pp. 25-26) Eventually, however, Gouletas "gifted" his 25% interest in the Garvey Court Project to family members through two newly formed LLCs, SEG Garvey, LLC (12%) and NKM Garvey, LLC (13%). (Id. p. 26; Citation Int. Resp. no. 10 p. 10; Px P pp. 48-9, 68-70 & 84; Px Q p. 27) The "SEG" stands for Gouletas' son, Steven E. Gouletas, and the "NKM" refers to Gouletas' wife, Nate! K. Matschulat. (Px M ¶45)

**RESPONSE:**  Debtor admits to only any verbatim recitations of Px Q and Px P.

**Answering further, Debtor objects to, and denies, Px M, ¶45 in that it lacks an adequate**

**evidentiary foundation and, therefore, is inadmissible for these purposes.**

(46)      On March 25, 2015, Gouletas represented under oath in his Citation Int. Resp. that he "does not have a membership interest in . . . NKM Garvey, LLC." (Px H no. 10 p. 10) In truth, however, during the course of the Citation Proceedings, Gouletas owned a percentage of NKM Garvey, LLC. (Ans. ¶26)

**RESPONSE:** Debtor admits to only any verbatim recitations of Px H and Px A.

(47)      While in his Answer to this Adversary Proceeding Gouletas now admits that he does, in fact, own a percentage of NKM Garvey, LLC, at no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Int. Resp. to

reflect his ownership interest in NKM Garvey, LLC, or otherwise disclose his ownership interest in that entity. (Ans. ¶26; Px M ¶47)

**RESPONSE: Debtor admits to only any verbatim recitations of Px A, ¶26.**

**Answering further, Debtor objects to, and denies, Px M, ¶47 in that it lacks an adequate**

**evidentiary foundation and, therefore, is inadmissible for these purposes.**

**I.      Gouletas Concealed His Deposit Of Money Into Two Checking Accounts In The Name Of Dorothea Touris And His Use Of Those Accounts For His Personal Financial Benefit.**

(48)      In Gouletas' Citation Disclosure Form (Px E; Px 17), Gouletas purported to list all of his bank accounts (id. p. 2), and then acknowledged under oath that he had no other accounts other than as listed in his Citation Disclosure Form. (Px Q pp. 15-16) Further, during the course of the Citation Proceedings, Gouletas testified on October 20, 2014 that from and after November of 2013, he "[did]n't know that [he's] been writing any checks." (Px K pp. 204-05)

**RESPONSE: Debtor admits to only any verbatim recitations of Px E, Px Q and Px**

**K.**

(49)      At no time did Gouletas reveal that he was, during the Citation Proceedings, depositing his funds into two checking accounts in the name of his close personal friend, Dorothea Touris ("Touris"), and then having Touris write checks from those accounts for his personal financial benefit. (Px M ¶49)

**RESPONSE: Debtor objects to, and denies, Px M ¶49, in that it lacks an adequate**

**evidentiary foundation and, therefore, is inadmissible for these purposes.**

(50)      Touris has known Gouletas for about 40 years. (Px R p. 93) Touris was the director of design for Gouletas at American Invsco, who performed design work for American Invsco over the last 20 years. (Px R pp. 35 & 93)

**RESPONSE: Debtor admits to only any verbatim recitations of Px R.**

(51)      Touris lives in the same condominium building as Gouletas at 111 East Chestnut Street in Chicago, and she bought

her condominium from one of Gouletas' entities after Gouletas developed that property into condominiums. (Px R pp. 3 & 94)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R.**

(52)    In early 2015 (and during the Citation proceedings), Gouletas requested that Touris deposit his funds into her checking accounts for the payment of Gouletas' bills. (Px J p. 3; Px R p. 14) Pursuant to Gouletas' plan, Touris would then take the funds that he had provided to her, put that money in her checking accounts, and then pay Gouletas' bills out of her accounts. (Px J p. 5; Px R pp. 11, 14 & 16) The funds that Gouletas deposited into Touris' checking accounts belonged to Gouletas. (Px J p. 55; Px R pp. 18, 20-21 & 25)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J and Px R.**

(53)    On February 17, 2015, Gouletas wire transferred $15,730 into Touris' checking account at Chase Bank (the "Touris Chase Account"). (Px 177; Px R pp. 19-20 & 55) The $15,730 was money that belonged to Gouletas. (Px R pp. 18-19) Gouletas, however, claims to have "no idea" where the $15,730 came from. (Px J p. 17)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J, Px R.**

**Answering further, Debtor objects to, and denies, Px 177, in that it lacks an adequate**

**evidentiary foundation and, therefore, is inadmissible for these purposes.**

(54)    In March of 2015, Gouletas told Touris that a check for $415,000 was coming to her, which she was to deposit in her account for the payment of Gouletas' bills. (Px R p. 13) Touris then deposited the $415,000 check into her checking account at Chase Bank. (Px R pp. 13 & 16-17; Px 178) According to Touris, she and Gouletas "talked about it together and he wanted the bills paid, so . . . he asked me [Touris], would you deposit this [$415,000 check] in your account and pay the bills." (Px R p. 14) Although Gouletas claimed that the money was a "loan" to him, he admitted that the $415,000 was his money. (Px R pp. 18 & 23)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R. Answering**

**further, Debtor objects to, and denies, Px 178, in that it lacks an adequate evidentiary**

**foundation and, therefore, is inadmissible for these purposes.**

(55)    The total amount of Gouletas' funds that he deposited into Touris' Chase Account was in excess of $431,145. (Px 177; Px R p. 31) Gouletas did not have the right on his own to withdraw funds from Touris' Chase Account. (Px R p. 61) Accordingly, by depositing Gouletas' funds into Touris' Chase Account, Gouletas put those funds beyond the reach of his creditors. (*Id.*)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R. Answering further, Debtor objects to, and denies, Px 177, in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

(56)    The account summaries for Touris' checking account at Chase Bank are reflected by DT 14 through DT 21, and are remarked herein as Px 180. Those account summaries all pertain to the requests that Gouletas made about taking funds that Gouletas had put into her checking account, and that Touris then withdrew from her account at Gouletas' request. (Px R pp. 89 & 116-17) As acknowledged by Touris, "those [account summaries reflected by Px 180 (DT 14 through DT 21)] are all of the financial transactions that [she] handled for Nick Gouletas' money", and "[e]very single thing was done by [Gouletas] telling me [Touris] to do it." (Px R p. 30 & 54)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R. Answering further, Debtor objects to, and denies, Px 180, in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

