# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | No. 16-01335 |
| | ) | |
| Debtor. | ) | Hon. Timothy A. Barnes |
| | ) | |
| | ) | |
| 800 SOUTH WELLS COMMERCIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 1:16 ap 141 |
| | ) | |
| NICHOLAS S. GOULETAS, | ) | |
| | ) | |
| Debtor/Defendant. | ) | |

**PLAINTIFF'S COUNTER-STATEMENT OF FACTS IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON LIMITATIONS AND IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT ON LIMITATIONS**

Pursuant to Rule 7056, Local Bankruptcy Rules, Plaintiff submits the following Counter-Statement of Facts in Opposition to Defendant's Motion for Summary Judgment on Limitations (D.N. 80[1]) and in Support of Plaintiff's Cross-Motion for Summary Judgment on Limitations.

**Parties**

(1)    Plaintiff 800 South Wells Commercial LLC ("Plaintiff" or "800 SWC") is an Illinois limited liability company with its principal place of business in Cook County, Illinois. (Answer (D.N. 7; Px A[2]) ("Ans.") ¶3)

---

[1] "D.N. ___" refers to Docket Number for the ECF filings in this Adversary Proceeding.

[2] "Px __" refers to the letter or number of Plaintiff"s Exhibits ("Px") submitted in Plaintiff's Appendix of Exhibits in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment.

(2)     Debtor/Defendant Nicholas S. Gouletas ("Gouletas") is an individual who resides in Cook County, Illinois. (Ans. ¶4)

### Jurisdiction And Venue

(3)     This Court has jurisdiction pursuant to 28 U.S.C. §1334. This suit is a core proceeding within the meaning of 28 U.S.C. §157(b). (Ans. ¶5)

(4)     Both Plaintiff and Defendant consent to the entry of final orders or judgment by this Court. (Ans. ¶5)

(5)     Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409. (Ans. ¶6)

### Facts

**A.     Background.**

(6)     Gouletas is the Chairman and CEO of American Invsco. (Px I pp. 69-70; Px 29)

(7)     As of September 8, 2013, American Invsco had properties and offices in over 40 major markets around the world. (Px I p. 77; Px 15)

(8)     Marked as Px 20 is a "Balance Sheet" (*i.e.,* "Financial Statement") of Gouletas as of March 31, 2013, which was signed by Gouletas. (Px J p. 25)

(9)     The representation by Gouletas in his Balance Sheet that he had a net worth of $25,287,563 was a fair and accurate representation of Gouletas' net worth as of March 31, 2013 (Px K p. 216), and Gouletas believed that his Balance Sheet was accurate at the time he signed it. (Px I p. 132)

**B.     The River City Complex.**

(10)    In 1997, the River City Complex located at 800 South Wells Street, Chicago, Illinois consisted of (a) an apartment complex of 448 apartments; (b) 240,000 square feet of

commercial/retail/office space (the "Commercial Space"); (c) a 133 space underground parking garage (the "Parking Garage"); (d) a surface parking lot; and (e) a 64 slip marina on the Chicago River. (Ans. ¶7)

(11)    In or about April of 1997, American Invsco Development Corporation purchased the River City Complex for $41,300,000, and the Plaintiff herein, 800 SWC, became the owner of the leasehold interests in the Commercial Space and Parking Garage. (Ans. ¶8)

(12)    Gouletas was the former manager of 800 SWC who hired his company, Invesco Management Company, Inc. (d/b/a American Invesco) ("Invesco"), to manage the Commercial Space in exchange for management fees paid by 800 SWC to Invesco. (Ans. ¶11)

(13)    As of late 2005, 800 SWC had refinanced the leasehold interests in the Commercial Space and the Parking Garage on numerous occasions, which were encumbered by two substantial leasehold mortgages.  The first mortgage was comprised of two loans from Parkway Bank and Trust Company ("Parkway") to 800 SWC in the original principal amount of $18,500,000 (the "First Mortgage").  By the end of 2005, the First Mortgage loan was current, with the amount owed by 800 SWC to Parkway totaling approximately $11,750,000. (Ans. ¶9)