(57)    Although the Citation was served on Gouletas on June 9, 2014, and was not suspended until Gouletas filed for bankruptcy herein on January 17, 2016 (Px M ¶57), the account summaries for Touris' Chase Account (Px 180) reflect the regular, continuous and systematic use of that account by Gouletas from February 17, 2015 when Gouletas made his initial wire transfer of $15,730 into that account until September 14, 2015 with the payment of Gouletas' credit card bill. (*Id.*) Some of the more significant withdrawals by Gouletas from Touris' Chase Account are set forth below:

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 2/18/15 | $7,000 | George Stray, friend of Gouletas. (Px 180-14; Px R pp. 55-56) |
| 3/16/15 | $5,000 | Cash. (Px 180-14; Px R pp. 56-57) |
| 3/17/15 | $5,000 | Cash. (Px 180-14; Px R pp. 59-60) |
| 3/20/15 | $10,000 | Transfer to other checking account. (Px 180-14; Px R p. 60) |
| 3/20/15 | $10,000 | Wire transfer at Gouletas' request to "Santander, B". (Px 180-14; Px R p. 60) |
| 3/20/15 | $20,000 | Cash. (Px 180-14; Px R p. 61) |
| 3/20/15 | $5,000 | Cash. (Px 180-14; Px R pp. 61-62) |
| 3/20/15 | $90,000 | Loan to Touris. (Px 180-15; Px R p. 62) |
| 3/24/15 | $53,000 | Steven Gouletas. (Px 180-15; Px R p. 65) |
| 3/24/15 | $16,000 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $7,200 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $440 | Steven Gouletas. (Px 180-15; Px R p. 66) |
| 3/24/15 | $30,000 | Natel Matschulat, Gouletas' wife. (Px 180-15; Px R pp. 66-67) |
| 3/26/15 | $5,512.22 | Condominium assessment. (Px 180-15; Px R pp. 67-68) |
| 3/26/15 | $3,436.06 | Payment for assessments on Gouletas' condominium. (Px 180-15: Px R pp. 67-68) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 3/26/15 | $1,061 | Payment to BOA for mortgage on Gouletas condominium. (Px 180-15; Px R p. 68) |
| 3/26/15 | $869.09 | Payment of Gouletas' ComEd bill. (Px 180-15; Px R p. 68) |
| 3/27/15 | $2,949.02 | Payment of mortgage. (Px 180-15; Px R p. 69) |
| 3/27/15 | $2,788.28 | Payment of assessments for condominiums. (Px 180-15; Px R p. 69) |
| 3/27/15 | $1,865.16 | Payment of assessments for condominiums. (Px 180-15; Px R p. 69) |
| 4/7/15 | $10,000 | Wire transfer to Luxury Management LLC. (Px 180-17; Px R pp. 70-71 & 83-84) |
| 4/9/15 | $3,581.01 | Assessment for Gouletas' condominium. (Px 180-17; Px R p. 71) |
| 4/13/15 | $1,391.55 | Payment for Gouletas' condominium on Delaware Street. (Px 180-17; Px R pp. 71-72) |
| 4/13/15 | $230 | Assessment for Gouletas' condominium on Delaware Street. (Px 180-17; Px R pp. 74-75) |
| 4/14/15 | $22,474.24 | Mortgage for Gouletas' condominium. (Px 180-17; Px R p. 75) |
| 4/14/15 | $4,299.75 | Mortgage for Gouletas' condominium. (Px 180-17; Px R p. 75) |
| 4/14/15 | $2,634.74 | Payment for assessments on Gouletas' condominium at Delaware Place. (Px 180-17) |
| 4/14/15 | $1,639.82 | Payment of Gouletas' ComEd bill. (Px 180-17) |
| 4/14/15 | $125 | Payment of AT&T bill. (Px 180-17) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 4/15/15 | $4,167.06 | Payment of assessment on Gouletas' condominium. (Px 180-17) |
| 4/16/15 | $15,150.29 | Unexplained. (Px 180-17) |
| 4/16/15 | $14,268.31 | Payment of Gouletas' mortgage. (Px 180-17; Px R p. 75) |
| 4/16/15 | $2,69_.25 | Payment of Gouletas' assessment on condominium. (Px 180-17) |
| 4/16/15 | $1,275.29 | Payment for Gouletas' parking. (Px 180-17) |
| 4/27/15 | $10,000 | Gouletas requested payment to Karen Thorton. (Px 180-18; Px R p. 76) |
| 4/28/15 | $1,620.10 | Payment for Gouletas' condominium. (Px 180-18) |
| 4/29/15 | $3,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 180-18; Px R pp. 76) |
| 4/29/15 | $1,500 | Charitable contribution by Gouletas to Greek Annunciation Church. (Px 180-18; Px R p. 76) |
| 4/30/15 | $2,000 | Unexplained. (Px 180-18) |
| 5/4/15 | $13,000 | Payment to Gouletas' wife, Natel Matschulat. (Px 180-18; Px R p. 78) |
| 5/4/15 | $10,000 | Payment to George Spanos. (Px 180-18; Px R p. 78) |
| 5/13/15 | $5,000 | Unexplained. (Px 180-18) |
| 5/14/15 | $10,000 | Transferred to another checking account. (Px 180-18) |
| 5/21/15 | $1,000 | Unexplained. (Px 180-18) |

| Date | Amount | Payee/Explanation |
|------|--------|-------------------|
| 5/26/15 | $2,712.05 | Transferred to checking account. (Px 180-19) |
| 5/28/15 | $10,000 | Gouletas gave the money to Touris. (Px 180-19; Px R pp. 80-81) |
| 5/28/15 | $5,000 | Cash.   (Px 180-19; Px R pp. 81-82) |
| 5/28/15 | $5,000 | Cash. (Px 180-19; Px R pp. 81-82) |
| 5/29/15 | $900 | Payment on Gouletas' credit card. (Px 180-19) |
| 5/29/15 | $6,500 | Payment on Gouletas' wife's credit card. (Px 180-19; Px R p. 82) |
| 6/4/15 | $10,000 | Payment to Vivien. (Px 180-19; Px R pp. 82-83) |
| 6/8/15 | $2,171.10 | Payment on Gouletas' credit card. (Px 180-19) |
| 6/9/15 | $6,178.31 | Payment for Gouletas' condominium. (Px 180-19) |
| 6/9/15 | $1,000 | Payment to Heather Von Ehr. (Px 180-19; Px R pp. 86-87) |
| 6/24/15 | $1,000 | Payment on Gouletas' credit card. (Px 180-20) |
| 6/24/15 | $5,000 | Unexplained. (Px 180-20) |
| 7/2/15 | $2,000 | Cash. (Px 180-20; Px R pp. 89-90) |
| 7/14/15 | $1,602.60 | Payment for three plane tickets to Atlanta. (Px 180-21; Px R p. 91) |