(14)    The Commercial Space and the Parking Garage were also encumbered by a second leasehold mortgage lien in favor of CIB Bank ("CIB"), which was comprised of a $5,900,000 loan from CIB to 800 SWC (the "Second Mortgage Loan").  In March of 2005, the Second Mortgage Loan was acquired by D.A.N. Joint Venture III, L.P. ("DJV"). (Ans. ¶10)

3

    **C.**    **After Default By 800 SWC In Repayment Of The Second Mortgage Loan, The Pledge Agreement Allowed The Lender (Now DJV) To Control The Voting Rights Of 800 SWC Until <u>The Full Amount Owed By 800 SWC To DJV Was Paid In Full</u>.**

(15)    By the end of 2005, the Second Mortgage Loan was in default for failure to repay the amount of principal and interest due thereon, with the amount owed by 800 SWC to DJV totaling approximately $10,000,000. (Ans. ¶10)

(16)    On November 16, 2006, DJV, as the owner and holder of the Second Mortgage Loan, took over control of the voting rights of 800 SWC pursuant to a Collateral Pledge and Security Agreement (Px 32-A) (the "Pledge Agreement") delivered to CIB, which was later assigned by CIB to DJV. (Px B p. 11 ¶21; p. 19 ¶3; p. 20 ¶11; Px L ¶19) Thereafter, DJV removed Gouletas as the manager of 800 SWC, and itself became the manager of 800 SWC. (*Id.*)

(17)    The "Pledgors" under the Pledge Agreement (referred to in the Pledge Agreement in the singular as "Pledgor") are Gouletas and River City Investors, LLC ("RCI"), which owned 100% of the membership units and voting rights in 800 SWC. As admitted by Gouletas and RCI in the Pledge Agreement, they "derive[d] substantial benefit from Lender's making of the [Second Mortgage] Loan . . .." (Px 32-A p. 1; Px V ¶17)

(18)    The Collateral to secure repayment of the Second Mortgage Loan is set forth in the Pledge Agreement as follows:

> Pledgor assigns, pledges and grants to Lender a security interest in and lien upon all of Pledgor's right, title and interest in and to Pledgor's interests in Borrower (including without limitation, Pledgor's rights to vote, to interim cash and property distributions, and to liquidating cash and property distributions) together with all proceeds of the same (collectively, the "<u>Collateral</u>") to secure the payment and the performance of the Obligations (as hereinafter defined).

4

(Px 32-A ¶1.1 (emphasis in original)) Accordingly, Gouletas and RCI, as Pledgors, agreed to a conditional assignment of their voting rights associated with their membership interests in 800 SWC to the Lender, now DJV, as part of the Collateral for repayment of the Second Mortgage Loan. (Px W ¶18)

 (19) The "Obligations" secured by the Pledge Agreement are defined as follows:

 2.1. All payment and performance duties, liabilities and obligations of the Borrower [800 SWC] to the Lender under the Loan Agreement, the Note [the Second Mortgage Loan], the Mortgage, the Security Agreement, any other Loan Document, or any renewal, extension or amendment to any Loan Document.

 2.2. All reasonable costs incurred by Lender to obtain, preserve, perfect and enforce this Agreement and security interest, collect the Obligations and maintain, preserve, collect and enforce the Collateral, including but not limited to taxes, assessments, insurance premiums, attorney's fees and legal expenses, and expenses of sale.

(Px 32-A p. 2 ¶2; Px W ¶19)

 (20) The voting rights of the Lender (now DJV) and Pledgors Gouletas and RCI over 800 SWC, upon default in repayment of the Second Mortgage Loan, are set forth in ¶6.1 of the Pledge Agreement as follows:

> After an Event of Default <u>and for so long as any of the Obligations remain unpaid</u>, . . . (i) Lender [now DJV] may, upon written notice to Pledgor of its intention to do so, exercise all voting rights, and all other ownership or consensual rights with respect to the Collateral [including the membership interests of Gouletas and RCI in 800 SWC], . . . and (ii) in addition to any other grants hereunder, Pledgor <u>hereby appoints</u> Lender Pledgor's true and lawful attorney-in-fact and <u>irrevocable proxy to vote the Collateral</u> in any manner Lender deems advisable for or against all matters submitted or which may be submitted to a vote of members of Borrower [800 SWC]. <u>The power of attorney granted hereby is coupled with an interest and shall be irrevocable for so long as any of the Obligations remain unpaid</u>.