As of February 10, 2017, there was only $1,368 of Gouletas' funds left in Touris' Chase Account. (Px R p. 30)

**RESPONSE: Debtor admits to only any verbatim recitations of Px R. Answering further, Debtor objects to, and denies, Px 180 and Px M, in that they lack an adequate**

**evidentiary foundation and, therefore, are inadmissible for these purposes.**

(58)     At his deposition conducted in this Adversary Proceeding, Gouletas was less than candid in testifying about his deposit and withdrawal of funds from Touris' Chase Account:

Q:     Why didn't you put the money in your own account?
A:     I don't recall.

Q:     Did you ever know why you did it?
A:     I don't recall.

Q:     By saying you don't recall, does that mean you at one time knew but now you don't remember?
A:     I don't recall.

\* \* \*

Q:     Can you provide the Court with any explanation as to why you did it?

\* \* \*

A:     Not that I know of.

Q:     Can you list any possible reasons as to why you did it?
A:     No, I don't.

Q:     How long did this Dorothea Touris, money in her account paying your bills, how long did that practice go on?
A:     I don't recall.

\* \* \*

Q:     The money that you had deposited into Dorothea Touris' checking account, where did that money come from?
A:     I don't recall.

Q:     How much did you . . . put into Dorothea Touris' account for the payment of your bills and the handling of your financial affairs?
A:     I don't recall.

Q:     Can you give me an estimate as to the amount?
A:     No, I can't.

Q:     Would you agree with me its more than a dollar?
A:     I don't know.

Q:     Would you agree with me its more than a million dollars?

A:     I don't know.

Q:     Would you agree with me its less than $10 million?
A:     I don't know.

* * *

Q:     Can you list any reasons why you didn't put [that money] in your own account?
A:     I don't recall.

* * *

Q:     Did you tell [Touris] anything about the money?
A:     I don't recall.

Q:     Did she ask any questions about the money?
A:     I don't recall.

Q:     Did it just happen by accident?
A:     I don't recall.

Q:     Did you ever have $15,730 wire transferred into Dorothea Touris' checking account?
A:     I don't recall.

Q:     Other than the $415,000 are you aware of any other sums that you had deposited into Dorothea Touris' checking account?
A:     I don't recall.

* * *

Q:     On March 16, 2015, Dorothea Touris withdrew $5,000 from her checking account in cash. Did she give that cash to you?
A:     I don't recall.

Q:     On March 20, 2015, there was a $20,000 withdrawal of cash from her checking account. Did she give that cash to you?
A:     I don't recall.

Q:     How did Dorothea Touris know what bills to pay?
A:     I don't remember.

* * *

Q:     The cash withdrawals, did you ask her to withdraw cash and give it to you?
A:     I don't recall.

Q:     Do you deny she withdrew on numerous occasions large sums of money in cash and gave the cash to you?
A:     I don't recall.

* * *

Q: Do you deny that Dorothea Touris routinely gave you large sums of cash?

A: I don't recall.

Q: Is there any part of your memory to the effect that Dorothea Touris would give [you] cash?

A: I don't recall.

Q: Did you ever request Dorothea Touris to give you cash?

A: I don't recall.

(Px J pp. 3-4, 6-7 & 16-19)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J.**

(59) In connection with Gouletas' "convenient amnesia" as to why he deposited his funds into Touris' checking accounts, Gouletas previously admitted that he understood "it's just as much a violation of your oath to say you don't recall when you do recall as it is to make an affirmative misrepresentation." (Px J p. 5)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J.**

(60) In late January of 2015, Touris met with Gouletas at his office, at which time Gouletas presented Touris with a check in the amount of $396,218.84. (Px R pp. 22-23) Touris understood that those funds belonged to Gouletas. (*Id*. p. 23) Gouletas, however, claims to not have "any recollection" about what the $396,218.84 check was in reference to. (Px J pp. 44-45)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R and Px J.**

(61) Gouletas then told Touris that "I would like you [Touris] to deposit this [the $396,218.84 check] in your account. And I want you [Touris] to pay $195,000 to [Gouletas' son] Steven Gouletas and $50,000 to a gentleman [named George Spanos]" (*id*. pp. 23-25), with the balance of a $150,000 to be kept by Touris as a purported reimbursement on an investment. (*Id*.p. 23)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J.**

(62) This was the first deposit of Gouletas' money into Touris' checking account. (Px R p. 24)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R.**

(63)     Thereafter, on February 6, 2015 Touris wrote a check from her MB Bank checking account in the amount of $195,000 to Steven E. Gouletas (Px 181; Px R pp. 96-97 & 117), and a $50,000 check to George Spanos. (Px 182; Px R pp. 116-117)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px R. Answering further, Debtor objects to, and denies, Px 181 and Px 182, in that they lack an adequate evidentiary foundation and, therefore, are inadmissible for these purposes.**

(64)     In addition to his "convenient amnesia" during his deposition conducted in this Adversary Proceeding, Gouletas provided conflicting testimony as to his deposit of funds into, and use of, other people's checking accounts. During the Contempt Proceedings, Gouletas told Judge White that his wife used the $51,323.29 from the sale of Gouletas' CIB Stock to "buy groceries" and pay for other "living expenses". (Px 0 pp. 21 & 30-31) At his 341 Meeting of Creditors, however, Gouletas, when confronted by copies of checks from Gouletas' wife's checking account, testified that he used the $51,323.29 placed in his wife's checking account to pay business and personal expenses. (Px S pp. 11-18) During his subsequent deposition conducted in this Adversary Proceeding, however, Gouletas claimed that he "did not remember" what he did with the $51,323.29 (Px J p. 66), and supposedly "did not remember" if he transferred those funds to his wife and used any of that money for his own benefit. (Id. pp. 66- 67)