(Px 32-A p. 5 ¶6.1 (emphasis added) Px W ¶20)

5

(21) On November 16, 2006, counsel for DJV notified Pledgors Gouletas and RCI that DJV was exercising its rights under the Pledge Agreement "to become Managing Member of the LLC, and claims full interest in all of the rights, title and interest in and to your interests in 800 South Wells Commercial, LLC, including, without limitation, all rights to vote . . .." (Px 187)

(22) By Resolution dated November 16, 2006 (Px 189), DJV, as the holder of 100% of the membership interests and voting rights of 800 SWC, terminated Gouletas as the manager of 800 SWC, and elected DJV as the manager of 800 SWC. (Px W ¶22)

(23) DJV became the manager of 800 SWC on November 16, 2006 pursuant to the terms of the Pledge Agreement (Px 32-A) executed by the "Borrower", 800 SWC, and the "Pledgors", RCI and Gouletas, as the sole members of 800 SWC, in favor of the "Lender", CIB Bank, which was succeeded by DJV. (*Id*. p. 1) As admitted by Gouletas, "on or about November 16, 2006, pursuant to a [Pledge Agreement] delivered to CIB Bank, and later assumed by DJV . . ., DJV took over control of the voting rights of [800 SWC], and removed Gouletas as the manager of [800 SWC]." (Px B p. 19 ¶3) Further, Gouletas admitted that "DJV took control of [800 SWC] . . . pursuant to [the Pledge Agreement], which allowed DJV to do so once an event of default occurred." (*Id*. p. 20 ¶11 (emphasis added))

(24) Pursuant to the Pledge Agreement, RCI and Gouletas agreed that, upon default by 800 SWC in repayment of the financial obligations owed by 800 SWC, the Lender, now DJV, could serve as the manager of 800 SWC unless and until the full amount of the financial obligations owed by 800 SWC to DJV under the Second Mortgage Loan was paid in full. (Px 32-A ¶¶1.1, 4.1, 4.8, 4.12 & 6.1) It is undisputed that, to date, the full amount of the financial obligations owed by 800 SWC to DJV under the Second Mortgage Loan has not been paid in full. (Px L ¶73)

6

(25) At all times from November 16, 2006 to the present, the Lender, DJV, held and still holds the power of attorney and irrevocable proxies granted by Gouletas and RCI pursuant to ¶6.1 of the Pledge Agreement to vote Gouletas' and RCI's membership interests in 800 SWC, which proxies, to date, have not been released, rescinded or terminated. (Px W ¶25)

(26) A number of the duties and waivers by Pledgors Gouletas and RCI under the Pledge Agreement are set forth in ¶4.10 of the Pledge Agreement as follows:

> The obligations of Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including Borrower) nor against the security or liens or encumbrances available to Lender or any of its successors and assigns. Pledgor hereby waives any right to require that an action be brought against any other person or entity or to require that resort be had to any security or any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights and remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Pledgor waives any right to the benefit of or to require or control application of any other security or proceeds thereof, and agrees that Lender shall have no duty or obligation to Pledgor to apply to the Obligations any such other security or proceeds thereof.

(Px 32-A p. 4 ¶4.10 (emphasis added)) Accordingly, the Pledgors, Gouletas and RCI, agreed that no delay or lack of diligence by the Lender, now DJV, in exercising any right with respect to the Obligations or any security thereof would in any manner impair or affect the rights of the Lender, now DJV, under the Pledge Agreement. (*Id.*; Px W ¶26)

7

(27) Some of the numerous remedies available to DJV upon default by 800 SWC in repayment of the Second Mortgage Loan are set forth in ¶7.2 of the Pledge Agreement as follows:

> When an Event of Default occurs, and at any time thereafter, Lender without notice or demand may declare the Obligations in whole or part immediately due and may enforce payment of the same and exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise. The proceeds of any disposition of Collateral after an Event of Default, shall be applied to the Obligations in such order and in such manner as Lender in its discretion shall decide. Lender may transfer, sell, or otherwise dispose of the Collateral or any portion of the Collateral at a public or private sale or make other commercially reasonable disposition of the Collateral or any portion thereof after ten (10) days notice to Pledgor, and Lender may purchase the Collateral or any portion thereof at any public or private sale, and any such sale made in good faith by Lender shall be deemed to be "commercially reasonable". Failure of Lender to exercise any of the above rights, powers and remedies ("<u>Rights</u>") in the event of any default shall not constitute a waiver of the right to exercise the same in connection with such default or any subsequent default. The aforementioned Rights are cumulative of each other; the resort to any Right or Rights shall not prevent the concurrent or subsequent employment of any other appropriate Right and no single or partial exercise of any Right shall exhaust it, or preclude any other or further exercise thereof, and every Right [*e.g.*, the discretionary right to dispose of the Collateral] may be exercised at any time and from time to time. No failure by Lender to exercise, and no delay in exercising, any Right, shall be deemed a waiver or modification of any Right.

(Px 32-A p. 7 ¶7.2 (emphasis in original)) Accordingly, while the Lender (now DJV) has the discretion to dispose of the Collateral ("may"), the failure of the Lender (DJV) to exercise any such right "shall not constitute a waiver of the right to exercise the same in connection with such default", with the conditional assignment of the voting rights to the Lender (now DJV) to vote the membership units of Gouletas and RCI constituting "cumulative" remedies with the discretionary right to dispose of the Collateral. Further, any exercise of the right to vote the

8

Collateral, and every right (including the discretionary right to dispose of the Collateral) "may be exercised <u>at</u> <u>any</u> <u>time</u> <u>and</u> <u>from</u> <u>time</u> <u>to</u> <u>time</u>." (*Id.*; Px W ¶27)

(28) There is no provision in the Pledge Agreement which requires that the Lender (now DJV) sell or otherwise dispose of its right to vote the membership interests of Gouletas and RCI, or otherwise sell or dispose of the Collateral, within ten years -- or any other period of time -- from the date of default in the repayment of the Second Mortgage Loan, or the date that the Lender (here DJV) invokes its rights under the Pledge Agreement. (Px 32-A) Simply, there is no requirement in the Pledge Agreement that the Lender (now DJV) must dispose of the Collateral, or that it do so within any particular period of time. Rather, the contractual provisions agreed to by the Pledgors, Gouletas and RCI; the Borrower, 800 SWC; and the Lender (now DJV) were that, after an Event of Default, the conditional assignment of the voting rights to the Lender stayed in effect, and Lender had the right to vote the Collateral, "for so long as any of the Obligations [including the amounts owed under the Second Mortgage Loan] remain unpaid . . .." (Px 32-A p. 5 ¶6.1; Px W ¶28)

(29) Moreover, upon the default by 800 SWC in repayment of the Second Mortgage Loan, Gouletas and RCI appointed the Lender (now DJV) as their "lawful attorney-in-fact and irrevocable proxy to vote [their membership interests in 800 SWC]", with the acknowledgment by Gouletas and RCI that "[t]he power of attorney granted hereby is coupled with an interest and shall be irrevocable for so long as any of the Obligations [including the amount owed by 800 SWC pursuant to the Second Mortgage Loan] remain unpaid." (Px 32-A p. 5 ¶6.1) It is undisputed that the full amount of the principal and interest owed by 800 SWC under the Second Mortgage Loan has not been repaid to the Lender, DJV. (Px W ¶29)

9

(30) In essence, the Pledge Agreement provides that if the Pledgors (Gouletas and RCI) want to reclaim the right to vote their membership interests in 800 SWC, they need only pay off the full amount of the indebtedness owed by the Borrower, 800 SWC, to the Lender, DJV, under the Second Mortgage Loan, which has not yet occurred. (Px 32-A p. 5 ¶6.1; Px W ¶30)

### D. The Commercial Space And Parking Garage Are Lost At A Foreclosure Sale, And DJV Obtains A Judgment Against 800 SWC For The $11,550,040.12 Owed On The Second Mortgage Loan.