**RESPONSE:  Debtor admits to only any verbatim recitations of Px J, Px O and Px S.**

(65)     At no time during the Citation Proceedings did Gouletas amend, supplement or correct his Citation Answer or his Citation Disclosure Form to reflect his deposit of funds into Touris' checking accounts, or otherwise disclose his deposit of funds into and use of Touris' checking accounts. (Px M ¶65)

**RESPONSE:  Debtor objects to, and denies, Px M ¶65, in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

**J.     Gouletas Failed To Disclose Charitable Contributions In Excess Of $600 That He Made To The Annunciation Greek Church Within Two Years Of His Bankruptcy Filing.**

(66)     In his bankruptcy filing, Gouletas represented under oath that he did not make any gifts to charities within the two years preceding his bankruptcy filing. (Px 188 (Statement of Financial Affairs) p. 11 no. 13) That representation was false. *(See* Px R pp. 10-11 & 76-77)

**RESPONSE: Debtor admits to only any verbatim recitation of Px R. Answering further, Debtor objects to, and denies, and Px 188 in that it is not included in the Exhibits submitted by Plaintiff for these purposes.**

(67)     In truth, on April 29, 2015, Gouletas had Touris, on Gouletas' behalf, take Gouletas' funds out of Touris' Chase Account, and write two checks (check nos. 2416 and 2417) (Px 180-18)) totaling $5,000 in charitable contributions by Gouletas to the Annunciation Greek Church. (Px R pp. 10-11 **&** 76-77)

**RESPONSE:  Debtor admits to only any verbatim recitation of Px R. Answering further, Debtor objects to, and denies, Px 180-18? in that they lack an adequate evidentiary foundation and, therefore, are inadmissible for these purposes.**

### K.      Gouletas Was Evasive About The Handling Of His Financial Affairs.

(68)     Not only was Gouletas evasive about the funds that he deposited in checking accounts held in the name of Touris, he was evasive about the handling of his financial affairs during the deposition that was conducted in this Adversary Proceeding:

Q:     Have you ever had access to a safety deposit box?
A:     I don't recall.
                              * * *
Q:     Where do you keep your valuable records?
A:     I don't remember.

(Px J pp. 61-62)

**RESPONSE:  Debtor admits to only any verbatim recitation of Px J.**

### L.     800 SWC Files An Adversary Complaint Against Gouletas For Denial Of Discharge Pursuant To 11 U.S.C. §727(a)(2).

(69)     On March 1, 2016, 800 SWC filed an Adversary Complaint against Gouletas seeking, in Count Three, the denial of Gouletas' bankruptcy discharge pursuant to **11** U.S.C. §727(a)(2)(A). (D.N. 1) Gouletas filed his answer to the above Adversary Complaint on May 20, 2016. (D.N. 7; Px A)

**RESPONSE: Debtor admits.**

### M.     There Is No Evidence To Support Gouletas' Affirmative Defenses.

(70)     In Gouletas' Answer filed herein, Gouletas asserted two affirmative defenses pertaining to Count Three. In his First Affirmative Defense, Gouletas asserted that "Plaintiff lacks standing to pursue its claim." (Ans. p. 14 ¶1) And in his Third Affirmative Defense, Gouletas asserted that "Plaintiffs claims are barred by the equitable doctrine of unclean hands." *(Id.* p. 15 ¶3)

**RESPONSE:   Debtor states that Px A speaks for itself.**

(71)     There is no evidence to support Gouletas' affirmative defense of Plaintiff s supposed lack of standing. In his "standing" affirmative defense, Gouletas argued that "[t]he duly appointed manager of [800 SWC] has not authorized this action." (Ans. p. 14 ¶1) Gouletas testified, however, that he has "no idea" whether Plaintiff has the authority to proceed with this suit, and has "no idea" of any facts to support any claim that Plaintiff did not have the authority to proceed with this suit. (Px J p. 68)

**RESPONSE:   Debtor states that Px A speaks for itself. Answering further, Debtor**

**admits to only any verbatim recitation of Px J.**

(72)     DJV became the manager of 800 SWC on November 16, 2006 pursuant to the terms of a Collateral Pledge and Security Agreement (Px 32-A) (the "Pledge Agreement") executed by (1) the "Borrower", 800 SWC, and (2) the "Pledgors", River City Investors ("RCI") and Gouletas, as the sole members of 800 SWC, in favor of the "Lender", CIB Bank, which was succeeded by DJV. *(Id.* p. 1) As admitted by Gouletas, "on or about November 16, 2006, pursuant to a [Pledge Agreement] delivered to CIB Bank, and later assumed by DJV . . DJV took over control of the voting rights of [800 SWC], and removed Gouletas as the manager of [800 SWC]." (Px B p. 19

¶3) Further, Gouletas admitted that "DJV took control of [800 SWC] . . . pursuant to [the Pledge Agreement], <u>which all owed DJV</u> to do so once an event of default occurred." *(Id.* p. 20 ¶11 (emphasis added))

**RESPONSE:  Debtor states that Px 32-A and Px B speak for themselves.**

(73)     Further, pursuant to the Pledge Agreement, RCI and Gouletas agreed that, upon default by 800 SWC in repayment of the full amount of financial obligations owed by 800 SWC, CIB (now DJV) could serve as the manager of 800 SWC unless and until the full amount of the financial obligations owed by 800 SWC to DJV was paid in full. (Px 32-A rlf1.1, 4.1, 4.8, 4.12 & 6.1) It is undisputed that, to date, the full amount of the financial obligations owed by 800 SWC to DJV has not been paid in full. (Px L ¶73)

**RESPONSE:  Debtor states that Px 32-A speaks for itself.**

(74)     In addition, Gouletas and the other previous member of 800 SWC, RCI, previously contested the ability of DJV to serve as the manager of 800 SWC. As concluded by Bankruptcy Judge Jacquelyn P. Cox in her Order denying Gouletas' prior Motion on the authority of DJV to continue as manager of 800 SWC:

> The argument [by RCI and Gouletas] that [DJV] has not acquired all of the manager-member power is without basis. Paragraph 1.1 of the Pledge Agreement [Px 32-A] states "Pledgor [i.e., Gouletas and RCI] assigns, pledges and grants to Lender [DJV] a security interest in and lien upon all of Pledgor's right, title and interest in and to Pledgor's interest in Borrower [800 SWC] (including without limitation, Pledgor's rights to [v]ote .". [DJV] succeeded to all, 100%, of the Pledgor's [i.e., Gouletas and RCI's] interest.