(31) On April 24, 2006, the holder of the First Mortgage (WRT-Marc RC, LLC ("WRT"), as assignee of Parkway) filed suit to foreclose its first mortgage lien on the Commercial Space and Parking Garage for nonpayment of the First Mortgage loan. Thereafter, the Commercial Space and Parking Garage were sold at a foreclosure sale on July 24, 2007 for $11,500,000 through a credit bid by WRT, which was not sufficient to cover the over $11,750,000 still owed to WRT as the First Mortgage lien holder. (Px V ¶31)

(32) Not a penny of the proceeds from the July 24, 2007 foreclosure sale of the Commercial Space and the Parking Garage (which served as collateral for the Second Mortgage Loan) was paid to reduce the indebtedness owed on the Second Mortgage Loan, and, as a consequence of the foreclosure sale, the Second Mortgage lien holder, DJV, lost the real estate assets that were pledged as collateral for the Second Mortgage Loan. (Px V ¶32)

(33) In September of 2007, DJV filed suit against 800 SWC to recover the balance owed to DJV on the Second Mortgage Loan (the "Promissory Note Suit"). (Px V ¶33)

(34) The Promissory Note Suit was tried before Circuit Court Judge Lee Preston on September 8 and 15, 2009. (Px V ¶34)

(35) On June 16, 2010, Judge Preston entered a Final Judgment against 800 SWC in the Promissory Note Suit for the principal and interest owed by 800 SWC to DJV on the Second Mortgage Loan in the amount of $11,550,040.12 (Px 190) (the "Promissory Note Judgment"). (Px V ¶35)

(36) To date, the Promissory Note Judgment has not been paid, with over $10,500,000 (plus post-judgment interest) still owed by 800 SWC to DJV on the Promissory Note Judgment. (Px V ¶36)

### E. Gouletas Is Sued For Self-Dealing And Breaching Fiduciary Duties Owed To 800 SWC.

(37) On March 17, 2011, 800 SWC filed suit against Gouletas in the Circuit Court of Cook County, Illinois, No. 2011-L-2895, alleging that Gouletas breached the fiduciary duties that he owed to 800 SWC by participating in a scheme with 800 SWC's vice president, John Cadden ("Cadden"), to loot the assets of 800 SWC, and by grossly mismanaging the affairs of 800 SWC by self-dealing (the "Underlying Suit"). (Ans. ¶15; Px L ¶20)

(38) After Gouletas failed to sit for his deposition despite numerous court orders by Circuit Court Judge Margaret Brennan to do so, on December 5, 2013 800 SWC filed a Motion for Sanctions against Gouletas, which was granted by the Court in the Underlying Suit on December 11, 2013. (Px L ¶21; Ans. ¶16)

(39) After Gouletas, once again, failed to sit for his deposition despite a court order to do so, on January 23, 2014 the Court in the Underlying Suit (per Judge Brennan) entered a Default Judgment against Gouletas in the amount of $11,550, 040.12 (the "Gouletas Judgment"). (Px L ¶22; Ans. ¶16)

11

(40) Gouletas, through counsel, took an appeal of the Gouletas Judgment to the Appellate Court of Illinois, First District, No. 14-0781 (the "First Appeal"). On November 6, 2014 the Court of Appeals granted Gouletas' Motion to Dismiss the First Appeal. (Ans. ¶17)

(41) On August 7, 2014, Gouletas filed in the Underlying Suit a Petition under Section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401) (the "2-1401 Petition") seeking to set aside the Gouletas Judgment. On September 18, 2014, the trial court in the Underlying Suit (per Judge Brennan) denied Gouletas' 2-1401 Petition. (Ans. ¶18)

(42) On October 20, 2014, Gouletas, through counsel, appealed the trial court's Order Denying Gouletas' 2-1401 Petition to the Appellate Court of Illinois, First District, No. 14-3214 (the "Second Appeal"). On April 2, 2015, the Court of Appeals dismissed Gouletas' Second Appeal for want of prosecution. (Ans. ¶19)

### F. The Citation Proceedings Against Gouletas.

(43) Due to Gouletas' failure to pay the amount owed under the Gouletas Judgment, on June 5, 2014 800 SWC filed a Citation to Discover Assets against Gouletas (Px C) (the "Citation") in connection with the Underlying Suit (the "Citation Proceedings"). The Citation was served on Gouletas on or about June 9, 2014. (Ans. ¶20; Px N p. 5; Px M ¶26)

(44) At all times during the Citation Proceedings, Gouletas was represented by Howard Teplinsky, Esq. from the firm of Beermann Pritikin Mirabelli Swerdlove LLP. (Px M ¶27)

(45) In the Citation, it was clearly stated that:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of . . . any property not exempt from execution . . . belonging to the judgment debtor [Gouletas] or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor . . ., until further order of Court or termination of the proceedings.