(Px T p. 6)

**RESPONSE:  Debtor admits to only any verbatim recitation of Px T. Answering further, Debtor objects to, and denies, the remainder of Paragraph (74) in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

(75)     In his other affirmative defense pertaining to Count Three, Gouletas argued that Plaintiff has "unclean hands" because "Plaintiff has pursued its claims in this Court and in the Circuit Court of Cook County with the knowledge that it did not have

authority to do so." (Ans. p. 15 ¶3) As discussed above, Plaintiff has the authority to pursue with its claims herein and had the authority to pursue its claims in the Circuit Court. (*See* Nos. 72-74)

**RESPONSE:  Debtor states that Px. A speaks for itself. Answering further, Debtor objects to, and denies, the remainder of Paragraph (75) in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

(76)     Further, there is no evidence to support Gouletas' affirmative defense of unclean hands. During his deposition herein, Gouletas admitted that he has "no idea" whether Plaintiff has unclean hands, and has "no idea" of any facts to support a claim that Plaintiff has unclean hands. (Px J p. 68)

**RESPONSE:  Debtor admits to only any verbatim recitation of Px J. Answering further, Debtor objects to, and denies, the remainder of Paragraph (76) in that it lacks an adequate evidentiary foundation and, therefore, is inadmissible for these purposes.**

L.      **The Exhibits Referred To Above Are True And Correct Copies Of The Originals, Are What They Purport To Be, And Are Admissible In Evidence Herein.**

(77)     The exhibits referred to above (specifically, Pxs A, B, C, D, E, F, H, I, J, K, L, M, N, O, P, Q, R, S, T, 15, 17, 20, 29, 32-A, 101, 120, 122, 127, 128, 139, 176, 177, 178, 179, 180, 181, 182 & 183) are true and correct copies of the originals, are what they purport to be, and are admissible in evidence in this action. (Px M ¶77)

**RESPONSE:  Debtor objects to, and denies, that Px L, Px M, Px 120, Px 122, Px 127, Px 128, Px 139, Px 177, Px 178, Px 180, Px 181 and Px 182 in that they lack an adequate evidentiary foundation and, therefore, are inadmissible for these purposes.**

## DEBTOR'S STATEMENT OF ADDITIONAL FACTS

D-1.    Attached hereto as Exhibit D-1 are certain pages of Plaintiff's "Operating Agreement that identifies Debtor as the "Managing Member" and set forth the authority of the Managing Member.

Dated: November 21, 2017.                    Respectfully submitted.


 /s/ Richard H. Fimoff
Richard H. Fimoff
rfimoff@rsplaw.com
ROBBINS, SALOMON & PATT, LTD.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 (Tele)
(312) 782-6690 (Fax)

# EXHIBIT D-1

OPERATING AGREEMENT
FOR
800 SOUTH WELLS COMMERCIAL, LLC
INDEX

**SECTION 1  THE LIMITED LIABILITY COMPANY** .......................... 2
    1.1    Formation ........................................... 2
    1.2    Name. .............................................. 2
    1.3    Purpose. ............................................ 2
    1.4    Principal Place of Business. ........................... 2
    1.5    Term ............................................... 2
    1.6    Filings ............................................. 2
    1.7    Title to Property ..................................... 3
    1.8    Payments of Individual Obligations ..................... 3
    1.9    Independent Activities; Transactions With Affiliates ...... 3
    1.10   Definitions ......................................... 4

**SECTION 2  MEMBERS' CAPITAL CONTRIBUTIONS** ................. 14
    2.1    Managing Member .................................. 14
    2.2    Non Managing Member .............................. 15
    2.3    RESERVED ........................................ 15
    2.4    Capital Contributions ............................... 15
    2.5    Other Matters ...................................... 16

**SECTION 3  ALLOCATIONS** ................................... 16
    3.1    Profits ............................................. 16
    3.2    Losses ............................................. 16
    3.3    Special Allocations ................................. 17
    3.4    Curative Allocations ................................ 19
    3.5    Other Allocation Rules .............................. 19
    3.6    Tax Allocations: Code Section 704(c) ................. 20

**SECTION 4  DISTRIBUTIONS** ................................. 20
    4.1    Net Cash From Operations .......................... 20
    4.2    Excess Net Cash From Operations ................... 21
    4.3    Payments Per Participation Agreement ............... 22

**SECTION 5  MANAGEMENT** .................................. 22
    5.1    Authority of the Managing Member ................... 22
    5.2    Right to Rely on Managing Member .................. 24
    5.3    Restrictions on Authority of Managing Member ........ 25
    5.4    Duties and Obligations of Managing Member .......... 26
    5.5    Indemnification of Managing Member ................ 28
    5.6    Compensation; Expenses of Managing Member; Loans ... 29

5.7      Operating Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
5.8      River City Investors, LLC Right to Act as Managing Member . . . . . . . . . . . . 30
5.9      Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**SECTION 6   ROLE OF NON MANAGING MEMBERS** . . . . . . . . . . . . . . . . . . . . . 31
6.1      Rights or Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.2      Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.3      Procedure for Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.4      Right to Designate Special Managing Member . . . . . . . . . . . . . . . . . . . . . 31

**SECTION 7   REPRESENTATIONS AND WARRANTIES** . . . . . . . . . . . . . . . . . . 32
7.1      In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
7.2      Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**SECTION 8   BOOKS AND RECORDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
8.1      Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
8.2      Annual Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
8.3      Tax Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**SECTION 9   AMENDMENTS; MEETINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
9.1      Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
9.2      Meetings of the Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**SECTION 10 TRANSFERS OF MEMBERSHIP INTERESTS** . . . . . . . . . . . . . . . . . . 37
10.1    Restriction on Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
10.2    Permitted Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
10.3    Conditions to Permitted Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
10.4    Prohibited Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
10.5    Rights of Unadmitted Assignees . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
10.6    Admission of Assignees as Members . . . . . . . . . . . . . . . . . . . . . . . . . . 39
10.7    Covenants; Legend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
10.8    Distributions and Allocations in Respect to Transferred Membership Interests . 40