12

(Px C p. 1) Gouletas understood that when he was served with the Citation, he was not to transfer anything after receiving the Citation. (Px I p. 108) Moreover, the Circuit Court judge presiding over the Citation Proceedings, Judge Alexander White, specifically informed Gouletas that "[f]rom the time you received the citation, all your assets were frozen . . .. [T]he citation language speaks for itself. It said you will not transfer any asset." (Px N p. 7) Further, in response to Judge White's questions, Gouletas testified as follows:

> THE COURT: And you read the citation?
> A (Gouletas): I read the citation, your Honor.
>
> THE COURT: And it said you shall not transfer any assets.
> A: Yes, and I did not think I had transferred any assets.

(Px O p. 15)

(46)   Based on the alleged violations by Gouletas of the Citation lien, on April 24, 2015, 800 SWC filed a Motion for Contempt against Gouletas, which was amended on October 9, 2015 (the "Contempt Motion"). The trial court (White, J.) conducted hearings in connection with the Contempt Motion on July 20, 2015, September 2, 2015, and November 24, 2015. (Ans. ¶32; Px M ¶33)

(47)   In connection with the evidence which showed that Gouletas, during the Citation Proceedings, had sold his CIB Stock and deposited the proceeds thereof in his wife's checking account, all without obtaining permission from the Circuit Court, Judge White stated:

> I'm a little bit confused here. We have a citation that says . . . don't transfer assets. And what I'm hearing from the testimony is that apparently [Gouletas' CIB Stock] was sold. The money was forthcoming and was used to buy food, which is a violation of the citation.

13

(Px O p. 21) Further, Gouletas testified at the contempt hearing that he supposedly had "no idea" why he was going through a series of cashier's checks during the time from and after the Citation was served upon him on June 9, 2014. (Px N pp. 13-14)

(48) The final day of the contempt hearing was scheduled for January 19, 2016. On the eve of Judge White's decision in connection with 800 SWC's motion to hold Gouletas in contempt, on January 17, 2016 Gouletas filed a Chapter 7 bankruptcy petition in this Court. (Ans. ¶33; Px M ¶35)

### G. 800 SWC Files An Adversary Complaint Against Gouletas For Denial Of Discharge Pursuant To 11 U.S.C. §727(a)(2).

(49) On March 1, 2016, 800 SWC filed an Adversary Complaint against Gouletas seeking, in Count Three, the denial of Gouletas' bankruptcy discharge pursuant to 11 U.S.C. §727(a)(2)(A). (D.N. 1) Gouletas filed his Answer to the above Adversary Complaint ("Ans.") on May 20, 2016. (D.N. 7; Px A)

### H. There Is No Evidence To Support Gouletas' Affirmative Defense Of Limitations.

(50) In Gouletas' Answer filed herein, Gouletas asserted in his First Affirmative Defense that "Plaintiff lacks standing to pursue its claim" because, supposedly, "[t]he duly appointed manager of [800 SWC] has not authorized this action." (Ans. p. 14 ¶1) At Gouletas' deposition conducted in this Adversary Proceeding, Gouletas testified that he has "no idea" whether Plaintiff has the authority to proceed with this suit, and has "no idea" of any facts to support any claim that Plaintiff did not have authority to proceed with this suit. (Px J p. 68)

(51) After Plaintiff moved for partial summary judgment on Gouletas' "lack of standing" affirmative defense, this Court in its January 10, 2018 Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment ruled that "the Debtor's

14

affirmative defense of lack of standing as set forth in his First Affirmative Defense is limited to the issue of the statute of limitations for enforcement." (D.N. 77 pp. 1-2) As stated by this Court at the December 20, 2017 hearing on Plaintiff's Motion for Partial Summary Judgment:

> Based on the arguments that I'm hearing today, I'm not going to strike the affirmative defense, but I'm not ruling other than the fact that it appears to be sufficient for the parties to continue at this point. I'm not granting the affirmative defense, nor am I striking it.
>
> * * *
>
> [B]ut on the issue with respect to the statute of limitations, I'm preserving that issue for . . . a later determination.