**SECTION 11 MANAGING MEMBERS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
11.1    Additional Managing Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
11.2    Covenant Not to Withdraw, Transfer, or Dissolve . . . . . . . . . . . . . . . . . . 41
11.3    Other Permitted Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
11.4    Prohibited Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
11.5    Termination of Status as Managing Member . . . . . . . . . . . . . . . . . . . . . 42
11.6    Election of New Managing Members . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**SECTION 12 POWER OF ATTORNEY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
12.1    Managing Member as Attorney-In-Fact . . . . . . . . . . . . . . . . . . . . . . . . 43
12.2    Nature as Special Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**SECTION 13 DISSOLUTION AND WINDING UP** ............................. 45
    13.1   Liquidating Events ............................................. 45
    13.2   Winding Up ................................................... 46
    13.3   RESERVED ................................................... 46
    13.4   Deemed Distribution and Recontribution ........................ 46
    13.5   Rights of Members ............................................ 47
    13.6   Notice of Dissolution ......................................... 47

**SECTION 14 MISCELLANEOUS** ...................................... 47
    14.1   Notices ...................................................... 47
    14.2   Binding Effect ............................................... 47
    14.3   Construction ................................................. 47
    14.4   Time ........................................................ 48
    14.5   Headings .................................................... 48
    14.6   Severability ................................................. 48
    14.7   Incorporation by Reference .................................... 48
    14.8   Further Action ............................................... 48
    14.9   Variation of Pronouns ........................................ 48
    14.10  Governing Law .............................................. 48
    14.11  Waiver of Action for Partition; No Bill for Company Accounting .......... 48
    14.12  Counterpart Execution ........................................ 48
    14.13  Sole and Absolute Discretion .................................. 48
    14.14  Specific Performance ......................................... 49

THE SECURITIES REPRESENTED BY THIS OPERATING AGREEMENT HAVE BEEN
ISSUED PURSUANT TO A CLAIM OF EXEMPTION FROM THE REGISTRATION OR
QUALIFICATION PROVISION OF FEDERAL AND STATE SECURITIES LAWS AND
MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE
REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND
STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS

OPERATING AGREEMENT FOR

800 SOUTH WELLS COMMERCIAL, LLC,

AN ILLINOIS LIMITED LIABILITY COMPANY

**THIS OPERATING AGREEMENT** is entered into and shall be effective as of the
1st day of March, 2001, by and between **NICHOLAS S. GOULETAS** (*"Managing Member"*),
and **RIVER CITY INVESTORS, LLC**, a Michigan limited liability company who agree as
follows:

Doc: 116417/7/1581.000

4.3     Payments Per Participation Agreement. Subject to the terms of the First Mortgage and Second Mortgage, the Managing Member may pay the Net Cash from Operations which is in excess of the distributions made pursuant to Sections 4.1(a), 4.1(b) and 4.2 to River City Investors, LLC pursuant to that certain Participation Agreement (*"Participation Agreement"*) dated of even date hereof, by and between 800 South Wells Commercial, LLC and River City Investors, LLC; provided, however, that in the event the Company receives any insurance proceeds, sales proceeds or refinancing proceeds with respect to the Property, the Manager Member shall, subject to the terms of the First Mortgage and Second Mortgage, pay the Net Cash from Operations which is in excess of the distributions made pursuant to Sections 4.1(a), 4.1(b) and 4.2 to River City Investors, LLC pursuant to the Participation Agreement. Except with respect to insurance proceeds, sales proceeds or refinancing proceeds, in no event may the distributions pursuant to the Participation Agreement exceed $600,000 in any Fiscal Year.

## SECTION 5

## MANAGEMENT

5.1     Authority of the Managing Member. Subject to the limitations and restrictions set forth in this Agreement including, without limitation, those set forth in this Section 5 and specifically Section 5.3(c), the Managing Member shall have the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by Managing Members under the Act including, without limitation, the right and power to:

(a)     Operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, and lease the Property, including any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(b)     Enter into the First Mortgage, and Second Mortgage, the Permitted Fees, the Amended and Restated Grant and Reservation of Easements Pertaining to the Project Commonly Known as River City, 800 South Wells Street, Chicago, Illinois, and the Amendment to the Ground Lease.

(c)     Execute any and all agreements, contracts, documents, certifications, leases and instruments necessary or convenient in connection with the management, maintenance, operation, improvement and sale or lease of the Property, or in connection with managing the affairs of the Company, including executing amendments to the Agreement and the Articles, in accordance with the terms of the Agreement, both as Managing Member and, if required, as attorney-in-fact for the Non Managing Members to any power of attorney granted by the Non Managing Members;

(d)     Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale,

contract, or other instrument purporting to convey or encumber any or all of the Company Property, including but not limited to the Property;

(e)    Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the Company Property, including but not limited to the Property, and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Company Property, including but not limited to the Property;

(f)    Care for and distribute funds to the Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(g)    Contract on behalf of the Company for the employment and services of employees (including Officers as set forth in Section 5.9) and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(h)    Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company Property and Managing Member liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a Company under the laws of each state in which the Company is then formed or qualified;

(i)    Make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Company Property, including but not limited to the Property, pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with transfers of interests in the Company and Company distributions; (ii) to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, or local tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231, to represent the Company, Managing Member, and the Non Managing Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company, Managing Member and Non Managing Members in their capacity as Managing Member and the Non Managing Members and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company, Managing Member and Non Managing Member. The Managing Member is specifically authorized to act as the *"Tax Matters Member"* under the Code and in any similar capacity under state or local law.    Provided, however, and notwithstanding the foregoing to the contrary, the Managing Member may not,

without the express prior written consent of the Non Managing Members, extend any applicable statute of limitations for assessment of tax deficiencies against the Non Managing Members with respect to adjustments to the Company's federal, state or local tax returns nor enter into any settlement of any tax controversy affecting the Non Managing Members.

(j)     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company; and

(k)     Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

Subject to the provisions of Section 5.8 to the contrary, in the event more than one Person is a Managing Member, the rights and powers of the Managing Member hereunder shall be exercised by them in such manner as they may agree. In the absence of an agreement among the Managing Members, no Managing Member shall exercise any of such rights and powers without the unanimous consent of all Managing Members.

## 5.2     Right to Rely on Managing Member.

(a)     Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any Managing Member as to:

(i)     The identity of any Member or Any Officer;

(ii)     The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a Managing Member or an Officer or which are in any other manner germane to the affairs of the Company;

(iii)     The Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)     Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

(b)     The signature of any Managing Member or any authorized Officer shall be necessary and sufficient to convey title to any real property owned by the Company or to execute any promissory notes, trust deeds, mortgages, or other instruments of hypothecation, and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same,

and further agree that the signature of any Managing Member shall be sufficient to execute any "statement of Company" or other documents necessary to effectuate this or any other provision of this Agreement. All of the Members do hereby appoint the Managing Member as their attorney-in-fact for the execution of any or all of the documents described in this Section 5.2(b).