(12/20/17 Tr. (Px 191) pp. 14 & 18)

(52) There is no evidence that 800 SWC engaged in a material breach of the Pledge Agreement. The only breach alleged by Gouletas is that "[b]y the end of 2005, the Second Mortgage loan was in default" (D's S/F (D.N. 81) #11), such that "800 SWC defaulted under its Second Mortgage in 2005 . . . ." (D's Mem. (D.N. 82) p. 4) While by the end of 2005, 800 SWC had defaulted in the repayment of the Second Mortgage Loan, that default was an "Event of Default" under the Pledge Agreement (Px 32-A p. 6 ¶7.1(a)), which triggered DJV's rights under the Pledge Agreement (*id*. p. 5 ¶6.1), with DJV timely exercising its rights thereunder on November 16, 2006. (Px 187; Px W ¶52)

(53) At no time from March of 2005 to the present has the Borrower, 800 SWC, defaulted in any way in connection with the rights of the Lender, DJV, under the Pledge Agreement to exercise voting control over the management and operations of 800 SWC as authorized in ¶6.1 of the Pledge Agreement. (Px W ¶53)

(54) Moreover, Gouletas and RCI expressly agreed that, upon the default by 800 SWC in repayment of the Second Mortgage Loan, Gouletas and RCI "<u>hereby appoints</u> Lender [now

15

DJV] Pledgor's true and lawful attorney-in-fact and irrevocable proxy to vote [their membership interests in 800 SWC] in any manner Lender [DJV] deems advisable", with the express acknowledgement that "[t]he power of attorney granted hereby is coupled with an interest and shall be irrevocable for so long as any of the Obligations [including the amount owed by 800 SWC pursuant to the Second Mortgage Loan] remain unpaid." (Px 32-A p. 5 ¶6.1(emphasis added)) It undisputed that the full amount of the sums owed by 800 SWC under the Second Mortgage Loan (and the Promissory Note Judgment entered thereon) has not been repaid to the Lender, DJV. (Px W ¶54)

(55) Pursuant to ¶6.1 of the Pledge Agreement, the appointment by Gouletas and RCI of the Lender (now DJV) as their "true and lawful attorney-in-fact and irrevocable proxy to vote the Collateral in any manner Lender deems advisable" is self effectuating ("hereby appoints") upon 800 SWC's default in the repayment of the Second Mortgage Loan, an express Event of Default under the Pledge Agreement. (Px W ¶55)

(56) At no time from November 16, 2005 to the present has there been a release, rescission or waiver of the conditional assignment of the voting rights granted by Gouletas and RCI to the Lender, DJV, as set forth in the Pledge Agreement. (Px 32-A ¶6.1; Px V ¶56)

(57) At no time from November 16, 2005 to the present has their been a release, rescission or waiver of the power of attorney and irrevocable proxies granted by Gouletas and RCI to the Lender, DJV, as set forth in ¶16.1 of the Pledge Agreement. (Px 32-A ¶6.1; Px V ¶57)

(58) At no time from November 16, 2006 to the present, has Gouletas, RCI, or anyone else made a demand, or even a request, that DJV sell or otherwise dispose of the Collateral. (Px V ¶58)

16

(59)    There is no evidence in the summary judgment record to support Gouletas' First Affirmative Defense of lack of standing based on the statute of limitations for enforcement, as limited by this Court in its January 10, 2018 Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment. (D.N. 77 pp. 1-2; Px X ¶59)

    **I.**    **The Collateral Has No Market Value And Any Sale Or Disposition Thereof Would Not Make Any Meaningful Reduction In The Amount Owed By 800 SWC To DJV Pursuant To The Promissory Note Judgment.**