5.3        Restrictions on Authority of Managing Member.

(a)        Each Managing Member shall not have the authority to, and covenants and agrees that it shall not, do any of the following acts without the unanimous consent of the Members:

(i)        Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 1.3 hereof;

(ii)        Knowingly do any act in contravention of this Agreement;

(iii)        Knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(iv)        Possess Company Property, or assign rights in specific Company Property, for other than a Company purpose;

(v)        Knowingly perform any act that would subject any Member to personal liability in any jurisdiction;

(vi)        Cause the Company to voluntarily take any action that would cause a Bankruptcy of the Company without prior written consent of all of the Members;

(vii)        Cause the Company to acquire any equity or debt securities of any Managing Member or any of its Affiliates, or otherwise make loans to any Managing Member or any of its Affiliates;

(viii)        File or permit a voluntary filing of a petition for protection under the Bankruptcy Code as set forth under Title 11 of the United States Code;

(ix)        Effect a sale of all or substantially all of the assets of the Company;

(x)        Allow the appointment of a receiver for the Property;

(xi)    Issue additional Membership Interests; or

(xii)    Except as permitted in Section 5.6(a) incur any cost or expense for services or product provided by a Member or Affiliate.

(b)    Each Managing Member shall not have the authority to, and covenants and agrees that it shall not, do any of the following acts without the consent of River City Investors, LLC:

(i)    *RESERVED.*

(ii)    Sell or otherwise dispose of at one time or from time to time in "bulk sales" all or any substantial portion of the Company Property, except for a liquidating sale of Company Property in connection with the dissolution of the Company;

(iii)    Elect to dissolve the Company; or

(iv)    Grant or convey a deed in lieu of foreclosure to the holder of the First Mortgage, or Second Mortgage, or any other party with respect to the Property or any portion thereof.

(c)    Notwithstanding the provisions of Section 5.1 to the contrary, following the expiration of 60 months following execution of this Agreement, the rights and powers possessed by the Managing Member shall be exercisable only with the prior written consent of the River City Investors, LLC and/or the Special Managing Member, if any.

5.4    **Duties and Obligations of Managing Member.**

(a)    Except with the consent of all of the Members, the Managing Member shall cause the Company to conduct its business and operations separate and apart from that of any Person, including but not limited to the Managing Member and any of its Affiliates, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Person other than the Company, (ii) maintaining books and financial records of the Company separate from the books and financial records of any other Person, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Members, (iii) causing the Company to pay its liabilities from assets of the Company, (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity, (v) correcting any misunderstandings by any Person regarding the separate identity of the Company and any other Person when the Managing Member is aware of such

misunderstanding, (vi) maintaining the Company's accounts separate from any other Person, (vii) maintaining an arm's length relationship with its Affiliates, (viii) paying the salaries of the Company's own employees and maintaining a sufficient number of employees in light of the Company's contemplated business operations, (ix) not guaranteeing or obligating the Company for the debts of any other entity or holding out the Company's credit as being available to satisfy the obligations of others, (x) not acquiring obligations or securities of the Company's Members or Affiliates, (xi) allocating fairly and reasonably any overheard for shared office space, (xii) using separate stationery, invoices and checks, (xiii) not pledging the Company's assets for the benefit of any other entity or making any loans or advances to any other entity, and (xiv) maintaining adequate capital in light of the Company's contemplated business operations.

(b)     Except with the unanimous consent of the Members, the Managing Member shall refrain from taking any actions which could/would (i) cause the discontinuance of the Company's valid existence as a limited liability company under the laws of the State of Illinois and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged, or (ii) prevent the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Company Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(c)     The Managing Member acknowledges its fiduciary duty to conduct the affairs of the Company in the reasonably best interests of the Company and of the Non Managing Members, including the safekeeping and use of all of the Company Property and the use thereof for the exclusive benefit of the Company.

(d)     The Managing Member shall cause to be provided, or cause the Company to carry, such insurance as is customary in the business in which the Company is engaged and in the places in which it is so engaged.

(e)     The Managing Member shall take all actions which may be necessary or appropriate to prevent the Company from being treated as a publicly traded Company within the meaning of Code Section 7704.

(f)     The Managing Member will give copies of any written notice it receives of a default under either the Parkway Loan or the Letter of Credit Reimbursement Obligation to River City Investors, LLC. In the event of a monetary default under either of said loans, the Managing Member must cure such monetary default within 20 days of the receipt of a notice from the applicable lender. In the event such monetary default is not cured within said 20 day period, River City Investors, LLC will have the right to cure such monetary default. In the event of a non-monetary default under either of said loans, the Managing Member must begin the process of curing such non-monetary default within 20 days of the receipt of a

notice from the applicable lender. In the event the Managing Member does not so begin the process within said 20 day period, River City Investors, LLC will have the right to cure such non-monetary default, provided that River City Investors, LLC gives written notice to the Managing Member of such intention to cure.

**5.5** **Indemnification of Managing Member.**

(a) The Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of Company property) shall indemnify, save harmless, and pay all judgments and claims against each Managing Member or officer or director of such Managing Member relating to any liability or damage incurred by reason of any act, provided such act does not constitute fraud, bad faith, willful misconduct or gross negligence, performed or omitted to be performed by such Managing Member, officer, or director in connection with the business of the Company, including attorneys' fees incurred by such Managing Member, officer, or director in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities (including attorneys' fees) under federal and state securities laws (including the Securities Act of 1933, as amended) and any allegations thereof as permitted by law.

(b) The Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of Company property) shall indemnify and hold harmless, to the maximum extent permitted by law, each Member from and against any and all liabilities, sums paid in settlement of claims (if such settlement is consented to by the Managing Member), obligations, charges, actions (formal or informal), claims (including, without limitation, claims for personal injury under any theory or for real or personal property damage), liens, taxes, administrative proceedings, losses, damages (including, without limitation, punitive damages), penalties, fines, court costs, administrative service fees, response and remediation costs, stabilization costs, encapsulation costs, treatment, storage or disposal costs, groundwater monitoring or environmental study, sampling or monitoring costs, other causes of action, and any other costs and reasonable expenses (including, without limitation, reasonable attorneys', experts', and consultants' fees and disbursements and investigating, laboratory and data review fees) imposed upon or incurred by any Managing Member or Non Managing Members (whether or not indemnified against by any other party) arising from and after the date of this Agreement directly or indirectly.