(60)    The Collateral for the Second Mortgage Loan (the membership units of Gouletas and RCI in 800 SWC) has no market value in that there is still over $10,500,000 (plus post-judgment interest) owed by 800 SWC to DJV on the Promissory Note Judgment, with 800 SWC not having any real estate or other material assets to liquidate to pay off the Promissory Note Judgment. Further, there is no realistic chance that the few remaining litigation claims of 800 SWC (the breach of fiduciary duty claims against Cadden in the Underlying Suit and the Gouletas Judgment in the Underlying Suit, which are the sole remaining assets of 800 SWC) would be able to yield sufficient sums to make any meaningful payment toward the over $10,500,000 (plus interest) still owed by 800 SWC to DJV on the Promissory Note Judgment. Accordingly, any sale or disposition of the Collateral would not make any meaningful reduction in the amount owed by 800 SWC to DJV pursuant to the Promissory Note Judgment, which was based on the amount of principal and interest still owed by 800 SWC to DJV pursuant to the Second Mortgage Loan. (Px W ¶60)

    **J.**    **Pledgors Gouletas And RCI Had No Authority To Terminate DJV As Manager Of 800 SWC.**

(61)    Pursuant to ¶6.1 of the Pledge Agreement, the Pledgors, Gouletas and RCI, agreed as follows: "After an Event of Default and for so long as any of the Obligations remain

17

<u>unpaid</u>, Pledgor covenants and agrees that it will not, without the prior written consent of Lender, exercise any voting rights under the Operating Documents . . .." (Px 32-A p. 5 ¶6.1 (emphasis added))

(62) As of late March of 2005, 800 SWC had defaulted on the repayment of the Second Mortgage Loan, which constituted an "Event of Default" under the Pledge Agreement. (Px 32-A p. 6 ¶7.1(a)) To date, the full amount of the Obligations owed by 800 SWC to DJV pursuant to the Second Mortgage Loan has not been repaid. (Px V ¶62)

(63) At no time from November 16, 2006 to the present has DJV provided any consent to Pledgors Gouletas and RCI for their authority to exercise any voting rights under the Operating Documents as set forth in ¶6.1 of the Pledge Agreement. (Px V ¶63)

(64) Further, Pledgors Gouletas and RCI expressly agreed that, upon default by 800 SWC in repayment of the Second Mortgage Loan, Gouletas and RCI appointed the Lender (now DJV) as their "lawful attorney-in-fact and irrevocable proxy to vote [their membership interests in 800 SWC]", with their express acknowledgement that "[t]he power of attorney granted hereby is coupled with an interest and shall be irrevocable for so long as any of the Obligations [including the amount owed by 800 SWC pursuant to the Second Mortgage Loan] remain unpaid." (Px 32-A p. 5 ¶6.1) It is undisputed that the full amount of the sums owed by 800 SWC under the Second Mortgage Loan (and the Promissory Note Judgment entered thereon) has not been repaid to the Lender, DJV, and at no time from November 16, 2006 to the present, have the irrevocable proxies granted by Gouletas and RCI been released, revoked or terminated in any form or fashion. (Px W ¶64)

(65) Accordingly, the purported February __, 2018 "Unanimous Written Consent" of Gouletas and RCI (Dx 4 (D.N. 81-4)) whereby Gouletas and DJV purport to vote their

membership interests in 800 SWC (a) to remove DJV as manager of 800 SWC; (b) to elect Kenneth B. Morgan as manager of 800 SWC; and (c) to direct 800 SWC to dismiss this Adversary Proceeding against Gouletas (*id.* ¶¶1, 2 & 3) is in violation of the covenants, promises and representations of Gouletas and RCI as set forth in the Pledge Agreement, and is of no force and effect. At all times from November 16, 2006 to the present, DJV has been the duly elected and authorized Manager of 800 SWC. Indeed, as of March 20, 2018, the Illinois Secretary of State Office lists "D.A.N. Joint Venture III LP." as the manager of 800 SWC. (Px 192; Px W ¶65)

Respectfully submitted,

ARMSTRONG LAW FIRM

Dated: March 27, 2018.

By   */s/F. Dean Armstrong*
   F. Dean Armstrong
23353 S. 88th Avenue
Frankfort, IL  60423
815/464-3243
Fax: 815/464-3449
Email: armstronglaw@sbcglobal.net

*Attorneys for 800 South Wells Commercial LLC*

**Certificate of Service**

The undersigned certifies that a true and correct copy of the foregoing pleading was served upon all parties receiving CM/ECF noticing on this 27th day of March, 2018.

   */s/F. Dean Armstrong*
   F. Dean Armstrong