(c) A Non Managing Member shall indemnify, save harmless, and pay all judgments and claims against the Company or the Managing Member relating to any liability or damage incurred arising out of any claim by any of the Non Managing Members' investors that their investment in the Non Managing Member fails to comply with applicable state or federal securities laws. In the event any such claim for which the Company or the Managing Member is entitled to be indemnified under this Section 5.5(c) should arise, upon receiving notice from the party seeking the indemnity and the Managing Member shall give the Non Managing Members the

opportunity to first settle the matter and thereafter, if the Non Managing Members are not able to so settle the matter, the Managing Member and the Non Managing Members shall jointly control the defense and settlement thereof.

(d)     Notwithstanding the provisions of Sections 5.5(a), 5.5(b) and 5.5(c) above, no Member shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

(e)     Notwithstanding anything to the contrary in any of Sections 5.5(a), 5.5(b) and 5.5(c) above, in the event that any provision in any of such Sections is determined to be invalid in whole or in part, such Section shall be enforced to the maximum extent permitted by law.

5.6       **Compensation: Expenses of Managing Member: Loans.**

(a)     **Compensation and Reimbursement.** Except (i) as otherwise provided in this Section 5.6, and (ii) for Permitted Fees and Marketing Expenses which may be paid to the Managing Member (or its Affiliates) under this Agreement, (iii) RESERVED, and (iv) expenses or costs, if any, incurred by the Managing Member in anticipation of the formation of the Company or such other reasonable and necessary expenses or costs incurred by the Managing Member to preserve, protect or defend Company property, no Member shall receive any salary, fee, or draw for services rendered to or on behalf of the Company, nor shall any Member be reimbursed for any expenses incurred by such Member on behalf of the Company, no Managing Member shall receive any additional fees or other compensation for serving as a Managing Member, unless such fees or other compensation are approved in writing by River City Investors, LLC or the Special Managing Member, if any. However, the Managing Member shall be entitled to the distributions and allocations otherwise provided for elsewhere in this Agreement.

(b)     **Loans.** Any Member or Affiliate of a Member may, with the consent of the Managing Member, lend or advance money to the Company. If any Member or Affiliate shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company. The amount of any such loan or advance by a lending Member or Affiliate of a Member shall be repayable out of the Company's cash in accordance with the provisions of Section 4.1(d) and shall bear interest at a rate not in excess of the lesser of (A) the prime rate established, from time to time, by any major bank selected by the Managing Member for loans to its most creditworthy commercial borrowers, plus two (2%) percent per annum, or (B) the maximum rate permitted by law. If any Managing Member, or any Affiliate of any Managing Member, is the lending Member, the rate of interest shall be determined by the Managing Member taking into consideration, without limitation, prevailing interest rates and the interest rates the lender is required to pay in the event such lender has itself borrowed funds to

at any time for any reason. Other Officers may be designated by the Managing Member in writing pursuant to resolutions of the Company. Each Officer shall be entitled to indemnification pursuant to Section 5.5 hereof in the same manner and on the same terms and conditions as provided to the Managing Member. No Officer shall receive any compensation for such Officer's services to the Company.

## SECTION 6

## ROLE OF NON MANAGING MEMBERS

6.1　　　　**Rights or Powers.** Except as otherwise set forth herein, the Non Managing Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.

6.2　　　　**Voting Rights.** The Non Managing Members shall have the right to vote on the matters specifically reserved for their approval or consent which are set forth in this Agreement.

6.3　　　　**Procedure for Consent.** In any circumstances requiring the approval or consent of all or certain Non Managing Members as specified in Section 5.3 of this Agreement or otherwise, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of the appropriate Non Managing Members and conveyed in writing to the Managing Member not later than thirty (30) days after such approval or consent was requested by the Managing Member. The Managing Member may require response within a shorter time, but not less than ten (10) business days. Failure to respond in any such time period shall constitute a vote which is consistent with the Managing Member's recommendation with respect to the proposal. If the Managing Member receives the necessary approval or consent of the appropriate Non Managing Members to such action, the Managing Member shall be authorized and empowered to implement such action without further authorization by Non Managing Members.

6.4　　　　**Right to Designate Special Managing Member.** At any time following the first to occur of (i) the later of the expiration of sixty (60) months following the execution of this Agreement and the repayment in full of the First Mortgage and the Second Mortgage, (ii) any event which with the passage of time and/or the giving of notice would constitute an event of default under any mortgage senior to the Fourth Mortgage, including without limitation the First Mortgage and the Second Mortgage, (iii) failure of the Company to make the payments required pursuant to the Participation Agreement, (iv) commission by the Managing Member of any act specified in Section 11.5, (v) the termination of the option River City Holdings, LLC has to redeem River City Investors, LLC's membership interest in River City Holdings, LLC, (vi) the failure of the Managing Member to cure a monetary default within the time period specified in Section 5.4(f), or (vii) the receipt of written notice from River City Investors, LLC of its intention to cure a non-monetary default in accordance with the provisions of Section 5.4(f), River City Investors, LLC, in its sole option may become a Special Managing Member. Such election to become a Special Managing Member shall occur ten (10) days following written notice to such

effect delivered to the Managing Member. Upon any such election, River City Investors, LLC or an Affiliate thereof, shall have the right to veto any action reserved to the Managing Member.

## SECTION 7

## REPRESENTATIONS AND WARRANTIES

7.1    In General. As of the date hereof, each of the Members hereby makes each of the representations and warranties applicable to such Member as set forth in Section 7.2 hereof, and such warranties and representations shall survive the execution of this Agreement.

7.2       Representations and Warranties. Each Member hereby represents and warrants that:

(a)    Due Incorporation or Formation; Authorization of Agreement; Tax Suitability.

(i)    If such Member is a corporation or a limited liability company, it is duly organized or duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the individual, corporate or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and, if such Member is a corporation or company, the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or company action. This Agreement constitutes the legal, valid and binding obligation of such Member.

(ii)    RESERVED.

(b)    No Conflict With Restrictions; No Default. Neither the execution, delivery, and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member or any of its Wholly Owned Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, or Company

Doc: 116417/7/1581.000

32